# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| iMedia Brands, Inc., *et al.*,[1] | Case No. 23-10852 ([___]) |
| Debtors. | (Joint Administration Requested) |

## DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING POSTPETITION USE OF CASH COLLATERAL; (II) GRANTING ADEQUATE PROTECTION TO CERTAIN PREPETITION SECURED PARTIES AND C&B NEWCO; (III) SCHEDULING A SECOND INTERIM HEARING; AND (IV) GRANTING RELATED RELIEF

iMedia Brands, Inc. ("iMedia") and its affiliated debtors and debtors in possession (each a "Debtor" and, collectively, the "Debtors") in the above-captioned chapter 11 cases, by and through their undersigned proposed counsel, hereby submit this motion (this "Motion") for entry of interim and final orders granting the relief described below. In support hereof, the Debtors rely on (a) the *Declaration of James Alt, Chief Transformation Officer of iMedia Brands, Inc., in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration")[2] and (b) the *Declaration of James Alt in Support of Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Postpetition Use of Cash Collateral; (II) Granting Adequate Protection to Certain Prepetition Secured Parties and C&B Newco; (III) Scheduling a Second Interim Hearing; and (IV) Granting Related Relief* (the "Cash Collateral Declaration" and, together with the First

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: ValueVision Media Acquisitions, Inc. (8670); iMedia Brands, Inc. (3770); ValueVision Interactive, Inc. (8730); Portal Acquisition Company (3403); VVI Fulfillment Center, Inc. (5552); ValueVision Retail Inc. (2155); JWH Acquisition Company (3109); PW Acquisition Company, LLC (0154); EP Properties, LLC (3951); FL Acquisition Company (3026); Norwell Television, LLC (6011); and 867 Grand Avenue, LLC (2642). The Debtors' service address is 6740 Shady Oak Road, Eden Prairie, MN 55344-3433.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in, as applicable, the First Day Declaration or the Interim Order.

Day Declaration, the "Declarations"), each filed in connection herewith and incorporated herein for reference, and further represent as follows:

## JURISDICTION AND VENUE

1.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012.  Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure for the District of Delaware (the "Local Rules"), the Debtors confirm their consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of these chapter 11 cases and this Motion is proper in this district under 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 105(a), 361, 362, 363, 506, 507, of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 4001-2 and 9013-1(m).

## RELIEF REQUESTED

4.      The Debtors seek entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the "Interim Order") and a final order, (a) authorizing the use of the Prepetition Collateral (as defined herein), including all "Cash Collateral"[3] (as defined in section 363(a) of the

---

[3]    As set forth more fully in the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue to  Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue Certain Intercompany Transactions, and (II) Granting Related Relief* (the "Cash Management Motion"), filed contemporaneously herewith, the Debtors

Bankruptcy Code) and the Consigned Inventory (as defined herein) in which the Prepetition Secured Parties (as defined herein) and C&B Newco LLC ("C&B Newco"), as applicable, have or purport to have an interest; (b) granting adequate protection of the interests of the Prepetition Secured Parties and C&B Newco; (c) scheduling a second interim hearing (the "Second Interim Hearing") pursuant to Bankruptcy Rule 4001(b); and (d) granting related relief.

## BACKGROUND

5.      On the date hereof (the "Petition Date"), each Debtor filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code.  The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  No trustee, examiner, or official committee of unsecured creditors has been appointed in these chapter 11 cases.

6.      The Debtors, together with their non-Debtor affiliates (collectively, the "Company"), capitalize on the convergence of entertainment, ecommerce, and advertising. The Company's global portfolio of entertainment, consumer brands and media commerce services businesses—including ShopHQ, 1-2-3.tv, Christopher & Banks, and iMedia Digital Services— cross-promote and exchange data with each other to optimize the engagement experiences the Company creates for advertisers and consumers.  The Company's ecommerce business extends across the United States, while the Company's entertainment and advertising services reach customers across the United States, Canada, Germany, and Austria.

---

hold approximately $1.5 million in a separate "Collateral Account" maintained at PNC Bank N.A.  As set forth in the Cash Management Motion, funds held in the Collateral Account collateralize a standby letter of credit and obligations under the Debtors' corporate card program.  By this Motion, the Debtors do not seek authority to use funds held in the Collateral Account."

7.     Additional factual background regarding the Debtors, including their business operations, corporate and capital structure, and the events leading to the filing of these chapter 11 cases, is set forth in detail in the First Day Declaration, filed concurrently herewith and incorporated herein by reference.

## PRELIMINARY STATEMENT

8.     Cash is critical to the Debtors' business enterprise, which consists of a broad-based portfolio of entertainment, consumer brands, and media commerce services businesses.  Absent the use of cash, the Debtors will be unable to make critical payments to their employees, vendors, and applicable taxing authorities.  Indeed, and as set forth more fully in the Declarations, the Debtors' inability to use Cash Collateral at the outset of these chapter 11 cases could impose the very real risk of immediate and irreparable harm to their estates.  The Debtors therefore have a very real and urgent need for the relief quested here.

9.     Accordingly, prior to the Petition Date, the Debtors undertook to negotiate and obtain the Prepetition ABL Secured Parties' (as defined herein) consent to utilize Cash Collateral to operate the Debtors' businesses during these chapter 11 cases.  To that end, the Debtors have already obtained Prepetition ABL Secured Parties' agreement to provide their consent to the use of cash to fund certain tax obligations, and discussions continue regarding the Debtors' use of Cash Collateral, on a limited basis, for a two-week period (the "Initial Interim Period") in accordance and in accordance with the budget attached to the order as **Annex A** (the "Interim Budget"). Pursuant to the Budget, the Debtors request authority to use Cash Collateral in a limited period to satisfy truly 'mission critical' obligations at the outset of these chapter 11 cases, namely:

| Obligation (projected disbursement / $) | Description |
|---|---|
| Postpetition Vendor Payments, including Content Distribution ($2.6 million) | "Content Distribution" refers to the carriage cost paid to cable operators in order to keep the Debtors' broadcast operations on the air.  The content distribution payments contemplated by the Debtors' Interim Budget refers to |

| Obligation (projected disbursement / $) | Description |
|---|---|
| | the prepayments required for the Debtors to broadcast in July 2023 on certain major broadcast carriers.  Should the Debtors not make these postpetition payments, the Debtors may be unable to broadcast and will be "off the air" on those carriers.  As a result, the Debtors will lose their ability to generate substantial amounts of revenue. |
| Wage / Benefit Obligations ($428,000) | Debtors have falling due certain wage and benefit obligations to their workforce in the interim period, including employee medical claims.  Failure to make these payments could significantly impair the Debtors' workforce and cause unnecessary hardship to individuals, and material business disruption, at the outset of these chapter 11 cases. |
| Sales Tax Obligations ($2.3 million) | Debtors have due approximately $2.3 million of sales and trust fund tax obligations, including obligations arising from ongoing reconciliations and reporting being undertaken by the Debtors.  These obligations are "trust fund" obligations held for the benefit of the applicable state taxing authorities, and failure to pay such obligations may result in the accrual of penalties, interest, or other liabilities, including potential liability for the Debtors' directors and officers. |
| Insurance Premium Obligations ($732,000) | Refers to financing premium due in connection with the Debtors' insurance policies covering, among other things, general liability, auto liability, workers compensation liability, umbrella liability, cyber liability, product liability, and professional liability. |

10.    As set forth more fully herein and in the Declarations, this relief is narrowly tailored to provide access to cash, for a limited period in a manner that both avoids immediate and irreparable harm to these estates and also provides adequate protection for their prepetition secured parties.  Further, and as detailed in the Cash Collateral Declaration, the Prepetition ABL Secured Parties are adequately protected on account of this limited use of cash by, among other things, the subsequent equity cushion benefitting such parties.  That is, the outstanding balance under the Prepetition ABL totals approximately $19.4 million as of the Petition Date.[4]  Such obligations are secured by, among other things, inventory and receivables with a book value of approximately $94.8 million.  And even after applying the "formula" adjustments applicable to the Debtors' borrowing base (such as reductions to the value of inventory and receivables), the Prepetition ABL

---

[4]    This balance includes an asserted "Early Termination Fee" totaling approximately $1.6 million and various fees and expenses charged to the loan balance totaling approximately $1.5 million.

