**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>iMedia Brands, Inc., *et al.*,[1]<br><br>                    Debtors. | Chapter 11<br><br>Case No. 23-10852 ([___])<br><br>(Joint Administration Requested) |

**DECLARATION OF JAMES ALT IN SUPPORT
OF DEBTORS' MOTION FOR ENTRY OF INTERIM AND
FINAL ORDERS (I) AUTHORIZING POSTPETITION USE OF CASH
COLLATERAL; (II) GRANTING ADEQUATE PROTECTION TO CERTAIN
PREPETITION SECURED PARTIES AND C&B NEWCO; (III) SCHEDULING
A SECOND INTERIM HEARING; AND (IV) GRANTING RELATED RELIEF**

I, James Alt, make this declaration pursuant to 28 U.S.C. § 1746 to the best of my knowledge, information, and belief:

1. I am the Chief Transformation Officer of iMedia Brands, Inc. ("iMedia")[2] and a Managing Director of Huron Consulting Group, Inc. ("Huron") with more than 20 years of experience assisting financially distressed companies implement turnaround strategies. I have extensive bankruptcy and insolvency related experience, having served in various advisory and executive roles in chapter 11 bankruptcy and out-of-court restructuring cases over the past 20 years, including: ZGallerie, ToysRUs, GenCanna Global, Roberts50, Amerimark, Capital Brands, Railworks, Venture Industries, Metropolitan Provisions, Anchor Manufacturing, Unaka Corporation, and others. Since November 2022, I and others at Huron have worked closely with

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: ValueVision Media Acquisitions, Inc. (8670); iMedia Brands, Inc. (3770); ValueVision Interactive, Inc. (8730); Portal Acquisition Company (3403); VVI Fulfillment Center, Inc. (5552); ValueVision Retail Inc. (2155); JWH Acquisition Company (3109); PW Acquisition Company, LLC (0154); EP Properties, LLC (3951); FL Acquisition Company (3026); Norwell Television, LLC (6011); and 867 Grand Avenue, LLC (2642). The Debtors' service address is 6740 Shady Oak Road, Eden Prairie, MN 55344-3433.

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion.

iMedia, each of iMedia's direct and indirect subsidiaries that are debtors and debtors in possession (collectively with iMedia, the "Debtors" and, each individually, a "Debtor"), and their non-debtor subsidiaries (together with the Debtors, the "Company") to manage the business and assist the Company as it evaluated strategic transactions and restructuring alternatives. Prior to the Debtors commencing these chapter 11 cases on June 28, 2023 (the "Petition Date"), I was appointed by the board of directors of iMedia to the position of Chief Transformation Officer of each of the Debtors, effective as of April 3, 2023.

2. I submit this declaration (the "Declaration") in support of the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Postpetition Use of Cash Collateral; (II) Granting Adequate Protection to Certain Prepetition Secured Parties and C&B Newco; (III) Scheduling a Second Interim Hearing; and (IV) Granting Related Relief* (the "Motion"). In addition, I submitted the *Declaration of James Alt, Chief Transformation Officer of iMedia Brands, Inc., in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith and incorporated herein by reference.

3. In making this Declaration, I relied in part on information and materials that the Debtors and their advisors supplied to me, and that my colleagues from Huron prepared and provided to me under my supervision. Unless otherwise indicated, any financial information contained in this Declaration is unaudited and subject to change but is accurate to the best of my knowledge.

4. I am over the age of 18 years and am authorized to submit this Declaration on behalf of the Debtors. If called upon to testify, I could and would testify competently to the facts set forth herein.

**I.    THE DEBTORS HAVE IMMEDIATE NEED FOR ACCESS TO CASH COLLATERAL**

5.     Cash is critical to the Debtors' business enterprise, which consists of a broad-based portfolio of entertainment, consumer brands, and media commerce services businesses. Absent the immediate use of Cash Collateral, the Debtors will be unable to make critical payments to their employees, vendors, and applicable taxing authorities. Without this ability to use Cash Collateral, the Debtors' business operations will be severely disrupted at a critical juncture where they seek to utilize the "breathing spell" provided by chapter 11 to stabilize operations and preserve and maximize value for all stakeholders.

