**<u>Exhibit 1</u>**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| iMedia Brands, Inc., *et al.*,[1] | Case No. 23-10852 ([___]) |
| Debtors. | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND**
**FINAL ORDERS (I) AUTHORIZING POSTPETITION USE OF CASH**
**COLLATERAL; (II) GRANTING ADEQUATE PROTECTION TO CERTAIN**
**PREPETITION SECURED PARTIES AND C&B NEWCO; (III) SCHEDULING**
**A SECOND INTERIM HEARING; AND (IV) GRANTING RELATED RELIEF**

iMedia Brands, Inc. ("iMedia") and its affiliated debtors and debtors in possession (each a "Debtor" and, collectively, the "Debtors") in the above-captioned chapter 11 cases, by and through their undersigned proposed counsel, hereby submit this motion (this "Motion") for entry of interim and final orders granting the relief described below. In support hereof, the Debtors rely on (a) the *Declaration of James Alt, Chief Transformation Officer of iMedia Brands, Inc., in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration")[2] and (b) the *Declaration of James Alt in Support of Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Postpetition Use of Cash Collateral; (II) Granting Adequate Protection to Certain Prepetition Secured Parties and C&B Newco; (III) Scheduling a Second Interim Hearing; and (IV) Granting Related Relief* (the "Cash Collateral Declaration" and, together with the First

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are:  ValueVision Media Acquisitions, Inc. (8670); iMedia Brands, Inc. (3770); ValueVision Interactive, Inc. (8730); Portal Acquisition Company (3403); VVI Fulfillment Center, Inc. (5552); ValueVision Retail Inc. (2155); JWH Acquisition Company (3109); PW Acquisition Company, LLC (0154); EP Properties, LLC (3951); FL Acquisition Company (3026); Norwell Television, LLC (6011); and 867 Grand Avenue, LLC (2642).  The Debtors' service address is 6740 Shady Oak Road, Eden Prairie, MN 55344-3433.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in, as applicable, the First Day Declaration or the Interim Order.

Day Declaration, the "Declarations"), each filed in connection herewith and incorporated herein for reference, and further represent as follows:

## JURISDICTION AND VENUE

1.    The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012.  Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure for the District of Delaware (the "Local Rules"), the Debtors confirm their consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.    This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of these chapter 11 cases and this Motion is proper in this district under 28 U.S.C. §§ 1408 and 1409.

3.    The statutory bases for the relief requested herein are sections 105(a), 361, 362, 363, 506, 507, of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 4001-2 and 9013-1(m).

## RELIEF REQUESTED

4.    The Debtors seek entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the "Interim Order") and a final order, (a) authorizing the use of the Prepetition Collateral (as defined herein), including all "Cash Collateral"[3] (as defined in section 363(a) of the

---

[3]    As set forth more fully in the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue to  Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue Certain Intercompany Transactions, and (II) Granting Related Relief* (the "Cash Management Motion"), filed contemporaneously herewith, the Debtors

Bankruptcy Code) and the Consigned Inventory (as defined herein) in which the Prepetition Secured Parties (as defined herein) and C&B Newco LLC ("C&B Newco"), as applicable, have or purport to have an interest; (b) granting adequate protection of the interests of the Prepetition Secured Parties and C&B Newco; (c) scheduling a second interim hearing (the "Second Interim Hearing") pursuant to Bankruptcy Rule 4001(b); and (d) granting related relief.

## BACKGROUND

5.      On the date hereof (the "Petition Date"), each Debtor filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code.  The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  No trustee, examiner, or official committee of unsecured creditors has been appointed in these chapter 11 cases.

6.      The Debtors, together with their non-Debtor affiliates (collectively, the "Company"), capitalize on the convergence of entertainment, ecommerce, and advertising. The Company's global portfolio of entertainment, consumer brands and media commerce services businesses—including ShopHQ, 1-2-3.tv, Christopher & Banks, and iMedia Digital Services— cross-promote and exchange data with each other to optimize the engagement experiences the Company creates for advertisers and consumers.  The Company's ecommerce business extends across the United States, while the Company's entertainment and advertising services reach customers across the United States, Canada, Germany, and Austria.

---

hold approximately $1.5 million in a separate "Collateral Account" maintained at PNC Bank N.A.  As set forth in the Cash Management Motion, funds held in the Collateral Account collateralize a standby letter of credit and obligations under the Debtors' corporate card program.  By this Motion, the Debtors do not seek authority to use funds held in the Collateral Account."

7.      Additional factual background regarding the Debtors, including their business operations, corporate and capital structure, and the events leading to the filing of these chapter 11 cases, is set forth in detail in the First Day Declaration, filed concurrently herewith and incorporated herein by reference.

## PRELIMINARY STATEMENT

8.      Cash is critical to the Debtors' business enterprise, which consists of a broad-based portfolio of entertainment, consumer brands, and media commerce services businesses. Absent the use of cash, the Debtors will be unable to make critical payments to their employees, vendors, and applicable taxing authorities. Indeed, and as set forth more fully in the Declarations, the Debtors' inability to use Cash Collateral at the outset of these chapter 11 cases could impose the very real risk of immediate and irreparable harm to their estates. The Debtors therefore have a very real and urgent need for the relief quested here.

9.      Accordingly, prior to the Petition Date, the Debtors undertook to negotiate and obtain the Prepetition ABL Secured Parties' (as defined herein) consent to utilize Cash Collateral to operate the Debtors' businesses during these chapter 11 cases. To that end, the Debtors have already obtained Prepetition ABL Secured Parties' agreement to provide their consent to the use of cash to fund certain tax obligations, and discussions continue regarding the Debtors' use of Cash Collateral, on a limited basis, for a two-week period (the "Initial Interim Period") in accordance and in accordance with the budget attached to the order as **Annex A** (the "Interim Budget"). Pursuant to the Budget, the Debtors request authority to use Cash Collateral in a limited period to satisfy truly 'mission critical' obligations at the outset of these chapter 11 cases, namely:

| Obligation (projected disbursement / $) | Description |
|---|---|
| Postpetition Vendor Payments, including Content Distribution ($2.6 million) | "Content Distribution" refers to the carriage cost paid to cable operators in order to keep the Debtors' broadcast operations on the air. The content distribution payments contemplated by the Debtors' Interim Budget refers to |

| Obligation (projected disbursement / $) | Description |
|---|---|
| | the prepayments required for the Debtors to broadcast in July 2023 on certain major broadcast carriers.  Should the Debtors not make these postpetition payments, the Debtors may be unable to broadcast and will be "off the air" on those carriers.  As a result, the Debtors will lose their ability to generate substantial amounts of revenue. |
| Wage / Benefit Obligations ($428,000) | Debtors have falling due certain wage and benefit obligations to their workforce in the interim period, including employee medical claims.  Failure to make these payments could significantly impair the Debtors' workforce and cause unnecessary hardship to individuals, and material business disruption, at the outset of these chapter 11 cases. |
| Sales Tax Obligations ($2.3 million) | Debtors have due approximately $2.3 million of sales and trust fund tax obligations, including obligations arising from ongoing reconciliations and reporting being undertaken by the Debtors.  These obligations are "trust fund" obligations held for the benefit of the applicable state taxing authorities, and failure to pay such obligations may result in the accrual of penalties, interest, or other liabilities, including potential liability for the Debtors' directors and officers. |
| Insurance Premium Obligations ($732,000) | Refers to financing premium due in connection with the Debtors' insurance policies covering, among other things, general liability, auto liability, workers compensation liability, umbrella liability, cyber liability, product liability, and professional liability. |

10.     As set forth more fully herein and in the Declarations, this relief is narrowly tailored to provide access to cash, for a limited period in a manner that both avoids immediate and irreparable harm to these estates and also provides adequate protection for their prepetition secured parties.  Further, and as detailed in the Cash Collateral Declaration, the Prepetition ABL Secured Parties are adequately protected on account of this limited use of cash by, among other things, the subsequent equity cushion benefitting such parties.  That is, the outstanding balance under the Prepetition ABL totals approximately $19.4 million as of the Petition Date.[4]  Such obligations are secured by, among other things, inventory and receivables with a book value of approximately $94.8 million.  And even after applying the "formula" adjustments applicable to the Debtors' borrowing base (such as reductions to the value of inventory and receivables), the Prepetition ABL

---

[4]     This balance includes an asserted "Early Termination Fee" totaling approximately $1.6 million and various fees and expenses charged to the loan balance totaling approximately $1.5 million.

Secured Parties remain substantially oversecured by a more-than-20% margin. *See* Cash Collateral Declaration ¶¶ 15–17. In other words, the Prepetition ABL Secured Parties will remain adequately protected by a substantial equity cushion during the Interim Period.

11.     The Debtors will also continue in their efforts to reach agreement on their requested relief prior to the Court's hearing to consider the relief requested here.

## CONCISE STATEMENT OF MATERIAL TERMS OF THE INTERIM ORDER

12.     In accordance with Bankruptcy Rule 4001 and Local Rule 4001-2, the following sets forth a concise summary of the material terms of the proposed use of Cash Collateral:[5]

| Term | Summary of Material Terms | Location |
|---|---|---|
| **Entities with Interest in Cash Collateral** <br> *Bankruptcy Rule 4001(b)(1)(B)(i)* | <u>**Entities With an Interest in Cash Collateral**</u> <br> The "<u>Prepetition ABL Secured Parties</u>" are as follows <br> • the Prepetition ABL Agent; <br> • the Prepetition ABL Lenders; and <br> • Synacor, solely with respect to Debtor Portal Acquisition Company. | (Interim Order ¶ E) |
| **Purpose for Use of Cash Collateral** <br> *Bankruptcy Rule 4001(b)(1)(B)(ii)* | To avoid immediate and irreparable harm to the Debtors and their Estates, the Debtors request authorization to use the Debtors' Cash Collateral on an interim basis, to fund (a) general operating, corporate, and working capital expenses of the Debtors in the ordinary course of business, (b) the costs and expenses of administering these chapter 11 cases; and (c) the payment of adequate protection obligations provided herein, if any, in each case in accordance with the Interim Budget. | (Interim Order ¶ H) |
| **Interim Budget** <br> *Bankruptcy Rule 4001(b)(1)(B)(ii)* <br><br> *Local Rule 4001-2(a)(iii)* | The Debtors' use of Cash Collateral will be subject to the Interim Budget described below, subject to any Permitted Variances (as defined herein). The Interim Budget for the Debtors' use of the Cash Collateral sets forth the Debtors' projected cash receipts and disbursements for the two-week period commencing on the Petition Date. The Interim Budget is annexed to the Interim Order as <u>Annex A.</u> | (Interim Order ¶ 3, Annex A) |

---

[5]     The summary of the proposed use of Cash Collateral is qualified in its entirety by reference to the applicable provisions of the Interim Order. If there are any inconsistencies between this summary and the provisions of the Interim Order, the provisions of the Interim Order shall control. Any capitalized terms used but not otherwise defined in this summary shall have the respective meanings ascribed to such terms in the Interim Order.

| Term | Summary of Material Terms | Location |
|---|---|---|
| **Duration of Use of Cash Collateral/ Termination Events/ Relief from Stay** *Bankruptcy Rule 4001(b)(1)(B)(iii)* | The Debtors' right to use Cash Collateral shall terminate on the earlier to occur of the following (a "Termination Date"): (x) 11:59 p.m., New York City time, at the expiration of the Initial Interim Period, unless (i) a further Interim Order or final order granting the relief requested in the Motion is entered by the Court extending the Debtors' right to use Cash Collateral or (ii) the Debtors' and the Prepetition ABL Secured Parties' reach a mutual agreement to extend the Debtors' right to use Cash Collateral; and (y) the date upon which the Court issues an order following notice and a hearing providing for the termination of the further use of Cash Collateral due to the failure by the Debtors to comply with the materials terms, covenants, and conditions of set forth in the Interim Order. | (Interim Order ¶ 12) |
| **Amount of Cash Collateral to be Used** *Local Rule 4001-2(a)(i)(A)* | The Debtors are authorized, subject to the terms and conditions of the Interim Order, to use Cash Collateral in accordance with the Interim Budget, subject to any Permitted Variances. | (Interim Order ¶ 3) |
| **Proposed Adequate Protection** *Bankruptcy Rule 4001(b)(1)(B)(iv)* | 1. Prepetition ABL Secured Parties' Adequate Protection. To the extent entitled under applicable law, as adequate protection for the Debtors' use of the "Collateral" (as defined in the Prepetition ABL Credit Agreement (as defined herein)) (hereafter referred to as the "Prepetition ABL Collateral"), the Prepetition ABL Secured Parties are granted, solely to the extent, if any, of diminution in value of the Prepetition ABL Secured Parties' interests in the Estates' interests in the Prepetition ABL Collateral as of the Petition Date to the extent resulting from the Debtors' use, sale, or lease of the Prepetition ABL Collateral and the imposition or enforcement of the automatic stay pursuant to section 362(a) of the Bankruptcy Code:<br><br>(a) valid and perfected replacement security interests in and liens upon the Debtors' assets, whether existing on the Petition Date or arising or acquired thereafter (the "Prepetition ABL Adequate Protection Liens"), including the Prepetition ABL Collateral, and any proceeds thereof, but excluding (i) any and all claims and causes of action under chapter 5 of the Bankruptcy Code and Bankruptcy Code section 724(a) (collectively, "Avoidance Actions") and the proceeds thereof and any property received on account of Avoidance Actions, whether by judgment, settlement, or otherwise, whether pursuant to federal law or applicable state law, (ii) any and all commercial tort claims held by the Debtors (the "Commercial Tort Claims") and the proceeds thereof and any property received on account of the Commercial Tort Claims, whether by judgment, settlement, or otherwise, whether pursuant to federal law or applicable state law, (iii) any and all proceeds from any insurance policy (including any "tail policy") issued or providing coverage to the Debtors for claims against or liabilities of any of the Debtors' current or former directors, managers, and officers, and (iv) any property or proceeds received by the Debtors or their Estates to the extent allocable to costs and expenses of preserving, or disposing of, any property in accordance with section 506(c) of the Bankruptcy Code (the foregoing | (Interim Order ¶¶ 4–7, 9) |

