**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| iMedia Brands, Inc., *et al.*,[1] | Case No. 23-10852 (KBO) |
| Debtors. | (Jointly Administered) |

**DEBTORS' MOTION FOR ENTRY OF
INTERIM AND FINAL ORDERS (I) AUTHORIZING THE
DEBTORS TO (A) OBTAIN POST-PETITION FINANCING,
(B) GRANT LIENS AND SUPERPRIORITY ADMINISTRATIVE
EXPENSE CLAIMS TO POST-PETITION LENDERS AND (C) UTILIZE
CASH COLLATERAL, (II) PROVIDING ADEQUATE PROTECTION TO
PRE-PETITION SECURED PARTIES, (III) MODIFYING THE AUTOMATIC STAY,
(IV) GRANTING RELATED RELIEF, PURSUANT TO 11 U.S.C. SECTIONS
105, 361, 362, 363, 364, 503, 506, 507 AND 552, AND (V) SCHEDULING A FINAL
HEARING PURSUANT TO BANKRUPTCY RULE 4001 AND LOCAL RULE 4001-2**

iMedia Brands, Inc. ("iMedia") and its affiliated debtors and debtors in possession

(each, a "Debtor" and collectively, the "Debtors")[2] in the above-captioned chapter 11 cases

(these "Chapter 11 Cases"), by and through their undersigned proposed counsel, hereby submit

this motion (this "Motion") pursuant to sections 105, 361, 362, 363, 364, 503, 506, 507, and 552

of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004, and

9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1,

4001-2, 9006-1, and 9013-1 of the Local Rules of Bankruptcy Practice and Procedure for the

---

[1]   The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are:  ValueVision Media Acquisitions, Inc. (8670); iMedia Brands, Inc. (3770); ValueVision Interactive, Inc. (8730); Portal Acquisition Company (3403); VVI Fulfillment Center, Inc. (5552); ValueVision Retail Inc. (2155); JWH Acquisition Company (3109); PW Acquisition Company, LLC (0154); EP Properties, LLC (3951); FL Acquisition Company (3026); Norwell Television, LLC (6011); and 867 Grand Avenue, LLC (2642).  The Debtors' service address is 6740 Shady Oak Road, Eden Prairie, MN 55344-3433.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them either later in this Motion, in the First Day Declaration, or in the Interim Order, as applicable.

District of Delaware (the "Local Rules") for entry of interim and final orders granting the relief requested below.  In support hereof, the Debtors rely on (i) the *Declaration of James Alt, Chief Transformation Officer of iMedia Bands, Inc., in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 17] (the "First Day Declaration"), (ii) the *Declaration of James Alt in Support of Debtors' Motion to Obtain Postpetition Debtor in Possession Financing* (the "Alt Declaration"), and (iii) the *Declaration of Eugene Lee in Support of Debtors' Motion to Obtain Postpetition Debtor in Possession Financing* (the "Lee Declaration" and, together with the Alt Declaration, the "DIP Declarations"), filed in connection herewith and incorporated herein by reference, and further represent as follows:

## PRELIMINARY STATEMENT

1.      On or about the date hereof, the Debtors entered into a going concern transaction with RNN-TV Licensing Co. LLC (the "Buyer")[3] providing for the sale of substantially all their assets, as a going concern, the repayment of the asset based lending obligations, the assumption of certain trade liabilities through contract cures or otherwise, and jobs for substantially all their 600 Debtor employees, as well as their approximately 100 non-Debtor employees.  Additionally, the transactions contemplated by their agreement with the Buyer (the "Proposed RNN Sale") provide the Debtors with a series of related forbearances and agreements with respect to their non-Debtor German subsidiaries that will avoid the need for a near-term insolvency filing by those entities.  Further still, the Proposed RNN Sale provides floor bid by which the Debtors can continue to seek higher and better offers for their business, knowing that a "bid in hand" exists by which they can transact—and the Debtors have been working to test the market to determine

---

[3]    As set forth more fully here, the Buyer is also one of the Debtors' proposed DIP Lenders, proposing to fund $7.5 million of the Debtors' proposed DIP Facility.

if higher and better values are available.[4]  To be sure, the Debtors also intend to move quickly through chapter 11 to minimize the administrative burdens on their Estates.

2.       In short, the Debtors believe that the transactions contemplated by their Proposed RNN Sale is a tremendous result for these chapter 11 Estates—but a key aspect of this value-maximizing transaction is the Debtors' ability to continue their operations in the ordinary course amidst the overhang of these cases.  In turn, the incremental liquidity provided under the Debtors' proposed DIP Facility is essential.  The Debtors commenced these Chapter 11 Cases with limited cash on hand.  As the Court is aware, the Debtors' cash on hand totaled approximately $1.7 million as of their June 30, 2023 "first day" hearing, excluding approximately $1.5 million held in the Debtors' Collateral Account.

3.       As the Court is also aware, the Debtors received Court approval for the interim, consensual use of Cash Collateral for a limited two-week period ending July 8, 2023 (the "Initial Interim Period").   However, the use of Cash Collateral alone is insufficient to fund the Debtors' business operations in the near term without risking immediate and potentially irreparable harm to the Debtors' Estates.  In particular, the Debtors' operations require substantial liquidity in terms of the Debtors' payroll obligations, vendor and content distribution payments, as well as rental expenses and other ordinary course obligations.  The use of Cash Collateral after the Initial Interim Period, alone, would not be reasonably sufficient to permit the Debtors to satisfy these obligations in the ordinary course without risking substantial degradation in value to the detriment of all parties in interest.

---

[4]     The Debtors, with the assistance of their investment banker, have been actively marketing their businesses since May 2023.

4.     This determination results from the analysis undertaken by the Debtors where the Debtors have, in consultation with Huron Consulting Group, Inc. ("Huron"), performed a review and analysis of their projected cash needs.  Based upon that review and analysis, the Debtors and their advisors determined that the use of Cash Collateral alone would be insufficient to operate their businesses, and that additional funding would be advisable to provide an adequate cushion to the Debtors' operations without imposing the material risk of immediate and potentially irreparable harm to the Debtors' business value.  That is, the Debtors cannot operate on a "cash collateral only" basis without unduly risking operational integrity and, in particular, their ability to proceed with the going concern transaction contemplated by the Asset Purchase Agreement with the proposed Buyer.  Absent the liquidity provided under their proposed DIP Facility at the outset of these Chapter 11 Cases, the Debtors' Estates will be materially and perhaps irreparably harmed.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012.  Pursuant to Local Rule 9013-1(f), the Debtors confirm their consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

6.     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of these Chapter 11 Cases and this Motion is proper in this district under 28 U.S.C. §§ 1408 and 1409.

7.     The statutory bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, 506, 507, and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014, and Local Rule 2002-1, 4001-2, 9006-1, and 9013-1.

## RELIEF REQUESTED

8.     The Debtors respectfully request entry of an interim order substantially in the form attached hereto as **<u>Exhibit A</u>** (the "<u>Interim Order</u>") and a final order (the "<u>Final Order</u>," and together with the Interim Order, the "<u>DIP Orders</u>"):

(i)     authorizing and approving the Debtors to obtain up to $34,947,305.40 in post-petition financing and other financial accommodations in connection with the post-petition, senior secured debtor-in-possession financing (the "<u>DIP Facility</u>"), comprised of up to $15,000,000 of that portion of the DIP Facility constituting the Term Loan Commitment (as defined in the DIP Credit Agreement) (the "<u>DIP Term Loans</u>," and in respect of the DIP Term Loans provided solely by the ABL Lenders (as defined in the DIP Credit Agreement), the "<u>DIP ABL Term Loans</u>"), plus that portion of the DIP Facility constituting the Revolving Loans (as defined in the DIP Credit Agreement) (the "<u>DIP Revolving Loans</u>," together with the DIP ABL Term Loans, the "<u>DIP ABL Loans</u>," and collectively with the DIP Term Loans, the "<u>DIP Loans</u>") re-advanced under the DIP Facility pursuant to and in accordance with the terms and conditions set forth in that certain *Debtor-In-Possession Loan and Security Agreement* (as it may be amended, modified, supplemented, extended, restated or replaced from time to time, the "<u>DIP Credit Agreement</u>"), dated as of July 3, 2023, substantially in the form as filed with the Court and attached to the DIP Motion as <u>Exhibit B</u>, by and among the Debtors, as borrowers, Siena Lending Group LLC, in its capacity as agent (in such capacity, the "<u>DIP Agent</u>"), and the financial institutions from time to time party thereto, as lenders, (in respect of the DIP Term Loans, the "<u>DIP Term Lenders</u>," in respect of the DIP Term Loans provided solely by the ABL Lenders (as defined in the DIP Credit Agreement), the "<u>DIP ABL Term Loan Lenders</u>"), in respect of the DIP Revolving Loans, the "<u>DIP Revolving Lenders</u>," and together with the DIP ABL Term Loan Lenders, the "<u>DIP ABL Lenders</u>"), and collectively, the "<u>DIP Lenders</u>," and together with the DIP Agent, the "<u>DIP Secured Parties</u>");

(ii)    authorizing the Debtors to use the proceeds of the DIP Facility and the Pre-Petition Revolving Collateral and Pre-Petition Synacor Collateral (each as defined herein), including Cash Collateral (as defined herein), in accordance with the terms of the Interim Order and the DIP Financing Documents (as defined herein), and in accordance with the Approved Budget (as defined herein), subject to Permitted Variance (as defined in the DIP Financing Documents, the "<u>Permitted Variances</u>"), for, *inter alia*: (a) general operating, corporate, and working capital purposes of the Debtors in the ordinary course of business; (b) funding of the

Carve-Out and the Carve-Out Reserve Account (each as defined herein); (c) funding of the costs and expenses of administering the Chapter 11 Cases, including without limitation, the DIP Segregated Funds (as defined herein); (d) payment of the Adequate Protection Obligations (as defined herein) and other payments as authorized by and provided in the Interim Order; (e) funding of the reasonable and documented costs, fees, and other expenses; (f) upon entry of the Interim Order, immediately applying the DIP Term Loan proceeds on account of the Pre-Petition Revolving Obligations (as defined herein) and continuing to apply amounts collected during the Interim Period on account of the DIP ABL Obligations (as defined herein) outstanding, in accordance with the terms of the DIP Financing Documents and the Interim Order (the "Initial Roll-Up"), in such order and manner determined by the DIP Agent in its sole and absolute discretion, including its discretion to apply any collections to the Pre-Petition Revolving Obligations (as defined herein) or the DIP Revolving Obligations (as defined herein); and (g) upon entry of the Final Order, at the option of the DIP Agent, exchanging and substituting in the DIP Agent's sole discretion all or a portion of the remaining amount, if any, of Total Revolving Loan Commitments (as defined in the Pre-Petition Revolving Credit Agreement) on a cashless, dollar-for-dollar basis with the DIP Facility (the "Subsequent Roll-Up," and together with the Initial Roll-Up, the "Roll-Up");

(iii)     authorizing the Debtors to (a) enter into, execute and perform under (i) the DIP Credit Agreement and (ii) all security agreements, pledge agreements, notes, guarantees, mortgages, deeds of trust, control agreements, Uniform Commercial Code financing statements, certificates, reports and other agreements, documents and instruments either or both executed and/or delivered with or to the DIP Agent and/or the DIP Lenders in connection with or related thereto (collectively, as amended, modified, supplemented, extended, restated or replaced from time to time, the "DIP Financing Documents") and (b) take and perform all other acts and steps as may be required or contemplated by or in connection with the DIP Financing Documents and the Interim Order;

(iv)     granting to the DIP Agent, for itself and on behalf of the DIP Lenders, first priority, priming, valid, perfected and enforceable liens (as defined in Bankruptcy Code section 101 (37)) in and upon all of the DIP Collateral (as defined herein), subject and subordinate in all respects to the Carve-Out and any valid, perfected, and non-avoidable Pre-Petition Prior Liens (as defined herein), to secure all existing and future obligations and liabilities of every kind or nature (including, without limitation, principal of, and accrued interest on, amounts advanced to the Debtors under the DIP Facility, which, upon entry of the Final Order, shall be deemed issued under the DIP Credit Agreement, and all other fees, indemnity obligations, reimbursement obligations, and other Obligations (as defined in the DIP Credit Agreement) under or in connection with the DIP Financing Documents, whether due or to become due, absolute or contingent, (in respect of the DIP Term Loans, the "DIP Term Obligations," in respect of the DIP Term Obligations to the ABL Lenders (as defined in the DIP Credit Agreement), the "DIP ABL Term Obligations," in respect of the DIP Revolving Loans, the "DIP Revolving

6

Obligations," together with the DIP ABL Term Obligations, the "DIP ABL Obligations," and collectively, the "DIP Obligations") as provided by, and more fully defined in, the DIP Financing Documents;

(v)     granting to the DIP Agent and the DIP Lenders allowed superpriority administrative expense claim status for the DIP Obligations, pursuant to Bankruptcy Code section 364(c)(1) and 507(b), subject and subordinate in all respects to the Carve-Out, in accordance with the terms of the Interim Order;

(vi)    authorizing the Debtors' use in accordance with the terms of the DIP Financing Documents, and in accordance with the Initial Budget (as defined in the DIP Credit Agreement) and any Approved Budget (subject to Permitted Variances), of all Cash Collateral;

(vii)   granting adequate protection, including, without limitation and as applicable, Pre-Petition ABL Adequate Protection Liens, Synacor Adequate Protection Liens, Pre-Petition ABL Adequate Protection Claims, Synacor Adequate Protection Claims, Pre-Petition ABL Adequate Protection Payments, the Synacor Adequate Protection Proceeds, and the C&B Newco Adequate Protection Proceeds (each as defined herein and collectively, the "Adequate Protection Obligations") to:

a.  for the benefit of the Pre-Petition Revolving Secured Parties (as defined herein), Siena Lending Group LLC, in its capacity as agent (in such capacity, the "Pre-Petition Agent") under that certain *Loan and Security Agreement*, dated as of July 30, 2021 (as amended, restated, amended and restated, modified, supplemented, or extended from time to time, the "Pre-Petition Revolving Credit Agreement") by and among the borrowers from time to time party thereto (the "Pre-Petition Revolving Borrowers"),[5] the guarantors from time to time party thereto (the "Pre-Petition Revolving Guarantors,"[6] pursuant to the guarantee in (i) the Pre-Petition Revolving Credit Agreement (the "US Law Guarantee") and (ii) that certain *Guarantee Agreement* dated February 28, 2023, between the Pre-Petition Revolving German Guarantors, as guarantors, and Siena Lending Group LLC, as beneficiary (the "German Law Guarantee"), the financial institutions party thereto from time to time (collectively, the "Pre-Petition Revolving Lenders", and together with the Pre-Petition Agent, sometimes collectively referred to as the "Pre-Petition Revolving

---

[5]   Pursuant to the Pre-Petition Revolving Credit Agreement, "Borrowers" means ValueVision Retail Inc., iMedia Brands, Inc., ValueVision Interactive, Inc., PW Acquisition Company, LLC, FL Acquisition Company, ValueVision Media Acquisitions, Inc., JWH Acquisition Company, Norwell Television, LLC, 867 Grand Avenue, LLC, and Portal Acquisition Company.

