# EXHIBIT A

**Interim Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| iMedia Brands, Inc., *et al.*,[1] | Case No. 23-10852 (KBO) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket No. ____** |

**INTERIM ORDER (I) AUTHORIZING**
**THE DEBTORS TO (A) OBTAIN POST-PETITION**
**FINANCING, (B) GRANT LIENS AND SUPERPRIORITY**
**ADMINISTRATIVE EXPENSE CLAIMS TO POST-PETITION**
**LENDERS AND (C) UTILIZE CASH COLLATERAL,**
**(II) PROVIDING ADEQUATE PROTECTION TO PRE-PETITION**
**SECURED PARTIES, (III) MODIFYING THE AUTOMATIC STAY,**
**(IV) GRANTING RELATED RELIEF, PURSUANT TO 11 U.S.C. SECTIONS**
**105, 361, 362, 363, 364, 503, 506, 507 AND 552, AND (V) SCHEDULING A FINAL**
**HEARING PURSUANT TO BANKRUPTCY RULE 4001 AND LOCAL RULE 4001-2**

Upon the motion ("DIP Motion") of the above-captioned debtors and debtors in possession (collectively, the "Debtors") in these chapter 11 cases (collectively, "Chapter 11 Cases"), pursuant to sections 105, 361, 362, 363, 364, 503, 506, 507, and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* ("Bankruptcy Code") and Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules") and Rules 2002-1, 4001-2, 9006-1, and 9013-1 of the Local Rules of Bankruptcy Practice and Procedure ("Local Rules") for the United States Bankruptcy Court for the District of Delaware (this "Court") seeking entry of an interim order (this "Interim Order") and a final order (the "Final Order") granting the following

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are:  ValueVision Media Acquisitions, Inc. (8670); iMedia Brands, Inc. (3770); ValueVision Interactive, Inc. (8730); Portal Acquisition Company (3403); VVI Fulfillment Center, Inc. (5552); ValueVision Retail Inc. (2155); JWH Acquisition Company (3109); PW Acquisition Company, LLC (0154); EP Properties, LLC (3951); FL Acquisition Company (3026); Norwell Television, LLC (6011); and 867 Grand Avenue, LLC (2642).  The Debtors' service address is 6740 Shady Oak Road, Eden Prairie, MN 55344-3433.

relief to be provided on an interim basis until the date that a Final Order has been entered

(such interim period being the "Interim Period"):

1.      authorizing and approving the Debtors to obtain up to $34,947,305.40 in post-petition financing and other financial accommodations in connection with the post-petition, senior secured debtor-in-possession financing (the "DIP Facility"), comprised of up to $15,000,000 of that portion of the DIP Facility constituting the Term Loan Commitment (as defined in the DIP Credit Agreement) (the "DIP Term Loans," and in respect of the DIP Term Loans provided solely by the ABL Lenders (as defined in the DIP Credit Agreement), the "DIP ABL Term Loans"), plus that portion of the DIP Facility constituting the Revolving Loans (as defined in the DIP Credit Agreement) (the "DIP Revolving Loans," together with the DIP ABL Term Loans, the "DIP ABL Loans," and collectively with the DIP Term Loans, the "DIP Loans") re-advanced under the DIP Facility pursuant to and in accordance with the terms and conditions set forth in that certain *Debtor-In-Possession Loan and Security Agreement* (as it may be amended, modified, supplemented, extended, restated or replaced from time to time, the "DIP Credit Agreement"), dated as of July 3, 2023, substantially in the form as filed with the Court and attached to the DIP Motion as Exhibit B, by and among the Debtors, as borrowers, Siena Lending Group LLC, in its capacity as agent (in such capacity, the "DIP Agent"), and the financial institutions from time to time party thereto, as lenders, (in respect of the DIP Term Loans, the "DIP Term Lenders," in respect of the DIP Term Loans provided solely by the ABL Lenders (as defined in the DIP Credit Agreement), the "DIP ABL Term Loan Lenders"), in respect of the DIP Revolving Loans, the "DIP Revolving Lenders," and together with the DIP ABL Term Loan Lenders, the "DIP ABL Lenders"), and collectively, the "DIP Lenders," and together with the DIP Agent, the "DIP Secured Parties");

2.      authorizing the Debtors to use the proceeds of the DIP Facility and the Pre-Petition Revolving Collateral and Pre-Petition Synacor Collateral (each as defined herein), including Cash Collateral (as defined herein), in accordance with the terms of this Interim Order and the DIP Financing Documents (as defined herein), and in accordance with the Approved Budget (as defined herein), subject to Permitted Variance (as defined in the DIP Financing Documents, the "Permitted Variances"), for, *inter alia*: (a) general operating, corporate, and working capital purposes of the Debtors in the ordinary course of business; (b) funding of the Carve-Out and the Carve-Out Reserve Account (each as defined herein); (c) funding of the costs and expenses of administering the Chapter 11 Cases, including without limitation, the DIP Segregated Funds (as defined herein); (d) payment of the Adequate Protection Obligations (as defined herein) and other payments as authorized by and provided in this Interim Order; (e) funding of the reasonable and documented costs, fees, and other expenses; (f) upon entry of the Interim Order, immediately applying the DIP Term Loan proceeds on account of the Pre-Petition Revolving Obligations (as defined herein) and continuing to apply amounts collected during the Interim Period on account of the DIP ABL Obligations (as defined herein) outstanding, in accordance with the terms of the DIP Financing Documents and this Interim Order (the "Initial Roll-Up"), in such order and manner determined by the DIP Agent in its sole and absolute discretion, including its discretion to apply any collections to the Pre-Petition Revolving Obligations (as defined herein) or the DIP Revolving

Obligations (as defined herein); and (g) upon entry of the Final Order, at the option of the DIP Agent, exchanging and substituting in the DIP Agent's sole discretion all or a portion of the remaining amount, if any, of Total Revolving Loan Commitments (as defined in the Pre-Petition Revolving Credit Agreement) on a cashless, dollar-for-dollar basis with the DIP Facility (the "Subsequent Roll-Up," and together with the Initial Roll-Up, the "Roll-Up");

3.    authorizing the Debtors to (a) enter into, execute and perform under (i) the DIP Credit Agreement and (ii) all security agreements, pledge agreements, notes, guarantees, mortgages, deeds of trust, control agreements, Uniform Commercial Code financing statements, certificates, reports and other agreements, documents and instruments either or both executed and/or delivered with or to the DIP Agent and/or the DIP Lenders in connection with or related thereto (collectively, as amended, modified, supplemented, extended, restated or replaced from time to time, the "DIP Financing Documents") and (b) take and perform all other acts and steps as may be required or contemplated by or in connection with the DIP Financing Documents and this Interim Order;

4.    granting to the DIP Agent, for itself and on behalf of the DIP Lenders, first priority, priming, valid, perfected and enforceable liens (as defined in Bankruptcy Code section 101 (37)) in and upon all of the DIP Collateral (as defined herein), subject and subordinate in all respects to the Carve-Out and any valid, perfected, and non-avoidable Pre-Petition Prior Liens (as defined herein), to secure all existing and future obligations and liabilities of every kind or nature (including, without limitation, principal of, and accrued interest on, amounts advanced to the Debtors under the DIP Facility, which, upon entry of the Final Order, shall be deemed issued under the DIP Credit Agreement, and all other fees, indemnity obligations, reimbursement obligations, and other Obligations (as defined in the DIP Credit Agreement) under or in connection with the DIP Financing Documents, whether due or to become due, absolute or contingent, (in respect of the DIP Term Loans, the "DIP Term Obligations," in respect of the DIP Term Obligations to the ABL Lenders (as defined in the DIP Credit Agreement), the "DIP ABL Term Obligations," in respect of the DIP Revolving Loans, the "DIP Revolving Obligations," together with the DIP ABL Term Obligations, the "DIP ABL Obligations," and collectively, the "DIP Obligations") as provided by, and more fully defined in, the DIP Financing Documents;

5.    granting to the DIP Agent and the DIP Lenders allowed superpriority administrative expense claim status for the DIP Obligations, pursuant to Bankruptcy Code section 364(c)(1) and 507(b), subject and subordinate in all respects to the Carve-Out, in accordance with the terms of this Interim Order;

6.    authorizing the Debtors' use in accordance with the terms of the DIP Financing Documents, and in accordance with the Initial Budget (as defined in the DIP Credit Agreement) and any Approved Budget (subject to Permitted Variances), of all Cash Collateral;

7.    granting adequate protection, including, without limitation and as applicable, Pre-Petition ABL Adequate Protection Liens, Synacor Adequate Protection Liens, Pre-Petition ABL Adequate Protection Claims, Synacor Adequate Protection Claims, Pre-Petition ABL

Adequate Protection Payments, the Synacor Adequate Protection Proceeds, and the C&B Newco Adequate Protection Proceeds (each as defined herein and collectively, the "Adequate Protection Obligations") to:

(a)     for the benefit of the Pre-Petition Revolving Secured Parties (as defined herein), Siena Lending Group LLC, in its capacity as agent (in such capacity, the "Pre-Petition Agent") under that certain *Loan and Security Agreement*, dated as of July 30, 2021 (as amended, restated, amended and restated, modified, supplemented, or extended from time to time, the "Pre-Petition Revolving Credit Agreement") by and among the borrowers from time to time party thereto (the "Pre-Petition Revolving Borrowers"),[2] the guarantors from time to time party thereto (the "Pre-Petition Revolving Guarantors,"[3] pursuant to the guarantee in (i) the Pre-Petition Revolving Credit Agreement (the "US Law Guarantee") and (ii) that certain *Guarantee Agreement* dated February 28, 2023, between the Pre-Petition Revolving German Guarantors, as guarantors, and Siena Lending Group LLC, as beneficiary (the "German Law Guarantee"), the financial institutions party thereto from time to time (collectively, the "Pre-Petition Revolving Lenders", and together with the Pre-Petition Agent, sometimes collectively referred to as the "Pre-Petition Revolving Secured Parties"), and all security agreements, pledge agreements, notes, mortgages, guarantees, control agreements, collateral access agreements, and related agreements and documents (collectively, with the Pre-Petition Revolving Credit Agreement, as amended, modified, supplemented, extended, restated, amended and restated, or replaced from time to time, the "Pre-Petition Revolving Financing Documents"), all such adequate protection with the priority set forth in this Interim Order and otherwise in accordance with the terms set forth in this Interim Order, for the imposition of the automatic stay and with respect to the use and aggregate diminution, if any, in the value of their interests in the Debtors' estates' (the "Estates") interests in the Pre-Petition Revolving Collateral as of the Petition Date, including all "cash collateral" ("Cash Collateral"), as such term is defined in Bankruptcy Code section 363(a), which shall include, without limitation, all cash and cash equivalents of the Debtors, whenever or wherever acquired, and the proceeds of all the Pre-Petition Revolving Collateral pledged to the Pre-Petition Agent and the DIP Agent, as applicable, all in accordance with the terms set forth herein (the "Pre-Petition ABL Adequate Protection");

(b)     solely to the extent entitled under applicable law, Synacor, Inc. ("Synacor"), in its capacity as holder under that certain *Secured Promissory Note*, dated July 30, 2021 (as amended, restated, amended and restated, modified, supplemented, or extended from time to time, the "Synacor Promissory Note"), by and between Debtors Portal Acquisition Company ("Portal" or the "Synacor Promissory Note Borrower"), as borrower, and iMedia Brands,

---

[2]    Pursuant to the Pre-Petition Revolving Credit Agreement, "Borrowers" means ValueVision Retail Inc., iMedia Brands, Inc., ValueVision Interactive, Inc., PW Acquisition Company, LLC, FL Acquisition Company, ValueVision Media Acquisitions, Inc., JWH Acquisition Company, Norwell Television, LLC, 867 Grand Avenue, LLC, and Portal Acquisition Company.

[3]    Pursuant to the Pre-Petition Revolving Credit Agreement (as defined *infra*), "Guarantors" means VVI Fulfillment Center, Inc., EP Properties, LLC, and iMedia & 123tv Holding GmbH. iMedia & 123tv Holding GmbH, 123tv Invest GmbH, 123tv Holding GmbH, 123tv Beteiligungs GmbH, 1-2-3.tv GmbH, and 1-2-Play GmbH (collectively, the "Pre-Petition Revolving German Guarantors") are not Debtors in these Chapter 11 Cases.

Inc. ("iMedia" or the "Synacor Promissory Note Guarantor"), as parent and unsecured guarantor, and Synacor, all such adequate protection with the priority set forth in this Interim Order and otherwise in accordance with the terms set forth in this Interim Order, for the imposition of the automatic stay and with respect to the use and aggregate diminution, if any, in the value of Synacor's interests in the Portal Estate's interests in the Pre-Petition Synacor Collateral (the "Synacor Adequate Protection"); and

(c)     solely to the extent entitled under applicable law, granting adequate protection to C&B Newco, LLC ("C&B Newco"), in its capacity as consignor under that certain *Amended and Restated Consignment Agreement*, dated as of November 23, 2022 (as amended, restated, amended and restated, modified, supplemented, or extended from time to time, the "Consignment Agreement"), between iMedia, as consignee, and C&B Newco, all such adequate protection with the priority set forth in this Interim Order and otherwise in accordance with the terms set forth in this Interim Order, with respect to the use and aggregate diminution, if any, in the value of C&B Newco's interests in iMedia's Estates' interests in the Consigned Inventory (as defined herein);

8.     approving the application of collections and proceeds of all of the Pre-Petition Revolving Collateral and DIP Collateral and the payment of certain Pre-Petition Revolving Obligations and DIP Revolving Obligations in the manner and on the terms set forth in the DIP Credit Agreement and this Interim Order (and, as applicable, the Final Order);

9.     subject to and upon entry of a Final Order, waiving: (a) the Debtors' ability to surcharge against the Pre-Petition Revolving Collateral or DIP Collateral pursuant to Bankruptcy Code section 506(c); (b) the applicability of the "equities of the case" exception under Bankruptcy Code section 552(b) with respect to the proceeds, products, offspring or profits of the Pre-Petition Revolving Collateral or DIP Collateral; and (c) the equitable doctrine of "marshaling" and any similar equitable doctrine with respect to any of the Pre-Petition Revolving Collateral or DIP Collateral;

10.     modifying the automatic stay imposed by Bankruptcy Code section 362 to the extent hereinafter set forth and waiving the fourteen (14) day stay provisions of Bankruptcy Rule 4001(a)(3);

11.     waiving the 21-day provision of Bankruptcy Rule 6003(b), the notice requirements of Bankruptcy Rule 6004(a), and any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of this Interim Order; and

12.     scheduling a final hearing on the DIP Motion ("Final Hearing") for entry of a Final Order authorizing the post-petition financing and use of Cash Collateral contemplated hereby on a final basis and granting such other relief as is requested in the DIP Motion and approving the form of notice with respect to the Final Hearing.

Notice of the DIP Motion, the relief requested therein, and the Interim Hearing (as defined herein) ("Notice") having been served by the Debtors in accordance with Bankruptcy Rule 4001(c) on: (i) the United States Trustee for the District of Delaware ("U.S. Trustee"); (ii) the Internal Revenue Service and all taxing authorities of states in which the Debtors are doing business; (iii) counsel to the Pre-Petition Agent and the DIP Agent, Blank Rome LLP, 1201 North Market Street, Suite 800, Wilmington, Delaware 19801; Attn: Regina Stango Kelbon, Esq. (regina.kelbon@blankrome.com); (iv) counsel to Crystal Financial LLC d/b/a SLR Credit Solutions, Morgan Lewis & Bockius, LLP, One Federal Street, Boston, Massachusetts 02110; Attn: Julia Frost-Davies, Esq. (julia.frost-davies@morganlewis.com); (v) the holders of the fifty (50) largest unsecured claims against the Estates on a consolidated basis; (vi) all parties known to the Debtors that hold any liens or security interests in the Debtors' assets, including those parties that have filed UCC-1 financing statements against the Debtors, or that, to the Debtors' knowledge, have asserted any liens on any of the Debtors' assets; (vii) all landlords and warehouseman of the Debtors; (viii) all creditors known to the Debtors to be holding a judgment against the Debtors; (ix) all creditors known to the Debtors to be holding a claim under Bankruptcy Code section 503(b)(9); (x) the United States Securities and Exchange Commission; (xi) U.S. Bank, N.A. as indenture trustee for the Senior Unsecured Notes; (xii) Synacor; (xiii) counsel to Synacor, Thompson Hine, LLP, 3900 Key Center, 127 Public Square, Cleveland, Ohio 44114, Attn: Curtis Tuggle and Emma Off (email: curtis.tuggle@ThompsonHine.com and emma.off@ThompsonHine.com); (xiv) counsel to C&B Newco, Riemer Braunstein LLP, Times Square Tower, Suite 2506, New York, New York 10036 (Attn: Steven Fox, Esq., email: sfox@riemerlaw.com) and Troutman Pepper Hamilton Sanders LLP, Hercules Plaza, Suite 5100,

1313 North Market Street, Wilmington, DE 19801 (Attn: Douglas D. Herrmann, email: douglas.herrmann@troutman.com); (xv) banks and financial institutions where the Debtors maintain accounts; and (xvi) all other parties entitled to receive notice pursuant to the Bankruptcy Rules and the Local Rules (collectively, the "Noticed Parties").

The initial hearing on the DIP Motion having been held by this Court on July 5, 2023 ("Interim Hearing").

This Court having considered the relief requested in the DIP Motion, the First Day Declaration,[4] the DIP Declarations,[5] and the arguments of counsel made at the Interim Hearing; the Interim Hearing having been held and concluded; all objections and reservations of rights, if any, to the relief requested in the DIP Motion having been withdrawn, resolved, or overruled on the merits by this Court; it appearing that approval of the interim relief requested in the DIP Motion is fair and reasonable and in the best interests of the Debtors and their Estates, and is necessary to avoid immediate and irreparable harm to the Debtors and their Estates pending the Final Hearing; it appearing that the Debtors' entry into the DIP Financing Documents is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor:

---

[4]    The term "First Day Declaration" means the *Declaration of James Alt, Chief Transformation Officer of the Debtors, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 17].

