**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>iMedia Brands, Inc., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 23-10852 (KBO)<br><br>(Jointly Administered) |

**DECLARATION OF JAMES ALT**
**IN SUPPORT OF DEBTORS' MOTION TO**
**OBTAIN POSTPETITION DEBTOR IN POSSESSION FINANCING**

I, James Alt, hereby declare under penalty of perjury:

1.      I am the Chief Transformation Officer of iMedia Brands, Inc. ("iMedia," and together with each of iMedia's direct and indirect subsidiaries that are debtors and debtors in possession, collectively, the "Debtors" and, each individually, a "Debtor") and a Managing Director of Huron Consulting Group, Inc. ("Huron") with more than 20 years of experience assisting financially distressed companies implement turnaround strategies.

2.      Since November 2022, I and others at Huron have worked closely with the Debtors and their non-debtor subsidiaries (together with the Debtors, the "Company") to manage the business and assist the Company as it evaluated strategic transactions and restructuring alternatives.  Based on my work with the Company, my oversight of the work that Huron has performed for the Debtors thus far, my review of relevant documents, and my discussions with members of the Company's management team and other professionals, I am familiar with the

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are:  ValueVision Media Acquisitions, Inc. (8670); iMedia Brands, Inc. (3770); ValueVision Interactive, Inc. (8730); Portal Acquisition Company (3403); VVI Fulfillment Center, Inc. (5552); ValueVision Retail Inc. (2155); JWH Acquisition Company (3109); PW Acquisition Company, LLC (0154); EP Properties, LLC (3951); FL Acquisition Company (3026); Norwell Television, LLC (6011); and 867 Grand Avenue, LLC (2642).  The Debtors' service address is 6740 Shady Oak Road, Eden Prairie, MN 55344-3433.

Debtors' day-to-day operations and business affairs.  I submit this declaration (this "<u>Declaration</u>") in support of the relief requested by the Debtors in their motion filed contemporaneously herewith to approve, among other things, postpetition debtor in possession financing (the "<u>DIP Motion</u>")[2] and the financing package proposed therein (the "<u>DIP Facility</u>").

3.    Except as otherwise indicated herein, all facts set forth in this Declaration are based upon:  (a) my personal knowledge of the Debtors' operations and finances; (b) information learned from my review of relevant documents, information supplied to me by members of the Company's management team and the Debtors' other professional advisors (including other members of the Huron team); or (c) my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition.  In addition, I filed the *Declaration of James Alt, Chief Transformation Officer of iMedia Brands, Inc., in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 17] (the "<u>First Day Declaration</u>"), which provides additional factual background regarding the Debtors, including their business operations, corporate and capital structure, and the events leading to the filing of these Chapter 11 Cases, and the *Declaration of James Alt in Support of Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Postpetition Use of Cash Collateral; (II) Granting Adequate Protection to Certain Prepetition Secured Parties and C&B Newco; (III) Scheduling a Second Interim Hearing; and (IV) Granting Related Relief* [Docket No. 19] (the "<u>Cash Collateral Declaration</u>"), which provides additional factual support regarding the Debtors' need and justification for the immediate access to Cash Collateral. The First Day Declaration and the Cash Collateral Declaration are incorporated herein by reference.

---

2    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the DIP Motion, or the Interim Order (as defined in the DIP Motion), as applicable.

4.    I am over the age of eighteen (18) and authorized to submit this Declaration on behalf of the Debtors.  I am not being compensated for this testimony other than through payments received by Huron as a professional engaged by the Debtors; none of those payments are specifically payable on account of this testimony.  If called upon to testify, I could and would testify competently to the statements set forth in this Declaration, as the information in this Declaration is complete and accurate to the best of my knowledge.

## I.    BACKGROUND AND QUALIFICATIONS

5.    I am a Managing Director of Huron and have extensive bankruptcy and insolvency related experience, having served in various advisory and executive roles in chapter 11 bankruptcy and out-of-court restructuring cases for more than 20 years, including: ZGallerie, ToysRUs, GenCanna Global, Roberts50, Amerimark, Capital Brands, Railworks, Venture Industries, Metropolitan Provisions, Anchor Manufacturing, Unaka Corporation, and others.  Since November 2022, I and others at Huron have worked closely with the Company to manage the business and assist the Company as it evaluated strategic transactions and restructuring alternatives.    Prior to the Debtors commencing these chapter 11 cases (the "Chapter 11 Cases") on June 28, 2023 (the "Petition Date"), I was appointed by the board of directors of iMedia to the position of Chief Transformation Officer of iMedia Brands, Inc., effective as of April 3, 2023.