Secured Parties remain substantially oversecured by a more-than-20% margin.  *See* Cash Collateral Declaration ¶¶ 15–17.  In other words, the Prepetition ABL Secured Parties will remain adequately protected by a substantial equity cushion during the Interim Period.

11.    The Debtors will also continue in their efforts to reach agreement on their requested relief prior to the Court's hearing to consider the relief requested here.

## CONCISE STATEMENT OF MATERIAL TERMS OF THE INTERIM ORDER

12.    In accordance with Bankruptcy Rule 4001 and Local Rule 4001-2, the following sets forth a concise summary of the material terms of the proposed use of Cash Collateral:[5]

| Term | Summary of Material Terms | Location |
|---|---|---|
| **Entities with Interest in Cash Collateral** *Bankruptcy Rule 4001(b)(1)(B)(i)* | <u>**Entities With an Interest in Cash Collateral**</u> <br> The "<u>Prepetition ABL Secured Parties</u>" are as follows <br><br> • the Prepetition ABL Agent; <br><br> • the Prepetition ABL Lenders; and <br><br> • Synacor, solely with respect to Debtor Portal Acquisition Company. | (Interim Order ¶ E) |
| **Purpose for Use of Cash Collateral** *Bankruptcy Rule 4001(b)(1)(B)(ii)* | To avoid immediate and irreparable harm to the Debtors and their Estates, the Debtors request authorization to use the Debtors' Cash Collateral on an interim basis, to fund (a) general operating, corporate, and working capital expenses of the Debtors in the ordinary course of business, (b) the costs and expenses of administering these chapter 11 cases; and (c) the payment of adequate protection obligations provided herein, if any, in each case in accordance with the Interim Budget. | (Interim Order ¶ H) |
| **Interim Budget** *Bankruptcy Rule 4001(b)(1)(B)(ii)* <br><br> *Local Rule 4001-2(a)(iii)* | The Debtors' use of Cash Collateral will be subject to the Interim Budget described below, subject to any Permitted Variances (as defined herein). The Interim Budget for the Debtors' use of the Cash Collateral sets forth the Debtors' projected cash receipts and disbursements for the two-week period commencing on the Petition Date.  The Interim Budget is annexed to the Interim Order as <u>Annex A.</u> | (Interim Order ¶ 3, Annex A) |

---

[5]    The summary of the proposed use of Cash Collateral is qualified in its entirety by reference to the applicable provisions of the Interim Order.  If there are any inconsistencies between this summary and the provisions of the Interim Order, the provisions of the Interim Order shall control.  Any capitalized terms used but not otherwise defined in this summary shall have the respective meanings ascribed to such terms in the Interim Order.

| Term | Summary of Material Terms | Location |
|---|---|---|
| **Duration of Use of Cash Collateral/ Termination Events/ Relief from Stay** *Bankruptcy Rule 4001(b)(1)(B)(iii)* | The Debtors' right to use Cash Collateral shall terminate on the earlier to occur of the following (a "Termination Date"): (x) 11:59 p.m., New York City time, at the expiration of the Initial Interim Period, unless (i) a further Interim Order or final order granting the relief requested in the Motion is entered by the Court extending the Debtors' right to use Cash Collateral or (ii) the Debtors' and the Prepetition ABL Secured Parties' reach a mutual agreement to extend the Debtors' right to use Cash Collateral; and (y) the date upon which the Court issues an order following notice and a hearing providing for the termination of the further use of Cash Collateral due to the failure by the Debtors to comply with the materials terms, covenants, and conditions of set forth in the Interim Order. | (Interim Order ¶ 12) |
| **Amount of Cash Collateral to be Used** *Local Rule 4001-2(a)(i)(A)* | The Debtors are authorized, subject to the terms and conditions of the Interim Order, to use Cash Collateral in accordance with the Interim Budget, subject to any Permitted Variances. | (Interim Order ¶ 3) |
| **Proposed Adequate Protection** *Bankruptcy Rule 4001(b)(1)(B)(iv)* | 1. Prepetition ABL Secured Parties' Adequate Protection. To the extent entitled under applicable law, as adequate protection for the Debtors' use of the "Collateral" (as defined in the Prepetition ABL Credit Agreement (as defined herein)) (hereafter referred to as the "Prepetition ABL Collateral"), the Prepetition ABL Secured Parties are granted, solely to the extent, if any, of diminution in value of the Prepetition ABL Secured Parties' interests in the Estates' interests in the Prepetition ABL Collateral as of the Petition Date to the extent resulting from the Debtors' use, sale, or lease of the Prepetition ABL Collateral and the imposition or enforcement of the automatic stay pursuant to section 362(a) of the Bankruptcy Code: <br><br> (a) valid and perfected replacement security interests in and liens upon the Debtors' assets, whether existing on the Petition Date or arising or acquired thereafter (the "Prepetition ABL Adequate Protection Liens"), including the Prepetition ABL Collateral, and any proceeds thereof, but excluding (i) any and all claims and causes of action under chapter 5 of the Bankruptcy Code and Bankruptcy Code section 724(a) (collectively, "Avoidance Actions") and the proceeds thereof and any property received on account of Avoidance Actions, whether by judgment, settlement, or otherwise, whether pursuant to federal law or applicable state law, (ii) any and all commercial tort claims held by the Debtors (the "Commercial Tort Claims") and the proceeds thereof and any property received on account of the Commercial Tort Claims, whether by judgment, settlement, or otherwise, whether pursuant to federal law or applicable state law, (iii) any and all proceeds from any insurance policy (including any "tail policy") issued or providing coverage to the Debtors for claims against or liabilities of any of the Debtors' current or former directors, managers, and officers, and (iv) any property or proceeds received by the Debtors or their Estates to the extent allocable to costs and expenses of preserving, or disposing of, any property in accordance with section 506(c) of the Bankruptcy Code (the foregoing | (Interim Order ¶¶ 4–7, 9) |

| Term | Summary of Material Terms | Location |
|------|---------------------------|----------|
| | clauses (i)–(iv) collectively, the "<u>Excluded Collateral</u>"), in each case, subject only to any valid, enforceable and perfected Prepetition Prior Liens; and<br><br>(b) a superpriority administrative claim (the "<u>Prepetition ABL Adequate Protection Superpriority Claim</u>") against the Debtors' Estates, as and to the extent provided in section 507(b) of the Bankruptcy Code; <u>provided</u> that the Prepetition ABL Adequate Protection Superpriority Claim shall not have recourse to the Excluded Collateral.<br><br>2.  <u>Prepetition ABL Secured Parties' Additional Adequate Protection</u>.  As additional adequate protection of the Prepetition ABL Secured Parties' respective interests:<br><br>(a)  The Debtors shall use the Prepetition ABL Collateral, including all Cash Collateral, substantially consistent with the Interim Budget, subject to any Permitted Variance, which is annexed to the interim Order as <u>Annex A</u>, in an amount that would not cause any of the Debtors to use Cash Collateral for operating disbursements and capital expenditures in an aggregate amount greater than 20% of the operating disbursements and capital expenditures, taken together, for any particular week in the Interim Budget ("<u>Permitted Variance</u>"), except with respect to the fees, expenses, costs, or other disbursements of any professionals, and all fees required to be paid to the clerk of the Court and the United States Trustee for the District of Delaware ("<u>U.S. Trustee</u>") under section 1930(a) of title 28 of the United States Code.  If the aggregate amount of Cash Collateral actually used for operating disbursements and capital expenditures, taken together, by the Debtors, for any particular week, is less than the aggregate amount of Cash Collateral available for use by the Debtors for operating disbursements and capital expenditures, taken together, in the Interim Budget during such period, then for purposes of the Permitted Variance, the Debtors may carry over any such unused amount to future periods.<br><br>3.  <u>Synacor Adequate Protection</u>.  To the extent entitled under applicable law, as adequate protection for the Debtors' use of the collateral (the "<u>Prepetition Synacor Collateral</u>," and together with the Prepetition ABL Collateral, the "<u>Prepetition Collateral</u>") securing the Synacor Promissory Note (as defined herein), Synacor, Inc. ("<u>Synacor</u>" and, together with the Prepetition ABL Secured Parties, the "<u>Prepetition Secured Parties</u>") is granted, solely to the extent, if any, of diminution in value of Synacor's interest in the Estates' interests in the Prepetition Synacor Collateral as of the Petition Date resulting from the Debtors' use, sale, or lease of the Prepetition Synacor Collateral and the imposition or enforcement of the automatic stay pursuant to section 362(a) of the Bankruptcy Code:<br><br>(a)  valid and perfected replacement security interests in and liens upon the assets of Debtor Portal Acquisition Company, whether existing on the Petition Date or arising or acquired thereafter (the "<u>Synacor Adequate Protection</u> | |