6.     In particular, the Debtors require the use of Cash Collateral to pay wages, benefits, taxes, and other items contemplated by the Debtors' Interim Budget, annexed to the Debtors' proposed interim Cash Collateral order as <u>Annex A</u>. Non-payment will materially and adversely affect the Debtors' operations and business relationships and, in all likelihood, substantially impair the value of the Prepetition Collateral. In particular, the Debtors propose to use Cash Collateral to pay the following obligations to avoid immediate and irreparable harm to their chapter 11 estates (the "<u>Estates</u>") at the outset of these chapter 11 cases:

| Obligation (projected disbursement / $) | Description |
|---|---|
| Postpetition Vendor Payments, including Content Distribution ($2.6 million) | "Content Distribution" refers to the carriage cost paid to cable operators in order to keep the Debtors' broadcast operations on the air. The content distribution payments contemplated by the Debtors' Interim Budget refers to the prepayments required for the Debtors to broadcast in July 2023 on certain major broadcast carriers. Should the Debtors not make these postpetition payments, the Debtors may be unable to broadcast and will be "off the air" on those carriers. As a result, the Debtors will lose their ability to generate substantial amounts of revenue. |
| Wage / Benefit Obligations ($428,000) | Debtors have falling due certain wage and benefit obligations to their workforce in the interim period, including employee medical claims. Failure to make these payments could significantly impair the Debtors' workforce and cause unnecessary hardship to individuals, and material business disruption, at the outset of these chapter 11 cases. |

| Obligation (projected disbursement / $) | Description |
|---|---|
| Sales Tax Obligations ($2.3 million) | Debtors have due approximately $2.3 million of sales and trust fund tax obligations, including obligations arising from ongoing reconciliations and reporting being undertaken by the Debtors. It is my understanding that these obligations are "trust fund" obligations held for the benefit of the applicable state taxing authorities, and failure to pay such obligations may result in the accrual of penalties, interest, or other liabilities, including potential liability for the Debtors' directors and officers. |
| Insurance Premium Obligations ($732,000) | Refers to financing premium due in connection with the Debtors' insurance policies covering, among other things, general liability, auto liability, workers compensation liability, umbrella liability, cyber liability, product liability, and professional liability. |

7. Accordingly, prior to the Petition Date, the Debtors undertook to negotiate and obtain the Prepetition ABL Secured Parties' consent to utilize Cash Collateral to operate the Debtors' businesses during these chapter 11 cases. These discussions remain ongoing but, out of the abundance of caution, the Debtors seek approval from the Court to use Cash Collateral on the bases set forth in the Motion and herein.

8. The Debtors' proposed immediate use of Cash Collateral is intended to provide working capital during a limited, two-week period (the "Initial Interim Period") in order to avoid immediate and irreparable harm to their businesses. Access to Cash Collateral will permit the Debtors to operate their businesses, fund operating expenses and the costs of administering these Estates, preserve the value of the Prepetition Collateral, and pursue a value-maximizing transaction for the benefit of the Debtors' stakeholders. Alternatively, failure to obtain access to Cash Collateral as provided by the Initial Budget, and as set forth above, will result in immediate and irreparable harm to the Debtors' Estates absent the relief requested by the Motion.

II. **THE PREPETITION ABL SECURED PARTIES HAVE CONSENTED TO CERTAIN USE OF CASH COLLATERAL**

9. The Prepetition ABL Secured Parties have previously agreed to provide their consent to the Debtors' use of Cash Collateral to pay certain sales tax obligations as set forth in

the Interim Budget.  Pursuant to that certain *Funding Agreement*, dated as of June 20, 2023, by and between the Prepetition ABL Borrowers, the Prepetition ABL Guarantors, and the Prepetition ABL Secured Parties (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "ABL Funding Agreement"), attached to the Motion as Exhibit B, the Prepetition ABL Secured Parties agreed to, among other things, make certain cash available to the Debtors through the consensual use of Cash Collateral for the payment of certain sales tax obligations consistent therewith.  Specifically, the ABL Funding Agreement provides that the ABL Secured Parties "hereby agree[d] to, make funds available to Borrowers in an amount equal to $3,160,140 to be used solely or the purpose of paying certain sales taxes . . . pursuant to . . . (y) a Bankruptcy Court approved cash collateral order consented to by the Agent and Lenders . . . ."  Accordingly, the Prepetition ABL Secured Parties have specifically consented to the use of Cash Collateral with respect to the applicable tax payments contemplated by the Initial Budget.