| Term | Summary of Material Terms | Location |
|------|---------------------------|----------|
|  | clauses (i)–(iv) collectively, the "<u>Excluded Collateral</u>"), in each case, subject only to any valid, enforceable and perfected Prepetition Prior Liens; and<br><br>(b)  a superpriority administrative claim (the "<u>Prepetition ABL Adequate Protection Superpriority Claim</u>") against the Debtors' Estates, as and to the extent provided in section 507(b) of the Bankruptcy Code; <u>provided</u> that the Prepetition ABL Adequate Protection Superpriority Claim shall not have recourse to the Excluded Collateral.<br><br>2.  <u>Prepetition ABL Secured Parties' Additional Adequate Protection</u>.  As additional adequate protection of the Prepetition ABL Secured Parties' respective interests:<br><br>(a)  The Debtors shall use the Prepetition ABL Collateral, including all Cash Collateral, substantially consistent with the Interim Budget, subject to any Permitted Variance, which is annexed to the interim Order as <u>Annex A</u>, in an amount that would not cause any of the Debtors to use Cash Collateral for operating disbursements and capital expenditures in an aggregate amount greater than 20% of the operating disbursements and capital expenditures, taken together, for any particular week in the Interim Budget ("<u>Permitted Variance</u>"), except with respect to the fees, expenses, costs, or other disbursements of any professionals, and all fees required to be paid to the clerk of the Court and the United States Trustee for the District of Delaware ("<u>U.S. Trustee</u>") under section 1930(a) of title 28 of the United States Code.  If the aggregate amount of Cash Collateral actually used for operating disbursements and capital expenditures, taken together, by the Debtors, for any particular week, is less than the aggregate amount of Cash Collateral available for use by the Debtors for operating disbursements and capital expenditures, taken together, in the Interim Budget during such period, then for purposes of the Permitted Variance, the Debtors may carry over any such unused amount to future periods.<br><br>3.  <u>Synacor Adequate Protection</u>.  To the extent entitled under applicable law, as adequate protection for the Debtors' use of the collateral (the "<u>Prepetition Synacor Collateral</u>," and together with the Prepetition ABL Collateral, the "<u>Prepetition Collateral</u>") securing the Synacor Promissory Note (as defined herein), Synacor, Inc. ("<u>Synacor</u>" and, together with the Prepetition ABL Secured Parties, the "<u>Prepetition Secured Parties</u>") is granted, solely to the extent, if any, of diminution in value of Synacor's interest in the Estates' interests in the Prepetition Synacor Collateral as of the Petition Date resulting from the Debtors' use, sale, or lease of the Prepetition Synacor Collateral and the imposition or enforcement of the automatic stay pursuant to section 362(a) of the Bankruptcy Code:<br><br>(a)  valid and perfected replacement security interests in and liens upon the assets of Debtor Portal Acquisition Company, whether existing on the Petition Date or arising or acquired thereafter (the "<u>Synacor Adequate Protection</u> |  |

8

| Term | Summary of Material Terms | Location |
|------|---------------------------|----------|
| | Liens"), including the Prepetition Synacor Collateral, and any proceeds thereof, but excluding the Excluded Collateral, in each case, subject only to any valid, enforceable and perfected Prepetition Prior Liens; and<br><br>(b) a superpriority administrative claim (the "Synacor Adequate Protection Superpriority Claim") against Debtor Portal Acquisition Company's estate, as and to the extent provided in section 507(b) of the Bankruptcy Code; provided that the Synacor Adequate Protection Superpriority Claim shall not have recourse to the Excluded Collateral.<br><br>4.    Prepetition Secured Parties' Additional Adequate Protection. As additional adequate protection of the Prepetition Secured Parties' respective interests, the Debtors shall provide the Prepetition Secured Parties with continued financial reporting consistent with the Prepetition ABL Credit Agreement and the Synacor Promissory Note, as applicable.<br><br>5.    C&B Newco Adequate Protection.  To the extent entitled under applicable law, as adequate protection for diminution in value, if any, of C&B Newco's interests in the Estates' interests in the merchandise inventory and other goods consigned by C&B Newco to Debtor iMedia Brands, Inc. pursuant to that certain *Amended and Restated Consignment Agreement*, dated as of November 23, 2022 (as amended, restated, amended and restated, modified, supplemented, or extended from time to time, the "Consignment Agreement"), between Debtor iMedia Brands, Inc., as consignee, and C&B Newco, as consignor (collectively, the "Consigned Inventory"), as of the Petition Date, the Debtors shall segregate the proceeds received by the Debtors on account of the sale of the Consigned Inventory (the "C&B Newco Adequate Protection Proceeds"); provided that the distribution of the C&B Newco Adequate Protection Proceeds by the Debtors shall remain subject to the resolution of the priority of security interests and liens on such proceeds among the Prepetition ABL Secured Parties, C&B Newco, and any other lawful holder of security interests and liens on the C&B Newco Adequate Protection Proceeds. | |

## FACTS SPECIFIC TO CASH COLLATERAL MOTION

**A.    Prepetition Indebtedness[6]**

13.    As of the Petition Date, the Debtors have approximately $129.7 million of funded

principal debt and interest obligations (the "Prepetition Debt Obligations"), consisting of

---

[6]    The description of the Debtors' prepetition indebtedness and the collateral securing such debt provided herein does not constitute, and should not be construed as, an admission by the Debtors regarding the validity, priority, enforceability, perfection, or amount of any obligation, claim, guarantee, lien, mortgage, pledge, or other security interest, or any other fact with respect thereto, and the Debtors reserve all rights to challenge or dispute any of the foregoing on any basis whatsoever.

obligations under the Prepetition ABL Credit Agreement, the Synacor Promissory Note, the Senior Unsecured Notes, the Growth Capital Partners Note, the PIPE Convertible Notes, and the guaranty by iMedia of the obligations of its wholly-owned German subsidiary under the 123TV Seller Note (each as defined herein).

14.    The following table summarizes the Debtors' prepetition capital structure (as of the Petition Date) with respect to funded debt, inclusive of accrued but unpaid interest and fees.

| Instrument | Balance ($mm) | Rate | Maturity | Security |
|---|---|---|---|---|
| Prepetition ABL Facility | $19.4[7] | S+5.86448% until 3/15/2023; thereafter S+7.86448% | 07/30/24 | Substantially all assets of each Debtor on a first lien basis, subject to customary exceptions<br><br>Additionally benefits from guarantees from non-Debtor German subsidiaries |
| 123TV Seller Note | $17.6 | 8.50% | 9/29/23 | None<br><br>Benefits from a guarantee from Debtor iMedia |
| Synacor Promissory Note | $4.1 | 9.00% until 07/30/2023; thereafter 11.00% | 12/31/23 | Substantially all assets of Debtor Portal Acquisition Company on a junior lien basis to the Pre-Petition ABL Facility |
| Senior Unsecured Notes | $81.7 | 8.50% | 9/30/26 | None<br><br>iMedia is the issuer and only obligor |
| Growth Capital Partners Note | $3.2 | 7.00% until 6/1/2023; thereafter 18.00% | 5/18/23 | None<br><br>iMedia is the issuer and only obligor |
| PIPE Convertible Notes | $3.6 | 7.75% until 12/31/23; thereafter 15.00% | 3/31/24 | None<br><br>iMedia is the issuer and only obligor |

---

[7]    This outstanding balance includes, among other things, an early termination fee asserted by the Prepetition ABL Secured Parties, which totals approximately $1.6 million, and the fees and expenses of the Prepetition ABL Secured Parties' professionals, which total approximately $1.4 million.

i.      **The Prepetition ABL Facility**

15.     On July 30, 2021, Debtor iMedia Brands, Inc. ("iMedia") entered into that certain *Loan and Security Agreement* (as amended, restated, amended and restated, modified, supplemented, or extended from time to time, the "Prepetition ABL Credit Agreement") among Debtors iMedia, ValueVision Interactive, Inc., ValueVision Retail, Inc., PW Acquisition Company, LLC, FL Acquisition Company, ValueVision Media Acquisitions, Inc., JWH Acquisition Company, Norwell Television, LLC, 867 Grand Avenue LLC and Portal Acquisition Company, as borrowers (the "Prepetition ABL Borrowers"), Debtors VVI Fulfillment Center, Inc. and EP Properties, LLC (together, the "Prepetition Debtor ABL Guarantors") and non-Debtor iMedia & 123tv Holding GmbH, as guarantors, Siena, as the Prepetition ABL Agent, and the Prepetition ABL Lenders from time to time party thereto.   On February 28, 2023, non-Debtors iMedia & 123tv Holding GmbH, 123tv Invest GmbH, 123tv Holding GmbH, 123tv Beteiligungs GmbH, 1-2-3.tv GmbH, and 1-2-Play GmbH, as guarantors (in such capacity, the "Prepetition Non-Debtor ABL Guarantors"[8] and, together with the Prepetition Debtor ABL Guarantors, the "Prepetition ABL Guarantors"), and the Prepetition ABL Agent, as Beneficiary, entered into a Guarantee Agreement (the "Prepetition ABL Guarantee"), pursuant to which the Prepetition Non-Debtor ABL Guarantors guaranteed the Prepetition ABL Credit Agreement.   The Prepetition ABL Credit Agreement currently provides for a senior secured revolving credit facility in the aggregate maximum committed principal amount of $80.0 million (including any letters-of-credit issued thereunder).

16.     The Prepetition Debtor ABL Guarantors, as well as non-Debtor iMedia & 123tv Holding GmbH, have guaranteed, as primary obligors, the prompt and complete payment and

---

[8]     The Prepetition Non-Debtor ABL Guarantors are not Debtors in these chapter 11 cases.

performance of all obligations under the Prepetition ABL Credit Agreement.  Pursuant to the Prepetition ABL Guarantee, each of the Prepetition Non-Debtor ABL Guarantors have agreed to pay any amount of principal, interest, costs, expenses or other amounts owed under or in connection with the Prepetition ABL Credit Agreement that has not been fully and irrevocably paid by the Prepetition ABL Borrowers.  The obligations under the Prepetition ABL Credit Agreement are secured by substantially all of the assets of each of the Prepetition ABL Borrowers and the Prepetition Debtor ABL Guarantors.  The Prepetition Non-Debtor ABL Guarantors' obligations under the Prepetition ABL Guarantee are secured by substantially all of the assets of each of the Prepetition Non-Debtor ABL Guarantors.  The liens securing the Prepetition ABL Credit Agreement rank senior to the liens securing the Synacor Promissory Note.

17.    The Prepetition ABL Credit Agreement has a stated maturity date of July 30, 2024. Interest on outstanding amounts under the Prepetition ABL Credit Agreement accrues at SOFR plus an applicable margin of 5.86448% (until March 15, 2023) and 7.86448% thereafter.  As of the Petition Date, approximately $19.4 million in aggregate principal amount and accrued but unpaid interest remains outstanding on the Prepetition ABL Facility.

ii.    **Seller Notes**

(a)    **123TV Seller Note**

18.    Pursuant to that certain Sale and Purchase Agreement, dated as of September 22, 2021 (the "Share Purchase Agreement"), sellers Emotion Invest GmbH & Co. KG, BE Beteiligungen Fonds GmbH & Co. geschlossene Investmentkommanditgesellschaft and Iris Capital Fund II (together, the "123TV Sellers") agreed to sell 100% of the shares of each of 123tv Invest GmbH and 123tv Holding GmbH to non-Debtor purchaser iMedia & 123tv Holding GmbH ("123tv Holding GmbH").  In connection with the Share Purchase Agreement, 123tv Holding GmbH entered into a Vendor Loan Agreement with the 123TV Sellers, as lenders (as amended,

12

restated, supplemented, amended and restated or otherwise modified from time to time, the "123TV Seller Note"), whereby the 123TV Sellers agreed to novate the obligation of 123tv Holding GmbH to pay a portion of the purchase price owed under the Share Purchase Agreement into an interest-bearing vendor loan. The obligations under the 123TV Seller Note are guaranteed by Debtor iMedia and non-Debtors 1-2-3.tv GmbH and 123tv Beteiligungs GmbH. The 123TV Seller Note had an original principal amount of EUR18,000,000.

19.    Interest on the 123TV Seller Note accrues at a per annum rate equal to 8.50%. As of the Petition Date, approximately EUR16,155,583 in aggregate principal amount and accrued but unpaid interest is outstanding on the 123TV Seller Note. The 123TV Seller Note has a maturity date of September 29, 2023.

20.    Non-Debtors 123tv Holding GmbH, 1-2-3.tv GmbH, and 123tv Beteiligungs GmbH have guaranteed, as primary obligors, the prompt and complete payment and performance of all obligations under the 123TV Seller Note. The 123TV Seller Note is subordinated to the full cash payment of the Prepetition ABL Facility.[9]

**(b)    Synacor Promissory Note**

21.    In connection with that certain Asset Purchase Agreement, dated as of July 30, 2021 (the "Synacor Asset Purchase Agreement"), by and among Debtors iMedia and Portal Acquisition Company, and Synacor, Debtor Portal Acquisition Company issued that certain *Secured Promissory Note*, dated as of July 30, 2021 (as amended, restated, amended and restated, modified, supplemented, or extended from time to time, the "Synacor Promissory Note") by and between Debtors iMedia Brands, Inc., as parent, and Portal Acquisition Company, as borrower, and

---

[9]    On July 29, 2022, Debtor iMedia entered into a letter agreement with 123tv Holding Gmbh (the "Financial Support Letter"), whereby, pursuant to the Financial Support Letter, iMedia agreed to directly pay to the 123TV Sellers any payment obligations under the 123TV Seller Note if 123tv Holding GmbH is unable to fulfill such payment obligations or if the payment of such obligations would render 123tv Holding GmbH as insolvent.

Synacor, as holder, to Synacor in an original principal amount of $10.0 million.

22.     Interest on the Synacor Promissory Note accrues at a per annum rate equal to 9.00% until July 30, 2023, and 11.00% thereafter.  As of the Petition Date, approximately $4.1 million in aggregate principal amount and accrued but unpaid interest is outstanding on the Synacor Promissory Note.   The Synacor Promissory Note has a maturity date of December 31, 2023.