[6]   Pursuant to the Pre-Petition Revolving Credit Agreement (as defined *infra*), "Guarantors" means VVI Fulfillment Center, Inc., EP Properties, LLC, and iMedia & 123tv Holding GmbH. iMedia & 123tv Holding GmbH, 123tv Invest GmbH, 123tv Holding GmbH, 123tv Beteiligungs GmbH, 1-2-3.tv GmbH, and 1-2-Play GmbH (collectively, the "Pre-Petition Revolving German Guarantors") are not Debtors in these Chapter 11 Cases.

Secured Parties"), and all security agreements, pledge agreements, notes, mortgages, guarantees, control agreements, collateral access agreements, and related agreements and documents (collectively, with the Pre-Petition Revolving Credit Agreement, as amended, modified, supplemented, extended, restated, amended and restated, or replaced from time to time, the "Pre-Petition Revolving Financing Documents"), all such adequate protection with the priority set forth in the Interim Order and otherwise in accordance with the terms set forth in the Interim Order, for the imposition of the automatic stay and with respect to the use and aggregate diminution, if any, in the value of their interests in the Debtors' estates' (the "Estates") interests in the Pre-Petition Revolving Collateral as of the Petition Date, including all "cash collateral" ("Cash Collateral"), as such term is defined in Bankruptcy Code section 363(a), which shall include, without limitation, all cash and cash equivalents of the Debtors, whenever or wherever acquired, and the proceeds of all the Pre-Petition Revolving Collateral pledged to the Pre-Petition Agent and the DIP Agent, as applicable, all in accordance with the terms set forth herein (the "Pre-Petition ABL Adequate Protection");

b.  solely to the extent entitled under applicable law, Synacor, Inc. ("Synacor"), in its capacity as holder under that certain *Secured Promissory Note*, dated July 30, 2021 (as amended, restated, amended and restated, modified, supplemented, or extended from time to time, the "Synacor Promissory Note"), by and between Debtors Portal Acquisition Company ("Portal" or the "Synacor Promissory Note Borrower"), as borrower, and iMedia Brands, Inc. ("iMedia" or the "Synacor Promissory Note Guarantor"), as parent and unsecured guarantor, and Synacor, all such adequate protection with the priority set forth in the Interim Order and otherwise in accordance with the terms set forth in the Interim Order, for the imposition of the automatic stay and with respect to the use and aggregate diminution, if any, in the value of Synacor's interests in the Portal Estates' interests in the Pre-Petition Synacor Collateral, including all Cash Collateral, as applicable (the "Synacor Adequate Protection"); and

c.  solely to the extent entitled under applicable law, granting adequate protection to C&B Newco, LLC ("C&B Newco"), in its capacity as consignor under that certain *Amended and Restated Consignment Agreement*, dated as of November 23, 2022 (as amended, restated, amended and restated, modified, supplemented, or extended from time to time, the "Consignment Agreement"), between iMedia, as consignee, and C&B Newco, all such adequate protection with the priority set forth in the Interim Order and otherwise in accordance with the terms set forth in the Interim Order, with respect to the use and aggregate diminution, if any, in the value of C&B Newco's interests in

iMedia's Estates' interests in the Consigned Inventory (as defined herein);

(viii)    approving the application of collections and proceeds of all of the Pre-Petition Revolving Collateral and DIP Collateral and the payment of certain Pre-Petition Revolving Obligations and DIP Revolving Obligations in the manner and on the terms set forth in the DIP Credit Agreement and the Interim Order (and, as applicable, the Final Order);

(ix)    subject to and upon entry of a Final Order, waiving: (a) the Debtors' ability to surcharge against the Pre-Petition Revolving Collateral or DIP Collateral pursuant to Bankruptcy Code section 506(c); (b) the applicability of the "equities of the case" exception under Bankruptcy Code section 552(b) with respect to the proceeds, products, offspring or profits of the Pre-Petition Revolving Collateral or DIP Collateral; and (c) the equitable doctrine of "marshaling" and any similar equitable doctrine with respect to any of the Pre-Petition Revolving Collateral or DIP Collateral;

(x)    modifying the automatic stay imposed by Bankruptcy Code section 362 to the extent hereinafter set forth and waiving the fourteen (14) day stay provisions of Bankruptcy Rule 4001(a)(3);

(xi)    waiving the 21-day provision of Bankruptcy Rule 6003(b), the notice requirements of Bankruptcy Rule 6004(a), and any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of the Interim Order; and

(xii)    scheduling a final hearing on the DIP Motion ("Final Hearing") for entry of a Final Order authorizing the post-petition financing and use of Cash Collateral contemplated hereby on a final basis and granting such other relief as is requested in the DIP Motion and approving the form of notice with respect to the Final Hearing.

## BACKGROUND

## I.    CHAPTER 11 CASES

9.    On June 28, 2023 (the "Petition Date"), each Debtor filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).  No request for the appointment of a trustee or examiner has been

made in these Chapter 11 Cases, and no official committee of unsecured creditors has been appointed.

10.     The Debtors, together with their non-Debtor affiliates (the "Company"), capitalize on the convergence of entertainment, ecommerce, and advertising.  The Company's global portfolio of entertainment, consumer brands and media commerce services businesses—including ShopHQ, 1-2-3.tv, Christopher & Banks, and iMedia Digital Services—cross promote and exchange data with each other to optimize the engagement experiences the Company creates for advertisers and consumers.  The Company's ecommerce business extends across the United States, while the Company's entertainment and advertising services reach customers across the United States, Canada, Germany, and Austria.

11.     Additional factual background regarding the Debtors, including their business operations, their corporate and capital structure, and the events leading to the filing of these Chapter 11 Cases, is set forth in detail in the First Day Declaration and incorporated herein by reference.

## II.    PREPETITION INDEBTEDNESS

12.     As of the Petition Date, the Debtors had approximately $129.7 million of funded principal debt and interest obligations, consisting of obligations under the Pre-Petition Revolving Credit Agreement, the Synacor Promissory Note, the Senior Unsecured Notes, the Growth Capital Partners Note, the PIPE Convertible Notes and the guaranty by iMedia of the obligations of its wholly-owned German subsidiary under the 123TV Seller Note (each as defined below).

13.     The following table summarizes the Debtors' prepetition capital structure (as of the Petition Date) with respect to funded debt, inclusive of accrued but unpaid interest and fees.

| Instrument | Balance ($mm) | Rate | Maturity | Security |
|---|---|---|---|---|
| Pre-Petition ABL Facility | $19.9[7] | S+5.86448% until 3/15/2023; thereafter S+7.86448% | 07/30/24 | Substantially all assets of each Debtor on a first lien basis, subject to customary exceptions<br><br>Additionally benefits from guarantees from non-Debtor German subsidiaries |
| 123.TV Seller Note | $17.6 | 8.50% | 9/29/23 | None<br><br>Benefits from a guarantee from Debtor iMedia |
| Synacor Promissory Note | $4.1 | 9.00% until 07/30/2023; thereafter 11.00% | 12/31/23 | Substantially all assets of Debtor Portal Acquisition Company on a junior lien basis to the Pre-Petition ABL Facility |
| Senior Unsecured Notes | $81.7 | 8.50% | 9/30/26 | None<br><br>iMedia is the issuer and only obligor |
| Growth Capital Partners Note | $3.2 | 7.00% until 6/1/2023; thereafter 18.00% | 5/18/23 | None<br><br>iMedia is the issuer and only obligor |
| PIPE Convertible Notes | $3.6 | 7.75% until 12/31/23; thereafter 15.00% | 3/31/24 | None<br><br>iMedia is the issuer and only obligor |

## A.    Pre-Petition ABL Facility

14.    On July 30, 2021, Debtor iMedia entered into the Pre-Petition Revolving Credit Agreement, among the Pre-Petition Revolving Borrowers, the Pre-Petition Revolving Guarantors, and the Pre-Petition Revolving Secured Parties.  On February 28, 2023, the Pre-Petition Revolving German Guarantors, and the Pre-Petition Agent, as Beneficiary, entered into a Guarantee Agreement (the "Pre-Petition Guarantee"), pursuant to which the Pre-Petition Revolving Guarantors guaranteed the Pre-Petition Revolving Credit Agreement.  The Pre-Petition

---

[7]    This outstanding balance is inclusive of the Early Termination Fee (as defined in the Pre-Petition Revolving Credit Agreement).

Revolving Credit Agreement currently provides for a senior secured revolving credit facility in the aggregate maximum committed principal amount of $80.0 million (including any letters-of-credit issued thereunder).

15. The Pre-Petition Revolving Guarantors have guaranteed, as primary obligors, the prompt and complete payment and performance of all obligations under the Pre-Petition Revolving Financing Documents. Pursuant to the US Law Guarantee and the German Law Guarantee, each of the Pre-Petition Revolving Guarantors and the Pre-Petition Revolving German Guarantors, have agreed to pay any amount of principal, interest, costs, expenses or other amounts owed under or in connection with the Pre-Petition Revolving Financing Documents that has not been fully and irrevocably paid by the Pre-Petition Revolving Borrowers. The obligations under the Pre-Petition Revolving Financing Documents are secured by substantially all of the (a) assets of each of the Pre-Petition Revolving Borrowers and the Pre-Petition Revolving Guarantors and (b) equity interests of the Pre-Petition Revolving German Guarantors. The Pre-Petition Revolving Liens rank senior to Synacor's liens as of the Petition Date.

16. The Pre-Petition Revolving Credit Agreement has a stated maturity date of July 30, 2024. Interest on outstanding amounts under the Pre-Petition Revolving Credit Agreement accrues at SOFR plus an applicable margin of 5.86448% (until March 15, 2023) and 7.86448% thereafter. As of the Petition Date, approximately $19.9 million in aggregate principal amount and accrued but unpaid interest remains outstanding on the Pre-Petition ABL Facility.

**B. Seller Notes**

**1. 123TV Seller Note**

17. Pursuant to that certain Sale and Purchase Agreement, dated as of September 22, 2021 (the "Share Purchase Agreement"), sellers Emotion Invest GmbH & Co. KG, BE Beteiligungen Fonds GmbH & Co. geschlossene Investmentkommanditgesellschaft and Iris

Capital Fund II (together, the "123TV Sellers") agreed to sell 100% of the shares of each of 123tv Invest GmbH and 123tv Holding GmbH to non-Debtor purchaser iMedia & 123tv Holding GmbH ("123tv Holding GmbH").  In connection with the Share Purchase Agreement, 123tv Holding GmbH entered into a Vendor Loan Agreement with the 123TV Sellers, as lenders (as amended, restated, supplemented, amended and restated or otherwise modified from time to time, the "123TV Seller Note"), whereby the 123TV Sellers agreed to novate the obligation of 123tv Holding GmbH to pay a portion of the purchase price owed under the Share Purchase Agreement into an interest-bearing vendor loan.  The obligations under the 123TV Seller Note are guaranteed by Debtor iMedia and non-Debtors 1-2-3.tv GmbH and 123tv Beteiligungs GmbH.  The 123TV Seller Note had an original principal amount of EUR18,000,000.

18.     Interest on the 123TV Seller Note accrues at a per annum rate equal to 8.50%.  As of the Petition Date, approximately EUR16,155,583 in aggregate principal amount and accrued but unpaid interest is outstanding on the 123TV Seller Note.  The 123TV Seller Note has a maturity date of September 29, 2023.

19.     Non-Debtors 123tv Holding GmbH, 1-2-3.tv GmbH, and 123tv Beteiligungs GmbH have guaranteed, as primary obligors, the prompt and complete payment and performance of all obligations under the 123TV Seller Note.  The 123TV Seller Note is subordinated to the full cash payment of the Pre-Petition ABL Facility.[8]

### 2.      Synacor Promissory Note

20.     In connection with that certain Asset Purchase Agreement, dated as of July 30, 2021 (the "Synacor Asset Purchase Agreement"), by and among Debtors iMedia and

---

[8]     On July 29, 2022, Debtor iMedia entered into a letter agreement with 123tv Holding Gmbh (the "Financial Support Letter"), whereby, pursuant to the Financial Support Letter, iMedia agreed to directly pay to the 123TV Sellers any payment obligations under the 123TV Seller Note if 123tv Holding GmbH is unable to fulfill such payment obligations or if the payment of such obligations would render 123tv Holding GmbH as insolvent.

Portal and Synacor, Debtor Portal issued the Synacor Promissory Note to Synacor in an original principal amount of $10.0 million.

21.     Interest on the Synacor Promissory Note accrues at a per annum rate equal to 9.00% until July 30, 2023, and 11.00% thereafter.  As of the Petition Date, approximately $4.1 million in aggregate principal amount and accrued but unpaid interest is outstanding on the Synacor Promissory Note.   The Synacor Promissory Note has a maturity date of December 31, 2023.

22.     Debtor iMedia guaranteed, as primary obligor, the prompt and complete payment and performance of all obligations under the Synacor Promissory Note.  The obligations under the Synacor Promissory Note are secured by substantially all of the assets of Debtor Portal, which consist principally of certain limited intellectual property assets and a limited number of contracts related to the Debtors' iMDS business.

**C.      Unsecured Notes**

**1.      Senior Unsecured Notes**

23.     Pursuant to an Indenture, dated as of September 28, 2021 (as amended by that certain First Supplemental Indenture, dated as of September 28, 2021, the "Indenture"), with U.S. Bank National Association as Trustee, Debtor iMedia issued senior notes in an original principal amount of $80.0 million in exchange for cash in the same amount (all such notes issued pursuant to the Indenture, the "Senior Unsecured Notes").  The Senior Unsecured Notes are traded publicly on the Nasdaq stock exchange under symbol "IMBIL".