[5]    The term "DIP Declarations" means, collectively, the *Declaration of James Alt in Support of Debtors' Motion to Obtain Postpetition Debtor in Possession Financing* [Docket No. [●]] and the *Declaration of Eugene Lee in Support of Debtors' Motion to Obtain Postpetition Debtor in Possession Financing* [Docket No. [●]].

7

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING,
THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS
OF LAW:**[6]

A.      *Disposition*.  The relief requested in the DIP Motion is **GRANTED** to the extent

set forth herein on an interim basis in accordance with the terms of this Interim Order.  Any

objections to the DIP Motion with respect to the entry of this Interim Order that have not been

withdrawn, waived, or settled, and all reservations of rights included therein, are hereby denied

and overruled on the merits.  This Interim Order shall become effective immediately upon its entry

and any applicable stay (including under Bankruptcy Rule 6004) is waived to permit such

effectiveness.

B.      *Petition Date*.  On June 28, 2023 (the "<u>Petition Date</u>"), each of the Debtors filed a

voluntary petition for relief under chapter 11 of the Bankruptcy Code.

C.      *Debtors in Possession*.  The Debtors continue to operate their businesses and

manage their properties as debtors-in-possession pursuant to Bankruptcy Code sections 1107(a)

and 1108.  No trustee or examiner has been appointed in the Chapter 11 Cases and no official

committee of unsecured creditors (a "<u>Committee</u>"), or any other statutory committee, has been

appointed in these Chapter 11 Cases.

D.      *Jurisdiction and Venue*.  The Court has jurisdiction of these Chapter 11 Cases, the

DIP Motion, this Interim Order and the parties and property affected hereby pursuant to 28 U.S.C.

§§ 157(b) and 1334, and the *Amended Standing Order of Reference* from the United States District

Court for the District of Delaware, dated February 29, 2012.  This Court's consideration of the

---

[6]    The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law
pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To
the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To
the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

DIP Motion constitutes a "core" proceeding as defined in 28 U.S.C. §§ 157(b)(2)(A), (D) and (M). This Court may enter a final order consistent with Article III of the United States Constitution. Venue of the Chapter 11 Cases and the DIP Motion in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The bases for the relief sought in the DIP Motion and granted in this Interim Order are Bankruptcy Code sections 105, 361, 362, 363, 364, 503, 506, 507, and 552, Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014, and Local Rules 2002-1, 4001-2, 9006-1, and 9013-1.

E.     *Cash Collateral*.   On June 30, 2023, the Court entered the *Interim Order (I) Authorizing Postpetition Use of Cash Collateral; (II) Granting Adequate Protection to Prepetition Secured Parties and C&B Newco; (III) Scheduling a Second Interim Hearing; and (IV) Granting Related Relief* [Docket No. 61] (the "Interim Cash Collateral Order") granting the Debtors' consensual use of Cash Collateral during the Initial Interim Period in accordance with the Interim Budget (each as defined in the Interim Cash Collateral Order).

F.     *Notice*.   Upon the record presented to this Court at the Interim Hearing, and under the exigent circumstances set forth therein and in the DIP Motion, the First Day Declaration and the DIP Declaration, notice of the DIP Motion and the relief requested thereby and granted in this Interim Order has been provided in accordance with Bankruptcy Rules 2002, 4001(b) and 4001(c)(1) and Local Rule 9013-1(m), which notice was appropriate under the circumstances and sufficient for entry of this Interim Order. No other or further notice of the DIP Motion is required for entry of this Interim Order. The interim relief granted herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending a Final Hearing.

9

G.    *Final Hearing*.  At the Final Hearing, the Debtors will seek approval of the Final

Order, which shall be subject to the terms and conditions of the DIP Financing Documents.  Notice

of the Final Hearing and Final Order will be provided in accordance with this Interim Order.

H.    *Debtors' Acknowledgements and Agreements*.  Without prejudice to the rights of

any other party (but subject to the limitations contained in Section VIII below), the Debtors admit,

stipulate, acknowledge, and agree (the "Paragraph H Stipulations") that:

(1)    *Pre-Petition Revolving Financing Documents.*  Prior to the commencement

of the Chapter 11 Cases, the Pre-Petition Revolving Secured Parties made loans and advances

(the "Pre-Petition Revolving Loans"), and provided other financial accommodations, pursuant to

the Pre-Petition Revolving Financing Documents to the Pre-Petition Revolving Borrowers

(the "Pre-Petition Revolving Credit Facility").  The Pre-Petition Revolving Guarantors guaranteed

the Pre-Petition Revolving Obligations of the Pre-Petition Revolving Borrowers under the

Pre-Petition Revolving Credit Agreement.

(a)    *Pre-Petition Revolving Obligations.*  As of the Petition Date, the

Pre-Petition Revolving Borrowers and the Pre-Petition Revolving Guarantors were justly and

lawfully indebted and liable to the Pre-Petition Revolving Secured Parties, without defense,

counterclaim, or offset of any kind, in the aggregate principal amount of not less than

$19,464,095.34, consisting of Pre-Petition Revolving Loans outstanding under the Pre-Petition

Revolving Credit Agreement (inclusive of the Early Termination Fee), plus interest accrued and

accruing thereon, together with all costs, expenses, fees, including, without limitation, the

Collateral Monitoring Fee, the Milestone Fee, the Forbearance Fee, unused line fees, letter of credit

fees, and other charges accrued, accruing, or chargeable with respect thereto under the Pre-Petition

Revolving Credit Agreement (collectively, together with accrued and unpaid interest, any fees, costs, expenses, and disbursements (including attorneys' fees, accountants' fees, auditor fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), indemnification obligations, guarantee obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Pre-Petition Revolving Borrowers' or the Pre-Petition Revolving Guarantors' obligations, including all Obligations (as defined in the Pre-Petition Revolving Credit Agreement) pursuant to, or secured by, the Pre-Petition Revolving Financing Documents (collectively, the "Pre-Petition Revolving Obligations"), which Pre-Petition Revolving Obligations have been guaranteed on a joint and several basis by the Pre-Petition Revolving Guarantors.

(b)     The Pre-Petition Revolving Obligations constitute allowed, legal, valid, binding, enforceable, and non-avoidable obligations of the Debtors, and are not subject to any offset, deduction, defense, counterclaim, avoidance, recovery, recharacterization, or subordination pursuant to the Bankruptcy Code or any other applicable law, and the Debtors do not possess, and shall not assert any claim, counterclaim, setoff, deduction, or defense of any kind, nature, or description that would in any way impair, reduce, or affect the validity, enforceability, and non-avoidability of any of the Pre-Petition Revolving Obligations.

(c)     *Pre-Petition Revolving Collateral.*   As of the Petition Date, the Pre-Petition Revolving Obligations were secured pursuant to the Pre-Petition Revolving Financing Documents by valid, binding, perfected, enforceable, and non-avoidable first priority security interests and liens ("Pre-Petition Revolving Liens") granted by the Debtors to the Pre-Petition

Agent, for the benefit of the Pre-Petition Revolving Secured Parties, upon the "Collateral" (as defined in the Pre-Petition Revolving Credit Agreement) in existence as of the Petition Date (hereafter, the "Pre-Petition Revolving Collateral"), subject only to any valid, binding, perfected, enforceable and unavoidable liens or security interests existing as of the Petition Date that were senior to the Pre-Petition Revolving Liens and were in existence immediately prior to the Petition Date, or that were subsequently perfected postpetition to the extent permitted by Bankruptcy Code section 546(b) (collectively, the "Pre-Petition Prior Liens" and each a "Pre-Petition Prior Lien"). For the avoidance of doubt, the Pre-Petition Prior Liens shall exclude  rights of a seller of goods to reclaim such goods under Bankruptcy Code section 546(c).  The Paragraph H Stipulations shall be binding on Synacor with respect to the Pre-Petition Revolving Secured Parties' asserted liens in the Pre-Petition Revolving Collateral except the Challenge Period (as defined herein) shall not apply solely with respect to a determination of (i) valuation of collateral and (ii) lien priority in the Pre-Petition Synacor Collateral.

(d)     Subject to the Pre-Petition Prior Liens, the Pre-Petition Agent, on behalf of the Pre-Petition Revolving Secured Parties, has a valid, binding, and perfected non-avoidable and first priority security interest and lien in all of the Pre-Petition Revolving Borrowers' Cash Collateral, including all amounts on deposit in all of the Pre-Petition Revolving Borrowers' banking, checking, or other deposit accounts with each of the Pre-Petition Revolving Secured Parties, whether as original collateral or as proceeds of other Pre-Petition Revolving Collateral, and all such Cash Collateral is part of the Pre-Petition Revolving Collateral.

(e)     The Debtors do and will not assert any claim, counterclaim, setoff, deduction, or defense of any kind, nature, or description that would in any way impair, reduce, or

12

affect the validity, enforceability, and non-avoidability of any of the Pre-Petition Revolving Secured Parties' liens, claims, or security interests in the Pre-Petition Revolving Collateral.

(f)     *Pre-Petition Revolving Guarantees.*  Pursuant to Article 8 of the Pre-Petition Revolving Credit Agreement and Article 2 of the German Law Guarantee, on a joint and several basis, the Pre-Petition Revolving Borrowers and the Pre-Petition Revolving Guarantors guaranteed the "Obligations" under the Pre-Petition Revolving Credit Agreement and the "Parallel Obligations" under the German Law Guarantee.

(2)     *Synacor Promissory Note.*  Pursuant to the Synacor Promissory Note, Synacor provided debt financing to the Synacor Promissory Note Borrower, which obligations were guaranteed by the Synacor Promissory Note Guarantor pursuant to the Synacor Promissory Note.

(a)     *Synacor Promissory Note Obligations.*  As of the Petition Date, the Synacor Promissory Note Borrower and the Synacor Promissory Note Guarantor were indebted and liable to Synacor in the aggregate principal amount of not less than $4,100,000, consisting of indebtedness outstanding under the Synacor Promissory Note plus interest accrued and accruing thereon (collectively, together with all "Obligations" (as defined in the Synacor Promissory Note) under the Synacor Promissory Note, the "Synacor Promissory Note Obligations"), which Synacor Promissory Note Obligations have been guaranteed on a joint and several basis by the Synacor Promissory Note Guarantor.

(b)     *Pre-Petition Synacor Collateral.*  As of the Petition Date, the Synacor Promissory Note Obligations were secured pursuant to the Synacor Promissory Note and related instruments, assignments, and other documents by valid, binding, and perfected security interests and liens granted by Portal to Synacor upon the "Collateral" (as defined in the Synacor

13

Promissory Note) (hereafter, the "<u>Pre-Petition Synacor Collateral</u>" and, together with the Pre-Petition Revolving Collateral, the "<u>Pre-Petition Collateral</u>") and in existence as of the Petition Date, subject to any valid, perfected, and non-avoidable liens senior in priority. The Paragraph H Stipulations shall be binding on the Pre-Petition Revolving Secured Parties with respect to Synacor's asserted liens in the Pre-Petition Synacor Collateral except the Challenge Period shall not apply solely with respect to a determination of (i) valuation of collateral and (ii) lien priority in the Pre-Petition Revolving Collateral.

(c)    *Pre-Petition Synacor Guarantees*. Pursuant to Section 8 of the Synacor Promissory Note, on a joint and several basis, the Synacor Promissory Note Borrower and the Synacor Promissory Note Guarantor guaranteed on an unsecured basis the Synacor Promissory Note Obligations under the Synacor Promissory Note.

I.    *Adequate Protection*.

(1)    Based on the DIP Motion, the First Day Declaration, and the DIP Declaration, and the record presented to this Court at the Interim Hearing, the terms of the adequate protection granted to the Pre-Petition Revolving Secured Parties, and solely to the extent entitled under applicable law as to Synacor and C&B Newco, as provided in this Interim Order, are fair and reasonable under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and provide the Debtors with reasonably equivalent value and fair consideration.

(2)    *Adequate Protection Obligations*. Subject to the Carve-Out in all respects, the Pre-Petition Revolving Secured Parties, and solely to the extent entitled under applicable law as to Synacor and C&B Newco, are each entitled to and being provided with the Adequate

14

Protection Obligations, as applicable, to the extent, if any, of diminution in value of their respective interests in the Estates' interests in the Pre-Petition Revolving Collateral, Portal's interest in the Pre-Petition Synacor Collateral, and iMedia's interests in the Consigned Inventory, as applicable, as of the Petition Date, resulting from the: (a) provisions of this Interim Order granting either or both first priority and priming liens on the Pre-Petition Revolving Collateral to the DIP Agent, for the benefit of the DIP Lenders, with respect to the DIP Facility; (b) use of the Cash Collateral; (c) use, sale, lease, decrease, or depreciation or other diminution in value of the Pre-Petition Revolving Collateral, Pre-Petition Synacor Collateral, and the Consigned Inventory, as applicable; (d) subordination to the Carve-Out; and (e) the imposition of the automatic stay under Bankruptcy Code section 362(a) or otherwise pursuant to Bankruptcy Code sections 361(a), 363(c), 364(c), and 364(d)(1).  Pursuant to Bankruptcy Code sections 361, 363 and 507(b), as adequate protection for the Pre-Petition Revolving Obligations, Synacor Promissory Note Obligations, and any obligations outstanding under the Consignment Agreement, the Debtors have agreed to provide the Pre-Petition Revolving Secured Parties with, and solely to the extent entitled under applicable law as to Synacor and C&B Newco, as applicable, the Adequate Protection Liens, the Adequate Protection Claims, the Adequate Protection Payments, and the C&B Newco Adequate Protection Proceeds.

(3)    In exchange for such adequate protection, the Pre-Petition Revolving Secured Parties have agreed or deemed to have agreed to the Debtors' use of the Cash Collateral on the terms set forth in this Interim Order and to the imposition of the Carve-Out as set forth herein.

(4)    *Necessity for Adequate Protection*.   The adequate protection and other treatment agreed to be provided by the Debtors pursuant to this Interim Order are consistent with and authorized by the Bankruptcy Code, reflect a sound exercise of the Debtors' business judgment, are consistent with the Debtors' need for the DIP Facility, and will facilitate the Debtors' ability to continue their orderly sale(s) of their respective assets.

J.    *Pre-Petition Prior Liens*.   Nothing contained in this Interim Order is intended to: (1) invalidate, negate, avoid, or prejudice the holders of alleged Pre-Petition Prior Liens; (2) find or rule that any alleged Pre-Petition Prior Liens are valid, binding, prior, perfected, enforceable, non-avoidable or senior; or (3) prejudice the right of any party-in-interest, including, without limitation, the Debtors, any Committee, the Pre-Petition Agent, or the DIP Agent, from challenging the validity, enforceability, perfection, extent, or priority of any alleged Pre-Petition Prior Lien.

K.    *No Control*.   Subject to entry of a Final Order, none of the Pre-Petition Revolving Secured Parties control (or have in the past controlled) the Debtors or their properties or operations, have authority to determine the manner in which any Debtors' operations are conducted or are control persons or insiders of the Debtors by virtue of any of the actions taken with respect to, in connection with, related to or arising from the Pre-Petition Revolving Financing Documents.

L.    *Findings Regarding the DIP Facility and Use of Cash Collateral*.

(1)    *Request for DIP Financing*.   The Debtors have requested from the DIP Agent and the DIP Lenders, and the DIP Agent and the DIP Lenders are only willing to extend, certain loans, advances, and other financial accommodations, as more particularly described, and

subject to the terms and conditions set forth, in this Interim Order and the DIP Financing Documents.

(2)    *Need for DIP Financing*.  As set forth in the DIP Declaration and the First Day Declaration, the Debtors do not have sufficient available sources of working capital to fund the administration of the Chapter 11 Cases or the orderly sale(s) of the Debtors' businesses in the ordinary course without the DIP Facility and the ability to use Cash Collateral as described in this Interim Order.  The Debtors' ability to maintain business relationships, to pay their employees, and to otherwise fund the orderly administration of their Estates is essential to the viability of the Debtors and the Chapter 11 Cases, and but for the DIP Facility, the Debtors could be forced to liquidate in an expedited fashion.  The ability of the Debtors to obtain sufficient working capital and liquidity through the proposed DIP Facility and the use of Cash Collateral on the terms set forth in the DIP Financing Documents and this Interim Order are vital to the preservation and maximization of the value of the Debtors' assets pending sale(s) of such assets.  Accordingly, the Debtors have an immediate need to obtain funds from the DIP Facility and authorization to use Cash Collateral as provided herein to, among other things, (a) maintain business relationships; (b) permit the orderly sale(s) of their assets; (c) make Adequate Protection Payments to the Pre-Petition Revolving Secured Parties; (d) pay the costs of administration of these Chapter 11 Cases and satisfy their other working capital and general corporate purposes; (e) satisfy the Carve-Out and fund the Carve-Out Reserve Account; (f) minimize disruption of their limited business operations; and (g) manage and preserve the assets of the Debtors' Estates in order to maximize the value of such assets and the recoveries to creditors of the Estates.

(3)    *No Credit Available on More Favorable Terms.*  Consistent with the DIP Declaration and the First Day Declaration, the Debtors are unable to procure financing or other financial accommodations on more favorable terms from sources other than from the DIP Lenders under the DIP Financing Documents and are unable to obtain satisfactory unsecured credit allowable under Bankruptcy Code section 364(a) or 364(b) and 503(b)(1) as an administrative expense.  The Debtors also are unable to obtain secured credit for the purposes set forth in the DIP Financing Documents and the consensual use of Cash Collateral on more favorable terms without the grant of liens (including priming liens) on all or substantially all of the Debtors' assets pursuant to Bankruptcy Code sections 364(c) and (d).  In the Debtors' business judgment, the Debtors have been unable to procure the necessary financing on terms consistent with applicable law and more favorable than the financing offered by the DIP Agent and the DIP Lenders pursuant to the DIP Financing Documents and this Interim Order.