## II.    THE DEBTORS HAVE AN IMMEDIATE AND CONTINUING NEED FOR DIP FINANCING AND ACCESS TO CASH COLLATERAL

6.    The Debtors commenced these Chapter 11 Cases with limited cash on hand.  As the Court is aware, the Debtors' cash on hand totaled approximately $1.7 million as of their June 30, 2023 "first day" hearing, excluding approximately $1.5 million held in the Debtors' Collateral Account.

7.      As the Court is also aware, the Debtors received Court approval for the interim, consensual use of Cash Collateral for a limited two-week period ending July 8, 2023 (the "Initial Interim Period").[3]  However, the use of Cash Collateral alone is insufficient to fund the Debtors' business operations in the near term without risking immediate and potentially irreparable harm to the Debtors' estates.   In particular, the Debtors' operations require substantial liquidity in terms of the Debtors' payroll obligations, vendor and content distribution payments, as well as rental expenses and other ordinary course obligations.  I do not believe the use of Cash Collateral after the Initial Interim Period, alone, would be sufficient to permit the Debtors to satisfy these obligations in the ordinary course without risking substantial degradation in value to the detriment of all parties in interest.

8.      Relatedly, on or about the date hereof, the Debtors entered into a going concern transaction with RNN-TV Licensing Co. LLC [4] (the "Buyer") providing for the sale of substantially all their assets, as a going concern, in a transaction that that the Debtors expect will preserve jobs for substantially all of their employees, will provide for the repayment of the asset-based lending obligations, and will provide for the assumption of certain trade liabilities through contract cures or otherwise.[5]  A key aspect of this value-maximizing transaction, though,

---

[3]     Such relief was granted by the Court pursuant to the *Interim Order (I) Authorizing Postpetition Use of Cash Collateral; (II) Granting Adequate Protection to Prepetition Secured Parties and C&B Newco; (III) Scheduling A Second Interim Hearing; and (IV) Granting Related relief* [Docket No. 61].

[4]     The Debtors' proposed sale transaction is described more fully in the *Debtors' Motion Pursuant to Sections 105, 363, and 365 of the Bankruptcy Code for Entry of an Order (I) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of All Encumbrances Other Than Assumed Liabilities; (II) Approving the Debtors' Entry into the Asset Purchase Agreement; (III) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief,* filed contemporaneously herewith.

[5]     To be sure, the Debtors, with the assistance of their advisors, are continuing to market their businesses to determine if a higher or better value-maximizing transaction may be available for the benefit of their stakeholders.

is the Debtors' ability to continue their operations in the ordinary course amidst the overhang of these Chapter 11 Cases.

9.      Incremental liquidity provided under the Debtors' proposed DIP Facility is essential in this regard.  This determination results from the analysis undertaken by the Debtors where the Debtors have, in consultation with Huron, performed a review and analysis of their projected cash needs.  Based upon that review and analysis, the Debtors and their advisors have determined that the use of Cash Collateral alone would be insufficient to operate their businesses, and that additional funding would be advisable to provide an adequate cushion to the Debtors' operational cash needs without imposing the material risk of immediate and potentially irreparable harm to the Debtors' business value.  That is, I do not believe the Debtors can operate on a "cash collateral only" basis without unduly risking operational integrity and, in particular, their ability to proceed with the going concern transaction contemplated by the Asset Purchase Agreement with the proposed Buyer.  The Debtors are in need of both access to Cash Collateral and an immediate infusion of liquidity to ensure sufficient working capital to operate their businesses in the ordinary course, purchase inventory, pay their employees, vendors and content providers, service their customers, and pursue a value-maximizing sale transaction during the Chapter 11 Cases.  Absent the liquidity provided under their proposed DIP Facility at the outset of these Chapter 11 Cases, I believe the Debtors' estates will be materially and perhaps irreparably harmed.

10.      Indeed, the Debtors' ability to maintain a going concern transaction and, relatedly, to obtain the financing available under their DIP Facility, is key to the Debtors' ability to prevent their non-Debtor German subsidiaries from undertaking insolvency proceedings as may otherwise be affirmatively required under German law.  I believe the Debtors' estates will be

materially harmed if in fact the Debtors' German subsidiaries commence such insolvency proceedings in the near term.

11.     In furtherance of assessing and then quantifying their cash needs, the Debtors, with assistance from Huron prepared an initial budget outlining the funding that will be critical in the initial six (6) weeks post-Petition Date, with such budget to be updated pursuant to the terms of the DIP Facility (the "Initial Budget").   The Initial Budget is sufficient and provides liquidity to pay for, among other things, wages, vendors, taxes to applicable taxing authorities, and inventory in the ordinary course of business.   Based on information available as of the Petition Date, I believe that the Initial Budget is an accurate reflection of the Debtors' initial funding requirements and will allow them to meet their obligations during these Chapter 11 Cases.   I believe that the Initial Budget is fair, reasonable, and appropriate under the circumstances here.