| Term | Summary of Material Terms | Location |
|------|---------------------------|----------|
| | Liens"), including the Prepetition Synacor Collateral, and any proceeds thereof, but excluding the Excluded Collateral, in each case, subject only to any valid, enforceable and perfected Prepetition Prior Liens; and<br><br>(b)  a superpriority administrative claim (the "Synacor Adequate Protection Superpriority Claim") against Debtor Portal Acquisition Company's estate, as and to the extent provided in section 507(b) of the Bankruptcy Code; <u>provided</u> that the Synacor Adequate Protection Superpriority Claim shall not have recourse to the Excluded Collateral.<br><br>4.   Prepetition Secured Parties' Additional Adequate Protection. As additional adequate protection of the Prepetition Secured Parties' respective interests, the Debtors shall provide the Prepetition Secured Parties with continued financial reporting consistent with the Prepetition ABL Credit Agreement and the Synacor Promissory Note, as applicable.<br><br>5.   C&B Newco Adequate Protection.  To the extent entitled under applicable law, as adequate protection for diminution in value, if any, of C&B Newco's interests in the Estates' interests in the merchandise inventory and other goods consigned by C&B Newco to Debtor iMedia Brands, Inc. pursuant to that certain *Amended and Restated Consignment Agreement*, dated as of November 23, 2022 (as amended, restated, amended and restated, modified, supplemented, or extended from time to time, the "Consignment Agreement"), between Debtor iMedia Brands, Inc., as consignee, and C&B Newco, as consignor (collectively, the "Consigned Inventory"), as of the Petition Date, the Debtors shall segregate the proceeds received by the Debtors on account of the sale of the Consigned Inventory (the "C&B Newco Adequate Protection Proceeds"); <u>provided</u> that the distribution of the C&B Newco Adequate Protection Proceeds by the Debtors shall remain subject to the resolution of the priority of security interests and liens on such proceeds among the Prepetition ABL Secured Parties, C&B Newco, and any other lawful holder of security interests and liens on the C&B Newco Adequate Protection Proceeds. | |

## FACTS SPECIFIC TO CASH COLLATERAL MOTION

### A.    Prepetition Indebtedness[6]

13.    As of the Petition Date, the Debtors have approximately $129.7 million of funded

principal debt and interest obligations (the "Prepetition Debt Obligations"), consisting of

---

[6]    The description of the Debtors' prepetition indebtedness and the collateral securing such debt provided herein does not constitute, and should not be construed as, an admission by the Debtors regarding the validity, priority, enforceability, perfection, or amount of any obligation, claim, guarantee, lien, mortgage, pledge, or other security interest, or any other fact with respect thereto, and the Debtors reserve all rights to challenge or dispute any of the foregoing on any basis whatsoever.

obligations under the Prepetition ABL Credit Agreement, the Synacor Promissory Note, the Senior Unsecured Notes, the Growth Capital Partners Note, the PIPE Convertible Notes, and the guaranty by iMedia of the obligations of its wholly-owned German subsidiary under the 123TV Seller Note (each as defined herein).

14.     The following table summarizes the Debtors' prepetition capital structure (as of the Petition Date) with respect to funded debt, inclusive of accrued but unpaid interest and fees.

| Instrument | Balance ($mm) | Rate | Maturity | Security |
|---|---|---|---|---|
| Prepetition ABL Facility | $19.4[7] | S+5.86448% until 3/15/2023; thereafter S+7.86448% | 07/30/24 | Substantially all assets of each Debtor on a first lien basis, subject to customary exceptions<br><br>Additionally benefits from guarantees from non-Debtor German subsidiaries |
| 123TV Seller Note | $17.6 | 8.50% | 9/29/23 | None<br><br>Benefits from a guarantee from Debtor iMedia |
| Synacor Promissory Note | $4.1 | 9.00% until 07/30/2023; thereafter 11.00% | 12/31/23 | Substantially all assets of Debtor Portal Acquisition Company on a junior lien basis to the Pre-Petition ABL Facility |
| Senior Unsecured Notes | $81.7 | 8.50% | 9/30/26 | None<br><br>iMedia is the issuer and only obligor |
| Growth Capital Partners Note | $3.2 | 7.00% until 6/1/2023; thereafter 18.00% | 5/18/23 | None<br><br>iMedia is the issuer and only obligor |
| PIPE Convertible Notes | $3.6 | 7.75% until 12/31/23; thereafter 15.00% | 3/31/24 | None<br><br>iMedia is the issuer and only obligor |

---

[7]     This outstanding balance includes, among other things, an early termination fee asserted by the Prepetition ABL Secured Parties, which totals approximately $1.6 million, and the fees and expenses of the Prepetition ABL Secured Parties' professionals, which total approximately $1.4 million.

i.      **The Prepetition ABL Facility**

15.      On July 30, 2021, Debtor iMedia Brands, Inc. ("iMedia") entered into that certain *Loan and Security Agreement* (as amended, restated, amended and restated, modified, supplemented, or extended from time to time, the "Prepetition ABL Credit Agreement") among Debtors iMedia, ValueVision Interactive, Inc., ValueVision Retail, Inc., PW Acquisition Company, LLC, FL Acquisition Company, ValueVision Media Acquisitions, Inc., JWH Acquisition Company, Norwell Television, LLC, 867 Grand Avenue LLC and Portal Acquisition Company, as borrowers (the "Prepetition ABL Borrowers"), Debtors VVI Fulfillment Center, Inc. and EP Properties, LLC (together, the "Prepetition Debtor ABL Guarantors") and non-Debtor iMedia & 123tv Holding GmbH, as guarantors, Siena, as the Prepetition ABL Agent, and the Prepetition ABL Lenders from time to time party thereto.  On February 28, 2023, non-Debtors iMedia & 123tv Holding GmbH, 123tv Invest GmbH, 123tv Holding GmbH, 123tv Beteiligungs GmbH, 1-2-3.tv GmbH, and 1-2-Play GmbH, as guarantors (in such capacity, the "Prepetition Non-Debtor ABL Guarantors")[8] and, together with the Prepetition Debtor ABL Guarantors, the "Prepetition ABL Guarantors"), and the Prepetition ABL Agent, as Beneficiary, entered into a Guarantee Agreement (the "Prepetition ABL Guarantee"), pursuant to which the Prepetition Non-Debtor ABL Guarantors guaranteed the Prepetition ABL Credit Agreement.  The Prepetition ABL Credit Agreement currently provides for a senior secured revolving credit facility in the aggregate maximum committed principal amount of $80.0 million (including any letters-of-credit issued thereunder).

16.      The Prepetition Debtor ABL Guarantors, as well as non-Debtor iMedia & 123tv Holding GmbH, have guaranteed, as primary obligors, the prompt and complete payment and

---

[8]      The Prepetition Non-Debtor ABL Guarantors are not Debtors in these chapter 11 cases.

performance of all obligations under the Prepetition ABL Credit Agreement.  Pursuant to the Prepetition ABL Guarantee, each of the Prepetition Non-Debtor ABL Guarantors have agreed to pay any amount of principal, interest, costs, expenses or other amounts owed under or in connection with the Prepetition ABL Credit Agreement that has not been fully and irrevocably paid by the Prepetition ABL Borrowers.  The obligations under the Prepetition ABL Credit Agreement are secured by substantially all of the assets of each of the Prepetition ABL Borrowers and the Prepetition Debtor ABL Guarantors.  The Prepetition Non-Debtor ABL Guarantors' obligations under the Prepetition ABL Guarantee are secured by substantially all of the assets of each of the Prepetition Non-Debtor ABL Guarantors.  The liens securing the Prepetition ABL Credit Agreement rank senior to the liens securing the Synacor Promissory Note.