### III. THE PREPETITION ABL SECURED PARTIES ARE ADEQUATELY PROTECTED BY A SUBSTANTIAL EQUITY CUSHION

10. In addition to the consents already provided by the Prepetition ABL Secured Parties, those parties are adequately protected here.  In particular, the Debtors propose to provide adequate protection to the Prepetition Secured Parties and C&B Newco LLC ("C&B Newco") solely to the extent, if any, of diminution of the Prepetition Secured Parties' and C&B Newco's interests in the Estates' interest in the collateral securing the Prepetition ABL Credit Agreement (the "Prepetition ABL Collateral"), the collateral securing the Synacor Promissory Note (the "Prepetition Synacor Collateral" and, together with the Prepetition ABL Collateral, the "Prepetition Collateral"), and the Consigned Inventory as of the Petition Date.  I understand that the liens of the Prepetition ABL Secured Parties are secured by a first-priority interest in

substantially all of the Debtors' assets, including Cash Collateral.  A true and correct copy of the Debtors' current borrowing base certificate with respect to their outstanding obligations under the Prepetition ABL Credit Agreement is attached as **Exhibit A**.

11. I believe the Prepetition ABL Secured Parties are materially oversecured as of the Petition Date by at least $74.8 million versus an outstanding balance on that debt of approximately $19.4 million.[3]  As of June 23, 2023, (i) the book value of the Prepetition ABL Collateral totals approximately $94.9 million, and (ii) the obligations outstanding under the Prepetition ABL Credit Agreement total approximately $19.4 million.

12. Accordingly, at the outset of these chapter 11 cases, the Prepetition ABL Secured Parties are protected by a substantial 383.88% cushion in the Prepetition ABL Collateral.

13. More specifically, as of June 23, 2023, the Debtors' accounts receivable totaled approximately $27.1 million, and the book value of the Debtors' inventory totaled approximately $67.7 million.  In other words, the Prepetition ABL Secured Parties are oversecured by a substantial margin as of the Petition Date, taking into account <u>only</u> the value of accounts receivable and inventory.

14. The Prepetition ABL Secured Parties' own Borrowing Base (as defined herein) further establishes the extent to which those parties are significantly oversecured as of the Petition Date.  Pursuant to the Prepetition ABL Credit Agreement, the Debtors' Borrowing Base formula is calculated based on applying significant discounts[4] to the book value and liquidation value of certain of the Debtors' assets, including certain consumer accounts, credit card receipts,

---

[3] This outstanding balance includes, among other things, an asserted termination fee totaling approximately $1.6 million and fees and expenses of the Prepetition ABL Secured Parties' professionals totaling approximately $1.5 million.

[4] Notably, and as discussed in greater detail herein, the significant discounts applied to the Debtors' assets pursuant to the Borrowing Base formula are not consistent with the Debtors' historical realization rates for such assets.

and inventory.[5] In addition, as further "cushion," the Borrowing Base formula is further decreased by discretionary reserves established by the Prepetition ABL Agent, which currently total approximately $11.6 million, of which $8.6 million constitutes the Availability Block under the Prepetition ABL Credit Agreement.[6] The Debtors are therefore unable to borrow up to the 100% value of the notional lending commitments provided by the Prepetition ABL Secured Parties at any given time precisely because the Prepetition ABL Secured Parties' borrowing formula provides for a substantial equity cushion.