23.     Debtor iMedia guaranteed, as primary obligor, the prompt and complete payment and performance of all obligations under the Synacor Promissory Note.  The obligations under the Synacor Promissory Note are secured by substantially all of the assets of Debtor Portal Acquisition Company, which consist principally of certain limited intellectual property assets and a limited number of contracts related to the Debtors' iMDS business.

    **iii.**        **Unsecured Notes**

        **(a)**      **Senior Unsecured Notes**

24.     Pursuant to an Indenture, dated as of September 28, 2021 (as amended by that certain First Supplemental Indenture, dated as of September 28, 2021, the "Indenture"), with U.S. Bank National Association as Trustee, Debtor iMedia issued senior notes in an original principal amount of $80.0 million in exchange for cash in the same amount (all such notes issued pursuant to the Indenture, the "Senior Unsecured Notes").  The Senior Unsecured Notes are traded publicly on the Nasdaq stock exchange under symbol "IMBIL".

25.     Interest on the Senior Unsecured Notes accrues at a per annum rate equal to 8.50%.  As of the Petition Date, approximately $81.7 million in aggregate principal amount and accrued but unpaid interest remains outstanding on the Senior Unsecured Notes.  The Senior Unsecured Notes have a maturity date of September 30, 2026.

26.     The Senior Unsecured Notes represent unsecured obligations of Debtor iMedia and rank equally with all other unsecured debt of Debtor iMedia.  Debtor iMedia is the sole obligor under the Senior Unsecured Notes and, therefore, the Senior Unsecured Notes are structurally junior to the obligations of iMedia's subsidiaries.

### (b)     Growth Capital Partners Note

27.     Pursuant to a Securities Purchase Agreement, dated as of April 18, 2022 (the "Securities Purchase Agreement"), Debtor iMedia issued a promissory note to Growth Capital Partners, LLC ("GCP") in an original principal amount of $10.6 million in exchange for cash in the same amount on April 18, 2022 (the "Growth Capital Partners Note").

28.     On May 25, 2023, GCP delivered a notice of default with respect to a "Trigger Event" (as defined in the Growth Capital Partners Note) that occurred on May 23, 2023.  Such notice of default stated, pursuant to the terms of the Growth Capital Partners Note, if Debtor iMedia failed to cure such Trigger Event within five (5) business days of receipt of such notice of default, an Event of Default under the Growth Capital Partners Note would occur on and as of such date. Debtor iMedia failed to cure such Trigger Event on or prior to June 2, 2023, and, as a result, an Event of Default under the Growth Capitals Partners Note occurred and was continuing on and as of such date. On June 14, 2023, as a result of such Event of Default, the Debtors received a notice of acceleration from GCP and a demand for payment of the full amount owed under the Growth Capital Partners Note.  On June 23, 2023, GCP filed suit against iMedia in the Third Judicial District Court of Salt Lake County in the State of Utah for breach of the Growth Capital Partners Note.

29.     Interest on the Growth Capital Partners Note accrued at a per annum rate equal to 7.00% until June 1, 2023, and at a default rate of 18% thereafter.  As of the Petition Date, approximately $3.2 million in aggregate principal amount and accrued but unpaid interest and fees

remain outstanding on the Growth Capital Partners Note. The Growth Capital Partners Note matured on May 18, 2023.

30.     The Growth Capital Partners Note represents an unsecured obligation of Debtor iMedia and ranks equally with all other unsecured debt of Debtor iMedia. Debtor iMedia is the sole obligor under the Growth Capital Partners Note and, therefore, the Growth Capital Partners Note is structurally junior to the obligations of iMedia's subsidiaries.

### (c)     PIPE Convertible Notes

31.     Pursuant to a Loan Agreement, dated as of April 10, 2023 (the "PIPE Loan Agreement"), Debtor iMedia issued promissory notes to, among others, BSMF LLC, OCI-VB, LLC, Mr. Tim Peterman, Invicta Media Investments LLC, Mr. Aaron Reitkopf, Mr. Michael Friedman and Mr. Alan Aldworth (each, a "Purchaser")[10] in an aggregate original principal amount totaling $3.5 million (all such notes issued pursuant to the PIPE Loan Agreement, the "PIPE Convertible Notes").[11]

32.     Interest on the PIPE Convertible Notes accrues at a per annum rate equal to 7.75%, increasing to 15.00% on January 1, 2024. As of the Petition Date, approximately $3.6 million in aggregate principal amount and accrued but unpaid interest remains outstanding on the PIPE Convertible Notes. The PIPE Convertible Notes have a maturity date of March 31, 2024.

33.     The PIPE Convertible Notes represent unsecured obligations of Debtor iMedia and rank equally with all other unsecured debt of Debtor iMedia. Debtor iMedia is the sole obligor under the PIPE Convertible Notes and, therefore, the PIPE Convertible Notes are structurally

---

[10]   Messrs. Reitkopf, Friedman, and Aldworth are members of the iMedia Board. Mr. Peterman is the Debtors' CEO, CFO, a member of the iMedia Board, and a director for certain iMedia subsidiaries. Invicta Media Investments LLC is affiliated with Mr. Eyal Lalo, a member of the iMedia Board, and Mr. Friedman.

[11]   As of the Petition Date, neither Mr. Friedman nor Invicta Media Investments, LLC has paid the Debtors their aggregate $155,000 owed pursuant to the PIPE Loan Agreement and their PIPE Convertible Notes.

junior to the obligations of iMedia's subsidiaries. The right of the Purchasers to receive any payments from Debtor iMedia in respect of such entity's obligations under the PIPE Convertible Notes is subordinated to the full cash payment of the Prepetition ABL Facility.

**B.     The Debtors Have Immediate Need for Access to Cash Collateral**

34.     Cash is critical to the Debtors' business enterprise, which consists of a broad-based portfolio of entertainment, consumer brands, and media commerce services businesses. *See* Cash Collateral Declaration, ¶ 5.  Absent the immediate use of Cash Collateral, the Debtors will be unable to make critical payments to their employees, vendors, and applicable taxing authorities. *Id*.  Without this ability to use Cash Collateral, the Debtors' business operations will be severely disrupted at a critical juncture where they seek to utilize the "breathing spell" provided by chapter 11 to stabilize operations and preserve and maximize value for all stakeholders. *Id*.

35.     In particular, the Debtors require the use of Cash Collateral to pay wages, benefits, taxes, and other items contemplated by the Debtors' Interim Budget, annexed to the Debtors' proposed interim Cash Collateral order as <u>Annex A</u>. *Id*. at ¶ 6.  Non-payment will materially and adversely affect the Debtors' operations and business relationships and, in all likelihood, substantially impair the value of the Prepetition Collateral. *Id*.  In particular, the Debtors propose to use Cash Collateral to pay the following obligations to avoid immediate and irreparable harm to their chapter 11 Estates at the outset of these chapter 11 cases.

36.     The Debtors' proposed immediate use of Cash Collateral is intended to provide working capital during the limited Initial Interim Period in order to avoid immediate and irreparable harm to their businesses. *Id*. at ¶ 8.  Access to Cash Collateral will permit the Debtors to operate their businesses, fund operating expenses and the costs of administering these Estates, preserve the value of the Prepetition Collateral, and pursue a value-maximizing transaction for the

benefit of the Debtors' stakeholders.  *Id*.  Alternatively, failure to obtain access to Cash Collateral as provided by the Initial Budget, and as set forth above, will result in immediate and irreparable harm to the Debtors' Estates absent the relief requested herein.  *Id*.

37.     As a result, the Debtors respectfully submit that the relief requested by this Motion is narrowly tailored to avoid immediate and irreparable harm to their estates.

**BASIS FOR RELIEF**

**A.     STANDARDS FOR RELIEF**

38.     Under section 363(c)(2) of the Bankruptcy Code, a debtor may not use cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2).  In turn, section 363(e) of the Bankruptcy Code provides that a debtor may use cash collateral (even absent consent), provided that any entity with an interest in such property is adequately protected.  More specifically, section 363(e) of the Bankruptcy Code provides that "on request of an entity that has an interest in property . . . proposed to be used, sold, or leased, by the trustee [or debtor in possession], the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).  Further, section 362(d)(1) provides for adequate protection of interests in property due to the imposition of the automatic stay.  *See* 11 U.S.C. § 362(d)(1); *see also In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996).

39.     The principal purpose of adequate protection is to safeguard the interest of the secured creditor in the particular collateral against diminution in the value of such interest in the estates' interest in such collateral as of the petition date.  *In re Satcon Tech. Corp.*, Case No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012) (quoting *In re*

*Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) ("The whole purpose of adequate

protection for a creditor is to insure that the creditor receives the value for which he bargained

prebankruptcy."); *Del. Tr. Co. v. Wilmington Tr., N.A. (In re Energy Future Holdings Corp.)*,

546 B.R. 566, 581 (Bankr. D. Del. 2016) (quoting *In re Satcon Tech.*, 2012 WL 6091160, at *6)

("The purpose of adequate protection 'is to protect a secured creditor from diminution in the value

of its interest in the particular collateral during the period of use by the debtor.'"); *In re Cont'l*

*Airlines, Inc.*, 154 B.R. 176, 180–81 (Bankr. D. Del. 1993) (adequate protection for use of

collateral under section 363 of the Bankruptcy Code is limited to use-based decline in value).  The

interest to be protected by virtue of the adequate protection requirement is the lesser of the amount

of the debt or the value of assets securing the debt as of the Petition Date.  *See Bankers Life Ins.*

*Co. of Neb. v. Alyucan Interstate Corp. (In re Alyucan Interstate Corp.)*, 12 B.R. 803, 808 (Bankr.

D. Utah 1981) ("[T]he 'interest in property' entitled to protection is not measured by the amount

of the debt but by the value of the lien.").

     40.    The Bankruptcy Code does not expressly define "adequate protection."  However,

section 361 of the Bankruptcy Code provides a non-exhaustive list of examples of adequate

protection:

> When adequate protection is required under section 362, 363, or 364 of this title of
> an interest of an entity in property, such adequate protection may be provided by—
>
> > (1) requiring the trustee to make a cash payment or periodic cash payments to
> > such entity, to the extent that the stay under section 362 of this title, use,
> > sale, or lease under section 363 of this title, or any grant of a lien under
> > section 364 of this title results in a decrease in the value of such entity's
> > interest in such property;
> >
> > (2) providing to such entity an additional or replacement lien to the extent that
> > such stay, use, sale, lease, or grant results in a decrease in the value of
> > such entity's interest in such property; or
> >
> > (3) granting such other relief, other than entitling such entity to compensation
> > allowable under section 503(b)(1) of this title as an administrative

> expense, as will result in the realization by such entity of the indubitable
> equivalent of such entity's interest in such property.

11 U.S.C. § 361.

41.    However, courts ultimately decide what constitutes sufficient adequate protection on a case-by-case basis. *See In re Swedeland Dev. Group, Inc*., 16 F.3d at 564 ("[A] determination of whether there is adequate protection is made on a case by case basis."); *see also In re Satcon Tech. Corp*., 2012 WL 6091160, at \*6 (same); H.R. Rep. No. 95-595, at 338, 95th Cong., 1st Sess. (1977) ("the purpose of [section 361] is to illustrate means by which it may be provided and to define the contours of the concept").

42.    In addition, where, as is the case here, there is a sufficient equity cushion, a lender is adequately protected and a debtor may use the subject collateral without consent. *See In re Cont'l Airlines, Inc.*, 146 B.R. 536, 539 (Bankr. D. Del. 1992) ("If the creditor is oversecured many courts hold that the equity cushion alone satisfies the adequate protection requirement of section 362(d)(1)."), *aff'd*, 91 F.3d 553 (3d Cir. 1996); *see also In re Mellor*, 734 F.2d 1396, 1400 (9th Cir. 1984) ("Although the existence of an equity cushion as a method of adequate protection is not specifically mentioned in § 361, it is the classic form of protection for a secured debt justifying the restraint of lien enforcement by a bankruptcy court."); *In re JER/Jameson Mezz Borrower II, LLC*, 461 B.R. 293, 306 (Bankr. D. Del. 2011) (citing *In re Indian Palms Assocs., Ltd.,* 61 F.3d 197, 207 (3d Cir. 1995)) ("'[I]n determining whether a secured creditor's interest is adequately protected [for purposes of section 362(d)(1)], most courts engage in an analysis of the property's 'equity cushion'—the value of the property after deducting the claim of the creditor seeking relief from the stay and all senior claims' while ignoring junior liens."); *In re Phoenix Steel Corp.*, 39 B.R. 218, 224 (D. Del. 1984) ("It is clear that if a sufficient equity cushion exists [a creditor's] security would not be impaired and they would be adequately protected.").

43.     Case law has consistently recognized that an equity cushion of 20% or more, in and of itself, constitutes adequate protection.  *See In re JER/Jameson Mezz Borrower*, 461 B.R.at 306 (*citing In re McKillips*, 81 B.R. 454, 458 (Bankr. N.D. Ill. 1987)) (surveying cases which show that an equity cushion of more than 20% is adequate protection but less than 11% is not); *see also In re San Clemente Estates*, 5 B.R. 605 (Bankr. S.D.Cal. 1980) (65% is adequate); *In re Nashua Trust Co.*, 73 B.R. 423 (Bankr. D.N.J. 1987) (50% is adequate); *In re Ritz Theatres*, 68 B.R. 256 (Bankr. M.D.Fla. 1986) (38% is adequate); *In re Helionetics, Inc.*, 70 B.R. 433 (Bankr. C.D.Cal. 1987) (20.4% is adequate).