24.     Interest on the Senior Unsecured Notes accrues at a per annum rate equal to 8.50%. As of the Petition Date, approximately $81.7 million in aggregate principal amount and accrued but unpaid interest remains outstanding on the Senior Unsecured Notes.  The Senior Unsecured Notes have a maturity date of September 30, 2026.

25.    The Senior Unsecured Notes represent unsecured obligations of Debtor iMedia and rank equally with all other unsecured debt of Debtor iMedia.  Debtor iMedia is the sole obligor under the Senior Unsecured Notes and, therefore, the Senior Unsecured Notes are structurally junior to the obligations of iMedia's subsidiaries.

## 2.    Growth Capital Partners Note

26.    Pursuant to a Securities Purchase Agreement, dated as of April 18, 2022 (the "Securities Purchase Agreement"), Debtor iMedia issued a promissory note to Growth Capital Partners, LLC ("GCP") in an original principal amount of $10.6 million in exchange for cash in the same amount on April 18, 2022 (the "Growth Capital Partners Note").

27.    On May 25, 2023, GCP delivered a notice of default with respect to a "Trigger Event" (as defined in the Growth Capital Partners Note) that occurred on May 23, 2023.  Such notice of default stated, pursuant to the terms of the Growth Capital Partners Note, if Debtor iMedia failed to cure such Trigger Event within five (5) business days of receipt of such notice of default, an Event of Default under the Growth Capital Partners Note would occur on and as of such date.  Debtor iMedia failed to cure such Trigger Event on or prior to June 2, 2023, and, as a result, an Event of Default under the Growth Capitals Partners Note occurred and was continuing on and as of such date. On June 14, 2023, as a result of such Event of Default, the Debtors received a notice of acceleration from GCP and a demand for payment of the full amount owed under the Growth Capital Partners Note.  On June 23, 2023, GCP filed suit against iMedia in the Third Judicial District Court of Salt Lake County in the State of Utah for breach of the Growth Capital Partners Note.

28.    Interest on the Growth Capital Partners Note accrued at a per annum rate equal to 7.00% until June 1, 2023, and at a default rate of 18% thereafter.  As of the Petition Date, approximately $3.2 million in aggregate principal amount and accrued but unpaid interest and

fees remain outstanding on the Growth Capital Partners Note.  The Growth Capital Partners Note matured on May 18, 2023.

29.     The Growth Capital Partners Note represents an unsecured obligation of Debtor iMedia and ranks equally with all other unsecured debt of Debtor iMedia. Debtor iMedia is the sole obligor under the Growth Capital Partners Note and, therefore, the Growth Capital Partners Note is structurally junior to the obligations of iMedia's subsidiaries.

### 3.      PIPE Convertible Notes

30.     Pursuant to a Loan Agreement, dated as of April 10, 2023 (the "PIPE Loan Agreement"), Debtor iMedia issued promissory notes to, among others, BSMF LLC, OCI-VB, LLC, Mr. Tim Peterman, Invicta Media Investments LLC, Mr. Aaron Reitkopf, Mr. Michael Friedman and Mr. Alan Aldworth (each, a "Purchaser")[9] in an aggregate original principal amount totaling $3.5 million (all such notes issued pursuant to the PIPE Loan Agreement, the "PIPE Convertible Notes").[10]

31.     Interest on the PIPE Convertible Notes accrues at a per annum rate equal to 7.75%, increasing to 15.00% on January 1, 2024.  As of the Petition Date, approximately $3.6 million in aggregate principal amount and accrued but unpaid interest remains outstanding on the PIPE Convertible Notes.  The PIPE Convertible Notes have a maturity date of March 31, 2024.

32.     The PIPE Convertible Notes represent unsecured obligations of Debtor iMedia and rank equally with all other unsecured debt of Debtor iMedia. Debtor iMedia is the sole obligor under the PIPE Convertible Notes and, therefore, the PIPE Convertible Notes are structurally

---

[9]     Messrs. Reitkopf, Friedman, and Aldworth are members of the iMedia Board.  Mr. Peterman is the Debtors' CEO, CFO, a member of the iMedia Board, and a director for certain iMedia subsidiaries.  Invicta Media Investments LLC is affiliated with Mr. Eyal Lalo, a member of the iMedia Board, and Mr. Friedman.

[10]    As of the Petition Date, neither Mr. Friedman nor Invicta Media Investments, LLC has paid the Debtors their aggregate $155,000 owed pursuant to the PIPE Loan Agreement and their PIPE Convertible Notes.

junior to the obligations of iMedia's subsidiaries. The right of the Purchasers to receive any payments from Debtor iMedia in respect of such entity's obligations under the PIPE Convertible Notes is subordinated to the full cash payment of the Prepetition ABL Facility.

RELIEF REQUESTED

## I.    THE DEBTORS HAVE AN IMMEDIATE AND CONTINUING NEED FOR DIP FINANCING AND ACCESS TO CASH COLLATERAL

33.    As noted above, the Debtors commenced these Chapter 11 Cases with limited cash on hand.  *See* Alt Declaration, ¶ 6.  As the Court is aware, the Debtors' cash on hand totaled approximately $1.7 million as of their June 30, 2023 "first day" hearing, excluding approximately $1.5 million held in the Debtors' Collateral Account (as defined in the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue to Operate their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue Certain Intercompany Transactions, and (II) Granting Related Relief [Docket No. 8]).  *Id.*

34.    As the Court is also aware, the Debtors received Court approval for the interim, consensual use of Cash Collateral for a limited two-week period ending July 8, 2023 (the "Initial Interim Period").[11]  *Id.* at ¶ 7.  However, the use of Cash Collateral alone is insufficient to fund the Debtors' business operations in the near term without risking immediate and potentially irreparable harm to the Debtors' Estates.  *Id.*  In particular, the Debtors' operations require substantial liquidity in terms of the Debtors' payroll obligations, vendor and content distribution payments, as well as rental expenses and other ordinary course obligations.  *Id.*  The use of Cash

---

[11]    Such relief was granted by the Court pursuant to the *Interim Order (I) Authorizing Postpetition Use of Cash Collateral; (II) Granting Adequate Protection to Prepetition Secured Parties and C&B Newco; (III) Scheduling A Second Interim Hearing; and (IV) Granting Related relief* [Docket No. 61] (the "Cash Collateral Motion").

Collateral after the Initial Interim Period, alone, would not be reasonably sufficient to permit the Debtors to satisfy these obligations in the ordinary course without risking substantial degradation in value to the detriment of all parties in interest.  *Id.*

35.     Relatedly, on or about the date hereof, the Debtors entered into a going concern transaction with the Buyer[12] providing for the sale of substantially all their assets, as a going concern, in a transaction that that the Debtors expect will provide jobs for substantially all of their employees, will provide for the repayment of the asset-based lending obligations, and will provide for the assumption of certain trade liabilities through contract cures or otherwise.[13]  *Id.* at ¶ 8.  A key aspect of this value-maximizing transaction, though, is the Debtors' ability to continue their operations in the ordinary course amidst the overhang of these Chapter 11 Cases.  *Id.*

36.     Incremental liquidity provided under the Debtors' proposed DIP Facility is essential in this regard.  *Id.* at ¶ 9.  This determination results from the analysis undertaken by the Debtors where the Debtors have, in consultation with their proposed financial advisor, Huron, performed a review and analysis of their projected cash needs.  *Id.*  Based upon that review and analysis, the Debtors and their advisors determined that the use of Cash Collateral alone would be insufficient to operate their businesses, and that additional funding would be advisable to provide an adequate cushion to the Debtors' operations without imposing the material risk of immediate and potentially irreparable harm to the Debtors' business value.  *Id.*  That is, the

---

[12]    The Debtors' proposed sale transaction is described more fully in the *Debtors' Motion Pursuant to Sections 105, 363, and 365 of the Bankruptcy Code for Entry of an Order (I) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of All Encumbrances Other Than Assumed Liabilities; (II) Approving the Debtors' Entry into the Asset Purchase Agreement; (III) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief,* filed contemporaneously herewith.

[13]    To be sure, the Debtors, with the assistance of their advisors, are continuing to market their businesses to determine if a higher or better value-maximizing transaction may be available for the benefit of their stakeholders.

Debtors cannot operate on a "Cash Collateral only" basis without unduly risking operational integrity and, in particular, their ability to proceed with the going concern transaction contemplated by their APA (as defined in the DIP Credit Agreement) with the proposed Buyer. *Id.* The Debtors are in need of both access to Cash Collateral and an immediate infusion of liquidity to ensure sufficient working capital to operate their businesses in the ordinary course, purchase inventory, pay their employees, vendors and content providers, service their customers, and pursue a value-maximizing sale transaction during the Chapter 11 Cases. *Id.* Absent the liquidity provided under their proposed DIP Facility at the outset of these Chapter 11 Cases, the Debtors' Estates will be materially and perhaps irreparably harmed. *Id.*

37.    Indeed, the Debtors' ability to maintain a going concern transaction and, relatedly, to obtain the financing available under their DIP Facility, is key to the Debtors' ability to prevent their non-Debtor German subsidiaries from undertaking insolvency proceedings as may otherwise be affirmatively required under German law. *Id.* at ¶ 10. The Debtors' Estates will be materially harmed if in fact the Debtors' German subsidiaries commence such insolvency proceedings in the near term. *Id.*

38.    In furtherance of assessing and then quantifying their cash needs, the Debtors, with assistance from Huron prepared an initial budget outlining the funding that will be critical in the initial six (6) weeks post-Petition Date, with such budget to be updated pursuant to the terms of the DIP Facility (the "Initial Budget"). *Id.* at ¶ 11. The Initial Budget is sufficient and provides liquidity to pay for, among other things, wages, vendors, taxes to applicable taxing authorities, and inventory in the ordinary course of business. *Id.* Based on information available as of the Petition Date, the Debtors believe the Initial Budget is an accurate reflection of their initial funding requirements and will allow them to meet their obligations during these Chapter 11 Cases.

*Id.*   The Debtors believe the Initial Budget is fair, reasonable, and appropriate under the circumstances here.  *Id.*

## II.    ALTERNATIVE SOURCES OF FINANCING ARE NOT AVAILABLE ON BETTER TERMS

### A.    THE MARKETING PROCESS

39.     Prior to the commencement of these Chapter 11 Cases, on April 18, 2023, the Debtors retained Lincoln Partners Advisors LLC ("Lincoln") to serve as their investment banker, initially to assist in identifying new lenders to refinance the Pre-Petition ABL Facility.  *See* Lee Declaration, ¶ 9.  In consultation with the Debtors, and with approval from the Special Committee, Lincoln began exploring strategic alternatives, including a prepetition marketing process for a sale of some or all of the Debtors' assets as well as a marketing process to obtain debtor in possession ("DIP") financing.  *Id.*  Lincoln was actively involved in the Debtors' prepetition marketing efforts, analysis of the financing options, and the Debtors' efforts to obtain DIP financing to ensure the Debtors' businesses maintained sufficient liquidity to operate while pursuing the sale of all or segments of the Debtors' businesses (the "Sale Process").  *Id.*

40.     Based on the Debtors' recent financial results and the existing capital structure, the Debtors and their advisors (including Lincoln) believed their only alternatives were to: (a) obtain the consent of the Pre-Petition Revolving Secured Parties to the priming of their liens by a third-party lender; (b) locate a third-party lender willing to provide postpetition financing on a junior or unsecured basis; or (c) find lenders willing to refinance out the Pre-Petition Revolving Secured Parties in full and provide incremental liquidity. *Id.* at ¶ 10.

41.     Concurrently with undertaking the prepetition Sale Process, on May 12, 2023, Lincoln launched the marketing process to raise third-party DIP financing in anticipation of a chapter 11 filing, as the Pre-Petition Revolving Lenders indicated a desire to be refinanced rather

than increase their credit exposure in order to support the Company through a sale transaction. *Id.* at ¶ 11.  Lincoln initiated outreach to 32 potential DIP lenders, including a mix of alternative lenders, hedge funds and private credit lenders, to discuss the provision of postpetition financing on a senior/priming basis, junior basis, or a full take-out of the Debtors' existing outstanding senior debt.  *Id.*  Of the 32 lenders contacted, 20  lenders executed non-disclosure agreements, received access to (i) the Debtors' Confidential Information Presentation (the "CIP") and (ii) additional diligence materials via a virtual data room, and held preliminary conversations with Lincoln.  *Id.*  All except one of the lenders who received the CIP indicated they would not consider providing financing on a non-consensual priming or junior basis and declined to provide DIP financing, citing recent negative financial performance, concerns around the value of the collateral, and/or the transaction structure.  *Id.*

42.      Lincoln received one proposal for a short-term priming bridge facility of $15 million, which would have required the Pre-Petition Revolving Lenders to take a junior position behind the new lender to give the Debtors time to continue negotiations with a potential Buyer.  *Id.* at ¶ 12.  However, given the limited two-week period provided by the facility, high fees and interest rate, and a proposed financing amount that was insufficient to repay the existing senior debt in full, the Pre-Petition Revolving Lenders and the Debtors determined the proposal was not worth pursuing.  *Id.*

43.      In light of the challenges associated with raising third-party financings, the Debtors, in consultation with their advisors, ultimately concluded that the best and most efficient approach was to continue engaging with the Pre-Petition Revolving Lenders to negotiate the terms of a DIP facility.  *Id.* at ¶ 13.  Concurrently with such negotiations, the Debtors, with the support of their advisors, began discussions with the Buyer regarding the sale of substantially all of the

Debtors' assets contemplated by the Proposed RNN Transaction.  *Id.*  As part of the negotiations in connection with the Proposed RNN Transaction, the Pre-Petition Revolving Lenders required that the Buyer provide new money DIP financing on a junior basis to their prepetition balances. *Id.*  Lincoln therefore worked with both the Pre-Petition Revolving Lenders, the Buyer, and the Debtors to negotiate both the size and the structure of the DIP Facility, whereby the Pre-Petition Revolving Lenders and the Buyer would each fund 50% of the new money DIP financing on a junior basis to the prepetition senior debt.  *Id.*  The Debtors, the Buyer, and the Pre-Petition Revolving Lenders agreed on this structure following extensive negotiations prior to and following the commencement of these Chapter 11 Cases, agreed to each fund $7.5 million of the $15 million new money portion of the DIP Facility on a pari passu basis to support the Proposed Sale Transaction.  *Id.*