(4)    *Budget*.  Based upon the record presented to this Court by the Debtors, (a) the Debtors have prepared and delivered the Initial Budget, (b) the Initial Budget has been thoroughly reviewed by the Debtors and their management and advisors, including the Chief Transformation Officer, and (c) the Initial Budget sets forth, among other things, the projected cash receipts and disbursements for the periods covered thereby.  The Initial Budget may be modified, amended and updated from time to time in accordance with the DIP Credit Agreement, and once approved in accordance with the DIP Credit Agreement, shall supplement and replace the Initial Budget (the Initial Budget annexed hereto as **Exhibit 1** and each subsequent approved budget, shall constitute without duplication, the "Approved Budget").  The Debtors believe in good faith that the Initial Budget, subject to  any variances that do not cause an Event of Default

18

under Section 7.1(kk) of the DIP Credit Agreement, is achievable and will allow the Debtors to operate in chapter 11 without the accrual of unpaid post-petition administrative expenses during the term of the Initial Budget. The Pre-Petition Revolving Secured Parties and the DIP Secured Parties are relying upon the Debtors' compliance with the Initial Budget and, as applicable, each Approved Budget, in each case subject to Permitted Variances, in determining to consent to the use of Cash Collateral for the limited purposes expressly set forth in this Interim Order, the funding of the Carve-Out Reserve Account, and to enter into (or as the case may be, consent to) the DIP Facility provided for in this Interim Order.

(5)     *Business Judgment and Good Faith Pursuant to Section 364(e) and Section 363(m).* Based on the record before this Court, including the Paragraph H Stipulations, (a) the Debtors and each of the Pre-Petition Revolving Secured Parties and the DIP Secured Parties have negotiated at arm's length and in good faith regarding the terms of the DIP Financing Documents, the DIP Facility, and the Debtors' use of Pre-Petition Revolving Collateral, including the Cash Collateral, respectively, all subject to the terms of this Interim Order and (b) the terms of the DIP Credit Agreement, the other DIP Financing Documents, and the DIP Facility are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and constitute reasonably equivalent value and fair consideration. Any credit extended under the terms of this Interim Order shall be deemed to have been extended in "good faith" (as that term is used in Bankruptcy Code sections 364(e) and 363(m)) by the Pre-Petition Revolving Secured Parties and the DIP Secured Parties.

(6)     *No Objection.* The Pre-Petition Revolving Secured Parties have no objection to the DIP Facility and the use of Cash Collateral on the terms and conditions set forth

19

in this Interim Order.  Nothing in this Interim Order, including, without limitation, any of the provisions herein with respect to adequate protection, shall constitute, or be deemed to constitute, a finding that the interests of the Pre-Petition Revolving Secured Parties are or will be adequately protected with respect to any non-consensual use of Cash Collateral.

(7)    *No Responsible Person.*  The Debtors stipulate that in making the decision to finance the Debtors' orderly sale(s) through the DIP Facility, to permit the Debtors to use Cash Collateral for the limited purposes set forth herein, in administering any loans, in approving the Initial Budget or any Approved Budget, as applicable, or in taking any actions permitted by this Interim Order or the DIP Financing Documents, none of the DIP Agent, the DIP Lenders, the Pre-Petition Agent, or the Pre-Petition Revolving Lenders, as applicable, shall be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person," "owner or operator," or part of any "control group" with respect to any of the Debtors or the management of the Debtors or owe any fiduciary duty to the Debtors, their respective creditors, shareholders, or Estates.  The foregoing shall be effective upon entry of the Final Order.

(8)    *Good Cause.*  Good and sufficient cause has been shown for the entry of this Interim Order and for authorizing the Debtors to obtain financing pursuant to the DIP Facility and to use the Cash Collateral of the Pre-Petition Revolving Secured Parties (solely to the extent consistent with the Initial Budget and any Approved Budget, as applicable, in each case subject to Permitted Variances) and to authorize the provision of adequate protection.  The relief requested in the DIP Motion is necessary, essential, and appropriate, and is in the best interest of and will benefit the Debtors and their Estates, as its implementation will, among other things, provide the Debtors with the necessary liquidity to: (a) administer the Chapter 11 Cases; (b) minimize

disruption to the Debtors' efforts for the orderly sale(s) of their businesses and assets; (c) preserve and maximize the value of the Debtors' Estates; and (d) avoid immediate and irreparable harm to the Debtors, their respective businesses, employees, and assets.

(9)     *Immediate Entry*.  Good and sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2), 6003(b), and, to the extent applicable, 6004(h).  Absent the immediate grant by this Court of the interim relief sought by the DIP Motion, each Debtor's Estate would be immediately and irreparably harmed pending the Final Hearing.  Consummation of the DIP Facility and the use of Cash Collateral, in accordance with the terms of this Interim Order and the DIP Financing Documents, are in the best interests of the Debtors' Estates and are consistent with the Debtors' exercise of their fiduciary duties.

Based upon the foregoing findings and conclusions, the DIP Motion, and the record before this Court with respect to the DIP Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

**I.     <u>Authorization and Terms of Financing</u>**

A.     *DIP Motion Granted*.  The interim relief sought in the DIP Motion is granted, the interim financing described herein is authorized and approved, and the use of Cash Collateral on an interim basis is authorized, in each case subject to the terms and conditions set forth in the DIP Financing Documents and this Interim Order.  All objections to this Interim Order to the extent not withdrawn, waived, settled, or resolved are hereby denied and overruled on the merits.  This Interim Order shall become effective immediately upon its entry.  To the extent of any

inconsistency between this Interim Order and the Interim Cash Collateral Order, this Interim Order shall govern.

B.      *Authorization to Borrow, Guarantee, and Use Loan Proceeds*.    To prevent immediate and irreparable harm to the Debtors' Estates, the Debtors are hereby expressly authorized and empowered to immediately borrow and obtain, on a joint and several basis, DIP Loans and the Debtors (on a joint and several basis) are hereby authorized and empowered to incur all other indebtedness and obligations owing to the DIP Agent and the DIP Lenders on the terms and subject to the conditions set forth in the DIP Financing Documents and this Interim Order, up to the aggregate amount of $34,947,305.40, comprised of $15,000,000 of the DIP Term Loan and the total amount of the DIP Revolving Loans re-advanced under the DIP Facility during the Interim Period, subject, as applicable, to the Initial Budget and any Approved Budget, in each case subject to Permitted Variances, and from the entry of this Interim Order through and including the earliest to occur of (i) entry of the Final Order, (ii) the Maturity Date (as defined in the DIP Credit Agreement) and (iii) an Event of Default (as defined herein).    For the avoidance of doubt, notwithstanding anything else provided for in this Interim Order, all reimbursement obligations and fees accruing after the Petition Date shall constitute DIP Obligations.

C.      *Financing Documents.*

(1)      *Authorization*.  The Debtors are hereby authorized to execute, deliver, enter into and, as applicable, perform all of their obligations under the DIP Financing Documents (including, without limitation, such other and further acts as may be necessary, appropriate, or desirable in connection therewith).  The Debtors are hereby authorized to borrow money and incur other obligations thereunder in accordance with its terms pursuant to the DIP Credit Agreement,

22

which shall be used for all purposes permitted under the DIP Financing Documents (and subject to and in accordance with the Initial Budget and any Approved Budget, as applicable, in each case subject to Permitted Variances).  Upon entry of this Interim Order, in furtherance of the foregoing and without further approval of this Court, the Debtors are hereby authorized and empowered, and the automatic stay imposed by Bankruptcy Code section 362 is hereby lifted to the extent necessary, to: (a) enter into, execute, deliver, perform, and comply with all of the terms, conditions, and covenants of the DIP Financing Documents, including, without limitation, the DIP Credit Agreement, and all security and pledge agreements; (b) execute and deliver all certificates, reports, statements, and other agreements and documents required or contemplated by the DIP Financing Documents (including, without limitation, documents required for the Debtors' performance of their obligations under the DIP Financing Documents and the creation and perfection of liens granted or contemplated therein); and (c) pay all obligations incurred under (whether principal, interest, fees, costs, expenses, indemnities, or other amounts described in) the DIP Financing Documents as such amounts become earned, due, and payable and without need to obtain further Court approval, including, without limitation and as applicable, any closing fees, the Collateral Monitoring Fee, unused line fees, and other charges accrued, accruing, or chargeable with respect thereto under the Pre-Petition Revolving Credit Agreement (collectively, together with accrued and unpaid interest, any fees, costs, expenses, and disbursements (including attorneys' fees, accountants' fees, auditor fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), indemnification obligations, guarantee obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Pre-Petition Revolving Borrowers' or

the Pre-Petition Revolving Guarantors' obligations pursuant to, or secured by, the Pre-Petition Revolving Financing Documents, including all Obligations (as defined in the Pre-Petition Revolving Credit Agreement)), and perform all other undertakings and acts required or contemplated by, the DIP Financing Documents.

(2)     *Approval of Financing Documents*.  The DIP Financing Documents (and all certificates, reports, statements, and other agreements and documents) are approved to the extent necessary to implement the terms and provisions of this Interim Order.

(3)     *Amendment of DIP Financing Documents*.  The Debtors, the DIP Agent, and the DIP Lenders are hereby authorized to approve and implement, in accordance with the terms of the DIP Financing Documents, any modification of the DIP Financing Documents; provided, however, that the Debtors shall provide all modifications to the DIP Financing Documents to counsel to any Committee and the U.S. Trustee; provided, further, that any material modification or amendment to the DIP Financing Documents that would increase the obligations thereunder, shorten the maturity date applicable thereto, or increase the interest rates applicable to the obligations thereunder (except as expressly agreed to in the DIP Financing Documents) shall be subject to providing notice of such modification or amendment to counsel to any Committee and the U.S. Trustee, each of which shall have three (3) business days from the date of such notice within which to object in writing to such modification or amendment unless the Committee and/or the U.S. Trustee agrees in writing to a shorter period.  If no timely objection is raised by any Committee or the U.S. Trustee to any such modification or amendment to the DIP Financing Documents, then such modification or amendment shall become effective upon the expiration of the aforementioned notice period pursuant to an Order of this Court to be submitted under

24

certification of counsel.  If a timely objection is interposed, the Court shall resolve such objection prior to such modification or amendment becoming effective.

(4)      *Application of DIP Facility Proceeds.*  The advances under the DIP Facility shall be used in each case in a manner consistent with the terms and conditions of the DIP Financing Documents and this Interim Order, and in accordance with the Initial Budget and any Approved Budget, as applicable, in each case subject to Permitted Variances, as follows, and, as applicable, subject to Section VIII below:

(a)      to pay fees, costs, and expenses as provided in the DIP Financing Documents, including amounts incurred in connection with the preparation, negotiation, execution, and delivery of the DIP Credit Agreement and the other DIP Financing Documents, it being understood and agreed any fees and out-of-pocket costs and expenses, and all indemnified losses payable to RNN Lender (as defined in the DIP Credit Agreement) shall be solely in their capacity as a DIP Lender and not otherwise incurred as a result of, or in connection with, its role as buyer under the APA (as defined in the DIP Credit Agreement);

(b)      for general operating and working capital purposes, for the payment of fees, expenses, and costs incurred in connection with the Chapter 11 Cases, and other proper corporate purposes of the Debtors not otherwise prohibited by the terms hereof for working capital, and other lawful corporate purposes of the Debtors;

(c)      to immediately apply the proceeds of the DIP Term Loans in the amount of $15,000,000 on account of the Pre-Petition Revolving Obligations (subject to Section VIII below) on the Closing Date (as defined in the DIP Credit Agreement);

(d)      for making other payments as provided in this Interim Order;

(e)    upon entry of a Final Order, for exchange and substitution on a cashless, dollar-for-dollar basis, in whole or in part, at the discretion of the DIP Agent, of the Subsequent Roll-Up (subject to Section VIII below), without which the DIP Lenders would not be willing to provide the DIP Loans; and

(f)    to fund the Carve-Out and the Carve-Out Reserve Account.

(5)    *Conditions Precedent*.  The DIP Lenders shall have no obligation to make any loan or advance under the DIP Credit Agreement unless the conditions precedent to such loan or extension of credit under the DIP Credit Agreement have been satisfied in full or waived in accordance with the DIP Credit Agreement.

(6)    *Budget Maintenance*.  Each budget proposed by the Debtors shall become the "Approved Budget" upon written approval thereof by the Required Lenders (as defined in the DIP Credit Agreement) in their sole discretion following a reasonable opportunity to review and comment thereon, and the Debtors shall update the Initial Budget and each Approved Budget, as applicable, within the time period specified in the DIP Credit Agreement unless otherwise agreed to pursuant to the terms of the DIP Credit Agreement.

D.    *Payments and Application of Payments*.  The Debtors are authorized to make all payments and transfers of the Estates' property to the DIP Agent and the DIP Lenders as provided, permitted, or required under the DIP Financing Documents and this Interim Order, in such order and manner determined by the DIP Agent, including, without limitation, applying all payments, proceeds, and other amounts either to the Pre-Petition Revolving Obligations or the DIP Obligations in the DIP Agent's sole and absolute discretion.  Upon entry of this Interim Order, the DIP Financing Documents shall constitute legal, valid, binding, and non-avoidable obligations of

the Debtors, enforceable in accordance with the terms of this Interim Order and the other DIP Financing Documents, against each Debtor, or in any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases or any other chapter of the Bankruptcy Code, or in any other proceedings superseding or related to any of the foregoing (collectively, the "Successor Cases").  No obligation, payment, transfer, or grant of security hereunder or under the DIP Financing Documents to the DIP Agent and/or the DIP Lenders shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under applicable law (including, without limitation, under Bankruptcy Code sections 502(d), 544, and 547 to 550 or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any defense, avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, claim, counterclaim, cross-claim, or challenge, whether under the Bankruptcy Code or any other applicable law or regulation by any person or entity for any reason.  Without limiting the generality of the foregoing, the Debtors are authorized, without further Order of this Court, to (i) pay all principal, interest, fees, and indemnities when due, under the DIP Financing Documents or the Pre-Petition Revolving Financing Documents (in the DIP Agent's sole and absolute discretion and provided that interest on the Pre-Petition Revolving Obligations shall continue to accrue in accordance with the terms of the Pre-Petition Revolving Financing Documents and the Bankruptcy Code), and (ii) pay or reimburse the DIP Agent and the DIP ABL Lenders, in accordance with the DIP Financing Documents, and the Pre-Petition Revolving Secured Parties, in accordance with the Pre-Petition Revolving Financing Documents, for all present and future costs and expenses, including, without

27

limitation, all reasonable and documented professional fees, consultant fees, and legal fees and expenses paid or incurred by the DIP Agent and the DIP ABL Lenders in connection with the financing transactions as provided in the DIP Financing Documents and this Interim Order regardless of whether such amounts are in the Initial Budget and any Approved Budget, as applicable; provided, however, that the DIP Agent shall send a redacted summary invoice of such fees and expenses (subject in all respects to applicable privilege or work product doctrines) to the Debtors and their counsel, the U.S. Trustee and, if appointed, the Committee or its counsel. Within ten (10) business days after delivery of such invoices in accordance with this paragraph (or such shorter time period agreed to by the DIP Agent, the Debtors, the U.S. Trustee, and, if appointed, the Committee), the Debtors shall pay such fees and costs; provided, however, that to the extent an objection has been raised to certain fees and costs within such ten (10) business days, the Debtors shall pay only such fees and costs to which no objection has been raised. To the extent there is an objection with respect to any such costs and fees that is not consensually resolved, this Court may resolve the objection. No attorney or advisor to the DIP Agent or other DIP Secured Parties shall be required to file an application seeking compensation for services or reimbursement of expenses with the Court.

E.    *Interest and Fees.* The rate(s) of interest to be charged for the DIP Loans pursuant to the DIP Credit Agreement shall be the rates set forth in the DIP Credit Agreement and shall be calculated in the manner and payable at the times set forth in the DIP Credit Agreement. The fees charged under the DIP Facility shall be those set forth in the DIP Credit Agreement and shall be unconditionally payable in the amounts and at the times set forth in the DIP Credit Agreement, including, without limitation, the Closing Fee, which shall be absolutely and unconditionally

earned upon entry of this Interim Order and execution of the DIP Credit Agreement, and which shall be non-refundable.

F.     *Application of Collections*.  All cash, collections, and proceeds of the Pre-Petition Revolving Collateral and the DIP Collateral shall immediately be applied in reduction of and payment in full of the Pre-Petition Revolving Obligations and the DIP ABL Obligations outstanding in accordance with the terms of the DIP Financing Documents and this Interim Order, in such order and manner determined by the DIP Agent in its sole and absolute discretion.

G.     *Interlender Provision*.  Notwithstanding that the DIP Facility is a senior secured priming facility, the interlender provisions in the DIP Credit Agreement are approved and as and among the DIP Agent, the Pre-Petition Agent, the DIP Term Lenders, and the DIP Revolving Lenders, the Pre-Petition Revolving Obligations and the DIP Revolving Obligations shall be Paid in Full[7] before the DIP Term Loans to the extent provided in Section 4.2 of the DIP Credit Agreement.