## III.   THE MILESTONES THAT THE DEBTORS MUST MEET UNDER THE TERMS OF THE DIP FACILITY ARE REASONABLE

12.     The DIP Facility contemplates, as a product of negotiation with and as required by the DIP Lenders as a condition to providing the DIP Facility, certain milestones the Debtors must meet throughout these Chapter 11 Cases, the failure of which would constitute an event of default under the DIP Credit Agreement.   These milestones were heavily negotiated and required by the DIP Lenders as a condition to providing the DIP Facility.

13.     The DIP Facility, including the milestones, serves as an important component of these Chapter 11 Cases because it will provide the Debtors with the stability and certainty they need to operate in the ordinary course of business while consummating the proposed sale, subject to identifying higher or better offers.   The continued and viable operation of the Debtors' business would not be possible absent access to the DIP Facility.   The DIP Facility, and the

Debtors' ability to achieve the milestones contemplated therein, will prevent interruptions to the Debtors' operations, preserve the Debtors' ability to maintain ordinary course relationships with, among other parties in interest, employees, customers, and vendors, satisfy working capital needs in the ordinary course, and enable the Debtors to facilitate the proposed sale to maximize the value of their estates.

## IV.    THE DIP FACILITY PROVIDES ADEQUATE PROTECTION TO THE DEBTORS' SECURED CREDITORS AND C&B NEWCO

14.    I believe the Debtors have provided sufficient adequate protection to their secured creditors who, like the Pre-Petition Revolving Secured Parties, would not otherwise consent to their treatment here.  First, the DIP Facility is not priming any lender that was already senior to the Pre-Petition ABL Facility.  Second, the liens securing the Synacor Promissory Note are junior to the liens securing the Pre-Petition ABL Facility, at the applicable obligor—namely, Debtor Portal Acquisition Company.  More fundamentally, neither Portal Acquisition Company, nor its assets, are being sold pursuant to the Debtors' proposed sale to the Buyer.  Consequently, Synacor, Inc.'s ("Synacor") substantive rights with respect to whatever collateral, if any, resides at Portal Acquisition Company, will be unaffected by the Debtors' proposed financing and related transaction.

15.    In addition, the DIP Facility provides adequate protection to all of the Debtors' secured creditors to the extent, if any, of diminution of such parties' interests in the Estates' interest in the applicable collateral as of the Petition Date.  More specifically, the Debtors propose the following various forms of adequate protection for the Pre-Petition Revolver Secured Parties, Synacor and C&B Newco LLC ("C&B Newco"), as applicable, subject to the terms of the DIP Order: (a) replacement liens upon the Pre-Petition Revolving Collateral and the Pre-Petition Synacor Collateral to the extent, if any, of diminution in value of the Pre-Petition

Revolving Secured Parties' and Synacor's respective interests in the respective Estates' interest in the Pre-Petition Revolving Collateral and the Pre-Petition Synacor Collateral as of the Petition Date; (b) superpriority administrative expense claims for any such diminution in value; (c) financial reporting; (d) with respect to the Pre-Petition Revolver Secured Parties, payment of reasonable and documented professional fees and expenses; (e) with respect to Synacor, segregation of the proceeds received by the Debtors on account of customer receipts generated by Debtor Portal Acquisition Company up to an aggregate amount of $40,000 per week; and (f) with respect to C&B Newco, segregation of proceeds received by the Debtors on account of the sale of the Consigned Inventory.  Therefore, even if the value of the Pre-Petition Revolving Collateral, the Pre-Petition Synacor Collateral, or the Consigned Inventory decreases during these Chapter 11 Cases, I believe the Pre-Petition Revolving Secured Parties, Synacor, and C&B Newco are adequately protected.

## CONCLUSION

16.    Without access to the DIP Facility and the use of cash collateral, I believe the Debtors would suffer immediate and irreparable harm and will not be able to successfully consummate a value-maximizing transaction and administer these Chapter 11 Cases.  I believe that the DIP Facility should be approved, and the Debtors be authorized to pay the Applicable Rate and the DIP Fees under the DIP Facility given the Debtors' financial circumstances and the lack of any other viable financing alternatives.  Based on my discussions with the Debtors' management team and their advisors, and my review of the terms of the DIP Facility, I believe that the DIP Facility is the best financing option presently available to the Debtors and that the terms of the DIP Facility are reasonable under the circumstances.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  July 3, 2023

_/s/ James Alt_____

James Alt
Chief Transformation Officer
iMedia Brands, Inc.