17.    The Prepetition ABL Credit Agreement has a stated maturity date of July 30, 2024.  Interest on outstanding amounts under the Prepetition ABL Credit Agreement accrues at SOFR plus an applicable margin of 5.86448% (until March 15, 2023) and 7.86448% thereafter.  As of the Petition Date, approximately $19.4 million in aggregate principal amount and accrued but unpaid interest remains outstanding on the Prepetition ABL Facility.

ii.    **Seller Notes**

(a)    **123TV Seller Note**

18.    Pursuant to that certain Sale and Purchase Agreement, dated as of September 22, 2021 (the "Share Purchase Agreement"), sellers Emotion Invest GmbH & Co. KG, BE Beteiligungen Fonds GmbH & Co. geschlossene Investmentkommanditgesellschaft and Iris Capital Fund II (together, the "123TV Sellers") agreed to sell 100% of the shares of each of 123tv Invest GmbH and 123tv Holding GmbH to non-Debtor purchaser iMedia & 123tv Holding GmbH ("123tv Holding GmbH").  In connection with the Share Purchase Agreement, 123tv Holding GmbH entered into a Vendor Loan Agreement with the 123TV Sellers, as lenders (as amended,

restated, supplemented, amended and restated or otherwise modified from time to time, the "123TV Seller Note"), whereby the 123TV Sellers agreed to novate the obligation of 123tv Holding GmbH to pay a portion of the purchase price owed under the Share Purchase Agreement into an interest-bearing vendor loan. The obligations under the 123TV Seller Note are guaranteed by Debtor iMedia and non-Debtors 1-2-3.tv GmbH and 123tv Beteiligungs GmbH. The 123TV Seller Note had an original principal amount of EUR18,000,000.

19.    Interest on the 123TV Seller Note accrues at a per annum rate equal to 8.50%. As of the Petition Date, approximately EUR16,155,583 in aggregate principal amount and accrued but unpaid interest is outstanding on the 123TV Seller Note. The 123TV Seller Note has a maturity date of September 29, 2023.

20.    Non-Debtors 123tv Holding GmbH, 1-2-3.tv GmbH, and 123tv Beteiligungs GmbH have guaranteed, as primary obligors, the prompt and complete payment and performance of all obligations under the 123TV Seller Note. The 123TV Seller Note is subordinated to the full cash payment of the Prepetition ABL Facility.[9]

**(b)    Synacor Promissory Note**

21.    In connection with that certain Asset Purchase Agreement, dated as of July 30, 2021 (the "Synacor Asset Purchase Agreement"), by and among Debtors iMedia and Portal Acquisition Company, and Synacor, Debtor Portal Acquisition Company issued that certain *Secured Promissory Note*, dated as of July 30, 2021 (as amended, restated, amended and restated, modified, supplemented, or extended from time to time, the "Synacor Promissory Note") by and between Debtors iMedia Brands, Inc., as parent, and Portal Acquisition Company, as borrower, and

---

[9]    On July 29, 2022, Debtor iMedia entered into a letter agreement with 123tv Holding Gmbh (the "Financial Support Letter"), whereby, pursuant to the Financial Support Letter, iMedia agreed to directly pay to the 123TV Sellers any payment obligations under the 123TV Seller Note if 123tv Holding GmbH is unable to fulfill such payment obligations or if the payment of such obligations would render 123tv Holding GmbH as insolvent.

Synacor, as holder, to Synacor in an original principal amount of $10.0 million.

22.    Interest on the Synacor Promissory Note accrues at a per annum rate equal to 9.00% until July 30, 2023, and 11.00% thereafter.  As of the Petition Date, approximately $4.1 million in aggregate principal amount and accrued but unpaid interest is outstanding on the Synacor Promissory Note.    The  Synacor  Promissory  Note  has  a  maturity  date  of December 31, 2023.

23.    Debtor iMedia guaranteed, as primary obligor, the prompt and complete payment and performance of all obligations under the Synacor Promissory Note.  The obligations under the Synacor Promissory Note are secured by substantially all of the assets of Debtor Portal Acquisition Company, which consist principally of certain limited intellectual property assets and a limited number of contracts related to the Debtors' iMDS business.

### iii.    Unsecured Notes

#### (a)    Senior Unsecured Notes

24.    Pursuant to an Indenture, dated as of September 28, 2021 (as amended by that certain First Supplemental Indenture, dated as of September 28, 2021, the "Indenture"), with U.S. Bank National Association as Trustee, Debtor iMedia issued senior notes in an original principal amount of $80.0 million in exchange for cash in the same amount (all such notes issued pursuant to the Indenture, the "Senior Unsecured Notes").  The Senior Unsecured Notes are traded publicly on the Nasdaq stock exchange under symbol "IMBIL".

25.    Interest on the Senior Unsecured Notes accrues at a per annum rate equal to 8.50%. As of the Petition Date, approximately $81.7 million in aggregate principal amount and accrued but unpaid interest remains outstanding on the Senior Unsecured Notes.  The Senior Unsecured Notes have a maturity date of September 30, 2026.

26.     The Senior Unsecured Notes represent unsecured obligations of Debtor iMedia and rank equally with all other unsecured debt of Debtor iMedia.  Debtor iMedia is the sole obligor under the Senior Unsecured Notes and, therefore, the Senior Unsecured Notes are structurally junior to the obligations of iMedia's subsidiaries.

### (b)     Growth Capital Partners Note

27.     Pursuant to a Securities Purchase Agreement, dated as of April 18, 2022 (the "Securities Purchase Agreement"), Debtor iMedia issued a promissory note to Growth Capital Partners, LLC ("GCP") in an original principal amount of $10.6 million in exchange for cash in the same amount on April 18, 2022 (the "Growth Capital Partners Note").

28.     On May 25, 2023, GCP delivered a notice of default with respect to a "Trigger Event" (as defined in the Growth Capital Partners Note) that occurred on May 23, 2023.  Such notice of default stated, pursuant to the terms of the Growth Capital Partners Note, if Debtor iMedia failed to cure such Trigger Event within five (5) business days of receipt of such notice of default, an Event of Default under the Growth Capital Partners Note would occur on and as of such date. Debtor iMedia failed to cure such Trigger Event on or prior to June 2, 2023, and, as a result, an Event of Default under the Growth Capitals Partners Note occurred and was continuing on and as of such date. On June 14, 2023, as a result of such Event of Default, the Debtors received a notice of acceleration from GCP and a demand for payment of the full amount owed under the Growth Capital Partners Note.  On June 23, 2023, GCP filed suit against iMedia in the Third Judicial District Court of Salt Lake County in the State of Utah for breach of the Growth Capital Partners Note.

29.     Interest on the Growth Capital Partners Note accrued at a per annum rate equal to 7.00% until June 1, 2023, and at a default rate of 18% thereafter.  As of the Petition Date, approximately $3.2 million in aggregate principal amount and accrued but unpaid interest and fees

remain outstanding on the Growth Capital Partners Note. The Growth Capital Partners Note matured on May 18, 2023.

30.     The Growth Capital Partners Note represents an unsecured obligation of Debtor iMedia and ranks equally with all other unsecured debt of Debtor iMedia. Debtor iMedia is the sole obligor under the Growth Capital Partners Note and, therefore, the Growth Capital Partners Note is structurally junior to the obligations of iMedia's subsidiaries.

### (c)     PIPE Convertible Notes

31.     Pursuant to a Loan Agreement, dated as of April 10, 2023 (the "PIPE Loan Agreement"), Debtor iMedia issued promissory notes to, among others, BSMF LLC, OCI-VB, LLC, Mr. Tim Peterman, Invicta Media Investments LLC, Mr. Aaron Reitkopf, Mr. Michael Friedman and Mr. Alan Aldworth (each, a "Purchaser")[10] in an aggregate original principal amount totaling $3.5 million (all such notes issued pursuant to the PIPE Loan Agreement, the "PIPE Convertible Notes").[11]

32.     Interest on the PIPE Convertible Notes accrues at a per annum rate equal to 7.75%, increasing to 15.00% on January 1, 2024. As of the Petition Date, approximately $3.6 million in aggregate principal amount and accrued but unpaid interest remains outstanding on the PIPE Convertible Notes. The PIPE Convertible Notes have a maturity date of March 31, 2024.