15. According to the Prepetition ABL Lenders' Borrowing Base formula, as of June 23, 2023, the Debtors' outstanding loan balance under the ABL Credit Agreement was not supposed to exceed $19.5 million. As of Petition Date, the Debtors had borrowed approximately $19.4 million, which was 0.51% below the Borrowing Base and equivalent to only 20.67% of the

---

[5] Pursuant to the Prepetition ABL Credit Agreement, "Borrowing Base" means "as of any date of determination, the Dollar Equivalent Amount as of such date of determination of:

(a) the aggregate amount of Eligible Consumer Accounts of each Borrower multiplied by the Accounts Advance Rate (*i.e.*, 85%); plus

(b) the aggregate amount of In-transit Credit Card Receipts multiplied by the Accounts Advance Rate (*i.e.*, 85%) (but in no event to exceed the In-transit Credit Card Receipts Sublimit); plus

(c) the aggregate amount of Eligible Portal Accounts of Portal multiplied by the Portal Accounts Advance Rate (*i.e.*, 80%) (but in no event to exceed the Portal Accounts Sublimit); plus

(d) the Net Orderly Liquidation Value of the applicable Eligible Inventory multiplied by the Inventory Advance Rate (*i.e.*, 85%) (but not to exceed the sublimit applicable to all Inventory); plus

(e) the Net Orderly Liquidation Value of the applicable Eligible Slow Moving Inventory multiplied by the Inventory Advance Rate (*i.e.*, 85%) (but not to exceed the sublimit applicable to Eligible Slow Moving Inventory); plus

(f) the Net Orderly Liquidation Value of Eligible In-Transit Inventory multiplied by the Inventory Advance Rate (*i.e.*, 85%) (but not to exceed the sublimit applicable to Eligible In-Transit Inventory); minus

(g) all Reserves which Agent has established pursuant to Section 1.2; minus

(h) the Availability Block."

[6] Pursuant to the Prepetition ABL Credit Agreement, "Availability Block" means an amount equal to (a) during the period commencing on the Tenth Amendment Effective Date and ending on April 30, 2023, $12,175,000, (b) during the period commencing on May 1, 2023 and ending on May 31, 2023, $12,375,000, (c) during the period commencing on June 1, 2023 and ending on June 30, 2023, $12,575,000, and (b) at all times on and after July 1, 2023, $13,000,000. As noted above, the "Availability Block" imposed by the Borrowing Base is $8.6 million, and the discretionary reserves "which the Agent has established pursuant to Section 1.2" of the Prepetition ABL Credit Agreement total $11.6 million, which includes the Availability Block.

book value of the Debtors' eligible accounts receivable and inventory. Further, the Debtors' historical realization rates on eligible accounts and inventory typically exceed the 80-85% advance rates built into the Borrowing Base formula.[7] In addition, the Prepetition ABL Secured Parties have a first-priority lien in other receivables and inventory notwithstanding that they are not included in the Borrowing Base (the "Excluded Borrowing Base Collateral"). The value of the Excluded Borrowing Base Collateral totaled approximately $23.7 million,[8] as of June 23, 2023, based on the book value of such assets. As a result, the value of the Prepetition ABL Collateral securing the claims of the Prepetition ABL Secured Parties substantially exceeds the $19.4 million loan balance by a significant margin.

16. During the Initial Interim Period, based on the Interim Budget, the Debtors and their professionals anticipate that the balance of the Prepetition ABL Collateral may decline by approximately $2.8 million, which would decrease the Prepetition ABL Secured Parties' equity cushion from 383.88% to 372.93% of the balance of the Prepetition ABL Collateral. Therefore, the Prepetition ABL Secured Parties will maintain their substantial equity cushion during the proposed budget period.

17. Additionally, the Debtors have been actively negotiating a going concern transaction that I believe would provide for the payment, in full, of the Prepetition ABL Facility. These discussions remain ongoing, and the relief requested with respect to the Debtors' use of Cash Collateral will, I believe, facilitate the Debtors' ability to complete this transaction. Indeed, the availability of this going concern transaction underscores the extent to which the Prepetition ABL Secured Parties are significantly oversecured as of the Petition Date.

---

[7]  See n. 5, *supra*.

[8]  This consists of approximately $10.5 million of accounts receivable and $13.2 million of inventory.

18. Finally, pursuant to that certain *Guarantee Agreement*, dated as of February 28, 2023, by and between iMedia & 123tv Holding GmbH, 123tv Invest GmbH, 123tv Holding GmbH, 123tv Beteiligungs GmbH, 1-2-3.tv GmbH, and 1-2-Play GmbH (collectively, the "Non-Debtor ABL Guarantors"), as guarantors, and the Prepetition ABL Agent, as beneficiary (as amended, restated, amended and restated, modified, supplemented, or extended from time to time, the "ABL Guarantee Agreement"), the obligations arising under the Prepetition ABL Credit Agreement are guaranteed by the Non-Debtor ABL Guarantors. For reference, iMedia purchased the Non-Debtor ABL Guarantors' business for EUR 80.0 million (or $94.5 million based on the September 13, 2021 exchange rate) in September 2021.