44.     Further, a bankruptcy court should, whenever possible, resolve issues in ways that allow a debtor to continue its business as a going concern.  *In re George Ruggiere Chrysler-Plymouth, Inc.*, 727 F.2d 1017, 1019 (11th Cir. 1984) ( "[a] debtor, attempting to reorganize a business under chapter 11 clearly has a compelling need to use 'cash collateral' in its effort to rebuild.  Without the availability of cash to meet daily operating expenses . . . the congressional policy favoring rehabilitation over economic failure would be frustrated."); *see also In re Trump Entm't Resorts, Inc.*, 519 B.R. 76, 87 (Bankr. D. Del. 2014) ("The fundamental purpose of [chapter 11] reorganization is to prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources.") (quoting *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984)).  Accordingly, courts in this District have authorized the use of cash collateral to enhance or preserve the debtor's going concern value.  *See, e.g., In re Sorenson Commc'ns, Inc.*, No. 14-10454 (BLS) (Bankr. D. Del. Mar. 4, 2014) (granting authority to use cash collateral where access to "sufficient working capital and liquidity through the use of Cash Collateral . . . is vital to the preservation and maintenance of the Debtors' going concern values and successful reorganization."); *In re WP Steel Venture LLC*, No. 12-11661 (KJC)

(Bankr. D. Del. Sept. 27, 2012) (same).  Accordingly, the Debtors seek authorization to utilize Cash Collateral in the ordinary course to sustain their business operations while the Debtors seek to maximize the going concern value of their business enterprise for the benefit of the Estates and the Debtors' stakeholders.

**B.     THE PREPETITION ABL SECURED PARTIES HAVE CONSENTED TO CERTAIN USE OF CASH COLLATERAL**

45.     The Prepetition ABL Secured Parties have previously agreed to provide their consent to the Debtors' use of Cash Collateral to pay certain sales tax obligations as set forth in the Interim Budget.  *See* Cash Collateral Declaration, ¶ 10.  Pursuant to that certain *Funding Agreement*, dated as of June 20, 2023, by and between the Prepetition ABL Borrowers, the Prepetition ABL Guarantors, and the Prepetition ABL Secured Parties (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "ABL Funding Agreement"), attached to hereto as **Exhibit B**, the Prepetition ABL Secured Parties agreed to, among other things, make certain cash available to the Debtors through the consensual use of Cash Collateral for the payment of certain sales tax obligations consistent therewith.  *Id*.  Specifically, the ABL Funding Agreement provides that the ABL Secured Parties "hereby agree[d] to, make funds available to Borrowers in an amount equal to $3,160,140 to be used solely or the purpose of paying certain sales taxes . . . pursuant to . . . (y) a Bankruptcy Court approved cash collateral order consented to by the Agent and Lenders . . . ."  *Id*.  Accordingly, the Prepetition ABL Secured Parties have specifically consented to the use of Cash Collateral with respect to the applicable tax payments contemplated by the Initial Budget.  *Id*.

**C.     THE PROPOSED USE OF CASH COLLATERAL IS APPROPRIATE AND SHOULD BE AUTHORIZED**

46.     In addition to the consents already provided by the Prepetition ABL Secured Parties, the Debtors respectfully submit that the proposed use of Cash Collateral is necessary to

preserve their respective assets during the Initial Interim Period and throughout these chapter 11 cases. As set forth above, absent the immediate use of Cash Collateral, the Debtors will be unable to make critical payments to their employees, vendors, and applicable taxing authorities. *See* Cash Collateral Declaration, ¶ 5. Without this ability to use Cash Collateral, the Debtors' business operations will be severely disrupted at a critical juncture where they seek to utilize the "breathing spell" provided by chapter 11 to stabilize operations and preserve and maximize value for all stakeholders. *Id*. at 8. In particular, the Debtors require the use of Cash Collateral to pay wages, benefits, taxes, vendors, and insurance obligations, as set forth in the Interim Budget. *Id.* at 6. Non-payment will adversely affect the Debtors' operations and business relationships and, in all likelihood, substantially impair the value of the Prepetition Collateral. *Id*.

47. Moreover, the Debtors' proposed immediate use of Cash Collateral is intended to provide working capital during the Initial Interim Period. *Id.* at 8. As set for the above, the Debtors' proposed is limited to expenditures required to avoid immediate and irreparable harm to their businesses and, in turn, preserving the value of their Estates for the benefit of the Debtors' stakeholders. *Id*. Alternatively, failure to obtain access to Cash Collateral would likely result in a forced liquidation of the Debtors' Estates and the significant impairment of stakeholder value. *Id.*

48. Accordingly, entry of the proposed Interim Order to ensure the Debtors' continued access to Cash Collateral is reasonable and necessary to avoid immediate and irreparable harm to the Debtors and their Estates.

## D.   THE PREPETITION ABL SECURED PARTIES WILL BE ADEQUATELY PROTECTED BY A SUBSTANTIAL EQUITY CUSHION

49. The Debtors propose to provide adequate protection to the Prepetition ABL Secured Parties solely to the extent, if any, of diminution of the Prepetition ABL Secured Parties' interests

in the Estates' interest in the Prepetition ABL Collateral as of the Petition Date. *Id*. at ¶ 10. As noted above, the Prepetition ABL Secured Parties' liens are secured by a first-priority interest in substantially all of the Debtors' assets, including Cash Collateral. *Id*. Moreover, the Prepetition ABL Secured Parties are materially oversecured as of June 23, 2023, by at least $74.8 million versus an outstanding balance on that debt of approximately $19.4 million.[12] *Id*. at ¶ 11. As of June 23, 2023, (i) the book value of the Prepetition ABL Collateral totals approximately $94.9 million, and (ii) the obligations outstanding under the Prepetition ABL Credit Agreement total approximately $19.4 million. *Id*.

50.    Accordingly, at the outset of these chapter 11 cases, the Prepetition ABL Secured Parties are protected by a substantial 383.88% cushion in the Prepetition ABL Collateral. *Id*. at ¶ 12.

51.    More specifically, as of June 23, 2023, the Debtors' accounts receivable totaled approximately $27.1, and the book value of the Debtors' inventory totaled approximately $67.7 million. *Id*. at ¶ 13. In other words, the Prepetition ABL Secured Parties are oversecured by a substantial margin as of June 23, 2023, taking into account only the value of accounts receivable and inventory. *Id*.

52.    The Prepetition ABL Secured Parties' own Borrowing Base (as defined herein) further establishes the extent to which those parties are significantly oversecured as of the Petition Date. *Id*. at ¶ 14. Pursuant to the Prepetition ABL Credit Agreement, the Debtors' Borrowing Base formula is calculated based on applying significant discounts[13] to the book value and liquidation value of certain of the Debtors' assets, including certain consumer accounts, credit card

---

[12]    *See* n.7, *supra*.

[13]    Notably, and as discussed in greater detail herein, the significant discounts applied to the Debtors' assets pursuant to the Borrowing Base formula are not consistent with the Debtors' historical realization rates for such assets.

receipts, and inventory.[14]  *Id*.  In addition, the availability under the Borrowing Base formula is further decreased by discretionary reserves established by the Prepetition ABL Agent, which currently total approximately $11.6 million, of which $8.6 million constitutes the Availability Block under the Prepetition ABL Credit Agreement.[15]  *Id*.  The Debtors are therefore unable to borrow up to the 100% value of the notional lending commitments provided by the Prepetition ABL Secured Parties at any given time precisely because the Prepetition ABL Secured Parties' borrowing formula provides for a substantial equity cushion.  *Id*.

53.    According to the Prepetition ABL Lenders' Borrowing Base formula, as of June 23, 2023, the Debtors' outstanding loan balance under the ABL Credit Agreement was not supposed to exceed $19.5 million.  *Id*. at  ¶ 15.  As of Petition Date, the Debtors had borrowed

---

[14]   Pursuant to the Prepetition ABL Credit Agreement, "Borrowing Base" means "as of any date of determination, the Dollar Equivalent Amount as of such date of determination of:

(a)  the aggregate amount of Eligible Consumer Accounts of each Borrower multiplied by the Accounts Advance Rate (*i.e.*, 85%); plus

(b)  the aggregate amount of In-transit Credit Card Receipts multiplied by the Accounts Advance Rate (*i.e.*, 85%) (but in no event to exceed the In-transit Credit Card Receipts Sublimit); plus

(c)  the aggregate amount of Eligible Portal Accounts of Portal multiplied by the Portal Accounts Advance Rate (*i.e.*, 80%) (but in no event to exceed the Portal Accounts Sublimit); plus

(d)  the Net Orderly Liquidation Value of the applicable Eligible Inventory multiplied by the Inventory Advance Rate (*i.e.*, 85%) (but not to exceed the sublimit applicable to all Inventory); plus

(e)  the Net Orderly Liquidation Value of the applicable Eligible Slow Moving Inventory multiplied by the Inventory Advance Rate (*i.e.*, 85%) (but not to exceed the sublimit applicable to Eligible Slow Moving Inventory); plus

(f)  the Net Orderly Liquidation Value of Eligible In-Transit Inventory multiplied by the Inventory Advance Rate (*i.e.*, 85%) (but not to exceed the sublimit applicable to Eligible In-Transit Inventory); minus

(g)  all Reserves which Agent has established pursuant to Section 1.2; minus

(h)  the Availability Block."

[15]   Pursuant to the Prepetition ABL Credit Agreement, "Availability Block" means an amount equal to (a) during the period commencing on the Tenth Amendment Effective Date and ending on April 30, 2023, $12,175,000, (b) during the period commencing on May 1, 2023 and ending on May 31, 2023, $12,375,000, (c) during the period commencing on June 1, 2023 and ending on June 30, 2023, $12,575,000, and (b) at all times on and after July 1, 2023, $13,000,000.  As noted above, the "Availability Block" imposed by the Borrowing Base is $8.6 million, and the discretionary reserves "which the Agent has established pursuant to Section 1.2" of the Prepetition ABL Credit Agreement total $11.6 million, which includes the Availability Block.

approximately $19.4 million, which was 0.51% below the Borrowing Base and equivalent to only 20.67% of the book value of the Debtors' eligible accounts receivable and inventory. *Id*. Further, the Debtors' historical realization rates on eligible accounts and inventory typically exceed the 80-85% level built into the Borrowing Base formula.[16] *Id*. In addition, the Prepetition ABL Secured Parties have a first-priority lien in other receivables and inventory notwithstanding that they are not included in the Borrowing Base (the "Excluded Borrowing Base Collateral"). *Id*. The value of the Excluded Borrowing Base Collateral totaled approximately $23.7 million[17] as of June 23, 2023 based on the book value of such assets. *Id*. As a result, the value of the Prepetition ABL Collateral securing the claims of the Prepetition ABL Secured Parties substantially exceeds the $19.4 million loan balance by a significant margin. *Id*.

54.     During the Initial Interim Period, based on the Interim Budget, the Debtors and their professionals anticipate that the balance of the Prepetition ABL Collateral may decline by approximately $2.8 million, which would decrease the Prepetition ABL Secured Parties' equity cushion from 383.88% to 372.93% of the balance of the Prepetition ABL Collateral. *Id*. at ¶ 16. Therefore, the Prepetition ABL Secured Parties will maintain their substantial equity cushion during the proposed budget period. *Id*.

55.     Additionally, the Debtors have been actively negotiating a going concern transaction that would provide for the payment, in full, of the Prepetition ABL Facility. *Id*. at 17. These discussions remain ongoing, and the relief requested with respect to the Debtors' use of Cash Collateral will facilitate the Debtors' ability to complete this transaction. *Id*. Indeed, the

---

[16]   *See* n. 14, *supra*.

[17]   This consists of approximately $10.5 million of accounts receivable and $13.2 million of inventory.

availability of this going concern transaction underscores the extent to which the Prepetition ABL Secured Parties are significantly oversecured as of the Petition Date. *Id.*

56.     Finally, pursuant to that certain *Guarantee Agreement*, dated as of February 28, 2023, by and between iMedia & 123tv Holding GmbH, 123tv Invest GmbH, 123tv Holding GmbH, 123tv Beteiligungs GmbH, 1-2-3.tv GmbH, and 1-2-Play GmbH (collectively, the "Non-Debtor ABL Guarantors"), as guarantors, and the Prepetition ABL Agent, as beneficiary (as amended, restated, amended and restated, modified, supplemented, or extended from time to time, the "ABL Guarantee Agreement"), the obligations arising under the Prepetition ABL Credit Agreement are guaranteed by the Non-Debtor ABL Guarantors. *Id.* at ¶ 18. For reference, iMedia purchased the Non-Debtor ABL Guarantors' business for EUR 80.0 million (or $94.5 million based on the September 13, 2021 exchange rate) in September 2021. *Id.*

57.     In addition to the Prepetition ABL Secured Parties' equity cushion, as well as the value of the guarantees in favor of the Prepetition ABL Secured Parties provided by the Debtors' non-Debtor affiliates, the Debtors propose additional forms of adequate protection for the Prepetition ABL Secured Parties, Synacor, and C&B Newco. *Id.* at ¶ 19. These additional forms of adequate protection include, as applicable: (a) additional liens on the Debtors' unencumbered assets existing as of the Petition Date (the "Unencumbered Assets") and replacement liens upon the Prepetition Collateral to the extent, if any, of diminution in value of the Prepetition Secured Parties' respective interests in the Estates' interest in the Prepetition Collateral as of the Petition Date; (b) superpriority administrative expense claims for any such diminution in value; (c) financial reporting; and (d) with respect to C&B Newco, segregation of proceeds received by the Debtors on account of the sale of the Consigned Inventory. *Id.* Therefore, even if the value of the Prepetition Collateral and Consigned Inventory decreases during the Initial

Interim Period, the Prepetition Secured Parties and C&B Newco are adequately protected through, among other things, the beforementioned adequate protection provided by the Debtors and the Debtors' granting of adequate protection liens on the Unencumbered Assets. *Id*.

58.    In light of the foregoing, the Debtors submit that the proposed adequate protection is: (a) fair and reasonable under the circumstances; (b) necessary to satisfy the requirements of sections 363(c)(2) and 363(e) of the Bankruptcy Code; and (c) in the best interests of the Debtors and their Estates. The Court should therefore authorize the Debtors to use the Cash Collateral under section 363(c)(2) of the Bankruptcy Code. If, following the filing of this Motion, the Debtors are unable to reach consensual agreements with the Prepetition Secured Parties regarding the Debtors' use of the Prepetition Collateral, including Cash Collateral, the Debtors reserve the right to request continued use of Cash Collateral at the Second Interim Hearing.