44.     Simply put, the DIP Facility is the value-maximizing financing option for the Debtors.  *Id.* at ¶ 14.  Although the Debtors received Court approval for the interim use of Cash Collateral at the outset of these Chapter 11 Cases, the Debtors' current cash flow is insufficient to prudently fund the postpetition Sale Process without unduly risking the operational integrity of the Debtors' businesses.  *Id.*  The financing provided by the DIP Facility is essential for the Debtors to fund their operations as they seek to effectuate the Proposed Sale Transaction, subject to higher or better bids, and prevent any further erosion of the value of their Estates.  Indeed, accepting the postpetition financing proposed by the DIP Lenders was an appropriate step given that the DIP financing (a) provides a path through these Chapter 11 Cases by allowing the Debtors to effectuate the Proposed Sale Transaction, subject to higher or better bids, and conduct an orderly wind-down, (b) provides additional liquidity to support the administration of these Chapter 11 Cases, (c) obviates the need for a potential protracted and expensive dispute regarding

adequate protection and further use of Cash Collateral, and (d) provides additional evidence of the Buyer's commitment to the Proposed Sale Transaction given the Buyer is funding a portion of the DIP Facility.  *Id.*

### B.   THE DIP FACILITY WAS NEGOTIATED IN GOOD FAITH AND AT ARM'S LENGTH

45.     The Debtors' management, legal, and financial advisors were actively involved throughout the negotiations with the DIP Lenders for debtor in possession financing, which were conducted at arm's length and in good faith.  *See* Lee Declaration, ¶ 16.  The terms of the DIP Facility, including the rates, fees, certain customary waivers, and the "roll-up" feature provided therein, were negotiated for over multiple weeks leading up to the Petition Date, with the Debtors and their advisors negotiating the Interim Order, the DIP Credit Agreement, and each of the DIP Financing Documents through a vigorous, hard-fought process.  *Id.*  The Debtors and their advisors worked to negotiate the most favorable terms of the DIP Facility available to the Debtors given the absence of alternative third-party financing.  *Id.*  Ultimately, the DIP Lenders were unwilling to lend on terms other than those specifically set forth in the DIP Financing Documents, including the roll-up of the Pre-Petition Revolving Obligations.  *Id.*

### C.   THE "ROLL-UP" AND RELATED RELIEF CONTEMPLATED BY THE DIP FACILITY ARE APPROPRIATE

46.     The "roll-up" is a material component of the structure of the DIP Facility and was a key point heavily negotiated between the Debtors and the DIP Lenders.  *Id.* at ¶ 14.  Moreover, the "roll-up" was a requirement of the Pre-Petition Revolving Secured Parties to agree to the further consensual use of Cash Collateral and provide postpetition financing, which is being provided on a junior basis to the Pre-Petition ABL Facility, and is necessary for the Debtors to effectuate a value-maximizing transaction.  *Id.*  The Debtors believe that the Pre-Petition Revolving Secured Parties were oversecured as of the Petition Date.  *Id.*  While the parties differ

as to the appropriate valuation method and exact collateral coverage ratio, they do agree that in all events that because the obligations under the Pre-Petition ABL Facility are fully secured, it is a matter of when – not if – they will need to be paid by the Debtors. *Id.* In connection with the DIP Financing, the Pre-Petition Revolving Lenders are providing significant benefits to the Debtors and their stakeholders by, among other things, releasing reserves and funding a new money DIP financing. *Id.* Accordingly, the Debtors believe the "roll-up" is justified under these circumstances and would not unduly prejudice any creditor. *Id.*

47.     The DIP Lenders indicated that the "roll-up" was part and parcel of, and integral to, the overall DIP Facility and a condition precedent for the DIP Lenders to extend postpetition financing to the Debtors. *See* Lee Declaration, ¶ 21. Based on consultation with their advisors and the results of the DIP marketing process, the Debtors believe that there are no alternative financing sources available to the Debtors, and the Debtors have an immediate need to obtain the DIP Facility and to use Cash Collateral to preserve value for their stakeholders and to prevent immediate and irreparable harm to the value of the Estates. *Id.* The Debtors therefore ultimately made the decision that the benefits of accessing the DIP Facility and consensual use of Cash Collateral in connection with the "roll-up" structure are in the best interests of the Debtors and their Estates. *Id.*

48.     In addition to the "roll-up," the DIP Lenders would not have consented to providing postpetition financing without the Debtors' waiver of, among other things, their ability to surcharge against the Pre-Petition Revolving Collateral or DIP Collateral pursuant to Bankruptcy Code section 506(c), subject to and upon entry of a Final Oder. *See* Lee Declaration at ¶ 17. The Pre-Petition Revolving Lenders are consenting to use of their Cash Collateral and new-money loans for, among other things, payments critical to the administration of these

Chapter 11 Cases, including funds set aside for the payment of professionals under the Carve-Out, to which the Pre-Petition Revolving Lenders have agreed to subordinate their Pre-Petition Revolving Liens. As set forth in the Lee Declaration, the Debtors believe such waiver is appropriate under the circumstances of these Chapter 11 Cases. *Id.*

**D.    THE RATES AND FEES OF THE DIP FACILITY ARE REASONABLE**

49.    Pursuant to the DIP Financing Documents, the Debtors have agreed, after good faith, arm's length negotiations with the DIP Lenders and subject to Court approval, to pay certain interest and fees to the DIP Agent and the DIP Lenders. *See* Lee Declaration, ¶ 18. Specifically, in connection with the DIP Facility, the Debtors have agreed to an interest rate of 10% plus the Term SOFR (as defined in the DIP Credit Agreement) per annum payable in cash on the first day of each month in arrears (the "<u>Applicable Rate</u>"). *Id.* The Applicable Rate applies to both the portion of the DIP Facility constituting the Term Loan Commitment (as defined in the DIP Credit Agreement) and the portion of the DIP Facility constituting the Revolving Loans (as defined in the DIP Credit Agreement). *Id.* Upon the occurrence and during the continuation of an Event of Default (as defined in the DIP Credit Agreement), interest will accrue at SOFR plus the Applicable Rate plus a rate equal to 2.0% per annum, payable in cash upon demand. In addition, the Debtors have agreed to pay to the DIP Agent the: (i) Closing Fee, (ii) Collateral Monitoring Fee, and (iii) the Unused Line Fee (each as defined in the DIP Credit Agreement and, collectively, the "<u>DIP Fees</u>"). *Id.* The Closing Fee will be calculated solely on account of the new money portion of the DIP Facility. *Id.*

50.    The Debtors believe the Applicable Rate and the DIP Fees provided for in the DIP Facility are reasonable under the circumstances as compared to similar debtor in possession financings in the market as well as the attendant interest rates and fees in comparable debtor in possession financing facilities. *Id.* at ¶ 19. The Applicable Rate and DIP Fees are customary,

usual, and in line with debtor in possession financings of this kind. *Id.* The Debtors and their advisors, including Lincoln considered the Applicable Rate and the DIP Fees when determining whether the DIP Facility constituted the best alternative reasonably available to the Debtors. *Id.* As a result, the Debtors' payment of the Applicable Rate and DIP Fees in order to obtain the DIP Facility is in the best interests of the Estates. *Id.*

51.     The Debtors and the DIP Lenders agree that the terms, covenants, interest rates, and fees under the DIP Credit Agreement, including the Applicable Rate and the DIP Fees, were subject to negotiation and are an integral component of the overall terms of the DIP Facility, which, in turn, is integral to the Debtors' restructuring's efforts and effectuating the Proposed Sale Transaction. *Id.* at ¶ 20. Under the Debtors' circumstances, the Applicable Rate and the DIP Fees pursuant to the DIP Financing Documents are reasonable because such economics constitute the best terms on which the Debtors could obtain the financing necessary to maintain their ongoing business operations and fund these Chapter 11 Cases and are an integral component of the overall terms of the DIP Facility. *Id.*

**D.     THE MILESTONES THAT THE DEBTORS MUST MEET UNDER THE TERMS OF THE DIP FACILITY ARE REASONABLE**

52.     The DIP Facility contemplates, as a product of negotiation with and as required by the DIP Lenders as a condition to providing the DIP Facility, certain milestones the Debtors must meet throughout these Chapter 11 Cases, the failure of which would constitute an event of default under the DIP Credit Agreement. *See* Alt Declaration, ¶ 12. These milestones were heavily negotiated and required by the DIP Lenders as a condition to providing the DIP Facility. *Id.*

53.     The DIP Facility, including the milestones, serves as an important component of these Chapter 11 Cases because it will provide the Debtors with the stability and certainty they need to operate in the ordinary course of business while consummating the proposed sale, subject

26

to identifying higher or better offers. *Id.* at ¶ 13. The continued and viable operation of the Debtors' business would not be possible absent access to the DIP Facility. *Id.* The DIP Facility, and the Debtors' ability to achieve the milestones contemplated therein, will prevent interruptions to the Debtors' operations, preserve the Debtors' ability to maintain ordinary course relationships with, among other parties in interest, employees, customers, and vendors, satisfy working capital needs in the ordinary course, and enable the Debtors to facilitate the proposed sale to maximize the value of their Estates. *Id.*

## III.   THE DIP FACILITY PROVIDES ADEQUATE PROTECTION TO THE PRE-PETITION SECURED PARTIES AND C&B NEWCO

54.     The Debtors have provided sufficient adequate protection to their secured creditors who, like the Pre-Petition Revolving Secured Parties, have not otherwise consented to their treatment here. *See* Alt Declaration, at ¶ 14. First, the DIP Facility is not priming any lender that was already senior[14] to the Pre-Petition ABL Facility. *Id.* Second, the liens securing the Synacor Promissory Note are junior to the liens securing the Pre-Petition ABL Facility, at the applicable obligor—namely, Debtor Portal. *Id.* More fundamentally, neither Portal, nor its assets, are being sold pursuant to the Debtors' proposed sale to the Buyer. *Id.* Consequently, Synacor's substantive rights with respect to whatever collateral, if any, resides at Portal, will be unaffected by the Debtors' proposed financing and related transaction. *Id.*

55.     In addition, the DIP Facility provides adequate protection to all of the Debtors' secured creditors to the extent, if any, of diminution of such parties' interests in the Estates' interest in the applicable collateral as of the Petition Date. *Id.* at ¶ 15. More specifically, the Debtors propose the following various forms of adequate protection for the Pre-Petition

---

[14]    As set forth more specifically in the DIP Order, certain liens that were valid, prior, senior, enforceable, and non-avoidable to those of the Pre-Petition Revolving Lenders may be considered "Pre-Petition Prior Liens."

Revolver Secured Parties, Synacor and C&B Newco, as applicable, subject to the terms of the

DIP Order: (a) replacement liens upon the Pre-Petition Revolving Collateral and the Pre-Petition

Synacor Collateral to the extent, if any, of diminution in value of the Pre-Petition Revolving

Secured Parties' and Synacor's respective interests in the respective Estates' interest in the

Pre-Petition Revolving Collateral and the Pre-Petition Synacor Collateral as of the Petition Date;

(b) superpriority administrative expense claims for any such diminution in value; (c) financial

reporting; (d) with respect to the Pre-Petition Revolver Secured Parties, payment of reasonable

and documented professional fees and expenses; (e) with respect to Synacor, segregation of the

proceeds received by the Debtors on account of customer receipts generated by Debtor Portal up

to an aggregate amount of $40,000 per week; and (f) with respect to C&B Newco, segregation of

proceeds received by the Debtors on account of the sale of the Consigned Inventory. *Id.*

Therefore, even if the value of the Pre-Petition Revolving Collateral, the Pre-Petition Synacor

Collateral, or the Consigned Inventory decreases during these Chapter 11 Cases, the Pre-Petition

Revolving Secured Parties, Synacor, and C&B Newco are adequately protected. *Id.*

## IV.     MATERIAL TERMS OF THE DIP FACILITY

56.     The following chart contains a summary of: (i) the material terms of the DIP

Facility; and (ii) use of the Pre-Petition Revolving Secured Parties' and Synacor's Cash

Collateral, each with references to the applicable sections of the relevant source documents, as

required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B), and Local Rule 4001-2.

| SUMMARY OF MATERIAL TERMS OF THE DIP FACILITY[15] | | |
|---|---|---|
| **Borrowers** | iMedia Brands, Inc.; Valuevision Interactive, Inc.; Valuevision Retail, Inc.; PW Acquisition Company, | DIP Credit Agreement, Preamble |

---

[15]   The summary of the DIP Facility is qualified in its entirety by reference to the applicable provisions of the DIP Credit Agreement or the Interim Order, as applicable. If there are any inconsistencies between this summary and the provisions of the DIP Credit Agreement or the Interim Order, the provisions of the DIP Credit Agreement or the Interim Order, as applicable, shall control. Any capitalized terms used but not otherwise defined in this

| | | |
|---|---|---|
| Bankruptcy Rule 4001(c)(1)(B) | LLC; FL Acquisition Company; Valuevision Media Acquisitions, Inc.; JWH Acquisition Company; Norwell Television, LLC; 867 Grand Avenue LLC; Portal Acquisition Company | |
| **Guarantors** Bankruptcy Rule 4001(c)(1)(B) | VVI Fulfillment Center, Inc.; EP Properties, LLC; iMedia&-1-2-3.TV Holding GmbH, 123TV Invest GmbH, 123TV Holding GmbH, 123TV Beteiligungs GmbH, 1-2-3.TV GmbH and 1-2-Pay GmbH | DIP Credit Agreement, Preamble; Section 1.6(a) |
| **Administrative Agent** Bankruptcy Rule 4001(c)(1)(B) | Siena Lending Group LLC | DIP Credit Agreement, Preamble |
| **DIP Lenders** Bankruptcy Rule 4001(c)(1)(B) | Siena Lending Group LLC; Crystal Financial SPV LLC; Crystal Financial LLC D/B/A SLR Credit Solutions; North Mill Capital D/B/A SLR Business Credit; RNN-TV Licensing Co. LLC | DIP Credit Agreement, Preamble; Signature Pages |
| **Commitment** Bankruptcy Rule 4001(c)(1)(B)  Local Rule 4001-2(a)(ii) | **Revolving Loans**: $19,947,305.40  **Term Loan**: $15,000,000 | DIP Credit Agreement, Sections 1.1(a)-(b); Schedule A, Section 1.1(a) |
| **Provisions Deeming Prepetition Debt To Be Postpetition Debt** Local Rule 4001-2(a)(i)(O) | **Interim Roll-Up**:  Upon entry of the Interim Order, the Debtors shall immediately apply the DIP Term Loan proceeds on account of the Pre-Petition Revolving Obligations (as defined herein) and continue to apply amounts collected during the Interim Period on account of the DIP ABL Obligations (as defined herein) outstanding, in accordance with the terms of the DIP Financing Documents and the Interim Order (the "Initial Roll-Up"), in such order and manner as elected by the DIP Agent in its sole and absolute discretion.  **Subsequent Roll-Up**:  Upon entry of the Final Order, at the option of the DIP Agent, the Debtors shall exchange and substitute in the DIP Agent's sole discretion all or a portion of the remaining amount, if any, of Total Revolving Loan Commitments (as defined in the Pre-Petition Revolving Credit Agreement) on a cashless, dollar-for-dollar basis with the DIP Facility (the "Subsequent Roll-Up," and together with the Initial Roll-Up, the "Roll-Up") . | DIP Credit Agreement, Section 1.4(b)  Interim Order, pp. 2–3 |
| **Scheduled Maturity Date** Bankruptcy Rule 4001(c)(1)(B)  Local Rule 4001-2(a)(i)(M) | The earliest to occur of (a) the APA Closing Date, (b) August 6, 2023, (c) the date of the conversion of the Case to a case under Chapter 7 of the Bankruptcy Code, (d) the date of the dismissal of the Case, and (e) July 24, 2023 if the Final Order has not been entered or has not become effective as of such date. | DIP Credit Agreement, Schedule A, Section 6 |

summary shall have the respective meanings ascribed to such terms in the DIP Credit Agreement or the Interim Order, as applicable.