H.     *Continuation of Pre-Petition Procedures*.  All pre-petition practices and procedures for the payment and collection of proceeds of Pre-Petition Revolving Collateral and DIP Collateral,

---

[7]   "Paid in Full" means the indefeasible repayment in full in cash of all obligations (including principal, interest, fees, prepayment premiums, expenses, indemnities, other than contingent indemnification obligations for which no claim has been asserted) under the Pre-Petition Revolving Credit Facility and, to the extent rolled up and refinanced, the DIP Facility, the cash collateralization or repayment in full in cash of all treasury and cash management obligations, hedging obligations, and bank product obligations, and the cancelation, replacement, backing, or cash collateralization of letters of credit, in each case, in accordance with the terms of the applicable credit facility.  No facility shall be deemed to have been Paid in Full until such time as, with respect to the applicable facility, (a) the commitments to lend thereunder have been terminated, (b) with respect to the Challenge Period (i) the Challenge Period (as defined in Section VIII of this Interim Order) shall have expired without the timely and proper commencement of a Challenge or (ii) if a Challenge is timely and properly asserted prior to the expiration of the Challenge Period, upon the final, non-appealable disposition of such Challenge; and (c) with respect to the Pre-Petition Revolving Obligations, the Pre-Petition Agent or the DIP Agent, as applicable, has received (i) a countersigned payoff letter in form and substance satisfactory to such Agent and (ii) releases in form and substance satisfactory to such Agent, each in its sole discretion.

as applicable, the turnover of cash, the delivery of property to the Pre-Petition Revolving Secured Parties, and the funding pursuant to the Pre-Petition Revolving Credit Agreement, including, without limitation, the use of any lockbox or blocked depository bank account arrangements, will be unchanged, remain in place, and be identical under the DIP Financing Documents for the benefit of the DIP Agent and the DIP Lenders and are hereby approved and shall continue without interruption after the commencement of the Chapter 11 Cases; provided, however, that the practices and procedures are otherwise consistent with the terms of the *Interim Order (I) Authorizing Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Perform Certain Intercompany Transactions and (II) Granting Related Relief* [Docket No. 67].

I.    *Subsequent Roll-Up*.  Upon entry of the Final Order, without any further action by the Debtors or any other party, and subject to the rights of parties set forth in Section VIII below, at the option of DIP Agent in its reasonable discretion and in accordance with the DIP Credit Agreement and the other DIP Financing Documents, the Debtors may use the proceeds of the next advance (or deemed advance) under the DIP Credit Agreement to exchange and substitute all or part of any remaining Pre-Petition Revolving Obligations solely at the DIP Agent's option, including, without limitation, Pre-Petition Revolving Loans outstanding under the Pre-Petition Revolving Credit Agreement on the date of the Final Order, to the extent any such obligations exist at such time, on a cashless, dollar-for-dollar basis with the DIP Facility and subject to the terms and conditions set forth in the DIP Financing Documents.  Other than as expressly provided in Section II(A)(2)(e) below, the Roll-Up will be without prejudice to the rights of any third party,

including, without limitation, any Committee, to seek any appropriate remedy from the Court in the event of a timely and successful Challenge (as defined herein).

**II.**     **Collateralization and Superpriority Administrative Claim Status**.

      A.     *Collateralization*.

      (1)     *DIP Lien Grant.*   Subject and subordinate to the Carve-Out in all respects, to secure the prompt payment and performance of any and all DIP Obligations of the Debtors to the DIP Agent and the DIP Lenders of whatever kind, nature, or description, absolute or contingent, now existing or hereafter arising, the DIP Agent, for the benefit of itself and the DIP Lenders, shall have and is hereby granted, effective as of the Petition Date, valid, binding, enforceable, continuing, non-avoidable and perfected first priority (subject only to any Pre-Petition Prior Liens) security interests and liens (such security interests and liens collectively, "DIP Liens") in and upon all property and rights and interests in property of each of the Debtors or their Estates of any kind or nature whatsoever in existence as of the Petition Date as well as thereafter created or acquired, and wherever located, including, without limitation: (a) all Pre-Petition Revolving Collateral; (b) all accounts and accounts receivable, inventory, chattel paper, equipment, fixtures, machinery, commercial tort claims, deposit accounts, instruments, documents, cash and cash equivalents, investment property (including, without limitation, all equity interests in subsidiaries), books and records, patents, trademarks, trade names, copyrights, rights under license agreements and all other intellectual property, rights, rebates, refunds and other claims under and with respect to insurance policies, tax refunds, deposits, rebates, contract rights and other general intangibles, software, letter of credit rights, money, and inter-company claims or receivables (whether or not evidenced by notes) at any time owing to each Debtor; (c) all real property, leaseholds, rents and profits, and

31

proceeds thereof; (provided, however, that as to a lien on all fee, leasehold, and other real property interests and the proceeds thereof: (i) with respect to non-residential real property leases, no liens or encumbrances shall be granted or extended to such leases under this Interim Order, except as permitted by the applicable lease or applicable law, provided, further, that if any such restriction applies, liens shall then be deemed to be granted and created upon the economic value of proceeds of any sale or other disposition of, and any other proceeds or products of, such leasehold interests; and (ii) should DIP Agent's or any DIP Lender's internal regulatory or compliance requirements require the completion of either or both flood due diligence and obtaining evidence of applicable flood insurance with respect to any real property or leasehold interest, then until completion of such flood due diligence, the DIP Agent shall be deemed to have obtained a lien only on the economic value of, proceeds of any sale or other disposition of such real property interests); (d) if not otherwise described above, all of the property or rights in property identified as Collateral (as defined in the Pre-Petition Revolving Credit Agreement) and Collateral (as defined in the DIP Credit Agreement); (e) all claims and causes of action of the Debtors and their Estates, whether pursuant to federal or applicable state law, and the proceeds thereof and property received thereby, whether by judgment, settlement, or otherwise including, and upon entry of a Final Order approving same, all claims and causes of action under chapter 5 of the Bankruptcy Code and Bankruptcy Code section 724(a) (collectively "Avoidance Actions") and all proceeds thereof and property received thereby, whether by judgment, settlement, or otherwise, whether pursuant to federal or applicable state law; (f) all other personal property of such Debtors and their Estates of every kind and nature; and (g) as to all of the foregoing, all rents, issues, products, proceeds (including insurance policies), and profits of, from, or generated by any of the foregoing, in

whatever form (all of the foregoing being collectively referred to in this Interim Order as "DIP Collateral").  For the avoidance of doubt, with respect to the Carve-Out Reserve Account, the Segregated Utility Funds,[8] and the Segregated Tax Funds[9] (collectively, with the Carve-Out Reserve Account and the Segregated Utility Funds, the "DIP Segregated Funds") respectively, the DIP Collateral shall include only a reversionary interest (the "Reversionary Interest") of the Debtors in such accounts and/or funds after all Professionals, utility providers, and taxing authorities benefitting from such funds, respectively, as applicable, have been indefeasibly paid in full, in cash consistent with the terms of the Utilities Orders,[10] the Taxes Orders,[11] and this Interim Order, as applicable.

(2)     Subject and subordinate to the Carve-Out in all respects, the DIP Liens shall be:

(a)     *Liens on Unencumbered Property*.  Pursuant to Bankruptcy Code section 364(c)(2), continuing valid, perfected, enforceable, and non-avoidable first priority, and fully perfected liens on and security interests in all now owned or hereafter acquired assets and property, of the Debtors' right, title, and interest in, to, and under all DIP Collateral that is not

---

[8]  "Segregated Utility Funds" means the Adequate Assurance Account (as defined in the *Debtors' Motion for Entry of Interim and Final Order (I)(A) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (B) Approving the Debtors' Proposed Procedures for Resolving Additional Assurance Requests, and (C) Prohibiting Utility Providers from Altering, Refusing, or Discounting Services, and (II) Granting Related Relief* [Docket No. 16] (the "Utilities Motion") and all funds held therein and the proceeds thereof.

[9]  "Segregated Tax Funds" means the segregated funds, and the proceeds thereof, authorized to be paid on account of the taxes and fees held in trust for the exclusive benefit of the applicable taxing authorities pursuant to the relief granted in paragraph four of the Court's *Interim Order (I) Authorizing Debtors to Pay Certain Prepetition Taxes and Fees and (II) Granting Related Relief* [Docket No. 64] (the "Interim Taxes Order") and any relief of similar import set forth in a final order of the Court.

[10]  "Utilities Orders" means the interim and final Court orders approving the Utilities Motion.

[11]  "Taxes Orders" means the Interim Taxes Order and any final order entered by the Court granting final relief in connection therewith.

otherwise encumbered by a validly perfected security interest or lien as of the Petition Date, including Avoidance Actions and the proceeds thereof upon entry of the Final Order;

(b)    *Liens on Encumbered Assets.*    Pursuant to Bankruptcy Code section 364(c)(3), a continuing valid, enforceable, and non-avoidable fully perfected junior liens on and security interests in (other than as set forth in clause (c) and (d) below) all now owned or hereafter acquired assets and property, of the Debtors' right, title, and interest in, to, and under all DIP Collateral that is subject to, as of the Petition Date, a Pre-Petition Prior Lien;

(c)    *Priming Lien on Collateral.*    Subject to any applicable Pre-Petition Prior Liens, pursuant to Bankruptcy Code section 364(d), valid, enforceable, non-avoidable, and fully perfected senior priming security interests in and senior priming liens upon all now owned or hereafter acquired assets and property of the Debtors' right, title, and interest in, to, and under all Collateral (each as defined in the DIP Credit Agreement);

(d)    *Liens Senior to Certain Other Liens.*    Notwithstanding anything to the contrary contained in this Interim Order, the DIP Liens and the Pre-Petition Agent's Adequate Protection Liens (as defined herein) shall not be (i) subject to avoidance or subordination (equitable or otherwise) under Bankruptcy Code sections 510, 549, or 550, or any other provision of the Bankruptcy Code or applicable law, (ii) subordinated to any lien or security interest that is avoided and preserved for the benefit of the Debtors or their Estates under Bankruptcy Code section 551, (iii) subject to any liens arising after the Petition Date (other than any applicable Pre-Petition Prior Liens), or (iv) subject to any intercompany or affiliate liens of the Debtors, if any; and

34

(e)     *Subordination Provision.* Notwithstanding anything to the contrary, including the full or partial roll up/refinancing of the Pre-Petition Revolving Obligations owing to the Pre-Petition Revolving Secured Parties into the DIP ABL Obligations, to the extent Synacor and/or C&B Newco or any other lienholder is *junior* in priority to the Pre-Petition Revolving Liens of the Pre-Petition Agent as of the Petition Date, such lienholder shall continue to be junior to the DIP Liens of the DIP Agent on account of the DIP Revolving Obligations owing under the DIP Facility and the liens of the Pre-Petition Agent on account of the Pre-Petition Revolving Obligations and the Pre-Petition ABL Adequate Protection.  Further, in such event, the Synacor Adequate Protection Superpriority Claim shall be junior in priority to the DIP Superpriority Claim and the Pre-Petition ABL Superpriority Claim.  To the extent Synacor and/or C & B Newco or any other lienholder holds a valid, perfected, nonavoidable lien determined to be *senior* in priority to the Pre-Petition Revolving Liens of the Pre-Petition Agent as of the Petition Date, then such liens shall remain senior in priority to the DIP Liens of the DIP Agent and the Pre-Petition ABL Adequate Protection Lien to the extent of the value of such liens on their respective collateral.  The liens of the Pre-Petition Agent in the Pre-Petition Revolving Collateral and the DIP Collateral, and the DIP Agent in the DIP Collateral, shall be deemed to be continuous liens securing the DIP Obligations and the Pre-Petition ABL Adequate Protection Obligation.  Notwithstanding anything herein to the contrary, the lien and claim priority with respect to the Cash Collateral comprising the Segregated Funds shall retain the priority of the interests held by lienholders and claimholders in such Cash Collateral, as applicable, as of the Petition Date.

(f)     *No Superior Rights of Reclamation.*  Based on the findings and ruling herein regarding the integrated nature of the DIP Facility and the Pre-Petition Revolving

Financing Documents and the relation back of the DIP Liens, in no event shall any alleged right of reclamation or return (whether asserted under Bankruptcy Code section 546(c) or otherwise) be deemed to have priority over the DIP Liens.

(3) *Post-Petition Lien Perfection*. This Interim Order shall be sufficient and conclusive evidence of the priority, perfection, and validity of the post-petition liens and security interests granted herein, effective as of the Petition Date, without any further act and without regard to any other federal, state, or local requirements or law requiring notice, filing, registration, recording, or possession of the DIP Collateral, or other act to validate or perfect such security interest or lien, including, without limitation, control agreements with any financial institution(s) holding any deposit account of the Debtors (a "Perfection Act"). Notwithstanding the foregoing, if the DIP Agent or the Pre-Petition Agent elect for any reason to file, record, or otherwise effectuate any Perfection Act, each of the DIP Agent and the Pre-Petition Agent, as applicable, is authorized to perform such Perfection Act, and the Debtors are authorized to perform such Perfection Acts to the extent necessary or required by the DIP Agent or Pre-Petition Agent, which act or acts shall be deemed to have been accomplished as of the Petition Date notwithstanding the date and time actually accomplished, and in such event, the subject filing or recording office is authorized to accept, file, or record any document in regard to such act in accordance with applicable law. The DIP Agent and/or the Pre-Petition Agent may choose to file, record, or present a certified copy of this Interim Order in the same manner as a Perfection Act, which shall be tantamount to a Perfection Act, and, in such event, the subject filing or recording office is authorized to accept, file, or record such certified copy of this Interim Order in accordance with applicable law. Should the DIP Agent and/or the Pre-Petition Agent so choose and attempt to file,

36

record, or perform a Perfection Act, no defect or failure in connection with such attempt shall in any way limit, waive, or alter the validity, enforceability, attachment, priority, or perfection of the DIP Liens or the Adequate Protection Liens granted herein by virtue of the entry of this Interim Order.

B.    *Superpriority Administrative Expense*.

(1)    Subject and subordinate to the Carve-Out in all respects, for all DIP Obligations, whether now existing or hereafter arising pursuant to this Interim Order, the DIP Financing Documents, or otherwise, the DIP Agent, for the benefit of itself and the DIP Lenders, is granted an allowed superpriority administrative expense claim in the Debtors' Estates pursuant to Bankruptcy Code section 364(c)(1), having priority in right of payment over any and all other obligations, liabilities, and indebtedness of any of such Debtors, whether now in existence or hereafter incurred by any of such Debtors, of every kind or nature, including any and all unsecured claims, administrative expenses, the Adequate Protection Claims, priority claims or any other claims of the kind specified in, or ordered pursuant to, the Bankruptcy Code, including, without limitation, *inter alia*, Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 507, 364(c)(1), 546(c), 726, or 1114 and, upon entry of the Final Order, sections 506(c) and 552(b) (the "DIP Superpriority Claim").

(2)    Subject and subordinate to the Carve-Out in all respects, (a) effective upon entry of the Final Order with respect to rights preserved under Bankruptcy Code section 506(c), no costs or expenses of administration, including, without limitation, professional fees allowed and payable under Bankruptcy Code sections 328, 330, and 331, or otherwise, that have been or may be incurred in the Chapter 11 Cases, or in any Successor Cases, and (b) no priority claims are,

37

or will be, senior to, prior to, or *pari passu* with the DIP Superpriority Claim or the DIP Obligations or with any other claims of the DIP Lenders arising hereunder.  For the avoidance of doubt, with respect to the DIP Segregated Funds, the DIP Superpriority Claim shall only have recourse to the Reversionary Interest in such funds.

**III.**    **Authorization to Use Cash Collateral.**

Subject to the terms and conditions of this Interim Order, pursuant to Bankruptcy Code section 363(c)(2), the Debtors are authorized to use Cash Collateral, in accordance with the DIP Financing Documents and consistent with the Initial Budget and any Approved Budget, as applicable, in each case subject to Permitted Variances.  Absent entry of the Final Order by the Court, the Debtors shall no longer be authorized to use Cash Collateral at the expiration of the Interim Period without the prior written approval of the DIP Agent and the Pre-Petition Agent in their reasonable discretion, in each case, except as provided in Section VII(B)(1) hereof and subject to the requirements of the Carve-Out.

**IV.**    **Adequate Protection.**

A.    *Pre-Petition Agent Adequate Protection.*  As adequate protection for the interests of the Pre-Petition Agent in the Pre-Petition Revolving Collateral, for the benefit of the Pre-Petition Revolving Lenders, the Pre-Petition Agent is being provided with adequate protection, subject and subordinate in all respects to the Carve-Out; provided that the Pre-Petition Revolving Secured Parties shall not have recourse to the DIP Segregated Funds other than the Reversionary Interest to such funds.

(i)    *Pre-Petition ABL Adequate Protection Liens*.  Subject in all respects to the Carve-Out and Section II(A)(2)(e) herein, and solely to the extent of  diminution in value, if any,

38

of such interests in the Estates' interests in such collateral as of the Petition Date pursuant to Bankruptcy Code section 361 and 363(c), and subject to the Pre-Petition Prior Liens and the DIP Liens, the Debtors shall grant the Pre-Petition Agent, for itself and for the benefit of the Pre-Petition Revolving Lenders, valid and perfected replacement security interests in, and liens on (the "Pre-Petition ABL Adequate Protection Liens"), the DIP Collateral.

(a)    The Pre-Petition Agent Adequate Protection Liens shall be deemed to be valid, binding, enforceable and fully-perfected as of the Petition Date and, subject to Section VIII below, not subject to subordination (except as set forth in Section II(A)(2)(e)) or avoidance for any cause or purpose in these Chapter 11 Cases.

(b)    The Pre-Petition Agent Adequate Protection Liens shall be enforceable against the Debtors, their Estates, and any successors thereto, including, without limitation, any trustee or other Estate representative appointed or elected in the Chapter 11 Cases or any Successor Cases.  The Pre-Petition Agent Adequate Protection Liens, (i) shall not be made subject to (except as set forth in Section II(A)(2)(e) herein) or *pari passu* with any lien or security interest by any court Order heretofore or hereafter entered in these Chapter 11 Cases (unless with the consent of the Pre-Petition Revolving Secured Parties and excluding, for the avoidance of doubt, the DIP Liens); (ii) upon entry of a Final Order, shall not be subject to Bankruptcy Code section 506(c); (iii) shall not be subject to Bankruptcy Code sections 510, 549, or 550; and (iv) no lien or interest avoided and preserved for the benefit of any Estate pursuant to Bankruptcy Code section 551 shall be made *pari passu* with or senior to the Pre-Petition Agent Adequate Protection Liens.