33.     The PIPE Convertible Notes represent unsecured obligations of Debtor iMedia and rank equally with all other unsecured debt of Debtor iMedia. Debtor iMedia is the sole obligor under the PIPE Convertible Notes and, therefore, the PIPE Convertible Notes are structurally

---

[10]     Messrs. Reitkopf, Friedman, and Aldworth are members of the iMedia Board. Mr. Peterman is the Debtors' CEO, CFO, a member of the iMedia Board, and a director for certain iMedia subsidiaries. Invicta Media Investments LLC is affiliated with Mr. Eyal Lalo, a member of the iMedia Board, and Mr. Friedman.

[11]     As of the Petition Date, neither Mr. Friedman nor Invicta Media Investments, LLC has paid the Debtors their aggregate $155,000 owed pursuant to the PIPE Loan Agreement and their PIPE Convertible Notes.

junior to the obligations of iMedia's subsidiaries. The right of the Purchasers to receive any payments from Debtor iMedia in respect of such entity's obligations under the PIPE Convertible Notes is subordinated to the full cash payment of the Prepetition ABL Facility.

**B.    The Debtors Have Immediate Need for Access to Cash Collateral**

34.    Cash is critical to the Debtors' business enterprise, which consists of a broad-based portfolio of entertainment, consumer brands, and media commerce services businesses.  *See* Cash Collateral Declaration, ¶ 5.  Absent the immediate use of Cash Collateral, the Debtors will be unable to make critical payments to their employees, vendors, and applicable taxing authorities. *Id*.  Without this ability to use Cash Collateral, the Debtors' business operations will be severely disrupted at a critical juncture where they seek to utilize the "breathing spell" provided by chapter 11 to stabilize operations and preserve and maximize value for all stakeholders.  *Id*.

35.    In particular, the Debtors require the use of Cash Collateral to pay wages, benefits, taxes, and other items contemplated by the Debtors' Interim Budget, annexed to the Debtors' proposed interim Cash Collateral order as <u>Annex A</u>.  *Id.* at ¶ 6.  Non-payment will materially and adversely affect the Debtors' operations and business relationships and, in all likelihood, substantially impair the value of the Prepetition Collateral.  *Id*.  In particular, the Debtors propose to use Cash Collateral to pay the following obligations to avoid immediate and irreparable harm to their chapter 11 Estates at the outset of these chapter 11 cases.

36.    The Debtors' proposed immediate use of Cash Collateral is intended to provide working capital during the limited Initial Interim Period in order to avoid immediate and irreparable harm to their businesses.  *Id.* at ¶ 8.  Access to Cash Collateral will permit the Debtors to operate their businesses, fund operating expenses and the costs of administering these Estates, preserve the value of the Prepetition Collateral, and pursue a value-maximizing transaction for the

benefit of the Debtors' stakeholders. *Id*. Alternatively, failure to obtain access to Cash Collateral as provided by the Initial Budget, and as set forth above, will result in immediate and irreparable harm to the Debtors' Estates absent the relief requested herein. *Id*.

37.     As a result, the Debtors respectfully submit that the relief requested by this Motion is narrowly tailored to avoid immediate and irreparable harm to their estates.

## BASIS FOR RELIEF

### A.     STANDARDS FOR RELIEF

38.     Under section 363(c)(2) of the Bankruptcy Code, a debtor may not use cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). In turn, section 363(e) of the Bankruptcy Code provides that a debtor may use cash collateral (even absent consent), provided that any entity with an interest in such property is adequately protected. More specifically, section 363(e) of the Bankruptcy Code provides that "on request of an entity that has an interest in property . . . proposed to be used, sold, or leased, by the trustee [or debtor in possession], the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). Further, section 362(d)(1) provides for adequate protection of interests in property due to the imposition of the automatic stay. *See* 11 U.S.C. § 362(d)(1); *see also In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996).

39.     The principal purpose of adequate protection is to safeguard the interest of the secured creditor in the particular collateral against diminution in the value of such interest in the estates' interest in such collateral as of the petition date. *In re Satcon Tech. Corp.*, Case No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012) (quoting *In re*

*Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) ("The whole purpose of adequate

protection for a creditor is to insure that the creditor receives the value for which he bargained

prebankruptcy."); *Del. Tr. Co. v. Wilmington Tr., N.A. (In re Energy Future Holdings Corp.)*,

546 B.R. 566, 581 (Bankr. D. Del. 2016) (quoting *In re Satcon Tech.*, 2012 WL 6091160, at *6)

("The purpose of adequate protection 'is to protect a secured creditor from diminution in the value

of its interest in the particular collateral during the period of use by the debtor.'"); *In re Cont'l

Airlines, Inc.*, 154 B.R. 176, 180–81 (Bankr. D. Del. 1993) (adequate protection for use of

collateral under section 363 of the Bankruptcy Code is limited to use-based decline in value).  The

interest to be protected by virtue of the adequate protection requirement is the lesser of the amount

of the debt or the value of assets securing the debt as of the Petition Date.  *See Bankers Life Ins.

Co. of Neb. v. Alyucan Interstate Corp. (In re Alyucan Interstate Corp.)*, 12 B.R. 803, 808 (Bankr.

D. Utah 1981) ("[T]he 'interest in property' entitled to protection is not measured by the amount

of the debt but by the value of the lien.").

40.     The Bankruptcy Code does not expressly define "adequate protection."  However,

section 361 of the Bankruptcy Code provides a non-exhaustive list of examples of adequate

protection:

> When adequate protection is required under section 362, 363, or 364 of this title of
> an interest of an entity in property, such adequate protection may be provided by—
>
> > (1) requiring the trustee to make a cash payment or periodic cash payments to
> > such entity, to the extent that the stay under section 362 of this title, use,
> > sale, or lease under section 363 of this title, or any grant of a lien under
> > section 364 of this title results in a decrease in the value of such entity's
> > interest in such property;
> >
> > (2) providing to such entity an additional or replacement lien to the extent that
> > such stay, use, sale, lease, or grant results in a decrease in the value of
> > such entity's interest in such property; or
> >
> > (3) granting such other relief, other than entitling such entity to compensation
> > allowable under section 503(b)(1) of this title as an administrative

> expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. § 361.

41.     However, courts ultimately decide what constitutes sufficient adequate protection on a case-by-case basis. *See In re Swedeland Dev. Group, Inc.*, 16 F.3d at 564 ("[A] determination of whether there is adequate protection is made on a case by case basis."); *see also In re Satcon Tech. Corp.*, 2012 WL 6091160, at *6 (same); H.R. Rep. No. 95-595, at 338, 95th Cong., 1st Sess. (1977) ("the purpose of [section 361] is to illustrate means by which it may be provided and to define the contours of the concept").

42.     In addition, where, as is the case here, there is a sufficient equity cushion, a lender is adequately protected and a debtor may use the subject collateral without consent. *See In re Cont'l Airlines, Inc.*, 146 B.R. 536, 539 (Bankr. D. Del. 1992) ("If the creditor is oversecured many courts hold that the equity cushion alone satisfies the adequate protection requirement of section 362(d)(1)."), *aff'd*, 91 F.3d 553 (3d Cir. 1996); *see also In re Mellor*, 734 F.2d 1396, 1400 (9th Cir. 1984) ("Although the existence of an equity cushion as a method of adequate protection is not specifically mentioned in § 361, it is the classic form of protection for a secured debt justifying the restraint of lien enforcement by a bankruptcy court."); *In re JER/Jameson Mezz Borrower II, LLC*, 461 B.R. 293, 306 (Bankr. D. Del. 2011) (citing *In re Indian Palms Assocs., Ltd.,* 61 F.3d 197, 207 (3d Cir. 1995)) ("'[I]n determining whether a secured creditor's interest is adequately protected [for purposes of section 362(d)(1)], most courts engage in an analysis of the property's 'equity cushion'—the value of the property after deducting the claim of the creditor seeking relief from the stay and all senior claims' while ignoring junior liens."); *In re Phoenix Steel Corp.*, 39 B.R. 218, 224 (D. Del. 1984) ("It is clear that if a sufficient equity cushion exists [a creditor's] security would not be impaired and they would be adequately protected.").