19. In addition to the Prepetition ABL Secured Parties' equity cushion, as well as the value of the guarantees in favor of the Prepetition ABL Secured Parties provided by the Debtors' non-Debtor affiliates, the Debtors propose additional forms of adequate protection for the Prepetition ABL Secured Parties and Synacor. These additional forms of adequate protection include, as applicable: (a) additional liens on the Debtors' unencumbered assets existing as of the Petition Date (the "Unencumbered Assets") and replacement liens upon the Prepetition Collateral to the extent, if any, of diminution in value of the Prepetition Secured Parties' respective interests in the Estates' interest in the Prepetition Collateral as of the Petition Date; (b) superpriority administrative expense claims for any such diminution in value; (c) financial reporting; and (d) with respect to C&B Newco, segregation of proceeds received by the Debtors on account of the sale of the Consigned Inventory. Therefore, even if the value of the Prepetition Collateral and Consigned Inventory decreases during the Initial Interim Period, the Prepetition Secured Parties and C&B Newco are adequately protected through, among other

things, the beforementioned adequate protection provided by the Debtors and the Debtors' granting of adequate protection liens on the Unencumbered Assets.

## IV. THE DEBTORS ARE PROPOSING ONLY A LIMITED USE OF CASH COLLATERAL DURING THE INITIAL INTERIM PERIOD TO AVOID IMMEDIATE AND IRREPARABLE HARM

20. Use of Cash Collateral is necessary to enable the Debtors to pay their ordinary-course operating expenses, continue to operate the business as a going concern, finance these chapter 11 cases, and pursue a value-maximizing postpetition sale process. If the Debtors are unable to access the Cash Collateral, they may be forced into an immediate, fire-sale liquidation, which would significantly reduce the expected proceeds from any sale process, and significantly reduce recoveries for all stakeholders.

21. At the same time, the Debtors' requested relief is narrow: The Debtors are proposing to use Cash Collateral on a limited basis in the interim period solely to the extent necessary to avoid immediate and irreparable harm to the Debtors' Estates at the outset of these chapter 11 cases. As noted above, the Debtors' proposed expenditures consist of a narrow band of expenditures necessary to avoid immediate and irreparable harm to these chapter 11 Estates.

22. I further believe this limited use of Cash Collateral will preserve, and not impair, the value of the collateral securing the Prepetition ABL Secured Parties' claims. The Debtors' proposed Interim Budget is established to preserve the going-concern value of the Debtors' businesses and solely provides for the payment of expenditures essential thereto. Indeed, the Debtors' proposed payments to content distributors will facilitate the Debtors' going concern value and also their ability to sell inventory in the ordinary course of business. Conversely, failure to make such payments could literally take the Debtors "off the air" in major markets and, therefore, both materially disrupt operations and impair collateral value at the outset of these chapter 11 cases. Preserving the value of the Debtors' businesses, and thus the

Prepetition ABL Collateral, should maintain the Prepetition ABL Secured Parties' equity cushion during the Initial Interim Period, as the Debtors seek to stabilize their businesses in chapter 11 and pursue a value-maximizing transaction for the benefit of the Debtors' Estates and their stakeholders, including the Prepetition ABL Secured Parties.

[*Remainder of page intentionally left blank*]

23. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 29th day of June, 2023

/s/ James Alt
James Alt
Chief Transformation Officer
iMedia Brands, Inc.