## E.    IMMEDIATE RELIEF IS NECESSARY TO AVOID IMMEDIATE AND IRREPARABLE HARM

59.    Bankruptcy Rule 4001(b)(2) permits a bankruptcy court to hold a preliminary hearing to authorize a debtor's use of cash collateral if the debtor will suffer "immediate and irreparable harm" if not permitted to use the cash collateral during the period prior to a final determination on a motion. *See* Fed. R. Bankr. P. 4001(b)(2). The Third Circuit has interpreted the language "immediate and irreparable harm" in the context of preliminary injunctions and has instructed that irreparable harm is a continuing harm that cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation. *See, e.g., Norfolk S. Ry. Co. v. City of Pittsburgh*, 235 F. App'x 907, 910 (3d Cir. 2007) (*citing Glasco v. Hills*, 558 F.2d 179, 181 (3d Cir. 1977)). Furthermore, the harm must be shown to be actual and imminent, not speculative or unsubstantiated. *See, e.g., Acierno v. New Castle County*, 40 F.3d 645, 653-55 (3d Cir. 1994).

60.    Use of Cash Collateral is necessary to enable the Debtors to pay their ordinary-course operating expenses, continue to operate the business as a going concern, finance these chapter 11 cases, and pursue a value-maximizing postpetition sale process.  *See* Cash Collateral Declaration ¶ 8.  If the Debtors are unable to access the Cash Collateral, they may be forced into an immediate, fire-sale liquidation, which would significantly reduce the expected proceeds from any sale process, and significantly reduce recoveries for all stakeholders.  *Id*.

61.    At the same time, the Debtors' requested relief is narrow:  The Debtors are proposing to use Cash Collateral on a limited basis in the interim period solely to the extent necessary to avoid immediate and irreparable harm to the Debtors' Estates at the outset of these chapter 11 cases.  *Id*. at ¶ 6.  As noted above, the Debtors' proposed expenditures consist of a narrow band of expenditures necessary to avoid immediate and irreparable harm to these chapter 11 Estates.  *Id*.

62.    This limited use of Cash Collateral will preserve, and not impair, the value of the collateral securing the Prepetition ABL Secured Parties' claims.  *Id*. at ¶ 8.  The Debtors' proposed Interim Budget is established to preserve the going-concern value of the Debtors' businesses and solely provides for the payment of expenditures essential thereto.  *Id*. at ¶ 6.  Indeed, the Debtors' proposed payments to content distributors will facilitate the Debtors' going concern value and also their ability to sell inventory in the ordinary course of business.  *Id*.  Conversely, failure to make such payments could literally take the Debtors "off the air" in major markets and, therefore, both materially disrupt operations and impair collateral value at the outset of these chapter 11 cases.  *Id*.  Preserving the value of the Debtors' businesses, and thus the Prepetition ABL Collateral, should maintain the Prepetition ABL Secured Parties' equity cushion during the Initial Interim Period, as the Debtors seek to stabilize their businesses in chapter 11 and pursue a

value-maximizing transaction for the benefit of the Debtors' Estates and their stakeholders, including the Prepetition ABL Secured Parties.  *Id*. at ¶¶ 6, 8.

63.     Therefore, the Debtors request that the Court enter the proposed Interim Order authorizing the Debtors' use of Cash Collateral in the ordinary course of their business during the Initial Interim Period.  The Debtors also request that the Court schedule the Second Interim Hearing to consider approval of the Debtors' use of Cash Collateral.

### WAIVER OF BANKRUPTCY RULE 4001(a)(3)

64.     To implement the foregoing successfully, and given the nature of the relief requested herein, the Debtors respectfully request a waiver of the stay of the effectiveness of the order approving this Motion under Bankruptcy Rule 4001(a)(3).  Bankruptcy Rule 4001(a)(3) provides that "[an] order granting a motion for relief from an automatic stay made in accordance with Rule 4001(a)(1) is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  As explained herein, immediate access to the Cash Collateral is essential to prevent irreparable damage to the Debtors' Estates.  Accordingly, ample cause exists to justify the waiver of the 14-day stay imposed by Bankruptcy Rule 4001(a)(3) to the extent such applies.

### RESERVATION OF RIGHTS

65.     The Debtors reserve all rights.  Without limiting the generality of the foregoing, nothing contained herein is or should be construed as: (a) an admission as to the validity, extent, perfection, priority, allowability, enforceability, or character of any claim or any security interest which purportedly secures such claim or other asserted right or obligation, or a waiver or other limitation on the Debtors' ability to contest the same on any ground permitted by bankruptcy or applicable non-bankruptcy law; (b) a waiver of the Debtors' or any appropriate party in interest's rights to dispute the amount of, basis for, or validity of any claim against the Debtors;

(c) a promise to pay any claim; (d) a waiver of any claims or causes of action which may exist against any creditor or interest holder; (e) an assumption or rejection of any executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code, and nothing herein otherwise affects the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract or unexpired lease with any party subject to this Motion; (f) granting third-party beneficiary status or bestowing any additional rights on any third party; or (g) being otherwise enforceable by any third party.

**NOTICE**

66.      The Debtors will provide notice of this Motion to:  (a) United States Trustee for the District of Delaware, 844 N. King Street, Room 2207, Wilmington, Delaware, 19801 (Attn: Richard L. Schepacarter, email: richard.schepacarter@usdoj.gov); (b) the United States Attorney's Office for the District of Delaware; (c) the state attorneys general for all states in which the Debtors conduct business; (d) the Internal Revenue Service; (e) the United States Securities and Exchange Commission; (f) the holders of the fifty (50) largest unsecured claims against the Debtors on a consolidated basis; (g) counsel to the Prepetition ABL Agent, Blank Rome LLP, 1201 North Market Street, Suite 800, Wilmington, Delaware 19801 (Attn: Regina Stango Kelbon, Esq., email: regina.kelbon@blankrome.com); (h) U.S. Bank, N.A. as indenture trustee for the Senior Unsecured Notes; (i) counsel to Synacor, Thompson Hine, LLP, 3900 Key Center, 127 Public Square, Cleveland, Ohio 44114 (Attn: Curtis Tuggle and Jonathan Hawkins, email: curtis.tuggle@ThompsonHine.com and jonathan.hawkins@ThompsonHine.com); (j) counsel to C&B Newco, Riemer Braunstein LLP, Times Square Tower, Suite 2506, New York, New York 10036 (Attn: Steven Fox, Esq., email: sfox@riemerlaw.com) and Troutman Pepper Hamilton Sanders LLP, Hercules Plaza, Suite 5100, 1313 North Market Street, Wilmington, DE 19801 (Attn: Douglas D. Herrmann, email: douglas.herrmann@troutman.com); (k) counsel to Crystal

Financial LLC d/b/a SLR Credit Solutions, Morgan Lewis & Bockius, LLP, One Federal Street, Boston, Massachusetts 021110 (Attn: Julia Frost-Davies, email: julia.frost-davies@morganlewis.com); (m) banks and financial institutions where the Debtors maintain accounts; and (n) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors respectfully submit that, in light of the nature of the relief requested, no further notice is necessary.

## NO PRIOR REQUEST

67.     No prior request for the relief sought in this motion has been made to this or any other court.

*[Remainder of Page Intentionally Left Blank]*

## CONCLUSION

WHEREFORE, the Debtors respectfully request that this Court enter the Interim Order, substantially in the form attached hereto as **Exhibit A**, and a final order granting the relief requested herein and such other and further relief as may be just and proper.

Dated:  June 29, 2023
       Wilmington, Delaware

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Laura Davis Jones*
Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: 302-652-4100
Facsimile: 302-652-4400
Email:  ljones@pszjlaw.com
        tcairns@pszjlaw.com

-and-

**ROPES & GRAY LLP**
Ryan Preston Dahl (*pro hac vice* admission pending)
Cristine Pirro Schwarzman (*pro hac vice* admission pending)
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
E-mail:  ryan.dahl@ropesgray.com
        cristine.schwarzman@ropesgray.com

-and-

**ROPES & GRAY LLP**
Stephen L. Iacovo (*pro hac vice* admission pending)
191 North Wacker Drive, 32nd Floor
Chicago, Illinois 60606
Telephone: (312) 845-1200
Facsimile: (212) 845-5500
E-mail:  stephen.iacovo@ropesgray.com

*Proposed Counsel to the Debtors and Debtors in Possession*

## EXHIBIT A

**Proposed Interim Order**

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>iMedia Brands, Inc., *et al.*,[1]<br><br>               Debtors. | Chapter 11<br><br>Case No. 23-10852 ([____])<br><br>(Jointly Administered)<br><br>**Ref. Docket No. ___** |

**INTERIM ORDER (I) AUTHORIZING POSTPETITION USE OF
CASH COLLATERAL; (II) GRANTING ADEQUATE PROTECTION TO
PREPETITION SECURED PARTIES AND C&B NEWCO; (III) SCHEDULING
A SECOND INTERIM HEARING; AND (IV) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an interim order (this "Interim Order") pursuant to sections 105(a), 361, 362, 363, 506, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 4001-2 of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") (i) authorizing the use of Cash Collateral (as defined herein), (ii) granting adequate protection to the Prepetition Secured Parties and C&B Newco (each as defined herein), (iii) scheduling a second interim hearing (the "Second Interim Hearing") pursuant to Bankruptcy Rules 4001(b) and (d), and (iv) granting related relief, as more fully set forth in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the *Amended*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: ValueVision Media Acquisitions, Inc. (8670); iMedia Brands, Inc. (3770); ValueVision Interactive, Inc. (8730); Portal Acquisition Company (3403); VVI Fulfillment Center, Inc. (5552); ValueVision Retail Inc. (2155); JWH Acquisition Company (3109); PW Acquisition Company, LLC (0154); EP Properties, LLC (3951); FL Acquisition Company (3026); Norwell Television, LLC (6011); and 867 Grand Avenue, LLC (2642). The Debtors' service address is 6740 Shady Oak Road, Eden Prairie, MN 55344-3433.

[2] All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the Motion.

*Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due, sufficient, and proper notice of the Motion having been provided under the circumstances and in accordance with the Bankruptcy Rules and the Local Rules, and it appearing that no other or further notice need be provided; and a first interim hearing to consider the relief requested in the Motion having been held on June 30, 2023 (the "First Interim Hearing"); and upon consideration of the *Declaration of James Alt, Chief Transformation Officer of iMedia Brands, Inc., in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. [●]], the *Declaration of James Alt in Support of Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Postpetition Use of Cash Collateral; (II) Granting Adequate Protection to Certain Prepetition Secured Parties and C&B Newco; (III) Scheduling a Second Interim Hearing; and (IV) Granting Related Relief* [Docket No. [●]], and the record of the First Interim Hearing and all of the proceedings had before the Court; and the Court having found and determined that the relief sought in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates (the "Estates"), as contemplated by Bankruptcy Rule 4001(b)(2), and is in the best interests of the Debtors, their Estates, their creditors, their stakeholders, and all other parties in interest, and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor,

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[3]**

A.  <u>Disposition</u>.  The relief requested in the Motion is hereby granted on an interim basis.  Any objections to the Motion that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are hereby denied and overruled on the merits.  This Interim Order shall become effective immediately upon its entry.

B.  <u>Petition Date</u>.  On June 28, 2023 (the "<u>Petition Date</u>"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with this Court.

C.  <u>Debtors in Possession</u>.  The Debtors are continuing to manage and operate their businesses and property as debtors and debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

D.  <u>Jurisdiction and Venue</u>.  The Court has jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012.  Consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The Court may enter a final order consistent with Article III of the United States Constitution.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

E.  <u>Cash Collateral</u>.  Cash Collateral shall be deemed to include, without limitation, all of each Debtor's "cash collateral" ("<u>Cash Collateral</u>") within the meaning of section 363 of

---

[3]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

the Bankruptcy Code, in which any Prepetition Secured Party or C&B Newco has a valid, perfected security interest, lien, or mortgage, regardless of whether such security interest, lien, or mortgage existed as of the Petition Date or arose thereafter pursuant to section 552 of the Bankruptcy Code.

F.  <u>Necessity of Relief Requested</u>.  Good cause has been shown for the entry of this Interim Order.  The Debtors have an immediate need to use Cash Collateral to, among other things, fund their businesses, maintain the confidence of their customers and vendors, pay their operating expenses, including, without limitation, expenses relating to employee wages and benefits and certain tax liabilities, and pursue a value maximizing transaction for the benefit of the Debtors, their Estates, and their stakeholders.  Without the ability to use Cash Collateral as provided by this Interim Order, the Debtors and their Estates would suffer immediate and irreparable harm, and the relief granted by this Interim Order is necessary to avoid such harm. The terms for the Debtors' use of Cash Collateral pursuant to this Interim Order are fair and reasonable and reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties.  The Debtors have requested entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2) and (d).  The use of Cash Collateral in accordance with this Interim Order is therefore in the best interests of the Debtors and their Estates, their creditors, and other parties in interest.

G.  <u>Debtors' Acknowledgments and Agreements</u>.  Without prejudice to the rights of any other party (but subject to the limitations contained in Paragraph 13 below), the Debtors admit, stipulate, acknowledge, and agree that:

(1)  <u>Prepetition ABL Financing Documents</u>.  Pursuant to that certain *Loan and Security Agreement*, dated as of July 30, 2021 (as amended, restated, amended and restated,

modified, supplemented, or extended from time to time, the "Prepetition ABL Credit Agreement"), by and among Siena Lending Group LLC, in its capacity as agent (in such capacity, the "Prepetition ABL Agent"), the borrowers from time to time party thereto (the "Prepetition ABL Borrowers"),[4] the guarantors from time to time party thereto (the "Prepetition ABL Guarantors"),[5] the financial institutions party thereto from time to time (collectively, the "Prepetition ABL Lenders" and, together with the Prepetition ABL Agent, sometimes collectively referred to as the "Prepetition ABL Secured Parties"), and all security agreements, pledge agreements, notes, mortgages, guarantees, control agreements, collateral access agreements, and related agreements and documents (collectively, with the Prepetition ABL Credit Agreement, as amended, modified, supplemented, extended, restated, amended and restated, or replaced from time to time, the "Prepetition ABL Financing Documents"), the Prepetition ABL Secured Parties made loans and advances (the "Prepetition ABL Loans"), and provided other financial accommodations to the Prepetition ABL Borrowers, which obligations were guaranteed by the Prepetition ABL Guarantors pursuant to the guarantee in (a) the Prepetition ABL Credit Agreement and (b) that certain *Guarantee Agreement*, dated February 28, 2023, between the Prepetition ABL German Guarantors, as guarantors, and Siena Lending Group LLC, as beneficiary (the "German Law Guarantee").