| **Use of Proceeds**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(L) | All proceeds of all Loans shall be used by Borrowers solely (a) to repay any and/or all of the Pre-Petition Obligations, in whole or in part, in cash, and/or to reimburse any and/or all of the professional fees, costs and expenses of the Pre-Petition Agent and the Pre-Petition Lenders, in whole or in part, in cash, in each case as elected by Agent in its sole and absolute discretion from time to time as provided for herein, (b) to pay fees and expenses payable under this Agreement or any of the Loan Documents to the Post-Petition Secured Parties, (c) for Borrowers' working capital purposes in accordance with the Initial Budget and each Approved Budget, (d) to fund the Carve-Out (including the Carve-Out Reserve Account) in accordance with the Initial Budget and each Approved Budget, and (e) for such other purposes as specifically permitted pursuant to the terms of this Agreement or the DIP Orders, in each case, to the extent such use of proceeds is not otherwise prohibited under the terms of this Agreement and is otherwise consistent with the terms of the Interim Order and the Final Order, as applicable.  All proceeds of all Loans will be used solely for lawful business purposes. | DIP Credit Agreement, Section 5.13; Interim Order, ¶ I.C.4 |
| **Interest Rate**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(B) | <u>DIP Revolving Loans and DIP Term Loans</u>:  10.0% per annum in excess of Term SOFR or if the Base Rate is then in effect pursuant to Section 2.6 of the DIP Credit Agreement, 9.00% per annum in excess of the Base Rate.<br><br><u>Default Interest Rate</u>: Additional 2.0% per annum upon the occurrence and during the continuance of an Event of Default. | DIP Credit Agreement, Section 2.1; Schedule A, Section 3 |
| **Fees**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(B) | <u>Closing Fee</u>: To Agent, For the ratable account of the Term Lenders, a fee equal to $300,000 (the "<u>Closing Fee</u>"). The full amount of the Closing Fee shall be deemed to be fully earned and payable on the Closing Date, and shall be allocated to the Term Lenders in accordance with their Pro Rata Shares.<br><br><u>Collateral Monitoring Fee</u>: To Agent, for its sole and separate account and not the account of any Lender, a collateral monitoring fee in the amount of $10,000 per month, payable on the Closing Date and on the first day of each month thereafter.  The collateral monitoring fee shall be deemed earned in full on the date when same is due and payable hereunder and shall not be subject to rebate or proration upon termination of this Agreement for any reason.<br><br><u>Unused Line Fee</u>: For the ratable benefit of Lenders holding the Revolving Loan Commitments, an unused line fee equal to 0.50% per annum of the amount by which (i) the Maximum Revolving Facility Amount exceeds (ii) the average daily outstanding principal balance of the Revolving Loans during the immediately | DIP Credit Agreement, Schedule C |

| | | |
|---|---|---|
| | preceding month (or part thereof), which each such monthly fee shall be deemed to be fully earned and payable, in arrears, on the first Business Day of each month until the Termination Date. | |
| **Priority, Collateral Under the DIP Facility** Bankruptcy Rules 4001(c)(1)(B)(i), 4001(c)(1)(B)(ii) | First priority liens on substantially all assets of the Debtors, subject to the Carve-Out and any valid, binding, perfected, enforceable, and unavoidable liens or security interests existing as of the Petition Date, or that were subsequently perfected postpetition to the extent permitted by Bankruptcy Code section 546(b) (collectively, the "Pre-Petition Prior Liens" and each a "Pre-Petition Prior Lien").<br><br>With respect to the Carve-Out Reserve Account, the Segregated Utility Funds,[16] and the Segregated Tax Funds[17] (collectively, with the Carve-Out Reserve Account and the Segregated Utility Funds, the "DIP Segregated Funds") respectively, the DIP Collateral shall include only a reversionary interest (the "Reversionary Interest") of the Debtors in such accounts and/or funds after all Professionals, utility providers, and taxing authorities benefitting from such funds, respectively, as applicable, have been indefeasibly paid in full, in cash consistent with the terms of the Utilities Orders,[18] the Taxes Orders,[19] and the Interim Order, as applicable. | DIP Credit Agreement, Section 3.1; Interim Order, ¶ II.A.1 |
| **Carve-Out** Bankruptcy Rule 4001(b)(1)(B)(iii)<br><br>Local Rule 4001-2(a)(i)(F) | The Interim DIP Order provides a "Carve-Out" of certain allowed fees and expenses of professionals retained under sections 327, 328, or 1103 of the Bankruptcy Code, including any official committee of unsecured creditors appointed under section 1102 of the Bankruptcy Code, subject to a cap of $25,000 for an investigation of the Pre-Petition Secured Parties' liens and claims by a committee, and a Post-Carve-Out Trigger Notice Cap (as defined in the Interim Order), all as detailed in the Interim DIP Order. | Interim Order, ¶ V |

---

[16]  "Segregated Utility Funds" means the Adequate Assurance Account (as defined in the *Debtors' Motion for Entry of Interim and Final Order (I)(A) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (B) Approving the Debtors' Proposed Procedures for Resolving Additional Assurance Requests, and (C) Prohibiting Utility Providers from Altering, Refusing, or Discounting Services, and (II) Granting Related Relief* [Docket No. 16] (the "Utilities Motion") and all funds held therein and the proceeds thereof.

[17]  "Segregated Tax Funds" means the segregated funds, and the proceeds thereof, authorized to be paid on account of the taxes and fees held in trust for the exclusive benefit of the applicable taxing authorities pursuant to the relief granted in paragraph four of the Court's *Interim Order (I) Authorizing Debtors to Pay Certain Prepetition Taxes and Fees and (II) Granting Related Relief* [Docket No. 64] (the "Interim Taxes Order") and any relief of similar import set forth in a final order of the Court.

[18]  "Utilities Orders" means the interim and final Court orders approving the Utilities Motion.

[19]  "Taxes Orders" means the Interim Taxes Order and any final order entered by the Court granting final relief in connection therewith.

| Adequate Protection Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | **Pre-Petition ABL Adequate Protection Liens.** Subject in all respects to the Carve-Out and Section II(A)(2)(e) herein, and solely to the extent of diminution in value, if any, of such interests in the Estates' interests in such collateral as of the Petition Date pursuant to Bankruptcy Code section 361 and 363(c), and subject to the Pre-Petition Prior Liens and the DIP Liens, the Debtors shall grant the Pre-Petition Agent, for itself and for the benefit of the Pre-Petition Revolving Lenders, valid and perfected replacement security interests in, and liens on (the "Pre-Petition ABL Adequate Protection Liens"), the DIP Collateral.<br><br>**Pre-Petition ABL Adequate Protection Claim.** Subject in all respects to the Carve-Out and Section II(A)(2)(e), as further adequate protection, to the extent that the Pre-Petition Agent Adequate Protection Liens do not adequately protect the diminution in value of the Pre-Petition Revolving Secured Parties' interests in the Pre-Petition Revolving Collateral and the DIP Collateral, the Pre-Petition Agent, for the benefit of the Pre-Petition Revolving Secured Parties, is hereby granted, to the extent of such diminution in value, an allowed superpriority administrative expense claim (the "Pre-Petition ABL Adequate Protection Claim" and together with the  Pre-Petition Agent Adequate Protection Liens, the "Pre-Petition ABL Adequate Protection") in these Chapter 11 Cases or any Successor Cases against the Debtors' Estates under Bankruptcy Code sections 503 and 507(b), which shall have priority over all other administrative expense claims (except as set forth in Section II(A)(2)(e) herein and the DIP Superpriority Claim), priority claims, and unsecured claims against the Debtors or their Estates, which are now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses and priority or other claims of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c) (upon entry of a Final Order), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114.<br><br>**Interest.**   As further adequate protection, the Pre-Petition Agent, for the benefit of the Pre-Petition Revolving Secured Parties, shall be entitled to interest on account of the outstanding secured Pre-Petition Revolving Obligations at the default rate set forth in the Pre-Petition Revolving Financing Documents, which was in effect as of the Petition Date and which shall accrue and be paid at the times and in the manner set forth in the Pre-Petition Revolving Financing Documents.<br><br>**Adequate Protection Payments.**  As further adequate protection, and without limiting any rights of the Pre-Petition Agent, for the benefit of the Pre-Petition | Interim Order, ¶ IV |

Revolving Secured Parties, under Bankruptcy Code section 506(b) (which rights are hereby preserved), the Debtors shall pay or reimburse the Pre-Petition Agent (the "Adequate Protection Payments") for any and all of its reasonable and documented fees, costs, expenses, and charges accrued and payable under the Pre-Petition Revolving Financing Documents, including, without limitation, the fees and expenses of the Pre-Petition Agent (including attorneys' fees and costs) as provided in Section 10.7 of the Pre-Petition Revolving Credit Agreement, whether accrued and unpaid pre-petition or accrued and unpaid post-petition, all without further notice, motion, or application to, Order of, or hearing before, this Court; provided, however, that the DIP Agent shall be permitted to include such fees and expenses in the DIP Obligations and make a DIP Revolving Loan for the purposes of effectuating such payment by the Debtors, following submission of a redacted summary invoice to the Debtors and their counsel, the U.S. Trustee and, if appointed, a Committee or its counsel, of a written invoice (subject in all respects to applicable privilege or work product doctrines). Within ten business (10) days after delivery of such invoices in accordance with this paragraph (or such shorter time period agreed to by the DIP Agent, the Debtors, the U.S. Trustee, and, if appointed, the Committee), the Debtors shall pay such reasonable and documented fees and costs, provided, however, that to the extent an objection has been raised to certain fees and costs within such ten (10) business days, the Debtors shall pay only such fees and costs to which no objection has been raised.  To the extent there is an objection with respect to such costs and fees that is not consensually resolved, the Court may resolve the objection.  Such written invoices shall include the invoices of Blank Rome LLP, counsel to the Pre-Petition Agent, counsel to Crystal Financial LLC d/b/a SLR Credit Solutions, Morgan Lewis & Bockius, LLP, and any other professional, advisor, or agent reasonably retained by the Pre-Petition Agent or its counsel in connection with the Pre-Petition Revolving Financing Documents pursuant to the Chapter 11 Cases; provided, however, that none of such fees and expenses paid as adequate protection payments hereunder shall be subject to approval by the Court or the United States Trustee Guidelines unless an objection is interposed and cannot be resolved by the parties.  No recipient of any such payment shall be required to file with respect thereto any interim or final fee application with the Court.  Any and all fees charged under the Pre-Petition Revolving Financing Documents shall be as set forth in the Pre-Petition Revolving Financing Documents and shall be payable at the times set forth in the Pre-Petition Revolving Financing Documents.

**Reporting**.  As further adequate protection, the Debtors shall provide the Pre-Petition Agent copies of all periodic reports required under the DIP Credit Agreement or the Interim Order, including without limitation weekly reporting with respect to the Debtors' sale efforts.

**Synacor Adequate Protection Liens.**  Solely to the extent entitled under applicable law and for diminution in value, if any, of such interests pursuant to Bankruptcy Code section 361 and 363(c), and subject and subordinate in all respects to the Carve-Out, Section II(A)(2)(e) hereof, the DIP Liens, and the Pre-Petition ABL Adequate Protection Liens, Portal shall grant Synacor valid and perfected replacement security interests in, and liens on (the "Synacor Adequate Protection Liens, and together with the Pre-Petition Agent Adequate Protection Liens, the "Adequate Protection Liens") the DIP Collateral comprised solely of the assets of Portal or its Estate; provided that distribution on account of such assets and Estate shall remain subject to resolution by separate Court order of the priority of security interests in and liens on such assets or Estate between the Pre-Petition Revolving Secured Parties, Synacor, and any other lawful holder of security interests in and liens.