(ii)     *Pre-Petition ABL Adequate Protection Claim*.  Subject in all respects to the Carve-Out and Section II(A)(2)(e), as further adequate protection, to the extent that the Pre-Petition Agent Adequate Protection Liens do not adequately protect the diminution in value of the Pre-Petition Revolving Secured Parties' interests in the Pre-Petition Revolving Collateral and the DIP Collateral, the Pre-Petition Agent, for the benefit of the Pre-Petition Revolving Secured Parties, is hereby granted, to the extent of such diminution in value, an allowed superpriority administrative expense claim (the "Pre-Petition ABL Adequate Protection Claim" and together with the  Pre-Petition Agent Adequate Protection Liens, the "Pre-Petition ABL Adequate Protection") in these Chapter 11 Cases or any Successor Cases against the Debtors' Estates under Bankruptcy Code sections 503 and 507(b), which shall have priority over all other administrative expense claims (except as set forth in Section II(A)(2)(e) herein and the DIP Superpriority Claim), priority claims, and unsecured claims against the Debtors or their Estates, which are now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses and priority or other claims of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c) (upon entry of a Final Order), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114.

(iii)     *Interest*.  As further adequate protection, the Pre-Petition Agent, for the benefit of the Pre-Petition Revolving Secured Parties, shall be entitled to interest on account of the outstanding secured Pre-Petition Revolving Obligations at the default rate set forth in the Pre-Petition Revolving Financing Documents, which was in effect as of the Petition Date and which shall accrue and be paid at the times and in the manner set forth in the Pre-Petition Revolving Financing Documents.

(iv)    *Adequate Protection Payments*.    As further adequate protection, and without limiting any rights of the Pre-Petition Agent, for the benefit of the Pre-Petition Revolving Secured Parties, under Bankruptcy Code section 506(b) (which rights are hereby preserved), the Debtors shall pay or reimburse the Pre-Petition Agent (the "Adequate Protection Payments") for any and all of its reasonable and documented fees, costs, expenses, and charges accrued and payable under the Pre-Petition Revolving Financing Documents, including, without limitation, the fees and expenses of the Pre-Petition Agent (including attorneys' fees and costs) as provided in Section 10.7 of the Pre-Petition Revolving Credit Agreement, whether accrued and unpaid pre-petition or accrued and unpaid post-petition, all without further notice, motion, or application to, Order of, or hearing before, this Court; provided, however, that the DIP Agent shall be permitted to include such fees and expenses in the DIP Obligations and make a DIP Revolving Loan for the purposes of effectuating such payment by the Debtors, following submission of a redacted summary invoice to the Debtors and their counsel, the U.S. Trustee and, if appointed, a Committee or its counsel, of a written invoice (subject in all respects to applicable privilege or work product doctrines).    Within ten business (10) days after delivery of such invoices in accordance with this paragraph (or such shorter time period agreed to by the DIP Agent, the Debtors, the U.S. Trustee, and, if appointed, the Committee), the Debtors shall pay such reasonable and documented fees and costs, provided, however, that to the extent an objection has been raised to certain fees and costs within such ten (10) business days, the Debtors shall pay only such fees and costs to which no objection has been raised.    To the extent there is an objection with respect to such costs and fees that is not consensually resolved, the Court may resolve the objection.    Such written invoices shall include the invoices of Blank Rome LLP, counsel to the Pre-Petition Agent,

counsel to Crystal Financial LLC d/b/a SLR Credit Solutions, Morgan Lewis & Bockius, LLP, and any other professional, advisor, or agent reasonably retained by the Pre-Petition Agent or its counsel in connection with the Pre-Petition Revolving Financing Documents pursuant to the Chapter 11 Cases; provided, however, that none of such fees and expenses paid as adequate protection payments hereunder shall be subject to approval by the Court or the United States Trustee Guidelines unless an objection is interposed and cannot be resolved by the parties. No recipient of any such payment shall be required to file with respect thereto any interim or final fee application with the Court. Any and all fees charged under the Pre-Petition Revolving Financing Documents shall be as set forth in the Pre-Petition Revolving Financing Documents and shall be payable at the times set forth in the Pre-Petition Revolving Financing Documents.

(v)     *Reporting*. As further adequate protection, the Debtors shall provide the Pre-Petition Agent copies of all periodic reports required under the DIP Credit Agreement or this Interim Order, including without limitation weekly reporting with respect to the Debtors' sale efforts.

B.     *Synacor Note Adequate Protection.* Subject in all respects to the Carve-Out and to Section II(A)(2)(e), and solely to the extent entitled under applicable law, as adequate protection for diminution in value, if any, in Synacor's interests in Portal's interests in the Pre-Petition Synacor Collateral as of the Petition Date, Synacor is being provided with adequate protection; provided that, on account of the Synacor adequate protection, Synacor shall not have recourse to (i) any and all Avoidance Actions or their proceeds, (ii) any and all proceeds from any insurance policy (including any "tail policy") issued or providing coverage to the Debtors for claims against or liabilities of any of the Debtors' current or former directors, managers, and officers, (iii) the

42

Carve-Out Reserve Account and all funds held therein and the proceeds thereof, (iv) the Segregated Utility Funds, and (v) the Segregated Tax Funds (collectively, the "Synacor Excluded Collateral") but shall have recourse solely to the Reversionary Interests in the Carve-Out Account, the Segregated Utility Funds, and the Segregated Tax Funds, if any, and to the extent applicable in accordance with the relative priority of Synacor's liens and claims as of the Petition Date.

(i)      *Synacor Adequate Protection Liens*.  Solely to the extent entitled under applicable law and for diminution in value, if any, of such interests pursuant to Bankruptcy Code section 361 and 363(c), and subject and subordinate in all respects to the Carve-Out, Section II(A)(2)(e) hereof, the DIP Liens, and the Pre-Petition ABL Adequate Protection Liens, Portal shall grant Synacor valid and perfected replacement security interests in, and liens on (the "Synacor Adequate Protection Liens, and together with the Pre-Petition Agent Adequate Protection Liens, the "Adequate Protection Liens"), the DIP Collateral comprised solely of the assets of Portal or its Estate; provided that distribution on account of such assets and Estate shall remain subject to resolution by separate Court order of the priority of security interests in and liens on such assets or Estate between the Pre-Petition Revolving Secured Parties, Synacor, and any other lawful holder of security interests in and liens.

(a)      The Synacor Adequate Protection Liens shall be deemed to be valid, binding, enforceable and fully-perfected as of the Petition Date.

(b)      The Synacor Adequate Protection Liens shall be enforceable solely against Portal, its Estate, and any successor thereto, including, without limitation, any trustee or other Estate representative of Portal appointed or elected in the Chapter 11 Cases or any

43

Successor Cases. The Synacor Adequate Protection Liens (i) shall not be made subject to (except as set forth in Section II(A)(2)(e) herein) or *pari passu* with any lien or security interest by any court Order heretofore or hereafter entered in these Chapter 11 Cases (excluding, for the avoidance of doubt, any Pre-Petition Prior Lien and the DIP Liens); (ii) upon entry of a Final Order, shall not be subject to Bankruptcy Code section 506(c); (iii) shall not be subject to Bankruptcy Code sections 510, 549, or 550; and (iv) no lien or interest avoided and preserved for the benefit of the Portal Estate pursuant to Bankruptcy Code section 551 shall be made *pari passu* with or senior to the Synacor Adequate Protection Liens.

(ii)     *Synacor Adequate Protection Claim.*    Subject in all respects to the Carve-Out and Section II(A)(2)(e), and solely to the extent entitled under applicable law, as further adequate protection, to the extent that the Synacor Adequate Protection Liens do not adequately protect the diminution in value of Synacor's interests in the Estates' interests in the Pre-Petition Synacor Collateral as of the Petition Date, Synacor is hereby granted, to the extent of such diminution in value, if any, an allowed superpriority administrative expense claim (the "Synacor Adequate Protection Claim" and together with the Pre-Petition Agent Adequate Protection Claim, the "Adequate Protection Claims," and the Adequate Protection Liens together with the Adequate Protection Claims, the "Adequate Protection") in the Portal Estate or any Successor Case against Portal's Estate under Bankruptcy Code sections 503 and 507(b), which, subject to the Carve-Out, shall have priority over all other administrative expense claims (except as set forth in Section II(A)(2)(e) herein), priority claims, and unsecured claims against Portal or its Estate (excluding the DIP Superpriority Claim), which are now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses and priority or other

44

claims of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c) (upon entry of a Final Order), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114; provided that that distribution on account of such superpriority administrative expense claims shall remain subject to resolution by separate Court order of the priority of security interests in and liens on such assets or Estate between the Pre-Petition Revolving Secured Parties, Synacor, and any other lawful holder of security interests in and liens.

(iii)     *Synacor Adequate Protection Proceeds*.   Subject in all respects to the Carve-Out and Section II(A)(2)(e), during the Interim Period, the Debtors shall segregate the proceeds received by the Debtors on account of customer receipts generated by Portal up to an aggregate amount of $40,000 per week (the "Synacor Adequate Protection Proceeds") to be used by Portal in the ordinary course of business, which, for the avoidance of doubt, shall not include any transfer to, or payment of any fees or expenses of, any other Debtor, in accordance with this Interim Order and the Initial Budget.

(iv)     *Synacor Reporting*.   As further adequate protection, the Debtors shall provide Synacor, concurrently with delivery to the DIP Agent or its counsel, copies of all periodic reports delivered under the DIP Credit Agreement or this Interim Order.

C.     *C&B Newco Adequate Protection.*   Subject in all respects to the Carve-Out and Section II(A)(2)(e), and solely to the extent entitled under applicable law, as adequate protection for diminution in value, if any, in C&B Newco's interests in iMedia's interests in the merchandise inventory and other goods consigned by C&B Newco to iMedia pursuant to the Consignment Agreement (the "Consigned Inventory") as of the Petition Date, on account of the Adequate Protection Obligations, C&B Newco is being provided with adequate protection.

45

(i)     *C&B Newco Adequate Protection Proceeds.*  Subject in all respects to the Carve-Out and Section II(A)(2)(e), and solely to the extent entitled under applicable law, to the extent of diminution in value of C&B Newco's interests in iMedia's interests in the Consigned Inventory as of the Petition Date pursuant to Bankruptcy Code section 361 and 363(c), if any, and subject and subordinate in all respects to the Carve-Out, the Debtors shall segregate the proceeds received by the Debtors on account of the sale of the Consigned Inventory (the "C&B Newco Adequate Protection Proceeds"); provided that the distribution of the C&B Newco Adequate Protection Proceeds by the Debtors shall remain subject to the resolution by separate Court order of the priority of security interests in and liens on such proceeds between the Pre-Petition Revolving Secured Parties, C&B Newco, and any other lawful holder of security interests in and liens on the C&B Newco Adequate Protection Proceeds.

## V.    Carve-Out.

A.     *Carve Out.*  The DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Claims, and the C&B Newco Adequate Protection Proceeds, and any other liens or claims granted by this Interim Order or any Final Order shall be subject only to the right of payment and priority of the following expenses (which expenses are collectively referred to as the "Carve-Out"), to the extent provided herein:

(1)     all fees required to be paid to the Clerk of the Court and to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6), together with the statutory rate of interest, which shall not be limited by any budget;

(2)     the allowed fees and expenses actually incurred by persons or firms retained by the Debtors or the Committee (if appointed) on or after the Petition Date and prior to the delivery of a

46

Carve-Out Trigger Notice (as defined herein) whose retention is approved by this Court pursuant to Bankruptcy Code section 327, 328, 363, or 1103 (each a "Professional" and collectively, "Professionals") and payable, subject in all respects to the terms of this Interim Order, any Final Order, and any other interim or other compensation Order entered by this Court in these Chapter 11 Cases ("Interim Compensation Procedures"), (i) for the period prior to the delivery of a Carve-Out Trigger Notice to the Debtors, Debtors' counsel, and counsel for any Committee, an amount not to exceed the lesser of (A) the aggregate amounts budgeted for all such Professionals for the period through and including the date a Carve-Out Trigger Notice is delivered for such week in accordance with the Initial Budget or any Approved Budget (to the extent a Carve-Out Trigger Notice is delivered mid-week, pro-rated for such week) and (B) the actual amount of such Allowed Professional Fees for all such Professionals incurred on or after the Petition Date up through and including the date a Carve-Out Trigger Notice is delivered ("Allowed Professional Fees").  The Carve-Out shall include all Allowed Professional Fees that are incurred or earned (i) at any time before delivery of a Carve-Out Trigger Notice as provided above, whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice, subject and limited in all respects to the amounts set forth in the Approved Budget for payment of such Professionals, *provided*, *that* the budgeted disbursements for subsequent Approved Budget periods shall be amended so that the Pre-Petition Borrowers may (a) carry forward any unspent budgeted line item disbursements for Professionals from prior periods and (b) carry back any unspent budgeted line item disbursements for Professionals from future periods, and (ii) beginning the first day after the delivery by the DIP Agent of written notice (which for the avoidance of doubt may be by electronic mail) of the occurrence of an Event of Default (such notice, "Carve-Out Trigger Notice") to the Debtors, the

Debtors' counsel, and counsel for any Committee, the fees and expenses incurred by the Professionals retained by the Debtors in an aggregate amount not to exceed $250,000 (the "Post-EOD Carve-Out Amount") (the aggregate amount of clauses (1) and (2), collectively, the "Carve-Out Cap"); provided, however, subject to the DIP Obligations and the Pre-Petition Revolving Obligations (other than the Early Termination Fee), including the Roll-Up balance, being repaid indefeasibly in full, in cash, any bonus, sale transaction fees, success fees, completion fees, substantial contribution fees, or any other fees of similar import owed to Professionals retained by the Debtors shall be included in the Carve-Out.  Notwithstanding the foregoing, the Carve-Out Trigger Notice shall be deemed to have been delivered to the required notice parties on the Maturity Date (as defined in the DIP Credit Agreement).  For the avoidance of doubt, the priority of the Carve-Out shall not be affected by repayment in full of the DIP Facility.

(3)     To the extent the actual amount of Allowed Professional Fees in respect of any Professional is less than the aggregate amounts budgeted for such Professional in accordance with the Initial Budget or any Approved Budget, the balance of budgeted amounts in respect of such Professional shall be made available pro rata to all other Professionals; provided, the mechanic for this test shall be applied upon the termination of the Carve-Out; provided further, for the avoidance of doubt, the actual amount of all Allowed Professional Fees in respect of all Professionals paid or funded out of the Carve-Out shall not exceed the Carve-Out Cap.

(4)     For the avoidance of doubt, (i) so long as a Carve-Out Trigger Notice has not been issued, the Debtors shall be permitted to pay Allowed Professional Fees as the same may be due and payable in accordance with the DIP Credit Agreement and this Interim Order; and (ii) nothing

herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described herein.

B.    *Excluded Professional Fees*.  Notwithstanding anything to the contrary in this Interim Order, neither the Carve-Out, nor the proceeds of any Pre-Petition Revolving Loans, borrowings under the DIP Credit Agreement, DIP Collateral, or Pre-Petition Revolving Collateral shall be used to pay any Allowed Professional Fees or any other fees or expenses incurred by any Professional in connection with any of the following: (a) an assertion or joinder in any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any Order, judgment, determination, or similar relief:  (i) challenging the legality, validity, priority, perfection, or enforceability of the Pre-Petition Revolving Obligations, the DIP Obligations, the Pre-Petition Agent's, the Pre-Petition Revolving Lenders,' or the DIP Agent's respective liens on and security interests in any of the Pre-Petition Revolving Collateral, or DIP Collateral as applicable; (ii) seeking to invalidate, set aside, avoid, or subordinate, in whole or in part, the Pre-Petition Obligations, or DIP Obligations or the Pre-Petition Agent's, the Pre-Petition Revolving Secured Parties,' or the DIP Agent's respective liens on and security interests in the Pre-Petition Revolving Collateral or the DIP Collateral, as applicable; or (iii) preventing, hindering, or delaying the Pre-Petition Agent's or the DIP Agent's respective assertion or enforcement of any lien, claim, right, or security interest or realization upon any Pre-Petition Revolving Collateral or DIP Collateral, as applicable, in accordance with the terms and conditions of this Interim Order; (b) a request to use Cash Collateral in any manner except to the extent expressly permitted in this Interim Order and DIP Financing Documents; (c) a request, without the prior written consent of the DIP Agent, for authorization to obtain debtor-in-possession financing or other financial

49

accommodations pursuant to Bankruptcy Code section 364(c) or 364(d) other than from the DIP Secured Parties, unless such other debtor-in-possession financing or financial accommodation is used, in part, to indefeasibly pay and satisfy in full in cash all Pre-Petition Revolving Obligations and the DIP ABL Obligations owed respectively to the Pre-Petition Revolving Secured Parties, the DIP Agent, and the DIP ABL Lenders; (d) the commencement or prosecution of any action or proceeding of any claims, causes of action, or defenses against the Pre-Petition Revolving Secured Parties, the DIP ABL Secured Parties, or any of their respective officers, directors, employees, agents, attorneys, affiliates, successors, or assigns, including, without limitation, any attempt to avoid any claim, lien, or interest of, or obtain any recovery from any of the Pre-Petition Revolving Secured Parties or the DIP Secured Parties, under Chapter 5 of the Bankruptcy Code; provided, however, that, subject to the Carve-Out Cap, an amount not to exceed $25,000.00 in the aggregate of the indebtedness incurred pursuant to the DIP Facility may be used to pay the Allowed Professional Fees of a Committee to investigate (but not prosecute) claims against and possible objections with respect to the Pre-Petition Revolving Obligations and the pre-petition liens and security interests of, the Pre-Petition Revolving Secured Parties (including, without limitation, issues regarding validity, perfection, priority, or enforceability of the secured claims of the Pre-Petition Revolving Secured Parties).