43.     Case law has consistently recognized that an equity cushion of 20% or more, in and of itself, constitutes adequate protection.  *See In re JER/Jameson Mezz Borrower*, 461 B.R. at 306 (*citing In re McKillips*, 81 B.R. 454, 458 (Bankr. N.D. Ill. 1987)) (surveying cases which show that an equity cushion of more than 20% is adequate protection but less than 11% is not); *see also In re San Clemente Estates*, 5 B.R. 605 (Bankr. S.D. Cal. 1980) (65% is adequate); *In re Nashua Trust Co.*, 73 B.R. 423 (Bankr. D.N.J. 1987) (50% is adequate); *In re Ritz Theatres*, 68 B.R. 256 (Bankr. M.D. Fla. 1986) (38% is adequate); *In re Helionetics, Inc.*, 70 B.R. 433 (Bankr. C.D. Cal. 1987) (20.4% is adequate).

44.     Further, a bankruptcy court should, whenever possible, resolve issues in ways that allow a debtor to continue its business as a going concern.  *In re George Ruggiere Chrysler-Plymouth, Inc.*, 727 F.2d 1017, 1019 (11th Cir. 1984) ( "[a] debtor, attempting to reorganize a business under chapter 11 clearly has a compelling need to use 'cash collateral' in its effort to rebuild.  Without the availability of cash to meet daily operating expenses . . . the congressional policy favoring rehabilitation over economic failure would be frustrated."); *see also In re Trump Entm't Resorts, Inc.*, 519 B.R. 76, 87 (Bankr. D. Del. 2014) ("The fundamental purpose of [chapter 11] reorganization is to prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources.") (quoting *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984)).  Accordingly, courts in this District have authorized the use of cash collateral to enhance or preserve the debtor's going concern value.  *See, e.g., In re Sorenson Commc'ns, Inc.*, No. 14-10454 (BLS) (Bankr. D. Del. Mar. 4, 2014) (granting authority to use cash collateral where access to "sufficient working capital and liquidity through the use of Cash Collateral . . . is vital to the preservation and maintenance of the Debtors' going concern values and successful reorganization."); *In re WP Steel Venture LLC*, No. 12-11661 (KJC)

(Bankr. D. Del. Sept. 27, 2012) (same).  Accordingly, the Debtors seek authorization to utilize Cash Collateral in the ordinary course to sustain their business operations while the Debtors seek to maximize the going concern value of their business enterprise for the benefit of the Estates and the Debtors' stakeholders.

## B.    THE PREPETITION ABL SECURED PARTIES HAVE CONSENTED TO CERTAIN USE OF CASH COLLATERAL

45.    The Prepetition ABL Secured Parties have previously agreed to provide their consent to the Debtors' use of Cash Collateral to pay certain sales tax obligations as set forth in the Interim Budget.  *See* Cash Collateral Declaration, ¶ 10.  Pursuant to that certain *Funding Agreement*, dated as of June 20, 2023, by and between the Prepetition ABL Borrowers, the Prepetition ABL Guarantors, and the Prepetition ABL Secured Parties (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "ABL Funding Agreement"), attached to hereto as **Exhibit B**, the Prepetition ABL Secured Parties agreed to, among other things, make certain cash available to the Debtors through the consensual use of Cash Collateral for the payment of certain sales tax obligations consistent therewith.  *Id*.  Specifically, the ABL Funding Agreement provides that the ABL Secured Parties "hereby agree[d] to, make funds available to Borrowers in an amount equal to $3,160,140 to be used solely or the purpose of paying certain sales taxes . . . pursuant to . . . (y) a Bankruptcy Court approved cash collateral order consented to by the Agent and Lenders . . . ."  *Id*.  Accordingly, the Prepetition ABL Secured Parties have specifically consented to the use of Cash Collateral with respect to the applicable tax payments contemplated by the Initial Budget.  *Id*.

## C.    THE PROPOSED USE OF CASH COLLATERAL IS APPROPRIATE AND SHOULD BE AUTHORIZED

46.    In addition to the consents already provided by the Prepetition ABL Secured Parties, the Debtors respectfully submit that the proposed use of Cash Collateral is necessary to

preserve their respective assets during the Initial Interim Period and throughout these chapter 11 cases.  As set forth above, absent the immediate use of Cash Collateral, the Debtors will be unable to make critical payments to their employees, vendors, and applicable taxing authorities.  *See* Cash Collateral Declaration, ¶ 5.  Without this ability to use Cash Collateral, the Debtors' business operations will be severely disrupted at a critical juncture where they seek to utilize the "breathing spell" provided by chapter 11 to stabilize operations and preserve and maximize value for all stakeholders.  *Id*. at 8.  In particular, the Debtors require the use of Cash Collateral to pay wages, benefits, taxes, vendors, and insurance obligations, as set forth in the Interim Budget.  *Id.* at 6.  Non-payment will adversely affect the Debtors' operations and business relationships and, in all likelihood, substantially impair the value of the Prepetition Collateral.  *Id*.

47.     Moreover, the Debtors' proposed immediate use of Cash Collateral is intended to provide working capital during the Initial Interim Period.  *Id.* at 8.  As set for the above, the Debtors' proposed is limited to expenditures required to avoid immediate and irreparable harm to their businesses and, in turn, preserving the value of their Estates for the benefit of the Debtors' stakeholders.  *Id*.  Alternatively, failure to obtain access to Cash Collateral would likely result in a forced liquidation of the Debtors' Estates and the significant impairment of stakeholder value.  *Id.*

48.     Accordingly, entry of the proposed Interim Order to ensure the Debtors' continued access to Cash Collateral is reasonable and necessary to avoid immediate and irreparable harm to the Debtors and their Estates.

## D.    THE PREPETITION ABL SECURED PARTIES WILL BE ADEQUATELY PROTECTED BY A SUBSTANTIAL EQUITY CUSHION

49.     The Debtors propose to provide adequate protection to the Prepetition ABL Secured Parties solely to the extent, if any, of diminution of the Prepetition ABL Secured Parties' interests

in the Estates' interest in the Prepetition ABL Collateral as of the Petition Date. *Id*. at ¶ 10. As noted above, the Prepetition ABL Secured Parties' liens are secured by a first-priority interest in substantially all of the Debtors' assets, including Cash Collateral. *Id*. Moreover, the Prepetition ABL Secured Parties are materially oversecured as of June 23, 2023, by at least $74.8 million versus an outstanding balance on that debt of approximately $19.4 million.[12] *Id*. at ¶ 11. As of June 23, 2023, (i) the book value of the Prepetition ABL Collateral totals approximately $94.9 million, and (ii) the obligations outstanding under the Prepetition ABL Credit Agreement total approximately $19.4 million. *Id*.

50.     Accordingly, at the outset of these chapter 11 cases, the Prepetition ABL Secured Parties are protected by a substantial 383.88% cushion in the Prepetition ABL Collateral. *Id*. at ¶ 12.

51.     More specifically, as of June 23, 2023, the Debtors' accounts receivable totaled approximately $27.1, and the book value of the Debtors' inventory totaled approximately $67.7 million. *Id*. at ¶ 13. In other words, the Prepetition ABL Secured Parties are oversecured by a substantial margin as of June 23, 2023, taking into account <u>only</u> the value of accounts receivable and inventory. *Id*.

52.     The Prepetition ABL Secured Parties' own Borrowing Base (as defined herein) further establishes the extent to which those parties are significantly oversecured as of the Petition Date. *Id*. at ¶ 14. Pursuant to the Prepetition ABL Credit Agreement, the Debtors' Borrowing Base formula is calculated based on applying significant discounts[13] to the book value and liquidation value of certain of the Debtors' assets, including certain consumer accounts, credit card

---

[12]  *See* n.7, *supra*.