# **EXHIBIT A**

**Borrowing Base Certificate**

| Borrowing Base ($ in 000's) | | | | | | 6/24/2023 |
|---|---|---|---|---|---|---|
| | Vpay AR | CC A/R | iMDS A/R | AR 4 | | |
| | | | | | | TOTAL |
| **Accounts Receivable per Aging** | 21,406,613 | 998,735 | 4,754,607 | 0 | | 27,159,955 |
| <u>Less Ineligibles:</u> | | | | | | |
| Accounts > 7 Days (VPay) or 90 Days (iMDS) Past Invoice | 2,007,269 | 0 | 570,015 | | | 2,577,284 |
| Credit Card Fees | 459,764 | 0 | 0 | | | 459,764 |
| Contra | 0 | 0 | 269,106 | | | 269,106 |
| Cross-Age (50%) | 0 | 0 | 12,138 | | | 12,138 |
| Foreign | 0 | 0 | 167,683 | | | 167,683 |
| Concentration | 0 | 0 | 0 | | | 0 |
| Synacor | 0 | 0 | 478,272 | | | 478,272 |
| | | | | | | 0 |
| **Ineligible Accounts** | 2,467,033 | 0 | 1,497,214 | 0 | | 3,964,248 |
| **Gross Eligible Accounts** | 18,939,580 | 998,735 | 3,257,393 | 0 | | 23,195,707 |
| Cap | 80,000,000 | 3,500,000 | | | | |
| Net Eligible A/R | 18,939,580 | 998,735 | 3,257,393 | | | 23,195,707 |
| Advance Rate | 85.0% | 85.0% | 80% | | | 84.3% |
| **Available before Reserves** | $16,098,643 | $848,925 | $2,605,914 | | | $19,553,482 |
| Dilution Reserve - LTM Dilution | 16.6% | | | | | |
| Dilution Reserve - $ | (2,187,521) | | (750,000) | | | ($2,937,521) |
| **AVAILABLE A/R before cap** | $13,911,121 | $848,925 | $1,855,914 | | | $16,615,960 |
| iMDS A/R Cap | | $3,500,000 | $8,000,000 | | | |
| **Available A/R <u>after</u> cap** | $13,911,121 | $848,925 | $1,855,914 | | | $16,615,960 |
| | | In-line | Slow Moving | | | TOTAL |
| **Gross Inventory As of 6/17/23** | $ | 45,146,163 | $22,558,260 | | | 67,704,423 |
| <u>Less:</u> | | | | | | |
| See Attached | | 13,230,803 | | | | 13,230,803 |
| **Ineligible Inventory** | | $13,230,803 | $0 | $0 | $0 | $13,230,803 |
| Eligible Inventory | | 31,915,361 | 22,558,260 | | | 54,473,621 |
| **NOLV % Estimate Only** | | 45.90% | 13.20% | | | |
| | | 85.0% | 85.0% | | | |
| Effective Advance Rate | | 39.0% | 11.2% | | | 27.5% |
| **Available Inv <u>before</u> cap** | | $12,452,140 | $2,531,037 | | | $14,983,177 |
| Inventory Cap | 40,000,000 | | $2,000,000 | | | |
| **Available Inv <u>after</u> cap** | | $12,452,140 | $2,000,000 | | | $14,452,140 |
| **Borrowing Base Availability, before Block & Reserves** | Line Cap  USD | $80,000,000 | | | | $31,068,100 |
| Add: Allowable Overadvance | | | | | | 0 |
| Less: Letters of Credit | | | | | | 0 |
| Less: Availablity Block | | | | | | (8,575,000) |
| Less: Royalty Reserve/C&B Reserve | | | | | | (1,915,445) |
| Less: Non-VP Sales Dilution Reserve | | | | | | (615,000) |
| Less: 20% Freight and Duty Reserve on In-Transit Inv. | | | | | | (2,951) |
| Less: Cares Act Reserve | | | | | | (510,000) |
| Less: Interest Payment Reserve/Legal Reserve | | | | | | 0 |
| Less: Field Exam Reserve | | | | | | 0 |
| **Total Sources** | | | | | | $19,449,704 |
| GreenLake Term Loan | | | | | | 0 |
| **Total Sources** | | | | | | $19,449,704 |
| Siena Revolver | | | | | | 19,449,043 |
| Less: Unswept funds | | | | | | 0 |
| PNC Term Loan | | | | | | |
| Early Termination Fee | | | | | | |
| DA Davidson Fee | | | | | | |
| SLG Fee | | | | | | |
| GreenLake Fee | | | | | | |
| Legal Fees | | | | | | |
| **Total Uses** | | | | | | $19,449,043 |
| | | | | | | |
| **Borrowing Base Availability** | | | | | | $662 |