---

[4]    Pursuant to the Prepetition ABL Credit Agreement, "Borrowers" means ValueVision Retail Inc., iMedia Brands, Inc., ValueVision Interactive, Inc., PW Acquisition Company, LLC, FL Acquisition Company, ValueVision Media Acquisitions, Inc., JWH Acquisition Company, Norwell Television, LLC, 867 Grand Avenue, LLC, and Portal Acquisition Company.

[5]    Pursuant to the Prepetition ABL Credit Agreement and the German Law Guarantee (as defined *infra*), "Guarantors" means VVI Fulfillment Center, Inc., EP Properties, LLC, iMedia & 123tv Holding GmbH, 123tv Invest GmbH, 123tv Holding GmbH, 123tv Beteiligungs GmbH, 1-2-3.tv GmbH, and 1-2-Play GmbH. iMedia & 123tv Holding GmbH, 123tv Invest GmbH, 123tv Holding GmbH, 123tv Beteiligungs GmbH, 1-2-3.tv GmbH, and 1-2-Play GmbH (collectively, the "Prepetition ABL German Guarantors") are not Debtors in these chapter 11 cases.

(2)  <u>Prepetition ABL Obligations</u>.   As of the Petition Date, the "Obligations" outstanding under, and as defined in, the Prepetition ABL Credit Agreement totaled not less $16,390,202.25 (collectively, the "<u>Prepetition ABL Obligations</u>"), which Prepetition ABL Obligations have been guaranteed on a joint and several basis by the Debtors.

(3)  <u>Prepetition ABL Collateral</u>.   As of the Petition Date, the Prepetition ABL Obligations were secured pursuant to the Prepetition ABL Financing Documents by valid, binding, and perfected security interests and liens ("<u>Prepetition ABL Liens</u>") granted by the Debtors to the Prepetition ABL Agent, for the benefit of the Prepetition ABL Secured Parties, upon the "Collateral" (as defined in the Prepetition ABL Credit Agreement) in existence as of the Petition Date (hereafter, the "<u>Prepetition ABL Collateral</u>"), subject only to any valid, perfected, and unavoidable liens or security interests otherwise existing as of the Petition Date that were senior to the Prepetition ABL Liens and were in existence immediately prior to the Petition Date, or that were subsequently perfected postpetition to the extent permitted by section 546(b) of the Bankruptcy Code (collectively, the "<u>Prepetition Prior Liens</u>" and each a "<u>Prepetition Prior Lien</u>").

(4)  <u>Synacor Promissory Note</u>.   Pursuant to that certain *Secured Promissory Note*, dated as of July 30, 2021 (as amended, restated, amended and restated, modified, supplemented, or extended from time to time, the "<u>Synacor Promissory Note</u>") by and between Debtors iMedia Brands, Inc., as parent, and Portal Acquisition Company, as borrower (the "<u>Synacor Promissory Note Borrower</u>"), and Synacor, Inc. ("<u>Synacor</u>" and, together with the Prepetition ABL Secured Parties, the "<u>Prepetition Secured Parties</u>"), as holder, Synacor provided debt financing to the Synacor Promissory Note Borrower, which obligations were guaranteed by

Debtor iMedia Brands, Inc. (the "Synacor Promissory Note Guarantor") pursuant to the Synacor Promissory Note.

(5)    Prepetition Synacor Promissory Note Obligations.  As of the Petition Date, the Synacor Promissory Note Borrower and the Synacor Promissory Note Guarantor were justly and lawfully indebted and liable to Synacor in the aggregate principal amount of not less than $4.1 million, consisting of indebtedness outstanding under the Synacor Promissory Note plus interest accrued and accruing thereon (collectively, together with all "Obligations" (as defined in the Synacor Promissory Note) under the Synacor Promissory Note, the "Prepetition Synacor Promissory Note Obligations"), which Synacor Promissory Note Obligations have been guaranteed on a joint and several basis by the Synacor Promissory Note Guarantor.

(6)    Prepetition Synacor Collateral.

(a)    As of the Petition Date, the Prepetition Synacor Promissory Note Obligations were secured pursuant to the Synacor Promissory Note by valid, binding, and perfected security interests and liens granted by Debtor Portal Acquisition Company to Synacor upon the "First Priority Collateral" and remaining "Collateral" (each as defined in the Synacor Promissory Note) (hereafter, the "Prepetition Synacor Collateral" and, together with the Prepetition ABL Collateral, the "Prepetition Collateral") and in existence as of the Petition Date, subject only to any Prepetition Prior Liens.

(7)    Prepetition Synacor Guaranties.  Pursuant to Section 8 of the Synacor Promissory Note, on a joint and several basis, the Synacor Promissory Note Borrower and the Synacor Promissory Note Guarantor guaranteed the Prepetition Synacor Promissory Note Obligations under the Synacor Promissory Note.

H.     Use of Cash Collateral.   All Cash Collateral may be used as and to the extent set forth in this Interim Order for (a) general operating, corporate, and working capital purposes of the Debtors in the ordinary course of business, (b) the costs and expenses of administering these chapter 11 cases, and (c) payment of the adequate protection obligations provided herein.

I.     Adequate Protection of Prepetition Secured Parties and C&B Newco.   The Debtors shall, pursuant to sections 361 and 363 of the Bankruptcy Code, provide the Prepetition Secured Parties and C&B Newco LLC ("C&B Newco") adequate protection, as and to the extent set forth in this Interim Order, for the diminution in the value, if any, of the Prepetition Secured Parties' or C&B Newco's respective interests in the Estates' interests in the Prepetition Collateral and Consigned Inventory (each as defined herein), respectively, as of the Petition Date resulting from (a) the use, sale, or lease by the Debtors of the Prepetition Collateral (including the use of any Cash Collateral) and the Consigned Inventory and (b) the imposition or enforcement of the automatic stay under section 362(a) of the Bankruptcy Code.

Based upon the foregoing findings and conclusions, the Motion and the record before this Court with respect to the Motion, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.     Motion Granted.   The Motion is GRANTED on an interim basis, and the Debtors' use of Cash Collateral is authorized on an interim basis, in accordance with the terms and conditions set forth in this Interim Order.

2.     Objections to Entry of Interim Order Overruled.   All objections to the entry of this Interim Order, to the extent not withdrawn, waived, or resolved, are hereby denied and overruled.

3.    <u>Authorization to Use Cash Collateral</u>.  Subject to the terms and conditions of this Interim Order, the Debtors are authorized to use the Cash Collateral substantially consistent with the Interim Budget, subject to any Permitted Variance (as defined herein), during the two-week period commencing as of the Petition Date (the "<u>Initial Interim Period</u>") through and including the occurrence of the Termination Date (as defined herein).

4.    <u>Prepetition ABL Secured Parties' Adequate Protection</u>.  To the extent entitled under applicable law, as adequate protection for the Debtors' use of the Prepetition ABL Collateral, the Prepetition ABL Secured Parties are granted, solely to the extent, if any, of diminution in value of the Prepetition ABL Secured Parties' interests in the Estates' interests in the Prepetition ABL Collateral as of the Petition Date to the extent resulting from the Debtors' use, sale, or lease of the Prepetition ABL Collateral and the imposition or enforcement of the automatic stay pursuant to section 362(a) of the Bankruptcy Code:

a.    valid and perfected replacement security interests in and liens upon the Debtors' assets, whether existing on the Petition Date or arising or acquired thereafter (the "<u>Prepetition ABL Adequate Protection Liens</u>"), including the Prepetition ABL Collateral, and any proceeds thereof, but excluding (i) any and all claims and causes of action under chapter 5 of the Bankruptcy Code and Bankruptcy Code section 724(a) (collectively, "<u>Avoidance Actions</u>") and the proceeds thereof and any property received on account of Avoidance Actions, whether by judgment, settlement, or otherwise, whether pursuant to federal law or applicable state law, (ii) any and all commercial tort claims held by the Debtors (the "<u>Commercial Tort Claims</u>") and the proceeds thereof and any property received on account of the Commercial Tort Claims, whether by judgment, settlement, or otherwise, whether pursuant to federal law or applicable state law, (iii) any and all proceeds from any insurance

policy (including any "tail policy") issued or providing coverage to the Debtors for claims against or liabilities of any of the Debtors' current or former directors, managers, and officers, and (iv) any property or proceeds received by the Debtors or their Estates to the extent allocable to costs and expenses of preserving, or disposing of, any property in accordance with section 506(c) of the Bankruptcy Code (the foregoing clauses (i)–(iv) collectively, the "Excluded Collateral"), in each case, subject only to any valid, enforceable and perfected Prepetition Prior Liens; and

b.      a superpriority administrative claim (the "Prepetition ABL Adequate Protection Superpriority Claim") against the Debtors' Estates, as and to the extent provided in section 507(b) of the Bankruptcy Code; provided that the Prepetition ABL Adequate Protection Superpriority Claim shall not have recourse to the Excluded Collateral.

5.      Prepetition ABL Secured Parties' Additional Adequate Protection.  As additional adequate protection of the Prepetition ABL Secured Parties' respective interests:

a.      The Debtors shall use the Prepetition ABL Collateral, including all Cash Collateral, substantially consistent with the Interim Budget, subject to any Permitted Variance, which is annexed hereto as **Annex A**, in an amount that would not cause any of the Debtors to use Cash Collateral for operating disbursements and capital expenditures in an aggregate amount greater than 20% of the operating disbursements and capital expenditures, taken together, for any particular week in the Interim Budget ("Permitted Variance"), except with respect to the fees, expenses, costs, or other disbursements of any professionals, and all fees required to be paid to the clerk of the Court and the United States Trustee for the District of Delaware ("U.S. Trustee") under section 1930(a) of title 28 of the United States Code.  If the aggregate amount of Cash Collateral actually used for operating disbursements and capital expenditures, taken together, by

the Debtors, for any particular week, is less than the aggregate amount of Cash Collateral available for use by the Debtors for operating disbursements and capital expenditures, taken together, in the Interim Budget during such period, then for purposes of the Permitted Variance, the Debtors may carry over any such unused amount to future periods.

6.      <u>Synacor's Adequate Protection</u>.  To the extent entitled under applicable law, as adequate protection for the Debtors' use of the Prepetition Synacor Collateral securing the Synacor Promissory Note, Synacor is granted, solely to the extent, if any, of diminution in value of Synacor's interest in the Estates' interests in the Prepetition Synacor Collateral as of the Petition Date resulting from the Debtors' use, sale, or lease of the Prepetition Synacor Collateral and the imposition or enforcement of the automatic stay pursuant to section 362(a) of the Bankruptcy Code:

a.      valid and perfected replacement security interests in and liens upon the assets of Debtor Portal Acquisition Company, whether existing on the Petition Date or arising or acquired thereafter (the "<u>Synacor Adequate Protection Liens</u>" and, together with the Prepetition ABL Adequate Protection Liens, the "<u>Adequate Protection Liens</u>"), including the Prepetition Synacor Collateral, and any proceeds thereof, but excluding the Excluded Collateral, in each case, subject only to any valid, enforceable and perfected Prepetition Prior Liens; and

b.      a superpriority administrative claim (the "<u>Synacor Adequate Protection Superpriority Claim</u>" and, together with the Prepetition ABL Adequate Protection Superpriority Claim, the "<u>Adequate Protection Superpriority Claims</u>") against Debtor Portal Acquisition Company's estate, as and to the extent provided in section 507(b) of the Bankruptcy Code; <u>provided</u> that the Synacor Adequate Protection Superpriority Claim shall not have recourse to the Excluded Collateral.

7.      <u>Prepetition Secured Parties' Additional Adequate Protection</u>.    As additional adequate protection of the Prepetition Secured Parties' respective interests, the Debtors shall provide the Prepetition Secured Parties with continued financial reporting consistent with the Prepetition ABL Credit Agreement and the Synacor Promissory Note, as applicable.

8.      <u>Priority of Adequate Protection Liens and Claims</u>.    The Adequate Protection Liens and the Adequate Protection Superpriority Claims shall have the same relative priorities as the liens and claims of the Prepetition ABL Secured Parties and Synacor, as applicable, as of the Petition Date.

9.      <u>C&B Newco Adequate Protection</u>.  To the extent entitled under applicable law, as adequate protection for diminution in value, if any, of C&B Newco's interests in the Estates' interests in the merchandise inventory and other goods consigned by C&B Newco to Debtor iMedia Brands, Inc. pursuant to that certain *Amended and Restated Consignment Agreement*, dated as of November 23, 2022 (as amended, restated, amended and restated, modified, supplemented, or extended from time to time, the "<u>Consignment Agreement</u>"), between Debtor iMedia Brands, Inc., as consignee, and C&B Newco, as consignor (collectively, the "<u>Consigned Inventory</u>"), as of the Petition Date, the Debtors shall segregate the proceeds received by the Debtors on account of the sale of the Consigned Inventory (the "<u>C&B Newco Adequate Protection Proceeds</u>"); <u>provided</u> that the distribution of the C&B Newco Adequate Protection Proceeds by the Debtors shall remain subject to the resolution of the priority of security interests in and liens on such proceeds among the Prepetition ABL Secured Parties, C&B Newco, and any other lawful holder of security interests in and liens on the C&B Newco Adequate Protection Proceeds.

10.     <u>Modification of Automatic Stay</u>.    The automatic stay under Bankruptcy Code section 362(a) is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order, including, without limitation, to: (a) permit the Debtors to grant the Adequate Protection Liens and the Adequate Protection Superpriority Claims; (b) permit the Debtors to perform such acts as may be requested to assure the perfection and priority of the liens granted herein; and (c) permit the Debtors to make the payments authorized to be made in accordance with the terms of this Interim Order.