**Synacor Adequate Protection Claim.**  Subject in all respects to the Carve-Out and Section II(A)(2)(e), and solely to the extent entitled under applicable law, as further adequate protection, to the extent that the Synacor Adequate Protection Liens do not adequately protect the diminution in value of Synacor's interests in the Portal Estate's interests in the Pre-Petition Synacor Collateral as of the Petition Date, Synacor is hereby granted, to the extent of such diminution in value, if any, an allowed superpriority administrative expense claim (the "Synacor Adequate Protection Claim" and together with the Pre-Petition Agent Adequate Protection Claim, the "Adequate Protection Claims," and the Adequate Protection Liens together with the Adequate Protection Claims, the "Adequate Protection") in the Portal Estate or any Successor Case against Portal's Estates under Bankruptcy Code sections 503 and 507(b), which, subject to the Carve-Out, shall have priority over all other administrative expense claims (except as set forth in Section II(A)(2)(e) herein), priority claims, and unsecured claims against Portal or its Estate (excluding the DIP Superpriority Claim), which are now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses and priority or other claims of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c) (upon entry of a Final Order), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114; provided that that distribution on

| | | |
|---|---|---|
| | account of such superpriority administrative expense claims shall remain subject to resolution by separate Court order of the priority of security interests in and liens on such assets or Estate between the Pre-Petition Revolving Secured Parties, Synacor, and any other lawful holder of security interests in and liens.<br><br>**Synacor Adequate Protection Proceeds**. Subject in all respects to the Carve-Out and Section II(A)(2)(e), during the Interim Period, the Debtors shall segregate the proceeds received by the Debtors on account of customer receipts generated by Debtor Portal Acquisition Company up to an aggregate amount of $40,000 per week (the "Synacor Adequate Protection Proceeds") to be used by Portal in the ordinary course of business, which, for the avoidance of doubt, shall not include any transfer to, or payment of any fees or expenses of, any other Debtor, in accordance with the Interim Order and the Initial Budget.<br><br>**Synacor Reporting.** As further adequate protection, the Debtors shall provide Synacor, concurrently with delivery to the DIP Agent or its counsel, copies of all periodic reports delivered under the DIP Credit Agreement or the Interim Order.<br><br>**C&B Newco Adequate Protection Proceeds.** Subject in all respects to the Carve-Out and Section II(A)(2)(e), and solely to the extent entitled under applicable law, to the extent of diminution in value of C&B Newco's interests in iMedia's interests in the Consigned Inventory as of the Petition Date pursuant to Bankruptcy Code section 361 and 363(c), if any, and subject and subordinate in all respects to the Carve-Out, the Debtors shall segregate the proceeds received by the Debtors on account of the sale of the Consigned Inventory (the "C&B Newco Adequate Protection Proceeds"); provided that the distribution of the C&B Newco Adequate Protection Proceeds by the Debtors shall remain subject to the resolution by separate Court order of the priority of security interests in and liens on such proceeds between the Pre-Petition Revolving Secured Parties, C&B Newco, and any other lawful holder of security interests in and liens on the C&B Newco Adequate Protection Proceeds. | |
| **Milestones**<br>Bankruptcy Rule 4001(c)(1)(B)(vi)<br><br><br>Local Rule 4001-2(a)(i)(H) | The Debtors shall comply with the following milestone deadlines (each, a "Milestone" and collectively, the "Milestones"):<br><br>(i)    obtain court approval of the Interim Order on or before July 6, 2023;<br><br>(ii)    obtain court approval of the Final Order on or before July 24, 2023; | DIP Credit Agreement, Section 5.15(n) |

|  |  |  |
|---|---|---|
|  | (iii) file a motion under section 363 of the Bankruptcy Code seeking authority to sell all or substantially all of the Loan Parties' and their Subsidiaries' assets pursuant to the APA (the "Sale Motion"), subject to the receipt of "higher and better" bids (the "Approved Sales"), in form and substance reasonably satisfactory to the Agent and Revolving Lenders, on or before the Closing Date; |  |
|  | (iv) file with the Bankruptcy Court the schedule of Purchased Contracts, including any Cure Costs (as such terms are defined in the APA) on or before July 25, 2023; |  |
|  | (v) the Bankruptcy Court shall have held the Sale Hearing on or before July 27, 2023; |  |
|  | (vi) obtain a court order of the Approved Sale (the "Sale Order") to the successful bidder on or before August 2, 2023, such Sale Order to be in form and substance reasonably satisfactory to the Revolving Lenders; and |  |
|  | (vii) consummate the Approved Sale on or before August 5, 2023. |  |
| **Loan Covenants** Bankruptcy Rule 4001(c)(1)(B)  Local Rule 4001-2(a)(i)(B) | The DIP Financing Documents contain customary and appropriate affirmative and negative covenants for DIP financings of this type, including: (i) provision of and compliance with the Initial Budget and any Approved Budget; (ii) use of proceeds of the DIP Facility in accordance with the terms of the DIP Credit Agreement; (iii) satisfaction of the Milestones; (iv) payment of taxes; (v) compliance with applicable law and regulations; (vi) provision of written notification to the DIP Agent in connection with any additional Intellectual Property acquired or arising after the Closing Date; (vii) maintenance of all federal, state, local and other licenses and permits; (viii) maintenance of insurance; (ix) reporting of financial information; (x) maintenance of collateral; (xi) prohibition of incurring any indebtedness other than the DIP Obligations or as otherwise permitted by the DIP Credit Agreement; and (xii) prohibition of incurring any lien or other encumbrance, except as contemplated by the DIP Credit Agreement. | DIP Credit Agreement, Section 5 |
| **Events of Default** Bankruptcy Rule 4001(c)(1)(B)  Local Rule 4001-2(a)(i)(M) | "Events of Default" that are usual and customary for financings of this type, including: (i) the entry of a Court order vacating the Interim DIP Order or the Final DIP Order; (ii) non-payment of principal, interest and fees when due; (iii) failure by any Debtor to be in compliance of any covenant, condition, or agreement contained in the DIP Credit Agreement; (iv) breaches of representations and warranties; (v) occurrence of a Change of Control; (vi) dismissal or conversion of the Debtors' Chapter 11 Cases; (vii) appointment of a trustee or examiner; (viii) relief from the automatic stay | DIP Credit Agreement, Section 7.1; Interim Order, ¶ VII.A |

| | | |
|---|---|---|
| | for the benefit of any other creditor with respect to any DIP Collateral where the amount in controversy is equal to or greater than $100,000; (ix) the payment of any prepetition obligations other than as permitted by the DIP Orders or set forth In the Initial Budget or any Approved Budget, as applicable; (x) termination of exclusivity; (xi) the Final Order is not entered on or before July 24, 2023 (or, if earlier, the date on which the Interim Order terminates or expires); (xii) the filing of a motion seeking approval to sell a material portion of the assets of the Debtors without the DIP Agent's prior written consent; (xiii) occurrence of a Material Budget Variation; (xiv) any default by under the APA which permits a party thereunder to terminate the APA (unless such default is waived or cured);  (xv) any default under the German Vendor Loan Amendment or the German Vendor Loan Deferral Agreement; (xvi) judgments for an aggregate amount in excess of $500,000; (xvii) defaults under any other Indebtedness of the Loan Parties in a principal amount in excess of $500,000; and  (xviii) a breach of the terms or provisions of the DIP Orders. | |
| **Conditions of Borrowing** Bankruptcy Rule 4001(c)(1)(B)  Local Rule 4001-2(a)(i)(E) | Certain customary conditions to extensions under the DIP Facility, including: (i) each Loan Party shall have executed and/or delivered the requisite agreements, instruments, documents and/or certificates to the DIP Agent; (ii) entry of the Interim Order; (iii) entry of the Final Order within twenty-three (23) days of the Closing Date; (iv) no default or event of default under the DIP Facility shall have occurred and be continuing; (v) all representations and warranties of the Debtors shall be true and correct in all material respects; and (vi) Revolving Lenders shall have received duly executed copies of the German Vendor Loan Amendment, the German Vendor Loan Deferral Agreement, the German Guarantee and the German Parallel Debt Agreement. | DIP Credit Agreement, Section 1.6 |
| **Indemnification** Bankruptcy Rule 4001(c)(1)(B)(ix) | The Loan Parties shall indemnify the Released Parties and hold them harmless from any and all liabilities based upon or arising out of the transactions contemplated by the DIP Credit Agreement, any of the Obligations, any DIP Collateral, or any other matter in connection with execution or performance of the DIP Agent or the DIP Lenders pursuant to the DIP Financing Documents, other than as a result the gross negligence or willful misconduct of the applicable Released Party(ies). | DIP Credit Agreement, Section 6.2 |
| **Budget** Bankruptcy Rule 4001(c)(1)(B)  Local Rule 4001-2(a)(iii) | The Loan Parties shall furnish the DIP Agent, not later than 5:00 p.m. (Eastern time) on the Wednesday of each week, a proposed update to the then in effect Initial Budget or Approved Budget, as applicable, for the period commencing the Sunday of the current week and through the following five (5) weeks, which shall be in substantially the same form and detail as the Initial | DIP Credit Agreement 5.15(k); Interim Order, ¶ L.4 |

| | | |
|---|---|---|
| | Budget, each to be accompanied by a certificate signed by an Authorized Officer of Borrowers to the effect that such proposed budget has been prepared on the basis of sound financial planning practice consistent with past budgets and financial statements, that such officer has no reason to question the reasonableness of any material assumptions on which such projections were prepared and the proposed budget has been thoroughly reviewed by the Borrowers, their management and their advisors. Such proposed budget shall become the "Approved Budget" as defined and for all purposes hereunder and under the DIP Orders upon written approval thereof by the Required Lenders in their sole discretion following a reasonable opportunity to review and comment thereon. Until such time as the Required Lenders have approved (or deemed approved) such proposed budget, the applicable budget hereunder shall be the Initial Budget or the most recent Approved Budget, as applicable.<br><br>The Debtors believe that the Initial Budget or any Approved Budget, as applicable, will be adequate, considering all available assets, to pay all administrative expenses due or accruing during the period covered by such budget. | |
| **Variance Covenant**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i) | The occurrence of any of the following shall constitute a "<u>Material Budget Deviation</u>":<br><br>(i)   as of the last day of any Budget Test Period, actual Gross A/R and Inventory is less than ninety percent (90%) of the projected amount of Gross A/R and Inventory as of such date set forth in the Initial Budget. "<u>Gross A/R and Inventory</u>" means the sum of (i) the aggregate book value of Loan Parties' Accounts, plus (ii) the aggregate book value of Loan Parties' Inventory.<br><br>(ii)  for any Budget Test Period (excluding the Budget Test Period ending July 8, 2023), actual aggregate net cash flow (as calculated in the line item "Net Cash Flow / (Deficit)" in the Initial Budget or Approved Budget) for the such Budget Test Period is greater than 115% of the projected aggregate net cash flow for such Budget Test Period set forth in the Initial Budget or Approved Budget (the "<u>Permitted Variance</u>"); provided that the Permitted Variance shall not be used for, and does not apply to, the Carve-Out Reserve Account or the Carve-Out. | DIP Credit Agreement, Section 7.1(kk) |
| **Use of Cash Collateral; Entities with Interest in Cash Collateral** | The Debtors are authorized to use Cash Collateral subject to and in accordance with the terms, conditions, and limitations set forth in the Interim Order and the DIP Financing Documents. | Interim Order, ¶ I.A |

| | | |
|---|---|---|
| Bankruptcy Rule 4001(b)(l)(B)(i) | The Pre-Petition Revolving Lenders have consented to the Debtors' use of Cash Collateral on the terms set forth in the Interim Order. | |
| **Liens on Avoidance Actions** Bankruptcy Rule 4001(c)(1)(B)(xi) Local Rule 4001(a)(i)(U) | Upon entry of the Final Order, the DIP Liens shall extend to Avoidance Actions and the proceeds thereof. | DIP Credit Agreement, Section 3.1; Interim Order, ¶ II.A.1 |
| **Challenge Period** Bankruptcy Rules 4001(c)(1)(B), 4001(c)(1)(B)(viii) Local Rule 4001(a)(i)(Q) | The Debtors' Stipulations made in the Interim Order are subject to the rights of parties to assert standing to bring a Challenge (as defined in the Interim Order) within seventy-five (75) days of the entry of the Interim Cash Collateral Order. Failure of the creditors' committee or any other party in interest to file such a pleading with the Court shall forever bar such party from making such a Challenge. | Interim Order, ¶ VIII.A |
| **Waivers/Modification of Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv) Local Rule 4001-2(a)(i)(S) | Upon the occurrence of and during the continuance of an Event of Default, and without the necessity of seeking relief from the automatic stay or any further Order of the Court, (i) the DIP Agent and DIP Lenders shall no longer have any obligation to make any DIP Loans (or otherwise extend credit), (ii) the DIP Agent and the Pre-Petition Agent shall be entitled to immediately terminate the Debtors' right to use Cash Collateral, without further application or Order of this Court, provided, however, that the Debtors shall have the right to use Cash Collateral to pay their weekly ordinary course payroll included in the Initial Budget and any Approved Budget, as applicable, in each case subject to Permitted Variances, through the date on which such Event of Default occurs, and (iii) the Debtors shall be bound by all post-default restrictions, prohibitions, and other terms as provided in the Interim Order, the DIP Credit Agreement and the other DIP Financing Documents and the Pre-Petition Revolving Financing Documents. Upon the occurrence of and during the continuance of an Event of Default, with the consent (to the extent such consent is required under the DIP Credit Agreement) of the Required Lenders (or, following the occurrence and during the continuance of a Specified Event of Default (as defined in the DIP Credit Agreement), with consent of the Revolving Lenders), and without the necessity of seeking relief from the automatic stay or any further Order of the Court, (x) all amounts outstanding under the DIP Financing Documents shall be accelerated and become immediately due and payable; (y) the DIP Agent shall be entitled to charge the default rate of interest under the DIP Credit Agreement; and (z) subject only to the notice requirement set forth in Section VII(B)(2) | Interim Order, ¶ VII.B.1 |

| | | |
|---|---|---|
| | below, both the DIP Agent and the Pre-Petition Agent shall be entitled to take any other action or exercise any other right or remedy as provided in the Interim Order, the DIP Financing Documents, the Pre-Petition Revolving Financing Documents, or applicable law, including, without limitation, setting off any DIP Obligations (other than with respect to any amount required to fund the Carve-Out Reserve Account up to the Carve-Out Cap as set forth in the Interim Order) or Pre-Petition Revolving Obligations with DIP Collateral, Pre-Petition Revolving Collateral, or proceeds in the possession of any Pre-Petition Revolving Secured Party or DIP Secured Party, and enforcing any and all rights and remedies with respect to the DIP Collateral or Pre-Petition Revolving Collateral, as applicable. | |
| **Section 506(c), 552(b) "Equities of the Case," and Marshalling Waivers** <br> Bankruptcy Rule 4001(c)(1)(B)(x) <br><br> Local Rule 4001-2(a)(i)(V)-(X) | Subject to entry of a Final Order, the Debtors waive any rights to surcharge against the DIP Collateral or the Pre-Petition Revolving Collateral pursuant to section 506(c) of the Bankruptcy Code without prior consent of the DIP Agent. <br><br> Subject to entry of a Final Order, the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Lenders or Pre-Petition Revolving Secured Parties with respect to the proceeds of any of the DIP Collateral or the Pre-Petition Revolving Collateral, as applicable. <br><br> Subject to the entry of a Final Order, in no event shall the DIP Agent, the DIP Lenders, or the Pre-Petition Revolving Secured Parties be subject to the equitable doctrine of "marshalling" or any similar equitable doctrine with respect to the Pre-Petition Revolving Collateral or the DIP Collateral. | Interim Order, ¶¶ IX.A, X.I |
| **Cross-Collateralization** <br> Local Rule 4001-2(a)(i)(N) | The DIP Credit Agreement secures Pre-Petition Obligations with a valid and perfected first priority continuing security interest in all post-petition property of the Debtors. | DIP Credit Agreement, Section 3.1 |
| **Prepayment** <br> Local Rule 4001-2(a)(i)(I) | There are no provisions that impose any prepayment penalty. However, the Borrowers shall be required to prepay the outstanding principal balance of the Loans on the date of each and every Prepayment Event (and on any date thereafter on which proceeds pertaining thereto are received by any Loan Party), in each case without any demand or notice from Agent, any Lender or any other Person, all of which is hereby expressly waived by Borrowers, in the amount of 100% of the proceeds (net of documented reasonable out-of-pocket costs and expenses incurred in connection with the collection of such proceeds, in each case payable to Persons that are not Affiliates of any Loan Party) received by any Loan Party with respect to such Prepayment Event. Such repayments, other than repayments made with proceeds | DIP Credit Agreement, Section 1.8(b) |