      C.    *Payment of Carve-Out*.

(1)    The Debtors shall maintain a segregated account for the payment of Allowed Professional Fees (the "Carve-Out Reserve Account"), which account shall be funded weekly by or on behalf of the Debtors, from Collateral or through borrowings under the DIP Credit Agreement in accordance with the terms thereof, and in accordance with the Approved Budget on

a weekly basis, in advance, until the delivery of a Carve-Out Trigger Notice, <u>provided</u>, <u>however</u>, that for this purpose, borrowing availability must exist under the DIP Credit Agreement (as determined without any regard to any reserve implemented specifically to restrict funding of the Carve-Out). For the avoidance of doubt, all liens and claims of the DIP Secured Parties and the Pre-Petition Revolving Secured Parties, as applicable, are subordinate to the Carve-Out Reserve Account. Upon the occurrence and during the continuance of an Event of Default, the Carve-Out Reserve Account may continue to be funded at the DIP Agent's option, up to the Carve-Out Cap. The Debtors shall pay Allowed Professional Fees to the Professionals, as applicable, from funds in the Carve-Out Reserve Account, in compliance with any Interim Compensation Procedures and in the manner set forth in this Interim Order in accordance with the Initial Budget or any Approved Budget; provided, however, that, prior to payment in full of the Pre-Petition Revolving Obligations, as applicable, and DIP Obligations and termination of the Carve-Out, to the extent that Allowed Professional Fees that have accrued from the Petition Date through and including the date a Carve-Out Trigger Notice is delivered to the Debtors, the Debtors' counsel, and counsel for any Committee are less than the amounts funded into the Carve-Out Reserve Account, the excess amounts in the Carve-Out Reserve Account shall be applied (a) first to fund the Post-EOD Carve-Out Amount, and (b) second remitted to the DIP Agent to apply to reduce either or both the Pre-Petition Revolving Obligations and the DIP Obligations at DIP Agent's sole discretion. For the avoidance of doubt, in making payments from the Carve-Out Reserve Account, the Debtors shall be entitled to conclusively rely upon written certifications of each Professional as to the amount due and owing to such Professional from the Carve-Out Reserve Account and in accordance with the Initial Budget or any Approved Budget and shall have no liability to any party based upon its

reliance on such certifications provided further that in the event the Maturity Date (as defined in the DIP Credit Agreement) has occurred, and to the extent the Carve-Out Reserve Account has been fully funded as required in this Section V and in accordance with the Initial Budget or any Approved Budget, all obligations of the DIP Secured Parties and Pre-Petition Revolving Secured Parties with respect to the Carve-Out shall be terminated.

(2)     The Carve-Out Cap shall be reduced, on a dollar-for-dollar basis, on a weekly basis by (without duplication or double counting) the amounts actually funded into the Carve-Out Reserve Account and/or the amounts actually paid on account of the Carve-Out.  To the extent the Carve-Out Reserve Account has not been funded in accordance with the Approved Budget prior to the delivery of a Carve-Out Trigger Notice, the DIP Agent, on behalf of the DIP Lenders, shall remit the difference to the Carve-Out Reserve Account solely from proceeds of the Pre-Petition Revolving Collateral and the DIP Collateral.  Payment of any amounts on account of the Carve-Out, whether by or on behalf of the DIP Agent or any DIP Lender, shall not and shall not be deemed to, reduce the Pre-Petition Obligations or the DIP Obligations, and shall not, and shall not be deemed to, subordinate any of the DIP Secured Parties' liens and security interests in the DIP Collateral or the DIP Superpriority Claim to any junior pre- or post-petition lien, interest, or claim in favor of any other party.  No DIP Secured Party shall, under any circumstance, be responsible for the payment or reimbursement of any fees or disbursements of any Professionals incurred in connection with the Chapter 11 Cases or Successor Cases under any chapter of the Bankruptcy Code, and nothing in this Section V shall be construed to obligate any DIP Secured Party, in any way, to pay compensation to or to reimburse expenses of any Professional, or to ensure that the Debtors have sufficient funds to pay such compensation or reimbursement.

(3)     Nothing in this Interim Order shall be construed as a consent to the allowance of the fees and expenses of any Professional or shall affect the right of the Pre-Petition Revolving Secured Parties and/or the DIP Secured Parties to object to the allowance and payment of such fees and expenses.  So long as no Event of Default has occurred or is continuing, and no Carve-Out Trigger Notice has been delivered, the Debtors shall be permitted to pay fees and expenses allowed and payable pursuant to an Order of the Court, including any Order approving Interim Compensation Procedures, under Bankruptcy Code sections 330 and 331, as the same may be due and payable, solely to the extent set forth in the Approved Budget, and not to exceed the amounts set forth in the Approved Budget; provided, however, that any such payment shall be subject to entry of a Final Order of the Court of each Professional's final application for allowance of such fees and expenses.

## VI.    Right to Credit Bid.

Subject to entry of the Final Order, in connection with any sale of assets by any Debtor outside of the ordinary course of business, pursuant to Bankruptcy Code section 363(k), each of Pre-Petition Agent, on behalf of itself and the Pre-Petition Revolving Lenders, and the DIP Agent, on behalf of itself and the DIP ABL Lenders (individually or collectively), shall be entitled to make a credit bid ("Credit Bid") to the extent permitted by Bankruptcy Code section 363(k) for any purchased assets comprising the Pre-Petition Revolving Collateral and the DIP Collateral, as applicable, and in each case subject to the terms and conditions of the DIP Credit Agreement.

**VII.** **Default; Rights and Remedies; Relief from Stay**.

A. *Events of Default*. The following shall constitute an "Event of Default" under this Interim Order:

(1)   the occurrence of any Event of Default as defined and under the DIP Credit Agreement;

(2)   the failure of the Debtors to obtain entry of this Interim Order within three (3) days of the filing of the DIP Motion, unless otherwise agreed in writing by the Pre-Petition Agent and the DIP Agent;

(3)   the failure of the Debtors to obtain entry of a Final Order on or before July 24, 2023, unless otherwise agreed in writing by the Pre-Petition Agent and the DIP Agent;

(4)   the Debtors seeking approval of a sale of all or a portion of the Debtors' property that is not acceptable to the Pre-Petition Agent and the DIP Agent (provided, that, (i) any sale that would provide for the payment in full in cash of the DIP Obligations and the Pre-Petition Revolving Obligations and (ii) the Debtors' contemplated sale of assets to RNN-TV Licensing Co. LLC as set forth in the APA, are, in each case, deemed to be acceptable to the Pre-Petition Agent and the DIP Agent); or

(5)   the sale of all or substantially all of the Debtors' property without the order approving such sale providing for the indefeasible payment and satisfaction in full in cash of the Pre-Petition Revolving Obligations and the DIP ABL Obligations, unless otherwise agreed in writing with a purchaser.

B.     *Rights and Remedies Upon Event of Default/Relief from Stay*.

(1)     Upon the occurrence of and during the continuance of an Event of Default, and without the necessity of seeking relief from the automatic stay or any further Order of the Court, (a) the DIP Agent and DIP Lenders shall no longer have any obligation to make any DIP Loans (or otherwise extend credit) under the DIP Facility, (b) all amounts outstanding under the DIP Financing Documents shall, at the option of the DIP Agent, be accelerated and become immediately due and payable, (c) the DIP Agent and the Pre-Petition Agent shall be entitled to immediately terminate the Debtors' right to use Cash Collateral, without further application or Order of this Court, provided, however, that the Debtors shall have the right to use Cash Collateral to pay their weekly ordinary course payroll included in the Initial Budget and any Approved Budget, as applicable, in each case subject to Permitted Variances,  through the date on which such Event of Default occurs, and (d) the Debtors shall be bound by all post-default restrictions, prohibitions, and other terms as provided in this Interim Order, the DIP Credit Agreement and the other DIP Financing Documents and the Pre-Petition Revolving Financing Documents.  Upon the occurrence of and during the continuance of an Event of Default, with the consent (to the extent such consent is required under the DIP Credit Agreement) of the Required Lenders (or, following the occurrence and during the continuance of a Specified Event of Default (as defined in the DIP Credit Agreement), with consent of the Revolving Lenders), and without the necessity of seeking relief from the automatic stay or any further Order of the Court, (x) all amounts outstanding under the DIP Financing Documents shall  be accelerated and become immediately due and payable; (y) the DIP Agent shall be entitled to charge the default rate of interest under the DIP Credit Agreement; and (z) subject only to the notice requirement set forth in Section VII(B)(2) below,

55

both the DIP Agent and the Pre-Petition Agent shall be entitled to take any other action or exercise any other right or remedy as provided in this Interim Order, the DIP Financing Documents, the Pre-Petition Revolving Financing Documents, or applicable law, including, without limitation, setting off any DIP Obligations (other than with respect to any amount required to fund the Carve-Out Reserve Account up to the Carve-Out Cap as set forth in this Interim Order) or Pre-Petition Revolving Obligations with DIP Collateral, Pre-Petition Revolving Collateral, or proceeds in the possession of any Pre-Petition Revolving Secured Party or DIP Secured Party, and enforcing any and all rights and remedies with respect to the DIP Collateral or Pre-Petition Revolving Collateral, as applicable.

(2)    Without further notice, application or order of this Court, upon the occurrence and during the continuance of an Event of Default, to the extent applicable and with the consent (to the extent such consent is required under the DIP Credit Agreement) of the Required Lenders (or, following the occurrence and during the continuance of a Specified Event of Default (as defined in the DIP Credit Agreement), with consent of the Revolving Lenders), and after providing not less than five (5) days' advance written notice thereof (the "Notice Period") (which five (5)  day period applies only to the DIP Collateral enforcement remedies described below), which notice may be by electronic mail (the "Enforcement Notice"), to counsel to the Debtors, the U.S. Trustee, and counsel to any Committee, the DIP Agent for the benefit of itself and the DIP Lenders, and the Pre-Petition Agent, for the benefit of itself and the other Pre-Petition Revolving Secured Parties, as applicable, shall be, subject and subordinate in all respects to the Carve-Out set forth in this Interim Order,  entitled to take any action and exercise all rights and remedies provided to them by this Interim Order, the DIP Financing Documents or the Pre-Petition

Revolving Financing Documents, or applicable law, unless otherwise ordered by this Court, as the DIP Agent or the Pre-Petition Agent, as applicable, may deem appropriate in their sole discretion to, among other things, proceed against and realize upon the DIP Collateral (including the Pre-Petition Revolving Collateral) or any other assets or properties of the Debtors' Estates upon which the DIP Agent, for the benefit of itself and the DIP Lenders, and the Pre-Petition Agent, for the benefit of itself and the other Pre-Petition Revolving Secured Parties, has been or may hereafter be granted liens or security interests to obtain the full and indefeasible payment of all the Pre-Petition Revolving Obligations and DIP Obligations. Notwithstanding the foregoing or anything in Section VII(B)(1) above, DIP Agent may continue to apply proceeds received into the lockbox or collection account to reduce the Pre-Petition Revolving Obligations or the DIP Obligations in any order at the sole discretion of the DIP Agent during the Notice Period; provided, that during the Notice Period the Debtors and any Committee shall be entitled to an emergency hearing with the Court with respect to the Enforcement Notice and whether an Event of Default has occurred and is continuing or such other matters as the Court may determine.

(3) Additionally, upon the occurrence and during the continuance of an Event of Default, expiration of the Notice Period, and the exercise by the DIP Agent or the Pre-Petition Agent of their respective rights and remedies under this Interim Order, the DIP Financing Documents, or Pre-Petition Revolving Financing Documents, the Debtors shall reasonably cooperate with the DIP Agent in the exercise of such rights and remedies and assist the DIP Agent in effecting any sale or other disposition of the DIP Collateral required by the DIP Agent, including any sale of DIP Collateral pursuant to Bankruptcy Code section 363 or assumption and assignment of DIP Collateral consisting of contracts and leases pursuant to Bankruptcy Code section 365, in

each case, upon such terms that are reasonably acceptable to the DIP Agent; provided that the Debtors and the DIP Agent agree upon a mutually acceptable wind down budget that is funded by the DIP Lenders.

(4)    Upon the occurrence and during the continuance of an Event of Default, to the extent applicable with the consent (to the extent such consent is required under the DIP Credit Agreement) of the Required Lenders (or, following the occurrence and during the continuance of a Specified Event of Default (as defined in the DIP Credit Agreement), with consent of the Revolving Lenders),  and subject to the Notice Period provided for above, in connection with a liquidation of any of the Pre-Petition Revolving Collateral or DIP Collateral, the DIP Agent or the Pre-Petition Agent (or any of their respective employees, agents, consultants, contractors, or other professionals), as applicable, shall have the right, at the sole cost and expense of the Debtors, to: (i) enter upon, occupy, and use any real or personal property, fixtures, equipment, leasehold interests, or warehouse arrangements owned or leased by the Debtors; provided, however, that the DIP Agent may only be permitted to do so in accordance with (a) existing rights under applicable non-bankruptcy law, including, without limitation, applicable leases, (b) any pre-petition (and, if applicable, post-petition) landlord waivers or consents, or (c) further Order of the Court on motion and notice appropriate under the circumstances; and (ii) use any and all trademarks, tradenames, copyrights, licenses, patents, equipment, or any other similar assets of the Debtors, or assets that are owned by or subject to a lien of any third party and that are used by the Debtors in their businesses; provided, however, the DIP Agent may use such assets upon entry of this Interim Order to the extent permitted by non-bankruptcy law.  The DIP Agent and the DIP Lenders will be responsible for the payment of any applicable fees, rentals, royalties, or other amounts owing to

such lessor, licensor or owner of such property (other than the Debtors) for the period of time that the DIP Agent actually occupies any real property or uses the equipment or the intellectual property (but in no event for any accrued and unpaid fees, rentals, or other amounts owing for any period prior to the date that the DIP Agent actually occupies or uses such assets or properties).

(5)    The rights and remedies of the DIP Agent specified herein are cumulative and not exclusive of any rights or remedies that the DIP Agent and/or the Pre-Petition Agent may have under the DIP Financing Documents, the Pre-Petition Revolving Financing Documents, or otherwise and may be exercised in whole or in part in any order.  With respect to the exercise of such rights and remedies, the fourteen-day stay provisions of Bankruptcy Rules 6004(h) and 4001(a)(3) are hereby waived.

C.    *Relief from Stay*.  For the purpose of exercising rights, options and remedies set forth in this Section VII, upon expiration of the Notice Period, unless otherwise ordered by the Court, the Pre-Petition Agent, on behalf of the other Pre-Petition Revolving Secured Parties, and the DIP Agent, on behalf of the other DIP Secured Parties, as applicable, shall be, subject and subordinate in all respects to the Carve-Out set forth in this Interim Order, automatically and completely relieved from the effect of any stay under Bankruptcy Code section 362, any other restriction on the enforcement of their liens upon and security interests in the DIP Collateral or any other rights granted to them, or any of them, pursuant to the terms and conditions of the DIP Financing Documents, the Pre-Petition Revolving Financing Documents, or this Interim Order.

D.    *Waiver Agreements*.  Subject to entry of a Final Order, all rights, options, and remedies granted to the Pre-Petition Agent or the DIP Agent in either or both of any landlord or warehouseman's waiver and/or consent executed and delivered in connection with the Pre-Petition

Revolving Obligations and the Pre-Petition Revolving Credit Agreement, including the right to access any premises leased by Debtors and access the Pre-Petition Revolving Collateral, shall be deemed to be continuing, enforceable, and applicable to and binding upon the landlords and other parties to such waiver or consent agreements with respect to the Pre-Petition Revolving Collateral and the DIP Collateral.