[13]  Notably, and as discussed in greater detail herein, the significant discounts applied to the Debtors' assets pursuant to the Borrowing Base formula are not consistent with the Debtors' historical realization rates for such assets.

receipts, and inventory.[14]  *Id*.  In addition, the availability under the Borrowing Base formula is further decreased by discretionary reserves established by the Prepetition ABL Agent, which currently total approximately $11.6 million, of which $8.6 million constitutes the Availability Block under the Prepetition ABL Credit Agreement.[15]  *Id*.  The Debtors are therefore unable to borrow up to the 100% value of the notional lending commitments provided by the Prepetition ABL Secured Parties at any given time precisely because the Prepetition ABL Secured Parties' borrowing formula provides for a substantial equity cushion.  *Id*.

53.    According to the Prepetition ABL Lenders' Borrowing Base formula, as of June 23, 2023, the Debtors' outstanding loan balance under the ABL Credit Agreement was not supposed to exceed $19.5 million.  *Id*. at ¶ 15.  As of Petition Date, the Debtors had borrowed

---

[14]  Pursuant to the Prepetition ABL Credit Agreement, "Borrowing Base" means "as of any date of determination, the Dollar Equivalent Amount as of such date of determination of:

(a)  the aggregate amount of Eligible Consumer Accounts of each Borrower multiplied by the Accounts Advance Rate (*i.e.*, 85%); plus

(b)  the aggregate amount of In-transit Credit Card Receipts multiplied by the Accounts Advance Rate (*i.e.*, 85%) (but in no event to exceed the In-transit Credit Card Receipts Sublimit); plus

(c)  the aggregate amount of Eligible Portal Accounts of Portal multiplied by the Portal Accounts Advance Rate (*i.e.*, 80%) (but in no event to exceed the Portal Accounts Sublimit); plus

(d)  the Net Orderly Liquidation Value of the applicable Eligible Inventory multiplied by the Inventory Advance Rate (*i.e.*, 85%) (but not to exceed the sublimit applicable to all Inventory); plus

(e)  the Net Orderly Liquidation Value of the applicable Eligible Slow Moving Inventory multiplied by the Inventory Advance Rate (*i.e.*, 85%) (but not to exceed the sublimit applicable to Eligible Slow Moving Inventory); plus

(f)  the Net Orderly Liquidation Value of Eligible In-Transit Inventory multiplied by the Inventory Advance Rate (*i.e.*, 85%) (but not to exceed the sublimit applicable to Eligible In-Transit Inventory); minus

(g)  all Reserves which Agent has established pursuant to Section 1.2; minus

(h)  the Availability Block."

[15]  Pursuant to the Prepetition ABL Credit Agreement, "Availability Block" means an amount equal to (a) during the period commencing on the Tenth Amendment Effective Date and ending on April 30, 2023, $12,175,000, (b) during the period commencing on May 1, 2023 and ending on May 31, 2023, $12,375,000, (c) during the period commencing on June 1, 2023 and ending on June 30, 2023, $12,575,000, and (b) at all times on and after July 1, 2023, $13,000,000.  As noted above, the "Availability Block" imposed by the Borrowing Base is $8.6 million, and the discretionary reserves "which the Agent has established pursuant to Section 1.2" of the Prepetition ABL Credit Agreement total $11.6 million, which includes the Availability Block.

approximately $19.4 million, which was 0.51% below the Borrowing Base and equivalent to only 20.67% of the book value of the Debtors' eligible accounts receivable and inventory.  *Id*.  Further, the Debtors' historical realization rates on eligible accounts and inventory typically exceed the 80-85% level built into the Borrowing Base formula.[16]  *Id*.  In addition, the Prepetition ABL Secured Parties have a first-priority lien in other receivables and inventory notwithstanding that they are not included in the Borrowing Base (the "<u>Excluded Borrowing Base Collateral</u>").  *Id*.  The value of the Excluded Borrowing Base Collateral totaled approximately $23.7 million[17] as of June 23, 2023 based on the book value of such assets.  *Id*.  As a result, the value of the Prepetition ABL Collateral securing the claims of the Prepetition ABL Secured Parties substantially exceeds the $19.4 million loan balance by a significant margin.  *Id*.

54.    During the Initial Interim Period, based on the Interim Budget, the Debtors and their professionals anticipate that the balance of the Prepetition ABL Collateral may decline by approximately $2.8 million, which would decrease the Prepetition ABL Secured Parties' equity cushion from 383.88% to 372.93% of the balance of the Prepetition ABL Collateral.  *Id*. at  ¶ 16. Therefore, the Prepetition ABL Secured Parties will maintain their substantial equity cushion during the proposed budget period.  *Id*.

55.    Additionally, the Debtors have been actively negotiating a going concern transaction that would provide for the payment, in full, of the Prepetition ABL Facility.  *Id*. at 17. These discussions remain ongoing, and the relief requested with respect to the Debtors' use of Cash Collateral will facilitate the Debtors' ability to complete this transaction.  *Id*.  Indeed, the

---

[16]    *See* n. 14, *supra*.

[17]    This consists of approximately $10.5 million of accounts receivable and $13.2 million of inventory.

availability of this going concern transaction underscores the extent to which the Prepetition ABL Secured Parties are significantly oversecured as of the Petition Date. *Id.*

56.     Finally, pursuant to that certain *Guarantee Agreement*, dated as of February 28, 2023, by and between iMedia & 123tv Holding GmbH, 123tv Invest GmbH, 123tv Holding GmbH, 123tv Beteiligungs GmbH, 1-2-3.tv GmbH, and 1-2-Play GmbH (collectively, the "Non-Debtor ABL Guarantors"), as guarantors, and the Prepetition ABL Agent, as beneficiary (as amended, restated, amended and restated, modified, supplemented, or extended from time to time, the "ABL Guarantee Agreement"), the obligations arising under the Prepetition ABL Credit Agreement are guaranteed by the Non-Debtor ABL Guarantors. *Id.* at ¶ 18.  For reference, iMedia purchased the Non-Debtor ABL Guarantors' business for EUR 80.0 million (or $94.5 million based on the September 13, 2021 exchange rate) in September 2021. *Id.*

57.     In addition to the Prepetition ABL Secured Parties' equity cushion, as well as the value of the guarantees in favor of the Prepetition ABL Secured Parties provided by the Debtors' non-Debtor affiliates, the Debtors propose additional forms of adequate protection for the Prepetition ABL Secured Parties, Synacor, and C&B Newco. *Id.* at ¶ 19.  These additional forms of adequate protection include, as applicable: (a) additional liens on the Debtors' unencumbered assets existing as of the Petition Date (the "Unencumbered Assets") and replacement liens upon the Prepetition Collateral to the extent, if any, of diminution in value of the Prepetition Secured Parties' respective interests in the Estates' interest in the Prepetition Collateral as of the Petition Date; (b) superpriority administrative expense claims for any such diminution in value; (c) financial reporting; and (d) with respect to C&B Newco, segregation of proceeds received by the Debtors on account of the sale of the Consigned Inventory. *Id.*  Therefore, even if the value of the Prepetition Collateral and Consigned Inventory decreases during the Initial

Interim Period, the Prepetition Secured Parties and C&B Newco are adequately protected through, among other things, the beforementioned adequate protection provided by the Debtors and the Debtors' granting of adequate protection liens on the Unencumbered Assets. *Id*.

58.    In light of the foregoing, the Debtors submit that the proposed adequate protection is: (a) fair and reasonable under the circumstances; (b) necessary to satisfy the requirements of sections 363(c)(2) and 363(e) of the Bankruptcy Code; and (c) in the best interests of the Debtors and their Estates. The Court should therefore authorize the Debtors to use the Cash Collateral under section 363(c)(2) of the Bankruptcy Code. If, following the filing of this Motion, the Debtors are unable to reach consensual agreements with the Prepetition Secured Parties regarding the Debtors' use of the Prepetition Collateral, including Cash Collateral, the Debtors reserve the right to request continued use of Cash Collateral at the Second Interim Hearing.