11.     <u>Perfection of Adequate Protection Liens</u>.    This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the security interests and liens granted under this Interim Order, without the necessity of filing or recording any mortgage, financing statement, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action to validate or perfect (in accordance with applicable non-bankruptcy law) the security interests and liens granted herein, or to entitle the Prepetition Secured Parties to the priorities granted herein. Notwithstanding the foregoing, the Prepetition Secured Parties may file such financing statements, mortgages, deeds of trust, notices of lien, or similar instruments or otherwise confirm perfection of such liens, security interests, and mortgages without seeking modification of the automatic stay under section 362 of the Bankruptcy Code and all such documents shall be deemed to have been filed or recorded at the time of and on the Petition Date. A Prepetition Secured Party may, in its discretion, file a photocopy of this Interim Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which any Debtor has real or personal property

and, in such event, the subject filing or recording officer shall be authorized to file or record such copy of this Interim Order.

12.    <u>Termination Date</u>.  The Debtors' right to use Cash Collateral shall terminate on the earlier to occur of the following (a "<u>Termination Date</u>"): (x) 11:59 p.m., New York City time, at the expiration of the Initial Interim Period, unless (i) a further Interim Order or final order granting the relief requested in the Motion is entered by the Court extending the Debtors' right to use Cash Collateral or (ii) the Debtors and the Prepetition ABL Secured Parties agree in writing agreement to extend the Debtors' right to use Cash Collateral; and (y) the date upon which the Court issues an order following notice and a hearing providing for the termination of the further use of Cash Collateral due to the failure by the Debtors to comply with the material terms, covenants, or conditions of this Interim Order or otherwise.

13.    <u>Challenges to the Prepetition ABL Obligations and the Prepetition Synacor Promissory Note Obligations</u>.  The Debtors have admitted, stipulated, and agreed to the various stipulations and admissions contained in this Interim Order, including, without limitation, the stipulations and admissions included in paragraph G (Debtors' Acknowledgments and Agreements) of the *Findings of Fact and Conclusions of Law* (the "<u>Paragraph G Stipulations</u>"), which stipulations and admissions are and shall be binding upon the Debtors, subject to the Challenge Period (as defined herein), and any successors thereto in all circumstances.  The stipulations and admissions contained in this Interim Order, including, without limitation, the Paragraph G Stipulations, shall also be binding upon the Debtors' Estates and all other parties in interest, including any statutory committee appointed pursuant to Bankruptcy Code section 1102 or any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors (a "<u>Trustee</u>"), for all purposes unless (a) any party in interest, no later than the date that is seventy five

(75) days from entry of this Interim Order (the "Initial Challenge Period"), has properly filed an

adversary proceeding as required under the Bankruptcy Rules challenging the amount or extent

of the Prepetition ABL Obligations, the Prepetition ABL Agent's liens on the Prepetition ABL

Collateral securing the Prepetition ABL Obligations, the Prepetition Synacor Promissory Note

Obligations, Synacor's liens on the Prepetition Synacor Collateral securing the Prepetition

Synacor Promissory Note Obligations (collectively, referred to herein as "Challenges"), and

(b) the Court rules in favor of the plaintiff sustaining any such Challenge in any such duly filed

adversary proceeding or contested matter; provided, however, that, as to the Debtors, all such

Challenges are hereby irrevocably waived and relinquished effective as of the Petition Date.  If

during the Initial Challenge Period, any statutory committee (if appointed) or other third party

files a motion for standing with a draft complaint identifying and describing all Challenge(s)

consistent with applicable law and rules of procedure, the Initial Challenge Period will be tolled

for such statutory committee or such other third party, but only for such party, solely with respect

to the Challenge(s) asserted in the draft complaint until three (3) business days from the entry of

an order granting the motion for standing to prosecute such Challenge(s) described in the draft

complaint and permitted by the Court (the "Extended Challenge Period", together with the Initial

Challenge Period, the "Challenge Period").  If standing is denied by the Court, the Challenge

Period shall be deemed to have expired.  If no such Challenge or motion for standing, as

applicable, is timely filed prior to the expiration of the Initial Challenge Period, without further

Order of the Court: (1) the Debtors' stipulations and admissions contained in this Interim Order

(including the Paragraph G Stipulations) shall be binding on all parties in interest, including the

Debtors' Estates, any statutory committee (if appointed), and any subsequently appointed

Trustee, case fiduciary, or successors and assigns; (2) the Prepetition ABL Obligations and the

Prepetition Synacor Promissory Note Obligations shall constitute allowed claims for all purposes in these chapter 11 cases and any successor cases thereto, including, without limitation, any subsequent chapter 7 case; (3) the Prepetition ABL Secured Parties' liens on the Prepetition ABL Collateral and Synacor's liens on the Prepetition Synacor Collateral shall be deemed to have been, as of the Petition Date, and to be, valid, binding, and perfected; and (4) the Prepetition ABL Obligations, the Prepetition ABL Agent's liens on the Prepetition ABL Collateral, the Prepetition ABL Secured Parties (and their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors), the Prepetition Synacor Promissory Note Obligations, Synacor's liens on the Prepetition Synacor Collateral, and Synacor (and its respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors) shall not be subject to any other or further Challenge by any statutory committee (if appointed) or any other party in interest, and any such statutory committee or party in interest shall be enjoined from seeking to exercise the rights of the Debtors' Estates, including, without limitation, any successor thereto (including, without limitation, any estate representative or a Trustee, whether such Trustee is appointed or elected prior to or following the expiration of the Initial Challenge Period); provided, however, that if these chapter 11 cases are converted to chapter 7 or a Trustee is appointed prior to the expiration of the Initial Challenge Period, any such estate representative or Trustee shall receive the full benefit of any remaining Initial Challenge Period or 21 days from appointment, whichever is greater, subject to the limitations described herein.  If any Challenge or motion for standing, as applicable, is timely and properly filed prior to the expiration of the Initial Challenge Period the stipulations and admissions (including, without limitation, in the Paragraph G Stipulations) contained in this Interim Order shall nonetheless remain binding and preclusive (as provided in the second sentence of this

paragraph) on any statutory committee (if appointed) and any other person, including any

Trustee appointed in any of these chapter 11 case(s) or any successor cases thereto, as applicable,

except as to any such findings and admissions that were expressly challenged in the original

complaint initiating the adversary proceeding and excluding any amended or additional claims

that may or could have been asserted thereafter through an amended complaint under Rule 15 of

the Federal Rules of Civil Procedure or otherwise.  Nothing in this Interim Order vests or confers

on any person, including any statutory committee (if appointed), any Trustee, or any other party

in interest, standing or authority to pursue any cause of action belonging to the Debtors or their

Estates.  This stipulation shall be binding upon the Debtors, their Estates, all parties in interest in

these chapter 11 cases and their respective successors and assigns, including, without limitation,

any Trustee or other fiduciary appointed in these chapter 11 cases or any successor cases thereto,

and shall inure to the benefit of the Prepetition ABL Secured Parties, Synacor, the Debtors and

the respective successors and assigns of each of the foregoing entities.

14.    <u>Reservation of Rights</u>.    Notwithstanding anything herein or in the Motion to the

contrary herein, the Debtors reserve all of their rights and nothing herein or in the Motion shall

prejudice the Debtors' ability to (a) seek any further use of Cash Collateral (including on a

non-consensual basis) on any terms and conditions, (b) seek a determination that adequate

protection payments, if any, provided by the Debtors pursuant to this Interim Order should be

recharacterized under section 506(b) of the Bankruptcy Code as repayment on account of the

secured portion of the applicable Prepetition Secured Parties' claims as of the Petition Date,

(c) surcharge collateral pursuant to section 506(c) of the Bankruptcy Code, (d) marshal the

claims of the Prepetition Secured Parties or C&B Newco, (e) seek relief under section 552(b) of

the Bankruptcy Code, (f) value the Debtors' assets and businesses, (g) dispute any claim or lien

on any grounds, or (h) assert any other claim, defense, counterclaim, or cause of action against any party belonging to the Debtors or their Estates.  This Interim Order reserves the rights of all parties in interest (including the Prepetition Secured Parties and C&B Newco) with respect to any request to use Cash Collateral and the validity, extent, and priority of any claims and any purported liens securing such claims.

15.    <u>Miscellaneous</u>.

a.    <u>Binding Effect of Interim Order</u>.  The provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in these chapter 11 cases, including, without limitation, the Prepetition Secured Parties, C&B Newco, the Debtors, and their respective successors and assigns (including any trustee hereinafter appointed or elected for the Estate of any Debtor, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of the Debtors or with respect to the property of the Estate of any of the Debtors).

b.    <u>Headings</u>.    The headings in this Interim Order are for purposes of reference only and shall not limit or otherwise affect the meaning of this Interim Order.

c.    <u>Effect of this Interim Order</u>.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable *effective as of* the Petition Date immediately upon execution thereof.

d.    <u>No Third-Party Rights</u>.    Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

e.    <u>Survival of Interim Order</u>.    The provisions of this Interim Order and any actions taken pursuant hereto shall survive the entry of any order which may be entered

(i) converting any of these chapter 11 cases to a case under chapter 7 of the Bankruptcy Code, (ii) to the extent authorized by applicable law, dismissing any of these chapter 11 cases, (iii) withdrawing of the reference of any of these chapter 11 cases from the Court, or (iv) providing for abstention from handling or retaining of jurisdiction of any of these chapter 11 cases in the Court.

   f. <u>Retention of Jurisdiction</u>. The Court has and will retain exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement this Interim Order according to its terms.

   g. <u>Debtor Authorization to Effectuate Relief</u>. The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Interim Order.

  16. <u>Second Interim Hearing</u>. The Second Interim Hearing on the Motion shall occur before the Court on __, 2023 at ____:_____.m (Prevailing Eastern Time) at the United States Bankruptcy Court for the District of Delaware, Bankruptcy Court, 824 North Market Street, ____ Floor, Courtroom ____, Wilmington, Delaware 19801.

  17. <u>Objections to Entry of the Second Interim Order</u>. Within three (3) business days after the Court's entry of this Interim Order, the Debtors shall mail copies of the Motion, this Interim Order, and notice of the Second Interim Hearing to counsel to the Prepetition ABL Agent, the Prepetition ABL Secured Parties, Synacor, C&B Newco, any party in interest that has filed prior to such date a request for notices with the Court, and counsel for any statutory committee, if one is appointed. Any party in interest objecting to the entry of the Second Interim Order shall file any such objection with the Court and serve such objection no later than [●], 2023 at 4:00 p.m. (Prevailing Eastern Time) on the following: (a) proposed co-counsel to the Debtors, Ropes & Gray LLP, 1211 Avenue of the Americas, New York, NY 10036 (Attn: Ryan

Preston Dahl and Cristine Pirro Schwarzman, email: ryan.dahl@ropesgray.com and cristine.schwarzman@ropesgray.com); Ropes & Gray LLP, 191 North Wacker Drive, 32nd Floor, Chicago, IL 60606 (Attn: Stephen L. Iacovo and Jeramy D. Webb, email: stephen.iacovo@ropesgray.com and jeramy.webb@ropesgray.com); and Pachulski Stang Ziehl & Jones LLP, 919 N. Market Street, 17th Floor, Wilmington, Delaware 19801 (Attn: Laura Davis Jones, email: ljones@pszjlaw.com and Timothy P. Cairns, email: tcairns@pszjlaw.com); (b) the United States Trustee for the District of Delaware, 844 N. King Street, Room 2207, Wilmington, Delaware 19801 (Attn: Richard L. Schepacarter, email: richard.schepacarter@usdoj.gov); (c) counsel to the Prepetition ABL Agent, Blank Rome LLP, 1201 North Market Street, Suite 800, Wilmington, Delaware 19801 (Attn: Regina Stango Kelbon, Esq., email: regina.kelbon@blankrome.com); (d) counsel to Synacor, Thompson Hine, LLP, 3900 Key Center, 127 Public Square, Cleveland, Ohio 44114 (Attn: Curtis Tuggle and Jonathan Hawkins, email: curtis.tuggle@ThompsonHine.com and jonathan.hawkins@ThompsonHine.com); (e) counsel to C&B Newco, Riemer Braunstein LLP, Times Square Tower, Suite 2506, New York, New York 10036 (Attn: Steven Fox, Esq., email: sfox@riemerlaw.com) and Troutman Pepper Hamilton Sanders LLP, Hercules Plaza, Suite 5100, 1313 North Market Street, Wilmington, DE 19801 (Attn: Douglas D. Herrmann, email: douglas.herrmann@troutman.com); (f) counsel to Crystal Financial LLC d/b/a SLR Credit Solutions, Morgan Lewis & Bockius, LLP, One Federal Street, Boston, Massachusetts 021110 (Attn: Julia Frost-Davies, email: julia.frost-davies@morganlewis.com); and (g) counsel for any statutory committee appointed in these chapter 11 cases.