| | | |
|---|---|---|
| | of Extraordinary Receipts (any such prepayment amount an "Extraordinary Receipt Amount"), shall be applied to either the Pre-Petition Obligations (other than the ETF) or the Post-Petition Obligations as Revolving Lenders may elect in its sole and absolute discretion in accordance with the Interim Order and the Final Order, subject to Borrowers' ability to reborrow Loans in accordance with the terms hereof. Extraordinary Receipt Amounts shall be applied in accordance with Section 4.2(ii) of the DIP Credit Agreement. | |
| **Releases**<br>Bankruptcy Rule<br>4001(c)(1)(B)(viii) | In consideration of and as a condition to Agent and the Lenders making Loans under this Agreement and providing other credit and financial accommodations to the Loan Parties pursuant to the provisions of the Interim Order and the Loan Documents, each Loan Party, on behalf of itself, its successors and assigns, its estate, and other legal representatives (collectively, the "Releasors"), hereby absolutely releases and forever discharges and acquits each Pre-Petition Secured Party and each of their respective successors, participants, and assigns, and their present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees, and other representatives (the Pre-Petition Agent and each Pre-Petition Lender, and all such other parties being hereinafter referred to collectively as the "Releasees") of and from any and all claims, demands, causes of action, suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages, and any and all other claims, counterclaims, cross claims, defenses, rights of set-off, demands, and liabilities whatsoever (individually, a "Pre-Petition Released Claim" and collectively, the "Pre-Petition Released Claims") of every kind, name, nature and description, known or unknown, foreseen or unforeseen, matured or contingent, liquidated or unliquidated, primary or secondary, suspected or unsuspected, both at law and in equity, including, without limitation, any so-called "lender liability" claims or defenses, that any Releasor may now or hereafter own, hold, have, or claim to have against the Releasees, or any of them for, upon, or by reason of any nature, cause, or thing whatsoever that arose or may have arisen at any time on or prior to the date of the Interim Order, in respect of the Loan Parties, the Pre-Petition Obligations, the Pre-Petition Loan Documents, and any Pre-Petition Loans, letters of credit, or other financial accommodations under the Pre-Petition Loan Documents. (b) Upon the payment in full of all Obligations owed to Agent and the Lenders by the Loan Parties and termination of the rights and obligations arising under this Agreement, the Interim Order and the other Loan Documents (which payment and termination shall be on terms and conditions acceptable to the Required Lenders), the Agent and the Lenders shall be automatically deemed absolutely and | DIP Credit Agreement, Section, Section 10.24; Interim Order IX.B |

| | forever released and discharged from any and all obligations, liabilities, actions, duties, responsibilities, commitments, claims and causes of action arising or occurring in connection with or related to this Agreement, the other Loan Documents, the Interim Order or the Final Order (whether known or unknown, direct or indirect, matured or contingent, foreseen or unforeseen, due or not due, primary or secondary, liquidated or unliquidated).(c) Each Releasor hereby absolutely, unconditionally and irrevocably covenants and agrees with each Releasee that it will not sue (at law, in equity, in any regulatory proceeding, or otherwise) any Releasee on the basis of any Pre-Petition Released Claim that has been released and discharged by each Releasor pursuant to this Section 10.24. If any Releasor violates the foregoing covenant, Loan Parties agree to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation. | |

57.     Each of the foregoing terms is justified because the Debtors need immediate access to financing and the use of Cash Collateral to continue in these Chapter 11 Cases and facilitate the Sale Process.  The DIP Facility is the only viable proposal to provide critical liquidity and was negotiated at arm's length.

<strong>BASIS FOR RELIEF REQUESTED</strong>

**I.     ENTRY INTO THE DIP FINANCING DOCUMENTS IS AN EXERCISE OF THE DEBTORS' SOUND BUSINESS JUDGEMENT**

58.     The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Financing Documents, obtain access to the proceeds of the DIP Facility, and continue using the Cash Collateral.  Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below.  Courts grant debtors considerable deference in acting in accordance with their business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g., In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a

postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

59.     To determine whether the business judgment test is met, the Court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Dura Auto. Sys. Inc.*, No. 06-11202 (KJC), 2007 WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007) (citation omitted). Bankruptcy courts generally will not second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the [Bankruptcy] Code." *In re Curlew Valley Assoc.'s*, 14 B.R. 506, 513–14 (Bankr. D. Utah. Oct. 8, 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

60.     In determining whether the Debtors have exercised sound business judgment in entering into the DIP Financing Documents, the Court should consider the economic terms of the DIP Facility under the totality of circumstances. *See* Hr'g Tr. at 734–35:24, *In re Lyondell Chem. Co.*, No. 09-10023 (Bankr. S.D.N.Y. Feb. 27, 2009) (recognizing that "the terms that are now available for DIP financing in the current economic environment aren't as desirable" as they once were previously, referring to the period following the 2008 financial markets collapse); *In re*

*Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003) (while many of the terms favored the DIP lenders, "taken in context, and considering the relative circumstances of the parties," the court found them to be reasonable); *In re Elingsen McLean Oil Co., Inc.*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard" bargains to acquire funds for its reorganization).    Moreover, the Court may appropriately take into consideration non-economic benefits to the Debtors offered under the DIP Facility.  *See In re ION Media Networks, Inc.*, No. 09-13125 (JMP), 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (holding that "a business decision to obtain credit from a particular lender is almost never based purely on economic terms. . . .   Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization. . . .").

61.    The Debtors' decision to enter into the DIP Facility is an exercise of their sound business judgment.  As further discussed in the Alt Declaration, the DIP Facility was a product of an arm's length negotiation and a careful evaluation of alternatives.  *See* Alt Declaration,  ¶ 12. The Debtors ultimately decided that moving forward with the proposed DIP Facility was an appropriate step given that the DIP Facility: (a) provides a path through these Chapter 11 Cases by allowing the Debtors to effectuate the Proposed Sale Transaction, subject to higher or better bids, and conduct an orderly wind-down, (b) provides additional liquidity to support the administration of these Chapter 11 Cases, (c) obviates the need for a potential protracted and expensive dispute regarding adequate protection and further use of Cash Collateral, and (d) provides additional evidence of the Buyer's commitment to the Proposed Sale Transaction given the Buyer is funding a portion of the DIP Facility.  *See* Lee Declaration, at ¶ 14.    The Debtors and their advisors therefore determined that entry into the DIP Facility was the best path

available and they have obtained the best terms currently achievable under the circumstances.  *Id.*

at ¶ 15.

## II.     THE DEBTORS SHOULD BE AUTHORIZED TO GRANT LIENS AND SUPERPRIORITY CLAIMS

62.     The Debtors propose to obtain the DIP Facility by providing security interests and

liens as set forth in the DIP Financing Documents and described above.  The Debtors satisfy the

requirements for relief under section 364 of the Bankruptcy Code, which authorizes a debtor to

incur secured or superpriority debt under certain circumstances.  Specifically, section 364(c) of

the Bankruptcy Code provides that:

> If the trustee is unable to obtain unsecured credit allowable under
> section 503(b)(1) of this title as an administrative expense, the court, after
> notice and a hearing, may authorize the obtaining of credit or the incurring
> of debt:
>
> (1)    with priority over any or all administrative expenses of the kind
>        specified in section 503(b) or 507(b) of this title;
>
> (2)    secured by a lien on property of the estate that is not otherwise
>        subject to a lien; or
>
> (3)    secured by a junior lien on property of the estate that is subject to a
>        lien[.]

11 U.S.C. § 364(c).

63.     To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor

need only demonstrate "by a good faith effort that credit was not available" to the debtor on an

unsecured or administrative expense basis.  *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549

(Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized,

after notice and hearing, upon showing that unsecured credit cannot be obtained).

"[Section 364(c)] imposes no duty to seek credit from every possible lender before concluding

that such credit is unavailable." *Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe*

*Co.*), 789 F.2d 1085, 1088 (4th Cir. 1986); *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense).

64.     When few (or no) lenders are likely to be able or willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom., *Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n. 4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two (2) national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and holding that debtor made reasonable efforts to satisfy standards of section 364(c) where it approached four (4) lending institutions, was rejected by two (2), and selected most favorable of two (2) offers it received).

65.     Courts have articulated a three (3)-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

    a.    the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;

    b.    the credit transaction is necessary to preserve the assets of the estate; and

    c.    the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*In re L.A. Dodgers LLC*, 457 B.R. at 312; *In re Aqua Assocs.*, 123 B.R. 192, 195–96 (Bankr. E.D. Pa. 1991); *In re St. Mary Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988).  Furthermore, in the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) of the Bankruptcy Code provides that a court "may authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien." 11 U.S.C. § 364(c).

66.    As described above, the Debtors are in need of an immediate infusion of liquidity to ensure sufficient working capital to operate their businesses and administer their Estates.  *See* Alt Declaration, at ¶ 7; *see also* Lee Declaration, at ¶ 20.  From the outset, several factors made clear that the required new money infusion in the form of debtor in possession financing would be highly likely to originate from existing members of the Debtors' capital structure.  *See* Lee Declaration, at ¶¶ 10–11, 15.  First, substantially all of the Debtors' assets were encumbered, which restricted the availability of, and the Debtors' options for, securing additional financing absent lenders consent or a bankruptcy.  *Id.* at ¶ 15.  Second, the Pre-Petition Revolving Lenders indicated they were not willing to provide the necessary DIP financing to support the Company through a sale transaction, including debt financing on an unsecured basis or equity financing subordinated to existing debt claims.  *Id.* at ¶ 11.  Third, unsecured financing was not a viable option due to the amount of existing secured debt relative to the Debtors' financial position.  *Id.* Fourth, the Debtors believed that the Pre-Petition Revolving Secured Parties would not consent

to "priming" debtor in possession financing. *Id.* at ¶ 10. Accordingly, the only available avenue for obtaining workable financing was with the Debtors' existing stakeholders.

67. As discussed above and as set forth in the Lee Declaration, Lincoln solicited potential alternative debtor in possession financing from 32 potential third-party DIP lenders to develop viable alternatives to the financing proposed by the DIP Lenders. *See* Lee Declaration, ¶ 11. Of the 32 lenders contacted, 20 lenders executed non-disclosure agreements, received access to (i) the Debtors' Confidential Information Presentation (the "CIP") and (ii) additional diligence materials via a virtual data room, and held preliminary conversations with Lincoln. *Id.* All except one of the lenders who received the CIP indicated they would not consider providing financing on a non-consensual priming or junior basis and declined to provide DIP financing, citing recent negative financial performance, concerns around the value of the collateral, and/or the transaction structure. *Id.*

68. As evidenced by the Alt Declaration, the incremental liquidity provided under the DIP Credit Agreement is needed to ensure adequate working capital and funding for the other administrative expenses associated with these Chapter 11 Cases. *See* Alt Declaration, at ¶¶ 7, 9. Absent this funding, the Debtors would not be able to continue to operate their businesses at the levels that are necessary to preserve their goodwill, employee morale, vendor confidence in the Debtors' businesses, and customer loyalty and reputation in the marketplace. *Id.* Accordingly, the enterprise value of the Debtors would be significantly impaired absent the funding provided by the DIP Facility.

69. Finally, the Debtors, with the assistance of Huron, Lincoln, and their other professionals, engaged in extensive, good-faith and arm's length negotiation with the DIP Lenders over the terms of the DIP Credit Agreement. *Id.* at ¶ 12. Those negotiations resulted in

fair and reasonable terms that are consistent with or better than terms generally available in the market for debtor in possession financing. *Id.* at ¶¶ 12–14.

## III.   THE DEBTORS SHOULD BE AUTHORIZED TO USE CASH COLLATERAL

70.     Section 363(c) of the Bankruptcy Code governs a debtor's use of a secured creditor's cash collateral.  Section 363(c) provides, in pertinent part, that:

> The trustee may not use, sell, or lease cash collateral . . . unless—
>
> (A) each entity that has an interest in such cash collateral consents; or
>
> (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2).   Here, the Pre-Petition Revolving Secured Parties consent to the Debtors' use of the Cash Collateral.

71.     Parties with an interest in cash collateral are entitled to adequate protection under section 363(e) of the Bankruptcy Code.  11 U.S.C. § 363(e).  Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay.  *In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc).  While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis.  *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")).

72.     As noted above, the Pre-Petition Revolving Secured Parties have consented to the use of Cash Collateral.  In addition, the Debtors propose providing the Pre-Petition Revolving Secured Parties, Synacor, and C&B Newco with adequate protection that (i) is fair and reasonable and (ii) adequately protects against the diminution in value of their interest in the Pre-Petition Revolving Collateral, the Pre-Petition Synacor Collateral, and the Consigned Inventory.  *See* Alt Declaration, at ¶¶ 17–18.  Specifically, the Debtors provide the Pre-Petition Revolving Secured Parties, Synacor, and C&B Newco with the following adequate protection, among other things, as applicable:

- Adequate Protection Liens (subject to the Carve-Out and the priorities set out in the Interim Order);

- Adequate Protection Claims (subject to the Carve-Out and the priorities set out in the Interim Order);

- Payment of professional fees, as applicable;

- financial reporting, as applicable;

- right to Credit Bid as set forth in the DIP Credit Agreement and the Interim Order;

- segregation of the proceeds received by the Debtors on account of the Consigned Inventory;

- segregation of the proceeds received by Debtors on account of customer receipts generated by Debtor Portal up to an aggregate amount of $40,000 per week;

- certain waivers described in the Interim Order; and

- compliance with the Milestones as set forth in the DIP Credit Agreement and the Interim Order.