**VIII.    Challenges to Pre-Petition Revolving and Synacor Promissory Note Obligations**.

A.    The Debtors have admitted, stipulated, and agreed to the various stipulations and admissions contained in this Interim Order, including, without limitation, the stipulations and admissions included in the Paragraph H Stipulations, which stipulations and admissions are and shall be binding upon the Debtors, subject to the Challenge Period, and any successors thereto in all circumstances.  The stipulations and admissions contained in this Interim Order, including, without limitation, the Paragraph H Stipulations, shall also be binding upon the Debtors' Estates and all other parties in interest, including any Committee or any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors (a "Trustee"), for all purposes unless (a) any party in interest, no later than the date that is seventy five (75) days from entry of the Interim Cash Collateral Order (the "Initial Challenge Period"), has properly filed an adversary proceeding as required under the Bankruptcy Rules (x) challenging the amount, validity, enforceability, priority, or extent of the Pre-Petition Revolving Obligations, the liens of the Pre-Petition Agent on the Pre-Petition Revolving Collateral securing the Pre-Petition Revolving Obligations, the Synacor Promissory Note Obligations, the liens of Synacor on the Pre-Petition Synacor Collateral securing the Synacor Promissory Note Obligations, or (y) otherwise asserting any other claims, counterclaims, causes of action, objections, contests, or defenses against the Pre-

Petition Agent and/or any other Pre-Petition Revolving Secured Party or Synacor on behalf of the Debtors' Estates (clauses (x) and (y), collectively, referred to herein as "Challenges"), and (b) the Court rules in favor of the plaintiff sustaining any such challenge or claim in any such duly filed adversary proceeding or contested matter; provided, however, that, as to the Debtors, all such Challenges are hereby irrevocably waived and relinquished effective as of the Petition Date.  If during the Initial Challenge Period, the Committee or other third party files a motion for standing with a draft complaint identifying and describing all Challenge(s) consistent with applicable law and rules of procedure, the Initial Challenge Period will be tolled for the Committee or such other third party, but only for such party, solely with respect to the Challenge(s) asserted in the draft complaint until three (3) business days from the entry of an Order granting the motion for standing to prosecute such Challenge(s) described in the draft complaint and permitted by the Court (the "Extended Challenge Period", together with the Initial Challenge Period, the "Challenge Period").  If standing is denied by the Court, the Challenge Period shall be deemed to have expired. If no such Challenge or motion for standing, as applicable, is timely filed prior to the expiration of the Initial Challenge Period, without further Order of the Court, except as set forth in the Paragraph H Stipulations:  (1) the Debtors' stipulations, admissions and releases contained in this Interim Order (including the Paragraph H Stipulations and the releases set forth in Section IX(B) below) shall be binding on all parties in interest, including the Debtors' Estates, the Committee, and any subsequently appointed Trustee, case fiduciary, or successors and assigns; (2) the Pre-Petition Revolving Obligations and the Synacor Promissory Note Obligations shall constitute allowed claims, not subject to counterclaim, setoff, subordination, recharacterization, defense or avoidance, for all purposes in these Chapter 11 Cases and any Successor Cases, including, without limitation,

61

any subsequent chapter 7 case; (3) the Pre-Petition Agent's liens on the Pre-Petition Revolving Collateral and Synacor's liens on the Pre-Petition Synacor Collateral shall be deemed to have been, as of the Petition Date, and to be, legal, valid, binding, perfected, and with the priority specified in the Paragraph H Stipulations and Section II(A)(2)(e), not subject to defense, counterclaim, recharacterization, subordination or avoidance; and (4) the Pre-Petition Revolving Obligations, the Pre-Petition Revolving Secured Parties' liens on the Pre-Petition Revolving Collateral, the Pre-Petition Revolving Secured Parties (and their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors), the Synacor Promissory Note Obligations, Synacor's liens on the Pre-Petition Synacor Collateral, and Synacor shall not be subject to any other or further Challenge by any Committee or any other party in interest, and any such Committee or party in interest shall be enjoined from seeking to exercise the rights of the Debtors' Estates, including, without limitation, any successor thereto (including, without limitation, any estate representative or a Trustee, whether such Trustee is appointed or elected prior to or following the expiration of the Initial Challenge Period); provided, however, that if the Chapter 11 Cases are converted to chapter 7 or a Trustee is appointed prior to the expiration of the Initial Challenge Period, any such estate representative or Trustee shall receive the full benefit of any remaining Initial Challenge Period or 21 days from appointment, whichever is greater, subject to the limitations described herein.  If any Challenge or motion for standing, as applicable, is timely and properly filed prior to the expiration of the Initial Challenge Period, the releases, stipulations, and admissions (including, without limitation, in the Paragraph H Stipulations) contained in this Interim Order shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on any Committee and any other person, including any Trustee appointed in any

Chapter 11 Case(s) or Successor Cases, as applicable, except as to any such findings and admissions that were expressly challenged in the original complaint initiating the adversary proceeding and excluding any amended or additional claims that may or could have been asserted thereafter through an amended complaint under Rule 15 of the Federal Rules of Civil Procedure or otherwise. Nothing in this Interim Order vests or confers on any person, including any Committee, any Trustee, or any other party in interest, standing or authority to pursue any cause of action belonging to the Debtors or their Estates. This stipulation shall be binding upon the Debtors, their Estates, all parties in interest in the Chapter 11 Cases and their respective successors and assigns, including, without limitation, any Trustee or other fiduciary appointed in the Chapter 11 Cases or Successor Cases, and shall inure to the benefit of the Pre-Petition Revolving Secured Parties, Synacor, and the Debtors and their respective successors and assigns.

**IX.**    **Debtors' Waivers and Releases**.

A.    *Section 506(c) Claims and 552(b) Equities*. Effective upon the entry of a Final Order approving the DIP Motion, no costs or expenses of administration that have been or may be incurred in the Chapter 11 Cases or Successor Cases at any time shall be charged against any of the Pre-Petition Revolving Secured Parties or the DIP Secured Parties, their respective claims, or the DIP Collateral or the Pre-Petition Revolving Collateral, as applicable, pursuant to Bankruptcy Code section 506(c) without the prior written consent of the DIP Agent (and no such consent shall be implied from any other action, inaction or acquiescence by the DIP Agent or any DIP Lender). Effective upon the entry of a Final Order, the Pre-Petition Revolving Secured Parties and the DIP Lenders shall each be entitled to all of the rights and benefits of Bankruptcy Code section 552(b), and the "equities of the case" exception under Bankruptcy Code section 552(b) shall not apply to

63

the Pre-Petition Revolving Secured Parties and the DIP Lenders with respect to proceeds, products, offspring, or profits of any of the Pre-Petition Revolving Collateral or DIP Collateral, as applicable.

B.    <u>Release</u>.

(1)    In consideration of and as a condition to the DIP Agent and the DIP Lenders making DIP Revolving Loans under the DIP Credit Agreement, consenting to the use of Cash Collateral, and providing other credit and financial accommodations to the Debtors pursuant to the provisions of this Interim Order and the DIP Financing Documents, each Debtor, on behalf of itself, and successors and assigns and its Estate (collectively, the "<u>Releasors</u>"), subject only to Section VIII above, hereby absolutely releases and forever discharges and acquits each of the Pre-Petition Revolving Secured Parties, and each of their respective successors, participants, and assigns, and their present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees, and other representatives (the Pre-Petition Agent and each of the Pre-Petition Revolving Lenders, and all such other parties, and each solely in their capacity as such, being hereinafter referred to collectively as the "<u>Releasees</u>") of and from any and all claims, demands, causes of action, suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages, and any and all other claims, counterclaims, cross claims, defenses, rights of set-off, demands, and liabilities whatsoever (individually, a "<u>Pre-Petition Released Claim</u>," and collectively, the "<u>Pre-Petition Released Claims</u>") of every kind, name, nature, and description, known or unknown, foreseen or unforeseen, matured or contingent, liquidated or unliquidated, primary or secondary, suspected or unsuspected, both at law and in equity, including, without limitation, any so-called "lender liability" claims or defenses, that any Releasor may now or hereafter own, hold, have, or claim to have against the Releasees,

or any of them for, upon, or by reason of any nature, cause, or thing whatsoever that arose or may have arisen at any time on or prior to the date of this Interim Order, in respect of the Debtors, the Pre-Petition Revolving Obligations, the Pre-Petition Revolving Financing Documents, and any Pre-Petition Revolving Loans, or other financial accommodations under the Pre-Petition Revolving Financing Documents; provided, however, that such release shall not be effective with respect to the Debtors until entry of a Final Order, and with respect to the Estates, until the expiration of the Challenge Period.  In addition, upon entry of a Final Order and subject to the Challenge Period, the indefeasible payment and satisfaction in full of all Obligations (as defined in the DIP Financing Documents) owed to the DIP Agent and the DIP ABL Lenders by the Debtors, and termination of the rights and obligations arising under this Interim Order and the DIP Financing Documents (which payment and termination shall be on terms and conditions acceptable to the DIP Agent), the DIP Agent and the DIP ABL Lenders shall be automatically deemed to be absolutely and forever released and discharged from any and all obligations, liabilities, actions, duties, responsibilities, commitments, claims, and causes of action arising, occurring in connection with, or related to the DIP Financing Documents or this Interim Order (whether known or unknown, direct or indirect, matured or contingent, foreseen or unforeseen, due or not due, primary or secondary, liquidated or unliquidated).

(2)    Upon the entry of a Final Order, subject to Section VIII with respect to all applicable parties other than the Debtors, each Releasor hereby absolutely, unconditionally and irrevocably covenants and agrees with each Releasee that it will not sue (at law, in equity, in any regulatory proceeding, or otherwise) any Releasee on the basis of any Pre-Petition Released Claim that has been released and discharged by each Releasor pursuant to Section IX(B)(1) above.  If

any Releasor violates the foregoing covenant, the Debtors agree to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

X.     **Other Rights and Obligations**.

A.     *No Modification or Stay of this Interim Order*.  Based upon the record presented to the Court by the Debtors, notwithstanding (i) any stay, modification, amendment, supplement, *vacatur*, revocation, or reversal of this Interim Order, the DIP Financing Documents or any term hereunder or thereunder, (ii) the failure to obtain a Final Order pursuant to Bankruptcy Rule 400l(c)(2), or (iii) the dismissal or conversion of one or more of the Chapter 11 Cases, the DIP Agent and the DIP Lenders shall retain and be entitled to all of the rights, remedies, privileges, and benefits in favor of the DIP Agent and the DIP Lenders pursuant to this Interim Order and the DIP Financing Documents, and subject to Bankruptcy Code section 364(e).

B.     *Power to Waive Rights; Duties to Third Parties*.  The Pre-Petition Revolving Secured Parties and the DIP Lenders shall have the right, in their respective sole discretion, to waive any of the terms, rights, and remedies provided or acknowledged in this Interim Order ("Lender Rights") with respect to each of them, as applicable, and shall have no obligation or duty to any other party with respect to the exercise or enforcement, or failure to exercise or enforce, any Lender Right(s).  Any waiver by any of them of any Lender Rights shall apply solely to such party and to the Lender Right so waived and shall not be or constitute a continuing waiver, except that any waiver by the Pre-Petition Agent, on behalf of the Pre-Petition Revolving Lenders, or the DIP Agent, on behalf of the DIP Lenders, shall bind the Pre-Petition Revolving Lenders or DIP Lenders, as applicable.  Any delay in or failure to exercise or enforce any Lender Right shall neither

66

constitute a waiver of such Lender Right, nor cause or enable any other party to rely upon or in any way seek to assert as a defense to any obligation owed by the Debtors to any Pre-Petition Revolving Credit Secured Party or any DIP Lender.

C.     *Reservation of Right to Value Collateral*.  Notwithstanding any other provision of this Interim Order, the Debtors shall retain the right to value the Pre-Prepetition Synacor Collateral and the Consigned Inventory.

D.     *Disposition of Collateral*.  The Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral without an order of this Court and the written consent of the DIP Agent, except for sales of the Debtors' inventory in the ordinary course of their business or as otherwise permitted in the DIP Credit Agreement.

E.     *Inventory*.  The Debtors shall not, without the prior written consent of the DIP Agent (and no such consent shall be implied, from any other action, inaction or acquiescence by the DIP Agent or any DIP Lender), (a) enter into any agreement to return any inventory to any of their creditors for application against any pre-petition indebtedness under any applicable provision of Bankruptcy Code section 546, or (b) consent to any creditor exercising any setoff against any of its pre-petition indebtedness based upon any such return pursuant to Bankruptcy Code section 553(b)(1) or otherwise**.**

F.     *Reservation of Rights*.  The terms, conditions, and provisions of this Interim Order are in addition, and without prejudice, to the rights of the Pre-Petition Revolving Secured Parties or the DIP Lenders to pursue any and all rights and remedies under the Bankruptcy Code, the DIP Financing Documents, the Pre-Petition Revolving Financing Documents, or any other applicable agreement or law, including, without limitation, rights to seek either or both adequate protection

and additional or different adequate protection, to seek relief from the automatic stay, to seek an injunction, to oppose any request for use of Cash Collateral (other than as permitted under this Interim Order and the DIP Credit Agreement) or granting of any interest in the DIP Collateral or priority in favor of any other party, to object to any sale of assets, and to object to applications for either or both allowance and payment of compensation of Professional Persons or other parties seeking compensation or reimbursement from the Estates.

      G.     *Modification of the Automatic Stay.*  The automatic stay under Bankruptcy Code section 362(a) is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order and the DIP Financing Documents, including, without limitation, authorization to make payments, granting of liens, and perfection of liens.

      H.     *Binding Effect.*

      (1)     The provisions of this Interim Order (including the Carve-Out), the DIP Financing Documents, the DIP Superpriority Claim, DIP Liens, the Adequate Protection Liens, the Adequate Protection Claim, and any and all rights, remedies, privileges, and benefits in favor of the Debtors, their Estates, the DIP Agent, the DIP Lenders, and the Pre-Petition Revolving Secured Parties, provided or acknowledged in this Interim Order, and any actions taken pursuant thereto, shall be effective immediately upon entry of this Interim Order pursuant to Bankruptcy Rules 6004(g) and 7062, shall continue in full force and effect, and shall survive entry of any such other Order, including, without limitation, any Order that may be entered confirming any plan of reorganization, converting one or more of the Chapter 11 Cases to any other chapter under the Bankruptcy Code, or dismissing one or more of the Chapter 11 Cases.

(2)    Any Order dismissing one or more of the Chapter 11 Cases under Bankruptcy Code section 1112 or otherwise shall be deemed to provide (in accordance with Bankruptcy Code sections 105 and 349) that (a) the DIP Agent's, the DIP Lenders' and the Pre-Petition Revolving Secured Parties' respective liens on, and security interests in, the DIP Collateral shall continue in full force and effect notwithstanding such dismissal until the DIP Obligations and  the Pre-Petition Revolving Obligations, as applicable, owed to such parties, respectively, are indefeasibly paid and satisfied in full, and (b) this Court shall retain jurisdiction, to the extent permissible under applicable law, notwithstanding such dismissal, for the purposes of enforcing the DIP Superpriority Claim, the DIP Liens, the Adequate Protection Liens, and the Adequate Protection Claim of the Pre-Petition Agent and the Pre-Petition Revolving Secured Parties in the DIP Collateral.

(3)    In the event this Court modifies any of the provisions of this Interim Order or the DIP Financing Documents following a Final Hearing, this Interim Order shall remain in full force and effect, except as expressly amended or modified at such Final Hearing.

(4)    This Interim Order shall be binding upon the Debtors, their Estates, all parties in interest in the Chapter 11 Cases, and their respective successors and assigns, including any trustee or other fiduciary appointed in the Chapter 11 Cases or any Successor Cases of any Debtors, and shall inure to the benefit of the Pre-Petition Revolving Secured Parties, the DIP Lenders, the Debtors, and their respective successors and assigns, subject to the rights of any trustee pursuant to Section VIII above.

I.    *Marshalling.*  Subject to the entry of a Final Order, in no event shall the DIP Agent, the DIP Lenders, or the Pre-Petition Revolving Secured Parties be subject to the equitable doctrine

of "marshalling" or any similar equitable doctrine with respect to the Pre-Petition Revolving Collateral or the DIP Collateral.

J.      *Proofs of Claim.*  Notwithstanding the entry of an Order establishing a bar date in any of these Chapter 11 Cases, or the conversion of these Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, the Pre-Petition Revolving Secured Parties shall not be required to file proofs of claim in any of the Chapter 11 Cases or Successor Cases with respect to any of Pre-Petition Revolving Obligations, Adequate Protection Obligations, Adequate Protection Liens, DIP Obligations, DIP Liens, DIP Superpriority Claims, or any other claims or liens granted hereunder or created by this Interim Order.  The Pre-Petition Agent, for the benefit of the other Pre-Petition Revolving Secured Parties, is hereby authorized and entitled, in its respective sole and absolute discretion, but in no event is required, to file (and amend and/or supplement, as it sees fit) proofs of claim in each of the Chapter 11 Cases on behalf of all of the Pre-Petition Revolving Secured Parties in respect of Pre-Petition Revolving Obligations.  Any proof of claim so filed shall be deemed to be in addition to, and not in lieu of, any other proof of claim that may be filed by any of the Pre-Petition Revolving Secured Parties.

K.      *Waiver of Bankruptcy Rule 6003(b), 6004(a) and 6004(h).*  The 21-day provision of Bankruptcy Rule 6003(b), the notice requirements of Bankruptcy Rule 6004(a), and the 14-day stay of 6004(h) are hereby waived.

L.      *Order Controls.*  In the event of a conflict between (a) the terms and provisions of the DIP Financing Documents or the Pre-Petition Revolving Financing Documents, as applicable, and (b) the terms and provisions of this Interim Order, then in each case the terms and provisions of this Interim Order shall govern.

M.     *Closing of the APA*.  Upon (1) the Closing (as defined in the APA) and indefeasible payment in full of the DIP Obligations and the Pre-Petition Revolving Obligations (other than the Early Termination Fee), (2) expiration of the Challenge Period with no Challenge having been brought, and (3) effectiveness of the releases and waivers in Section IX of this Interim Order and any Final Order, including without limitation the section 506(c) waiver thereunder, any and all liens on the Minimum Cash Amount (as defined in the APA), including, for the avoidance of doubt, the DIP Liens and the Pre-Petition Revolving Liens, shall be released, and the Debtors shall be authorized to use such Minimum Cash Amount to fund the winddown of the Debtors and their Estates.

N.     *No Third-Party Rights*.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

O.     Notwithstanding language in this Interim Order that provides that certain relief is subject to or conditioned upon entry of a Final Order, such provisions are not intended to be automatically effective and are without prejudice to rights of parties in interest to object and the Court's right to determine the relief.

## XI.    <u>Final Hearing and Response Dates</u>.

The Final Hearing on the DIP Motion pursuant to Bankruptcy Rule 4001(c)(2) is scheduled for **[•], 2023 at [•]: [•] [•]. m. (Eastern)** before this Court.  The Debtors shall promptly mail copies of this Interim Order to the Noticed Parties, and to any other party that has filed a request for notices with this Court and to any Committee after the same has been appointed, or Committee counsel, if the same shall have filed a request for notice.  Any party in interest objecting to the

relief sought at the Final Hearing shall serve and file written objections, which objections shall be served upon (a) proposed co-counsel for the Debtors, Ropes & Gray LLP, 1211 Avenue of the Americas, New York, NY 10036 (Attn: Ryan Preston Dahl and Cristine Pirro Schwarzman, email: ryan.dahl@ropesgray.com and cristine.schwarzman@ropesgray.com); Ropes & Gray LLP, 191 North Wacker Drive, 32nd Floor, Chicago, IL 60606 (Attn: Stephen L. Iacovo and Jeramy D. Webb, email: stephen.iacovo@ropesgray.com and jeramy.webb@ropesgray.com); and Pachulski Stang Ziehl & Jones LLP, 919 N. Market Street, 17th Floor, Wilmington, Delaware 19801 (Attn: Laura Davis Jones, email: ljones@pszjlaw.com); (b) counsel for the DIP Agent, Blank Rome LLP, 1201 North Market Street, Suite 800, Wilmington, Delaware 19801; Attn: Regina Stango Kelbon, Esq. (regina.kelbon@blankrome.com); (c) counsel to any Committee; and (d) the United States Trustee, Office of the United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801 (Attn: Richard L. Schepacarter, email: richard.schepacarter@usdoj.gov); and shall be filed with the Clerk of the United States Bankruptcy Court for the District of Delaware, by no later than **[●], 2023 at 4:00 p.m. (Eastern)**.