## E.    IMMEDIATE RELIEF IS NECESSARY TO AVOID IMMEDIATE AND IRREPARABLE HARM

59.    Bankruptcy Rule 4001(b)(2) permits a bankruptcy court to hold a preliminary hearing to authorize a debtor's use of cash collateral if the debtor will suffer "immediate and irreparable harm" if not permitted to use the cash collateral during the period prior to a final determination on a motion. *See* Fed. R. Bankr. P. 4001(b)(2). The Third Circuit has interpreted the language "immediate and irreparable harm" in the context of preliminary injunctions and has instructed that irreparable harm is a continuing harm that cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation. *See, e.g., Norfolk S. Ry. Co. v. City of Pittsburgh*, 235 F. App'x 907, 910 (3d Cir. 2007) (*citing Glasco v. Hills*, 558 F.2d 179, 181 (3d Cir. 1977)). Furthermore, the harm must be shown to be actual and imminent, not speculative or unsubstantiated. *See, e.g., Acierno v. New Castle County*, 40 F.3d 645, 653-55 (3d Cir. 1994).

60.     Use of Cash Collateral is necessary to enable the Debtors to pay their ordinary-course operating expenses, continue to operate the business as a going concern, finance these chapter 11 cases, and pursue a value-maximizing postpetition sale process.  *See* Cash Collateral Declaration ¶ 8.  If the Debtors are unable to access the Cash Collateral, they may be forced into an immediate, fire-sale liquidation, which would significantly reduce the expected proceeds from any sale process, and significantly reduce recoveries for all stakeholders.  *Id.*

61.     At the same time, the Debtors' requested relief is narrow:  The Debtors are proposing to use Cash Collateral on a limited basis in the interim period solely to the extent necessary to avoid immediate and irreparable harm to the Debtors' Estates at the outset of these chapter 11 cases.  *Id.* at ¶ 6.  As noted above, the Debtors' proposed expenditures consist of a narrow band of expenditures necessary to avoid immediate and irreparable harm to these chapter 11 Estates.  *Id.*

62.     This limited use of Cash Collateral will preserve, and not impair, the value of the collateral securing the Prepetition ABL Secured Parties' claims.  *Id.* at ¶ 8.  The Debtors' proposed Interim Budget is established to preserve the going-concern value of the Debtors' businesses and solely provides for the payment of expenditures essential thereto.  *Id.* at ¶ 6.  Indeed, the Debtors' proposed payments to content distributors will facilitate the Debtors' going concern value and also their ability to sell inventory in the ordinary course of business.  *Id.*  Conversely, failure to make such payments could literally take the Debtors "off the air" in major markets and, therefore, both materially disrupt operations and impair collateral value at the outset of these chapter 11 cases.  *Id.*  Preserving the value of the Debtors' businesses, and thus the Prepetition ABL Collateral, should maintain the Prepetition ABL Secured Parties' equity cushion during the Initial Interim Period, as the Debtors seek to stabilize their businesses in chapter 11 and pursue a

value-maximizing transaction for the benefit of the Debtors' Estates and their stakeholders, including the Prepetition ABL Secured Parties. *Id*. at ¶¶ 6, 8.

63.     Therefore, the Debtors request that the Court enter the proposed Interim Order authorizing the Debtors' use of Cash Collateral in the ordinary course of their business during the Initial Interim Period.  The Debtors also request that the Court schedule the Second Interim Hearing to consider approval of the Debtors' use of Cash Collateral.

## WAIVER OF BANKRUPTCY RULE 4001(a)(3)

64.     To implement the foregoing successfully, and given the nature of the relief requested herein, the Debtors respectfully request a waiver of the stay of the effectiveness of the order approving this Motion under Bankruptcy Rule 4001(a)(3).  Bankruptcy Rule 4001(a)(3) provides that "[an] order granting a motion for relief from an automatic stay made in accordance with Rule 4001(a)(1) is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  As explained herein, immediate access to the Cash Collateral is essential to prevent irreparable damage to the Debtors' Estates.  Accordingly, ample cause exists to justify the waiver of the 14-day stay imposed by Bankruptcy Rule 4001(a)(3) to the extent such applies.

## RESERVATION OF RIGHTS

65.     The Debtors reserve all rights.  Without limiting the generality of the foregoing, nothing contained herein is or should be construed as: (a) an admission as to the validity, extent, perfection, priority, allowability, enforceability, or character of any claim or any security interest which purportedly secures such claim or other asserted right or obligation, or a waiver or other limitation on the Debtors' ability to contest the same on any ground permitted by bankruptcy or applicable non-bankruptcy law; (b) a waiver of the Debtors' or any appropriate party in interest's rights to dispute the amount of, basis for, or validity of any claim against the Debtors;

(c) a promise to pay any claim; (d) a waiver of any claims or causes of action which may exist against any creditor or interest holder; (e) an assumption or rejection of any executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code, and nothing herein otherwise affects the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract or unexpired lease with any party subject to this Motion; (f) granting third-party beneficiary status or bestowing any additional rights on any third party; or (g) being otherwise enforceable by any third party.

## NOTICE

66.    The Debtors will provide notice of this Motion to:  (a) United States Trustee for the District of Delaware, 844 N. King Street, Room 2207, Wilmington, Delaware, 19801 (Attn: Richard L. Schepacarter, email: richard.schepacarter@usdoj.gov); (b) the United States Attorney's Office for the District of Delaware; (c) the state attorneys general for all states in which the Debtors conduct business; (d) the Internal Revenue Service; (e) the United States Securities and Exchange Commission; (f) the holders of the fifty (50) largest unsecured claims against the Debtors on a consolidated basis; (g) counsel to the Prepetition ABL Agent, Blank Rome LLP, 1201 North Market Street, Suite 800, Wilmington, Delaware 19801 (Attn: Regina Stango Kelbon, Esq., email: regina.kelbon@blankrome.com); (h) U.S. Bank, N.A. as indenture trustee for the Senior Unsecured Notes; (i) counsel to Synacor, Thompson Hine, LLP, 3900 Key Center, 127 Public Square, Cleveland, Ohio 44114 (Attn: Curtis Tuggle and Jonathan Hawkins, email: curtis.tuggle@ThompsonHine.com and jonathan.hawkins@ThompsonHine.com); (j) counsel to C&B Newco, Riemer Braunstein LLP, Times Square Tower, Suite 2506, New York, New York 10036 (Attn: Steven Fox, Esq., email: sfox@riemerlaw.com) and Troutman Pepper Hamilton Sanders LLP, Hercules Plaza, Suite 5100, 1313 North Market Street, Wilmington, DE 19801 (Attn: Douglas D. Herrmann, email: douglas.herrmann@troutman.com); (k) counsel to Crystal

Financial LLC d/b/a SLR Credit Solutions, Morgan Lewis & Bockius, LLP, One Federal Street, Boston, Massachusetts 021110 (Attn: Julia Frost-Davies, email: julia.frost-davies@morganlewis.com); (m) banks and financial institutions where the Debtors maintain accounts; and (n) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors respectfully submit that, in light of the nature of the relief requested, no further notice is necessary.

## NO PRIOR REQUEST

67.    No prior request for the relief sought in this motion has been made to this or any other court.

*[Remainder of Page Intentionally Left Blank]*

## CONCLUSION

WHEREFORE, the Debtors respectfully request that this Court enter the Interim Order, substantially in the form attached hereto as **Exhibit A**, and a final order granting the relief requested herein and such other and further relief as may be just and proper.

Dated:  June 29, 2023
          Wilmington, Delaware

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Laura Davis Jones*
Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: 302-652-4100
Facsimile: 302-652-4400
Email:  ljones@pszjlaw.com
       tcairns@pszjlaw.com

-and-

**ROPES & GRAY LLP**
Ryan Preston Dahl (*pro hac vice* admission pending)
Cristine Pirro Schwarzman (*pro hac vice* admission pending)
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
E-mail:  ryan.dahl@ropesgray.com
       cristine.schwarzman@ropesgray.com

-and-

**ROPES & GRAY LLP**
Stephen L. Iacovo (*pro hac vice* admission pending)
191 North Wacker Drive, 32nd Floor
Chicago, Illinois 60606
Telephone: (312) 845-1200
Facsimile: (212) 845-5500
E-mail:  stephen.iacovo@ropesgray.com

*Proposed Counsel to the Debtors and Debtors in Possession*