## <u>ANNEX A</u>

**Interim Budget**

**iMedia, Inc.**

Cash Collateral Budget Summary (in 000s of USD)

| | -1 | 0 | 1 | 1 | 2 | | Total |
|---|---|---|---|---|---|---|---|
| Month | Jun | Jun | Jul | Jul | Jul | | 2-Week |
| Period Ending | FY2023-P5 | FY2023-P5 | FY2023-P5 | FY2023-P5 | FY2023-P6 | | Forecast |
| Actual/Forecast | Pre-Petition | Pre-Petition | Pre-Petition | Post-Petition | Post-Petition | | |
| Week Ending | 06/17/23 | 06/24/23 | 07/01/23 | 07/01/23 | 07/08/23 | | |
| **Cash Receipts** | $ 4,550 | $ 4,534 | $ 2,582 | $ 1,703 | $ 4,532 | | $ 6,234 |
| Vendor Payments | 69 | 962 | 7 | 175 | 2,454 | | 2,629 |
| Payroll/Benefits | 52 | 1,677 | 3 | 148 | 280 | | 428 |
| Freight | 912 | 606 | 15 | - | 418 | | 418 |
| Taxes | 2 | 582 | 490 | 450 | 1,850 | | 2,300 |
| Rent | - | 378 | - | 378 | 150 | | 528 |
| Insurance | 0 | 255 | 19 | 732 | - | | 732 |
| **Total Disbursements** | 1,036 | 4,460 | 533 | 1,883 | 5,152 | | 7,034 |
| Net Cash Flow | $ 3,514 | $ 75 | $ 2,048 | $ (180) | $ (620) | | (800) |
| | | | | | | | |
| **Pre-Petition ABL Revolver** | | | | | | | |
| Beginning Revolver | $ 20,777 | $ 18,300 | $ 19,449 | $ 19,465 | $ 19,465 | | $ 19,465 |
| Account Sweep | (4,157) | (4,787) | (2,582) | - | - | | - |
| Repayment | - | - | - | - | - | | - |
| Weekly Revolver Advances, Incl. Inte | 1,680 | 5,936 | 2,598 | - | - | | - |
| **Ending ABL Revolver Balance*** | $ 18,300 | $ 19,449 | $ 19,465 | $ 19,465 | $ 19,465 | | $ 19,465 |

| | | | | | | |
|---|---|---|---|---|---|---|
| ABL Balance | | | | $ 19,465 | $ 19,465 | |
| Gross AR | | | | 26,333 | 26,396 | |
| Gross Inventory | | | | 67,856 | 65,661 | |
| Gross Collateral | | | | 94,189 | 92,057 | |
| BBC Eligible Collateral | | | | 29,645 | 28,489 | |
| | | | | | | |
| *% Cushion* | | | | *20%* | *20%* | |
| Implied 20% Equity Cushion to BBC | | | | | | |
| Eligible Collateral | | | | 23,358 | 23,358 | |
| Balance in Excess of Cushion | | | | 6,286 | 5,131 | |

\* ABL Revolver Balance inclusive of disputed fees and expenses

# **EXHIBIT B**

**ABL Funding Agreement**

**SIENA LENDING GROUP LLC**
9 W Broad Street, 6th Floor
Stamford, Connecticut 06902


June 20, 2023


<u>VIA ELECTRONIC MAIL</u>

iMedia Brands, Inc.
6740 Shady Oak Road
Eden Prairie, Minnesota 55344
Attention: General Counsel
Telephone: 952-943-6517
Email: lenderlegalnotices@imediabrands.com


Re:    <u>Funding Agreement</u>

Ladies and Gentlemen:

Reference is made to that certain Loan and Security Agreement, dated as of July 30, 2021 (as may be amended, restated, supplemented or modified from time to time, the "***Loan Agreement***"), among iMediaBrands, Inc., a Minnesota corporation ("***iMedia***"), ValueVision Interactive, Inc., a Minnesota corporation ("***Value Interactive***"), ValueVision Retail, Inc., a Delaware corporation ("***Value Retail***"), PW Acquisition Company, LLC, a Minnesota limited liability company ("***PW Acquisition***"), FL Acquisition Company, a Minnesota corporation ("***FL Acquisition***"), ValueVision Media Acquisitions, Inc., a Delaware corporation ("***Value Media***"), JWH Acquisition Company, a Minnesota corporation ("***JWH Acquisition***"), Norwell Television, LLC, a Delaware limited liability company ("***Norwell***"), 867 Grand Avenue LLC, a Minnesota limited liability company ("***867 Grand Avenue***"), Portal Acquisition Company, a Minnesota corporation ("***Portal***" and together with iMedia, Value Interactive, Value Retail, PW Acquisition, FL Acquisition, Value Media, JWH Acquisition, Norwell, 867 Grand Avenue and any other Person who from time to time becomes a Borrower under the Loan Agreement, collectively, the "***Borrowers***"), VVI Fulfillment Center, Inc., a Minnesota corporation ("***VVI Fulfillment***"), EP Properties, LLC, a Minnesota limited liability company ("***EP Properties***"), IMedia&123TV Holding GmbH ("***iMedia&123tv Holding***" and together with VVI Fulfillment, and EP Properties, collectively, the "***Guarantors***"), Siena Lending Group LLC, as a lender ("***Siena***" and together with any other financial institutions who become part to the Loan Agreement referred to below from time to time, each a "***Lender***" and collectively, the "***Lenders***") and Siena Lending Group LLC, as administrative and collateral agent for the Lenders (in such capacity, the "***Agent***"). Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Loan Agreement.

As the Loan Parties have acknowledged in the Forbearance Agreement, Tenth Amendment to Loan and Security Agreement and Amendment to Fee Letter dated April 10, 2023 (the "***Forbearance Agreement***"), the Existing Defaults identified and defined in the Forbearance Agreement have

occurred and are continuing. The Lenders have not waived any of such Existing Defaults, and the Forbearance Period established pursuant to the Forbearance Agreement has terminated.

As a result of the Existing Defaults, Agent and Lenders may, but are not obligated to, in their sole discretion, continue to make loans, advances and extensions of credit, including but not limited to Revolving Loans, as provided for in the Loan Agreement, to Borrowers from time to time, on and after the date hereof. Furthermore, all Revolving Loans advanced by Lenders on and after the date on which the Forbearance Period terminated have been made by Lenders in their sole and absolute discretion and do not constitute a course of dealing with respect to the making of any additional Revolving Loans.

Notwithstanding the foregoing, Borrowers have requested that Agent and Lenders, and Agent and Lenders hereby agree that they shall, fund Revolving Loans in an aggregate amount of up to $5,400,000 during the week ending June 23, 2023 (the "*Funding Period*"); *provided*, that:

(i) after giving effect to each such Revolving Loan, (A) the outstanding balance of all Revolving Loans will not exceed the lesser of (x) the Maximum Revolving Facility Amount, and (y) the Borrowing Base, and (B) none of the other Loan Limits for Revolving Loans will be exceeded, and

(ii) Lenders hereby agree that, solely during the Funding Period, the Availability Block shall be reduced by an amount equal to the lesser of (A) $4,000,000 and (B) the difference of (x) the outstanding balance of all Revolving Loans *minus* (y) the Borrowing Base (calculated prior to giving effect to any reduction to the Availability Block pursuant to this clause (ii)).

In addition, Borrowers have requested that Agent and Lenders, and the Agent and Lenders hereby agree to, make funds available to Borrowers in an amount equal to $3,160,314 to be used solely for the purpose of paying certain sales taxes set forth on Exhibit A hereto pursuant to (x) a Bankruptcy court approved debtor-in-possession financing order pursuant to Section 364(c) and (d) of the Bankruptcy Code consented to by the Agent and Lenders, or (y) a Bankruptcy court approved cash collateral order pursuant to Section 363 of the Bankruptcy Code consented to by the Agent and Lenders (any such order per (x) or (y) a "Financing Order"), in either case, pursuant to one or more Bankruptcy court orders that authorizes the payment of such taxes (a "Sales Tax Payment Authorization Order") that includes customary protections for the Debtors, the Agents, and the Lenders upon making payment to any taxing authority.

The making of any loan, advance or Revolving Loans, or the extension of any other credit by Agent or any Lender to Borrowers (including without limitation, the advances described in the two immediately preceding paragraphs) shall not in any case (a) obligate Agent or any Lender to make any additional loan, advance, Revolving Loan or other extension of credit to any Loan Party, or (b) constitute (i) a waiver by Agent or any Lender of the Existing Defaults or any other Default or Event of Default (whether or not Agent or any Lender has knowledge thereof), or (ii) a waiver by Agent or any Lender of any of its rights, whether under the Loan Agreement, any of the other Loan Documents, applicable law or otherwise, and all of such rights, and all other rights, powers and remedies are hereby expressly reserved. Any such loan, advance or Revolving Loan, or the extension of any other credit by Agent or any Lender to Borrowers shall be included in the Obligations.

Agent and each Lender hereby specifically reserve all of the rights and remedies available to Agent and Lenders under the Loan Agreement, any of the other Loan Documents, applicable law or otherwise, as a result of the Existing Defaults, including, without limitation, the right to charge interest at the Default Rate retroactive to the first date on which any outstanding Event of Default occurred. Neither Agent nor the Lenders waive the Existing Defaults or any other Event of Default that may have occurred prior to the date of this letter, that may exist on the date of this letter, or that may hereafter

occur. An Event of Default may only be waived pursuant to an agreement in writing executed by the Agent and Lenders. Any delay or failure by Agent or any Lender in pursuing any rights or remedies as a result of any Event of Default or otherwise shall not be deemed a waiver of such Event of Default or any such rights or remedies.

This letter agreement is without prejudice to, and Agent and each Lender hereby specifically reserves, all of its rights and remedies.

Each Loan Party, on behalf of itself and on behalf of its officers, directors, employees and consultants, hereby absolutely and unconditionally releases and forever discharges Agent and each Lender, and any and all of their respective participants, parent corporations, subsidiary corporations, affiliated corporations, insurers, indemnitors, successors and assigns thereof, together with all of the present and former directors, officers, agents, consultants and employees of any of the foregoing (each a "Released Party"), from any and all claims, demands or causes of action of any kind, nature or description, whether arising in law or equity or upon contract or tort or under any state or federal law or otherwise, which any Loan Party has had, now has or has made claim to have against any such person for or by reason of any act, omission, matter, cause or thing whatsoever arising from the beginning of time to and including the date of this Amendment, whether such claims, demands and causes of action are matured or unmatured or known or unknown (collectively, the "***Released Claims***"); _provided_ that the Released Claims shall not include any rights by any Loan Party to enforce this Funding Agreement. It is the intention of each Loan Party in providing this release that the same shall be effective as a bar to each and every Released Claim.

Each Loan Party acknowledges that it may hereafter discover facts different from or in addition to those now known or believed to be true with respect to such claims, demands, or causes of action and agree that this instrument shall be and remain effective in all respects notwithstanding any such differences or additional facts. Each Loan Party understands, acknowledges and agrees that the release set forth above may be pleaded as a full and complete defense and may be used as a basis for an injunction against any action, suit or other proceeding which may be instituted, prosecuted or attempted in breach of the provisions of such release.

Each Loan Party, on behalf of itself and its successors, assigns, and other legal representatives, hereby absolutely, unconditionally and irrevocably, covenants and agrees with and in favor of each Released Party above that it will not sue (at law, in equity, in any regulatory proceeding or otherwise) any Released Party on the basis of any Released Claim. If any Loan Party or any of its successors, assigns or other legal representatives violates the foregoing covenant, such Loan Party, for itself and its successors, assigns and legal representatives, agrees to pay, in addition to such other damages as any Released Party may sustain as a result of such violation, all attorneys' fees and costs incurred by such Released Party as a result of such violation.

Except as specifically stated herein, the Loan Agreement and each of the other Loan Documents, is and shall continue to be in full force and effect and is hereby in all respects ratified and confirmed and shall constitute the legal, valid, binding and enforceable obligations of the Loan Parties.

The terms and provisions of each of Section 10.2 (Severability), Section 10.13 (Counterparts), Section 10.14 of the Loan Agreement (Governing Law), and Section 10.15 (Waivers and Jurisdiction) of the Loan Agreement are hereby incorporated herein by reference and shall apply to this letter agreement mutatis mutandis as if fully set forth herein.

Very truly yours,

**SIENA LENDING GROUP LLC**, as Agent and a Lender

By: _____

Name: Steven Sanicola

Title: Authorized Signatory

**CRYSTAL FINANCIAL SPV LLC**, as a Lender

By:_____

Name:

Title:

**CRYSTAL FINANCIAL LLC D/B/A SLR CREDIT SOLUTIONS**, as a Lender

By: _____

Name:

Title:

**NORTH MILL CAPITAL LLC D/B/A SLR BUSINESS CREDIT**, as a Lender

By:_____

Name:

Title:

Very truly yours,

**SIENA LENDING GROUP LLC**, as Agent
and a Lender

By: _____
Name:
Title: Authorized Signatory

**CRYSTAL FINANCIAL SPV LLC,**
as a Lender

By:_____
Name:
Title:            Mirko Andric
          Senior Managing Director

**CRYSTAL FINANCIAL LLC D/B/A SLR CREDIT
SOLUTIONS,**
as a Lender

By: _____
Name:
Title:            Mirko Andric
          Senior Managing Director

**NORTH MILL CAPITAL LLC D/B/A SLR
BUSINESS CREDIT,**
as a Lender

By:_____
Name:
Title:

Very truly yours,

**SIENA LENDING GROUP LLC**, as Agent
and a Lender

By: _____
Name:
  Title: Authorized Signatory

**CRYSTAL FINANCIAL SPV LLC,**
as a Lender

By:_____
Name:
Title:

**CRYSTAL FINANCIAL LLC D/B/A SLR CREDIT
SOLUTIONS,**
as a Lender

By: _____
Name:
Title:

**NORTH MILL CAPITAL LLC D/B/A SLR
BUSINESS CREDIT,**
as a Lender

By: *Beatriz Hernández*
Name: *Beatriz Hernández*
Title: *EVP*

**ACKNOWLEDGED AND AGREED:**

**IMEDIA BRANDS, INC.**

By:_____
    Name: Timothy Peterman
    Its: CEO


**VALUEVISION RETAIL, INC.**

By:_____
    Name: Timothy Peterman
    Its: CEO


**FL ACQUISITION COMPANY**

By:_____
    Name: Timothy Peterman
    Its: CEO


**PW ACQUISITION COMPANY, LLC**

By:_____
    Name: Timothy Peterman
    Its: CEO


**VALUEVISION MEDIA ACQUISITIONS, INC.**

By:_____
    Name: Timothy Peterman
    Its: CEO


**JWH ACQUISITION COMPANY**

By:_____
    Name: Timothy Peterman
    Its: CEO

**NORWELL TELEVISION, LLC**

By:_____
     Name: Timothy Peterman
     Its: CEO

**867 GRAND AVENUE LLC**

By:_____
     Name: Timothy Peterman
     Its: CEO

**VALUEVISION INTERACTIVE, INC.**

By:_____
     Name: Timothy Peterman
     Its: CEO

**PORTAL ACQUISITION COMPANY**

By:_____
     Name: Timothy Peterman
     Its: CEO

**VVI FULFILLMENT CENTER, INC.**

By:_____
     Name: Timothy Peterman
     Its: CEO

**EP PROPERTIES, LLC**

By:_____
     Name: Timothy Peterman
     Its: CEO

**IMEDIA&123TV HOLDING GMBH**

By:_____
     Name: Timothy Peterman
     Its: Managing Director