73.     Accordingly, the Adequate Protection Obligations above are sufficient to protect the Pre-Petition Revolving Secured Parties, Synacor, and C&B Newco from diminution in value, if any, of their collateral, including the Cash Collateral, and the Consigned Inventory.  *See* Alt

Declaration, at ¶ 18.  In light of the foregoing, the Debtors submit, and the Pre-Petition Revolving

Secured Parties agree, that the proposed adequate protection is appropriate.

## IV.    THE DEBTORS SHOULD BE AUTHORIZED TO PAY THE FEES DUE UNDER THE DIP FINANCING DOCUMENTS

74.    The Debtors have agreed, subject to Court approval, to pay certain fees (including

the Closing Fee, the Collateral Monitoring Fee, and the Unused Line Fee) to the DIP Agent in

exchange for providing the DIP Facility.  As set forth in the Lee Declaration, the terms of the DIP

Financing Documents, including the fees imposed thereunder, constitute the best terms on which

the Debtors could obtain the financing necessary to maintain their ongoing business operations

and fund their Chapter 11 Cases and are an integral component of the overall terms of the DIP

Facility.  *See* Lee Declaration, ¶¶ 16–19.  Moreover, the fees are customary and usual and in line

with debtor in possession financings of this kind.  *Id.* at ¶ 17.  The Debtors considered the fees

when determining in their sound business judgment whether the DIP Facility constituted the best

alternative reasonably available to the Debtors.  *Id.*  The Debtors believe paying these fees in

order to obtain the DIP Facility is in the best interests of the Estates.  *Id.*  Accordingly, the Court

should authorize the Debtors to pay the fees.

## V.    THE "ROLL-UP" SHOULD BE APPROVED

75.    The DIP Facility requires that upon entry of the (a) Interim Order, collections

received by the Debtors during the Interim Period shall be applied on account of the Pre-Petition

Revolving Obligations and the DIP Obligations outstanding; and (b) upon entry of the Final

Order, the remaining amount of Total Revolving Loan Commitments be "rolled-up" into the DIP

Facility on a cashless, dollar-for-dollar basis.

76.    Here, the Debtors believe that the "roll-up" feature of the DIP Facility is

reasonable under the facts of this case.  *See* Lee Declaration, ¶ 19; *see also* Alt Declaration, ¶ 13.

The roll-up feature, in particular, was a heavily negotiated element of the DIP Facility.  *See* Alt Declaration, ¶ 13.  The DIP Lenders indicated that the roll-up element was part and parcel of, and integral to, the overall DIP Facility and a condition precedent to any postpetition financing to the Debtors.  *Id.*  Based on consultation with their advisors and the results of the DIP marketing process, the Debtors believe that there are no alternative financing sources available to the Debtors, and the Debtors have an immediate need to obtain the DIP Facility and to use Cash Collateral to preserve value for their stakeholders and to prevent immediate and irreparable harm to the value of the Estates.  *See* Lee Declaration, ¶ 13.  The Debtors therefore ultimately made the decision that the benefits of accessing the DIP Facility and consensual use of Cash Collateral in connection with the "roll-up" structure are in the best interests of the Debtors and their Estates under the circumstances.  *Id.* at ¶ 19.  The roll-up contemplated under the DIP Facility is also consistent with other roll-ups approved by this Court in similar circumstances.[20]

## VI.    THE 506(c) SURCHARGE WAIVER SHOULD BE APPROVED

77.    Section 506(c) of the Bankruptcy Code provides that the debtor in possession may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.  11 U.S.C. § 506(c).  It is customary for debtors to waive their ability to surcharge against their prepetition collateral or collateral securing a DIP financing in exchange for the DIP lenders' agreement that their liens and superpriority claims shall be subject to payment of a carve-out and permitted liens, subject to an entry of a final order, and courts in this district routinely grant such relief.  *See e.g., In AeroFarms, Inc.*, Case No. 23-10737 (MFW) (Bankr. D.

---

[20]    *See, e.g., In re Christmas Tree Shops, LLC*, Case No. 23-10576 (TMH) (Bankr. D. Del. June 5, 2023); *In re Indep. Pet Partners Holdings, LLC*, Case No. 23-10153 (LSS) (Bankr. D. Del. Mar. 3, 2023); *In re EYP Grp. Holdings, Inc.*, Case No. 22-10367 (MFW) (Bankr. D. Del. May 25, 2022).

Del. June 9, 2023) [Docket No. 50] (finding Debtors' request to seek waiver of 506(c) relief appropriate upon entry of a final order); *In re FB Debt Financing Guarantor, LLC*, Case No. 23-10025 (KBO) (Bankr. D. Del. Jan. 13, 2023) [Docket No. 100] (approving section 506(c) waiver subject to entry of a final order); *In re Carestream Health, Inc.*, Case No. 22-10778 (JKS) (Bankr. D. Del. Aug. 24, 2022) [Docket No. 65] (finding Debtors' request to seek waiver of 506(c) relief appropriate upon entry of a final order).  Here, in light of the DIP Lenders' agreement that their DIP Superpriority Claims shall be subject to the Carve-Out in all respects, the Debtors submit that the 506(c) surcharge waiver should be approved.

## VII.   THE DIP LENDERS SHOULD BE DEEMED GOOD FAITH LENDERS

78.    Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

79.    Here, the Debtors believe the DIP Facility embodies the most favorable terms on which the Debtors could obtain postpetition financing.  As further described in the Alt Declaration, negotiations of the terms of the DIP Credit Agreement with the DIP Lenders were conducted in good faith and at arm's length.  *See* Alt Declaration, ¶ 13.  The terms and conditions of the DIP Financing Documents are fair and reasonable, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code, and in accordance

with the DIP Orders and the DIP Financing Documents, including, for the avoidance of doubt, the Initial Budget and any Approved Budget, as applicable, in each case subject to any Permitted Variances. Further, no consideration is being provided to any party to the DIP Financing Documents other than as described herein and in the Alt Declaration. Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code, and are entitled to all of the protections afforded by that section.

## VIII.   SCOPE OF CARVE-OUT IS APPROPRIATE

80.     The DIP Liens (as defined in the Interim Order) and Adequate Protection Obligations are subject to the Carve-Out. Without the Carve-Out, the Debtors and other parties in interest may be deprived of certain rights and powers because the services for which professionals may be paid in these Chapter 11 Cases would be restricted. *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (observing that courts insist on carve-outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). The Carve-Out does not directly or indirectly deprive the Estates or other parties in interest of possible rights and powers. Additionally, the Carve-Out ensures that assets will be available for the payment of fees of the Clerk of the Court and the Office of the United States Trustee for the District of Delaware, under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate, and professional fees of the Debtors and an unsecured creditors committee, if one is appointed. Accordingly, the Carve-Out is necessary and appropriate, and should be approved.

81.     Furthermore, courts in this district and others routinely approve carve-outs agreed to by the debtors and their DIP lenders, similar to and less-restrictive than the Carve-Out. *See, e.g., In re Vesta Holdings, LLC*, No. 22-11019 (LSS) (Bankr. D. Del. Dec. 2, 2022); *In re Chinos Holdings, Inc.*, No. 20-32181 (KLP) (Bankr. D. Del June 5, 2020); *In re Pier 1 Imports, Inc.*, No.

20-30805 (KRH) (Bankr. E.D. Va. Mar. 13, 2020); *In re The Gymboree Corp.*, No. 19-30258 (KLP) (Bankr. E.D. Va. Feb. 15, 2019); *In re Claire's Stores, Inc.*, No. 18-10584 (MFW) (Bankr. D. Del. Apr. 24, 2018).

## IX.    MODIFICATION OF THE AUTOMATIC STAY IS WARRANTED

82.    The relief requested herein contemplates a modification of the automatic stay to permit the Debtors and the DIP Secured Parties, as applicable, to, among other things:  (i) grant the security interests, liens, and superpriority claims described above and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens; (ii) upon the occurrence of an Event of Default under the DIP Credit Agreement, subject to any applicable notice periods set forth in the DIP Orders, exercise any remedies available to them; and (iii) implement the terms of the proposed DIP Orders, including payment of all amounts referred to in the DIP Financing Documents.

83.    Stay modifications of this kind are ordinary and standard features of debtor in possession financing arrangements and, in the Debtors' business judgment, are reasonable and fair under the circumstances of the Chapter 11 Cases.    *See, e.g., In re FB Debt Financing Guarantor, LLC*, No. 23-10025 (KBO) (Bankr. D. Del. Feb. 16, 2023); *In re OSG Group Holdings, Inc.*, No. 22-10718 (JTD) (Bankr. D. Del. Aug. 9, 2022); *In re RentPath Holdings, Inc.*, No. 20-10312 (BLS) (Bankr. D. Del. Mar. 10, 2020); *In re Blackhawk Mining LLC*, No. 19-11595 (LSS); (Bankr. D. Del. Aug. 13, 2019); *In re Z Gallerie, LLC*, No. 19-10488 (LSS) (Bankr. D. Del. Apr. 9, 2019).

## REQUEST FOR A FINAL HEARING

84.    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request the Court set a date for the final hearing that is as soon as practicable, and in no event more than

twenty-one (21) days from the date of the filing of this Motion in accordance with the Milestones, and fix the time and date prior to the final hearing for parties to file objections to this Motion.

## IMMEDIATE AND UNSTAYED RELIEF IS NECESSARY

85.    The Court may grant the relief requested in this Motion immediately if the "relief is necessary to avoid immediate and irreparable harm."  Bankruptcy Rule 6003; *In re First NLC Fin. Servs., LLC*, 382 B.R. 547, 549 (Bankr. S.D. Fla. 2008).  The Third Circuit Court of Appeals has interpreted the language "immediate and irreparable harm" in the context of preliminary injunctions.  In that context, the Third Circuit has instructed that irreparable harm is that which "cannot be redressed by a legal or an equitable remedy following a trial."  *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989).  As explained above and in the Declarations, access to the DIP Facility and the use of Cash Collateral, in the interim amounts proposed, are essential and the relief requested is narrowly tailored to only the relief that is necessary to prevent immediate and irreparable damage to the Debtors' operations, and therefore, Bankruptcy Rule 6003 is satisfied.

## BANKRUPTCY RULE 6004(a) AND (h) WAIVERS ARE APPROPRIATE

86.    To implement the foregoing successfully, the Debtors request that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances, and waive the fourteen (14)-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).  As explained above and in the DIP Declarations, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors. Accordingly, ample cause exists to justify finding that the notice requirements under Bankruptcy Rule 6004(a) have been satisfied and to grant a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

## RESERVATION OF RIGHTS

87.    Except as otherwise provided in the DIP Orders, nothing contained herein is intended or shall be construed as:  (i) an admission as to the validity of any claim against the Debtors; (ii) a waiver of the Debtors' or any appropriate party in interest's rights to dispute the amount of, basis for, or validity of any claim against the Debtors; (iii) a waiver of any claims or causes of action that may exist against any creditor or interest holder; or (iv) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy between the Debtors and any third-party under section 365 of the Bankruptcy Code.

## NOTICE

88.    The Debtors will provide notice of this Motion to:  (a) United States Trustee for the District of Delaware, 844 N. King Street, Room 2207, Wilmington, Delaware, Attn: Richard L. Schepacarter (richard.schepacarter@usdoj.gov); (b) the United States Attorney's Office for the District of Delaware; (c) the state attorneys general for all states in which the Debtors conduct business; (d) the Internal Revenue Service; (e) the United States Securities and Exchange Commission; (f) the holders of the fifty (50) largest unsecured claims against the Debtors on a consolidated basis; (g) counsel to the Pre-Petition Agent, Blank Rome LLP, 1201 North Market Street, Suite 800, Wilmington, Delaware 19801; Attn: Regina Stango Kelbon, Esq. (regina.kelbon@blankrome.com);  (h) counsel to Crystal Financial LLC d/b/a SLR Credit Solutions, Morgan Lewis & Bockius, LLP, One Federal Street, Boston, Massachusetts 021110, Attn: Julia Frost-Davies (julia.frost-davies@morganlewis.com); (i) U.S. Bank, N.A. as indenture trustee for the Senior Unsecured Notes; (j) banks and financial institutions where the Debtors maintain accounts; (k) Wells Fargo; (l) counsel to C&B Newco, Riemer Braunstein LLP, Times Square Tower, Suite 2506, New York, New York 10036, Attn: Steven Fox, Esq. (sfox@riemerlaw.com) and Troutman Pepper Hamilton Sanders LLP, Hercules Plaza, Suite 5100,

1313 North Market Street, Wilmington, DE 19801, Attn: Douglas D. Herrmann (douglas.herrmann@troutman.com); (m) counsel to Synacor, Thompson Hine, LLP, 3900 Key Center, 127 Public Square, Cleveland, Ohio 44114 (Attn: Curtis Tuggle and Jonathan Hawkins, email: curtis.tuggle@ThompsonHine.com and jonathan.hawkins@ThompsonHine.com); (n) all parties known to have asserted a lien against the Debtors' assets; (o) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by this Motion; and (p) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors respectfully submit that, in light of the nature of the relief requested, no further notice is necessary.

[*Remainder of Page Intentionally Left Blank*]

**CONCLUSION**

WHEREFORE, the Debtors respectfully request that the Court enter the Interim Order, substantially in the form annexed hereto as **Exhibit A**, and the Final Order, granting the relief requested herein and such other and further relief as the Court deems appropriate under the circumstances.

Dated:  July 3, 2023
       Wilmington, Delaware

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Laura Davis Jones*
Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: 302-652-4100
Facsimile: 302-652-4400
Email:  ljones@pszjlaw.com
       tcairns@pszjlaw.com

-and-

**ROPES & GRAY LLP**
Ryan Preston Dahl (admitted *pro hac vice*)
Cristine Pirro Schwarzman (admitted *pro hac vice*)
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
E-mail:  ryan.dahl@ropesgray.com
       cristine.schwarzman@ropesgray.com

-and-

**ROPES & GRAY LLP**
Stephen L. Iacovo (admitted *pro hac vice*)
191 North Wacker Drive, 32nd Floor
Chicago, Illinois 60606
Telephone: (312) 845-1200
Facsimile: (312) 845-5500
E-mail:  stephen.iacovo@ropesgray.com

*Proposed Counsel to the Debtors and Debtors in Possession*