**<u>Exhibit 1</u>**

**Initial Budget**

**iMedia, Inc.**  *DRAFT - Confidential; Subject to Material Revision*

| | DIP Budget Week | -2 | -1 | 0 | 1 | 2[1] | 2[1] | 3 | 4 | 5 | 6 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Actual/Forecast | Pre-Petition | Pre-Petition | Pre-Petition | Post-Petition-CC | Post-Petition-CC | Post-Petition-ABL | Post-Petition-ABL | Post-Petition-ABL | Post-Petition-ABL | Post-Petition-ABL | Forecast |
| | Week Ending | 06/17/23 | 06/24/23 | 07/01/23 | 07/01/23 | 07/08/23 | 07/08/23 | 07/15/23 | 07/22/23 | 07/29/23 | 08/05/23 | |
| **Operating Receipts** | | | | | | | | | | | | |
| ShopHQ Networks - ecommerce & tcommerce - | | 3,736,045 | 4,055,876 | 1,998,125 | 1,277,489 | 2,226,210 | 2,226,210 | 4,628,219 | 3,901,179 | 3,709,730 | 5,683,080 | 23,652,119 |
| CB - ecommerce & stores - | | 255,597 | 172,940 | 149,032 | 95,283 | 163,709 | 163,709 | 327,418 | 327,418 | 327,418 | 267,318 | 1,672,273 |
| iMDS - advertising & SaaS - | | 518,534 | 303,303 | 413,596 | 106,546 | 325,539 | 325,539 | 506,393 | 506,393 | 506,393 | 715,341 | 2,992,143 |
| Other/Misc Receipts | | 39,964 | 2,148 | 22,458 | 19,542 | 26,550 | 26,550 | 50,150 | 54,575 | 48,675 | 51,625 | 277,667 |
| Subtotal - Operating Receipts | | 4,550,140 | 4,534,267 | 2,583,210 | 1,498,860 | 2,742,008 | 2,742,008 | 5,512,181 | 4,789,566 | 4,592,217 | 6,717,363 | 28,594,202 |
| **Disbursements (Non A/P)** | | | | | | | | | | | | |
| Payroll/Benefits | | 52,036 | 1,676,512 | 3,050 | - | 100,772 | 100,772 | 1,510,004 | 206,482 | 1,510,004 | 206,358 | 3,634,391 |
| Freight | | 912,099 | 605,805 | 15,000 | - | - | - | 102,199 | 356,194 | 370,258 | 312,094 | 1,140,745 |
| Taxes - Current | | 2,212 | 582,262 | 489,677 | - | - | - | 161,395 | 322,790 | 322,790 | - | 806,974 |
| Taxes - Past Due | | - | - | - | - | - | 3,160,314 | - | - | - | - | 3,160,314 |
| Consignment | | - | - | - | - | - | 100,000 | 50,000 | 50,000 | 50,000 | 50,000 | 300,000 |
| Royalty Fees | | - | - | - | - | - | 21,135 | 16,371 | 16,371 | 16,371 | 13,366 | 83,614 |
| Rent | | - | 378,000 | - | - | 378,000 | 150,000 | - | - | 378,000 | 150,000 | 1,056,000 |
| Board of Directors | | - | - | - | - | - | - | - | - | - | 168,750 | 168,750 |
| Other (Insurance, P-Card, etc.) | | 465 | 255,387 | 18,714 | - | - | 732,021 | 75,000 | 180,000 | - | 114,059 | 1,101,080 |
| Subtotal - Disbursements (Non-A/P) | | 966,812 | 3,497,966 | 526,441 | - | 478,772 | 4,264,242 | 1,914,969 | 1,131,836 | 2,647,422 | 1,014,626 | 11,451,867 |
| Inventory | | - | - | - | - | - | 2,708,500 | 4,671,875 | 1,735,250 | 888,994 | 3,040,208 | 13,044,827 |
| Content Distribution | | - | 141,918 | - | - | - | 2,382,000 | 1,263,797 | - | - | 3,920,920 | 7,566,717 |
| G&A | | 69,324 | 415,572 | 6,877 | 25,000 | 118,123 | 612,754 | 276,812 | 215,172 | 556,738 | 442,172 | 2,246,770 |
| iMDS | | - | 404,125 | - | - | - | 558,940 | 263,255 | 324,390 | 105,096 | 480,440 | 1,732,122 |
| Inventory C&B | | - | - | - | - | - | - | - | - | - | - | - |
| Subtotal - Disbursements (Trade A/P) | | 69,324 | 961,616 | 6,877 | 25,000 | 118,123 | 6,262,194 | 6,475,739 | 2,274,812 | 1,550,828 | 7,883,740 | 24,590,436 |
| **Total Operating Disbursements** | | 1,036,136 | 4,459,582 | 533,318 | 25,000 | 596,895 | 10,526,435 | 8,390,708 | 3,406,648 | 4,198,251 | 8,898,366 | 36,042,303 |
| **Restructuring Related Costs** | | | | | | | | | | | | |
| Professional Fees | | - | 1,693,405 | - | - | - | 1,859,375 | 1,369,250 | 1,369,250 | 1,508,750 | 2,977,188 | 9,083,813 |
| Special Committee | | - | - | - | - | - | 76,000 | - | - | - | 76,000 | 152,000 |
| US Trustee Fees | | - | - | - | - | - | 250 | - | - | - | - | 250 |
| KERP (Non-Insider) | | - | - | - | - | - | - | - | - | - | - | - |
| Utility Deposit | | - | - | - | - | - | 225,000 | - | - | - | - | 225,000 |
| Debt Service/ DIP Interest | | 80,189 | 536,194 | - | - | - | 242,312 | - | - | 234,269 | - | 476,581 |
| Critical Vendor Payments | | - | - | - | - | - | - | - | - | - | - | - |
| 503 (b)(9) | | - | - | - | - | - | - | 125,000 | 125,000 | - | - | 250,000 |
| DIP Fee | | - | - | - | - | - | 300,000 | - | - | - | - | 300,000 |
| Subtotal - Restructuring Related Costs | | 80,189 | 2,229,600 | - | - | - | 2,702,937 | 1,494,250 | 1,494,250 | 1,743,019 | 3,053,188 | 10,487,644 |
| **Total Disbursements** | | 1,116,325 | 6,689,181 | 533,318 | 25,000 | 596,895 | 13,229,372 | 9,884,958 | 4,900,898 | 5,941,270 | 11,951,554 | 46,529,946 |
| **Net Cash Flow / (Deficit)** | | 3,433,815 | (2,154,915) | 2,049,892 | 1,473,860 | 2,145,113 | (10,487,364) | (4,372,777) | (111,333) | (1,349,053) | (5,234,191) | (17,935,744) |
| **Cumulative Cash Flow / (Deficit)** | | 3,433,815 | (2,154,915) | 2,049,892 | 1,473,860 | 3,618,973 | (6,868,390) | (11,241,167) | (11,352,500) | (12,701,553) | (17,935,744) | (17,935,744) |
| **Cash Balance** | | | | | | | | | | | | |
| Beginning Cash (Book) | | 1,013,254 | 1,970,190 | 964,246 | 930,929 | 2,404,789 | 4,549,902 | 4,549,902 | 3,772,971 | 3,661,639 | 2,312,585 | 930,929 |
| Net Cash Flow / (Deficit), from above | | 3,433,815 | (2,154,915) | 2,049,892 | 1,473,860 | 2,145,113 | (10,487,364) | (4,372,777) | (111,333) | (1,349,053) | (5,234,191) | (17,935,744) |
| Net Change in Borrowing, from below | | (2,476,879) | 1,148,970 | (2,083,210) | - | - | 10,487,364 | 3,595,846 | - | - | 3,000,000 | 17,083,210 |
| **Ending Cash (Book)** | | 1,970,190 | 964,246 | 930,929 | 2,404,789 | 4,549,902 | 4,549,902 | 3,772,971 | 3,661,639 | 2,312,585 | 78,395 | 78,395 |
| **Pre-Petition ABL Revolver** | | | | | | | | | | | | |
| Beginning Revolver | | 20,776,951 | 18,300,072 | 19,449,043 | 17,864,095 | 17,864,095 | 17,864,095 | 122,087 | - | - | - | 17,864,095 |
| Account Sweep | | (4,157,068) | (4,787,224) | (2,583,210) | - | - | (2,742,008) | (122,087) | - | - | - | (2,864,095) |
| Repayment | | - | - | - | - | - | (15,000,000) | - | - | - | - | (15,000,000) |
| Weekly Revolver Advances, Incl. Interest & Fees | | 1,680,189 | 5,936,194 | 998,263 | - | - | - | - | - | - | - | - |
| **Ending Pre-Petition ABL Revolver Balance[2]** | | 18,300,072 | 19,449,043 | 17,864,095 | 17,864,095 | 17,864,095 | 122,087 | - | - | - | - | - |
| **DIP ABL Revolver** | | | | | | | | | | | | |
| Beginning Revolver | | - | - | - | - | - | - | 13,229,372 | 16,947,305 | 16,947,305 | 16,947,305 | - |
| Account Sweep | | - | - | - | - | - | - | (5,390,094) | (4,789,566) | (4,592,217) | (6,717,363) | (21,489,239) |
| Repayment | | - | - | - | - | - | - | - | - | - | - | - |
| Weekly Revolver Advances, Incl. Interest & Fees | | - | - | - | - | - | 13,229,372 | 9,108,027 | 4,789,566 | 4,592,217 | 9,717,363 | 41,436,544 |
| **Ending Post-Petition DIP ABL Revolver Balance** | | - | - | - | - | - | 13,229,372 | 16,947,305 | 16,947,305 | 16,947,305 | 19,947,305 | 19,947,305 |
| **DIP Term Loan Balance** | | | | | | | | | | | | |
| Beginning DIP Balance | | - | - | - | - | - | - | 15,000,000 | 15,000,000 | 15,000,000 | 15,000,000 | - |
| DIP Advances, Incl. Interest & Fees | | - | - | - | - | - | 15,000,000 | - | - | - | - | 15,000,000 |
| **Ending DIP Balance** | | - | - | - | - | - | 15,000,000 | 15,000,000 | 15,000,000 | 15,000,000 | 15,000,000 | 15,000,000 |
| **Total DIP/Revolver** | | 18,300,072 | 19,449,043 | 17,864,095 | 17,864,095 | 17,864,095 | 28,351,459 | 31,947,305 | 31,947,305 | 31,947,305 | 34,947,305 | 34,947,305 |
| **Net Debt** | | 16,329,882 | 18,484,796 | 16,933,167 | 15,459,306 | 13,314,193 | 23,801,557 | 28,174,334 | 28,285,667 | 29,634,720 | 34,868,911 | 34,868,911 |

iMedia, Inc.  *DRAFT - Confidential; Subject to Material Revision*

| DIP Budget Week | -2 | -1 | 0 | 1 | 2 [1] | 2 [1] | 3 | 4 | 5 | 6 | Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Actual/Forecast | Pre-Petition | Pre-Petition | Pre-Petition | Post-Petition-CC | Post-Petition-CC | Post-Petition-ABL | Post-Petition-ABL | Post-Petition-ABL | Post-Petition-ABL | Post-Petition-ABL | |
| Week Ending | 06/17/23 | 06/24/23 | 07/01/23 | 07/01/23 | 07/08/23 | 07/08/23 | 07/15/23 | 07/22/23 | 07/29/23 | 08/05/23 | |
| **Asset Coverage** | | | | | | | | | | | |
| Borrowing Base | $ 32,541,605 | $ 31,068,100 | $ 31,068,100 | $ 33,192,312 | $ 32,843,922 | $ 32,843,922 | $ 33,763,801 | $ 33,669,494 | $ 32,887,354 | $ 32,664,326 | $ 32,664,326 |
| Less: Borrowing Base Reserves | (15,519,687) | (11,618,396) | (11,618,396) | - | - | - | - | - | - | - | - |
| Plus: Overadvance | 1,500,000 | 4,000,000 | 4,000,000 | - | - | - | - | - | - | - | - |
| Less: Outstanding DIP/Revolver Balance | (18,300,072) | (19,449,043) | (17,864,095) | (17,864,095) | (17,864,095) | (28,351,459) | (31,947,305) | (31,947,305) | (31,947,305) | (34,947,305) | (34,947,305) |
| **Ending Asset Coverage** | $ 221,846 | $ 4,000,662 | $ 5,585,609 | $ 15,328,217 | $ 14,979,826 | $ 4,492,462 | $ 1,816,495 | $ 1,722,188 | $ 940,049 | $ (2,282,980) | $ (2,282,980) |
| **Revolver Availability** | | | | | | | | | | | |
| Max Availability | $ 32,541,605 | $ 31,068,100 | $ 19,449,043 | $ 17,864,095 | $ 17,864,095 | $ 17,864,095 | $ 17,864,095 | $ 17,864,095 | $ 17,864,095 | $ 17,864,095 | $ 17,864,095 |
| Less: Borrowing Base Reserves/Carve-Out Reserve | (15,519,687) | (11,618,396) | (11,618,396) | - | - | (3,000,000) | (3,000,000) | (3,000,000) | (3,000,000) | - | - |
| Plus: Overadvance/Sweep Credit | 1,500,000 | 4,000,000 | 4,000,000 | - | - | 2,083,210 | 2,083,210 | 2,083,210 | 2,083,210 | 2,083,210 | 2,083,210 |
| Less: Outstanding DIP/Revolver Balance | (18,300,072) | (19,449,043) | (17,864,095) | (17,864,095) | (17,864,095) | (13,351,459) | (16,947,305) | (16,947,305) | (16,947,305) | (19,947,305) | (19,947,305) |
| **Ending Availability** | $ 221,846 | $ 4,000,662 | $ (6,033,449) | $ - | $ - | $ 3,595,846 | $ - | $ - | $ - | $ - | $ - |
| **Total Available Liquidity (Book)** | $ 2,192,036 | $ 4,964,908 | $ 6,516,538 | $ 2,404,789 | $ 4,549,902 | $ 8,145,748 | $ 3,772,971 | $ 3,661,639 | $ 2,312,585 | $ 78,395 | $ 78,395 |
| **Net Cash Use** | | | | | | | | | | | $ (32,935,744) |
| **Post-Transaction Winddown Related Costs** | | | | | | | | | | | |
| Professional Fees | - | - | - | - | - | - | - | - | 1,491,563 | 1,491,563 |
| US Trustee Fees | - | - | - | - | - | - | - | - | 250,000 | 250,000 |
| 503 (b)(9) | - | - | - | - | - | - | - | - | - | - |
| Misc. Windown Expense | - | - | - | - | - | - | - | - | 500,000 | 500,000 |
| Subtotal: Winddown Related Costs | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 2,241,563 | $ 2,241,563 |

[1] For week-ending 7/8, the above forecast assumes the Cash Collateral budget in effect from 6/29 - 7/5 and the DIP/ABL budget in effect from 7/6 - 7/8 (and forward each week thereafter through week-ending 8/5).
[2] The Prepetition Lenders/DIP Lenders are also owed an additional $1.6 million on account of the Early Termination Fee and, not included in the opening balance reflected above

| Covenant Variance Testing | | 07/08/23 | 07/08/23 | 07/15/23 | 07/22/23 | 07/29/23 | 08/05/23 |
|---|---|---|---|---|---|---|---|
| **[1] Net Cash Flow / (Deficit)** | | | | | | | |
| Total Net Cash Flow / (Deficit) (above) | | $ 2,145,113 | $ (10,487,364) | $ (4,372,777) | $ (111,333) | $ (1,349,053) | $ (5,234,191) |
| Cumulative Net Cash Flow / (Deficit) (above) | | $ 2,145,113 | $ (8,342,251) | $ (12,715,028) | $ (12,826,360) | $ (14,175,413) | $ (19,409,604) |
| Cushion | | 115.0% | 115.0% | 115.0% | 115.0% | 115.0% | 115.0% |
| *Minimum Allowable Net Cash Flow / (Deficit)* | | *N/A* | *(14,622,282)* | *(14,750,314)* | *(16,301,725)* | *(22,321,045)* | |
| *Cushion to Budget* | | *N/A* | *(1,907,254)* | *(1,923,954)* | *(2,126,312)* | *(2,911,441)* | |
| **[2] Asset Coverage Test** | | | | | | | |
| Gross A/R + Inventory: | | | | | | | |
| Gross Inventory [3] | | | 65,701,402 | 68,391,390 | 68,568,875 | 67,345,207 | 66,897,817 |
| ValuePay A/R | | | 20,844,555 | 20,632,862 | 20,464,299 | 20,485,559 | 20,689,618 |
| CC A/R | | | 910,349 | 910,594 | 910,876 | 911,201 | 837,497 |
| iMDS A/R | | | 4,640,923 | 4,632,504 | 4,624,085 | 4,615,667 | 4,566,175 |
| **Total Gross A/R + Inventory** | | | 92,097,228 | 94,567,349 | 94,568,135 | 93,357,633 | 92,991,107 |
| **Asset Coverage Covenant Test:** | | | | | | | |
| Implied Gross Collateral | | | 92,097,228 | 94,567,349 | 94,568,135 | 93,357,633 | 92,991,107 |
| Cushion to Budget - % | | | (10.0%) | (10.0%) | (10.0%) | (10.0%) | (10.0%) |
| *Minimum Allowable Gross Collateral* | | | *82,887,506* | *85,110,614* | *85,111,322* | *84,021,870* | *83,691,996* |
| *Cushion to Budget - $* | | | *9,209,723* | *9,456,735* | *9,456,814* | *9,335,763* | *9,299,111* |

[3] Gross inventory excludes C&B consignment inventory