**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| iMedia Brands, Inc., *et al.*,[1] | Case No. 23-10852 (KBO) |
| Debtors. | (Jointly Administered) |

**DECLARATION OF EUGENE LEE**
**IN SUPPORT OF DEBTORS' MOTION TO**
**OBTAIN POSTPETITION DEBTOR IN POSSESSION FINANCING**

I, Eugene Lee, hereby declare under penalty of perjury:

1. I am a Managing Director at Lincoln Partners Advisors LLC ("Lincoln"), the proposed investment banker for iMedia Brands, Inc. ("iMedia") and each of iMedia's direct and indirect subsidiaries that are debtors and debtors in possession (collectively with iMedia, the "Debtors" and, each individually, a "Debtor").

2. Based on my work with the Debtors and their non-debtor subsidiaries (together with the Debtors, the "Company") and my oversight of the work that Lincoln has performed for the Debtors thus far, my review of relevant documents, and my discussions with members of the Company's management team and other professionals, I am familiar with the Debtors' day-to-day operations and business affairs. I submit this declaration (this "Declaration") in support of the relief requested by the Debtors in their motion filed contemporaneously

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: ValueVision Media Acquisitions, Inc. (8670); iMedia Brands, Inc. (3770); ValueVision Interactive, Inc. (8730); Portal Acquisition Company (3403); VVI Fulfillment Center, Inc. (5552); ValueVision Retail Inc. (2155); JWH Acquisition Company (3109); PW Acquisition Company, LLC (0154); EP Properties, LLC (3951); FL Acquisition Company (3026); Norwell Television, LLC (6011); and 867 Grand Avenue, LLC (2642). The Debtors' service address is 6740 Shady Oak Road, Eden Prairie, MN 55344-3433.

herewith to approve, among other things, postpetition financing (the "DIP Motion")[2] and the financing package proposed therein (the "DIP Facility").

3. Except as otherwise indicated herein, all facts set forth in this Declaration are based upon: (a) my personal knowledge of the Debtors' operations and finances; (b) information learned from my review of relevant documents, information supplied to me by members of the Company's management team and the Debtors' other professional advisors (including other members of the Lincoln team); or (c) my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition.

4. I am over the age of eighteen (18) and authorized to submit this Declaration on behalf of the Debtors. I am not being compensated for this testimony other than through payments received by Lincoln as a professional engaged by the Debtors; none of those payments are specifically payable on account of this testimony. If called upon to testify, I could and would testify competently to the statements set forth in this Declaration, as the information in this Declaration is complete and accurate to the best of my knowledge.

## I. BACKGROUND AND QUALIFICATIONS

5. I am a Managing Director at Lincoln, a multinational investment banking firm with approximately 900 professionals in more than 21 offices around the world. In 2022 alone, Lincoln closed over 360 transactions and completed over 15,000 company valuations. Lincoln and its senior professionals have extensive experience in providing investment banking services to various parties in complex situations, including both-in-and-out-of-court.

6. Lincoln has extensive experience representing debtors in a wide variety of bankruptcy cases, including Fast Radius Inc, IEK Auto Parts Holding, LLC (dba Auto Plus),

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the DIP Motion, or the Interim Order (as defined in the DIP Motion), as applicable.

Valeritas Holdings, Inc, Benevis Corp, Hobbico, Inc., Katy Industries, Bobs' Stores/Eastern Mountain Sports, Hancock Fabrics, Inc, Constar International, Northern Beef Packers, Summit Business Media, and CP Industries, among others.

7. I am a seasoned corporate restructuring professional with over 30 years of experience in high-profile buyside and advisory roles. My background includes large and complex financial restructurings, mergers and acquisitions, distressed and regular way financings, and event-driven investments, including: Choice One Communications, Evercom Systems, Geneva Steel, High Voltage Engineering, IWO Holdings, Orbital Sciences, Source Media, US Unwired, The Williams Companies, DBSD/ICO Global, American Media, Reader's Digest, The Sports Authority, PG&E, Nextel Partners, Centennial Communications, BellSouth, Aladdin Gaming, Global Crossing, Motient Corp. and Williams Communications Group, among others.

8. Over the course of my 30-year career, I have served both as a financial advisor to debtors and creditors in out-of-court and chapter 11 restructurings as well as an investor and member of ad-hoc committees on the creditor side. Immediately prior to joining Lincoln, I executed investments in distressed debt and event-driven investments at a number of hedge funds, most recently at Taal Capital and Fort Warren Capital, each fund that I founded, and prior to these funds at Regiment Capital and GSO Capital, where I led investments in the media, telecom, and retail sectors. Prior to that I was a Managing Director in the Restructuring Group at Evercore Partners, where I led many of their restructuring engagements.

## II. THE DEBTORS' MARKETING PROCESS AND EFFORTS TO SECURE POSTPETITION FINANCING

9. Prior to the commencement of these Chapter 11 Cases, on April 18, 2023, the Debtors retained Lincoln to serve as their investment banker, initially to assist in identifying new lenders to refinance the Pre-Petition ABL Facility. In consultation with the Debtors,

3

and with approval from the Special Committee, Lincoln began exploring strategic alternatives, including a prepetition marketing process for a sale of some or all of the Debtors' assets, as well as a marketing process to obtain debtor in possession ("DIP") financing. In my role as investment banker, I was actively involved in the Debtors' prepetition marketing efforts, analysis of the financing options, and their efforts to obtain DIP financing to ensure the Debtors' businesses maintained sufficient liquidity to operate while pursuing the sale of all or segments of the Debtors' businesses (the "Sale Process").

10. Based on the Debtors' recent financial results and the existing capital structure, the Debtors and their advisors (including Lincoln) believed their only alternatives were to: (a) obtain the consent of the Pre-Petition Revolving Secured Parties to the priming of their liens by a third-party lender; (b) locate a third-party lender willing to provide postpetition financing on a junior or unsecured basis; or (c) find lenders willing to refinance out the Pre-Petition Revolving Secured Parties in full and provide incremental liquidity.

11. Concurrently with undertaking the prepetition Sale Process, on May 12, 2023, Lincoln launched the marketing process to raise third-party DIP financing in anticipation of a chapter 11 filing, as the Pre-Petition Revolving Lenders indicated a desire to be refinanced rather than increase their credit exposure in order to support the Company through a sale transaction. Lincoln initiated outreach to 32 potential DIP lenders, including a mix of alternative lenders, hedge funds and private credit lenders, to discuss the provision of postpetition financing on a senior/priming basis, junior basis, or a full take-out of the Debtors' existing outstanding senior debt. Of the 32 lenders contacted, 20 lenders executed non-disclosure agreements, received access to (i) the Debtors' Confidential Information Presentation (the "CIP") and (ii) additional diligence materials via a virtual data room, and held preliminary conversations with Lincoln. All

except one of the lenders who received the CIP indicated they would not consider providing financing on a non-consensual priming or junior basis and declined to provide DIP financing, citing recent negative financial performance, concerns around the value of the collateral, and/or the transaction structure.

12. Lincoln received one proposal for a short-term priming bridge facility of $15 million, which would have required the Pre-Petition Revolving Lenders to take a junior position behind the new lender to give the Debtors time to continue negotiations with a potential Buyer. However, given the limited two-week period provided by the facility, high fees and interest rate, and a proposed financing amount that was insufficient to repay the existing senior debt in full, the Pre-Petition Revolving Lenders and the Debtors determined the proposal was not worth pursuing.

13. In light of the challenges associated with raising third-party financings, the Debtors, in consultation with their advisors, ultimately concluded that the best and most efficient approach was to continue engaging with the Pre-Petition Revolving Lenders to negotiate the terms of a DIP facility. Concurrently with such negotiations, the Debtors, with the support of their advisors, began discussions with RNN-TV Licensing Co. LLC (the "Buyer") regarding the sale of substantially all of the Debtors' assets (the "Proposed RNN Transaction"). As part of the negotiations in connection with the Proposed RNN Transaction, the Pre-Petition Revolving Lenders required that the Buyer provide new money DIP financing on a junior basis to their prepetition balances. Lincoln therefore worked with both the Pre-Petition Revolving Lenders, the Buyer, and the Debtors to negotiate both the size and the structure of the DIP Facility, whereby the Pre-Petition Revolving Lenders and the Buyer would each fund 50% of the new money DIP financing on a junior basis to the prepetition senior debt. Notably, in my experience,

it is very unusual for a Buyer to provide any form of DIP financing and even more unusual for a new money DIP financing to come in on a junior basis. The Debtors, the Buyer, and the Pre-Petition Revolving Lenders agreed on this structure following extensive negotiations prior to and following the commencement of these Chapter 11 Cases, agreed to each fund $7.5 million of the $15 million new money portion of the DIP Facility on a *pari passu* basis to support the Proposed RNN Transaction.

14. Simply put, the DIP Facility is the most value-maximizing financing option for the Debtors. Although the Debtors received Court approval for the interim use of Cash Collateral at the outset of these Chapter 11 Cases, the Debtors' current cash flow is insufficient to prudently fund the postpetition Sale Process without unduly risking the operational integrity of the Debtors' businesses. The financing provided by the DIP Facility is essential for the Debtors to fund their operations as they seek to effectuate the Proposed RNN Transaction, subject to higher or better bids, and prevent any further erosion of the value of their Estates. Indeed, accepting the postpetition financing proposed by the DIP Lenders was an appropriate step given that the DIP financing (a) provides a path through these Chapter 11 Cases by allowing the Debtors to effectuate the Proposed RNN Transaction, subject to higher or better bids, and conduct an orderly wind-down, (b) provides additional liquidity to support the administration of these Chapter 11 Cases, (c) obviates the need for a potential protracted and expensive dispute regarding adequate protection and further use of Cash Collateral, and (d) provides additional evidence of the Buyer's commitment to the Proposed RNN Transaction given the Buyer is funding a portion of the DIP Facility.

15. Based on my experience, my involvement in the marketing process for the DIP Facility, and my review of the material terms and conditions thereof, the DIP Facility should be

approved. I believe that the DIP Facility and related financing arrangements reflect substantial arm's length and good faith negotiations between the Debtors and the DIP Lenders and are reasonable particularly given the Debtors' encumbered capital structure and lack of alternative financing. I further believe that the Debtors' entry into the DIP Credit Agreement is an exercise of the Debtors' sound business judgment, and that the benefits of accessing the DIP Facility and further use of Cash Collateral outweigh the modest burdens and expenses imposed by the financing arrangements.

**III.  THE DIP FACILITY WAS NEGOTIATED IN GOOD FAITH AND AT ARM'S LENGTH**

16.  The Debtors' management, legal, and financial advisors were actively involved throughout the negotiations with the DIP Lenders for debtor in possession financing, which were conducted at arm's length and in good faith. The terms of the DIP Facility, including the rates, fees, certain customary waivers, and "roll-up" feature provided therein, were negotiated for over multiple weeks leading up to the Petition Date, with the Debtors and their advisors negotiating the Interim Order, the DIP Credit Agreement, and each of the DIP Financing Documents through a vigorous, hard-fought process. Given the absence of alternative third-party financing, the Debtors and their advisors worked hard to negotiate the most favorable terms of the DIP Facility available to the Debtors. Ultimately, the DIP Lenders were only willing to lend on terms specifically set forth in the DIP Financing Documents, including the roll-up of the Pre-Petition Revolving Obligations.

17.  In addition to the "roll-up," I understand the DIP Lenders would not have consented to providing postpetition financing without the Debtors' waiver of, among other things, their ability to surcharge against the Pre-Petition Revolving Collateral or DIP Collateral pursuant to Bankruptcy Code section 506(c), subject to and upon entry of a Final Order. Based on my

experience, I understand such waiver to be customary in debtor in possession financings and believe it is appropriate under the circumstances of these Chapter 11 Cases.

### IV. THE RATES, FEES, AND ROLL-UP FEATURE OF THE DIP FACILITY ARE REASONABLE

18.     I understand that the Debtors have agreed, after good faith, arm's length negotiations with the DIP Lenders and subject to Court approval, to pay certain interest and fees to the DIP Agent and the DIP Lenders.  Specifically, in connection with the DIP Facility, the Debtors have agreed to an interest rate of 10% plus the Term SOFR (as defined in the DIP Credit Agreement) per annum payable in cash on the first day of each month in arrears (the "Applicable Rate").  The Applicable Rate applies to both the portion of the DIP Facility constituting the Term Loan Commitment (as defined in the DIP Credit Agreement) and the portion of the DIP Facility constituting the Revolving Loans (as defined in the DIP Credit Agreement).  Upon the occurrence and during the continuation of an Event of Default (as defined in the DIP Credit Agreement), interest will accrue at SOFR plus the Applicable Rate plus a rate equal to 2.0% per annum, payable in cash upon demand.  In addition, the Debtors have agreed to pay to the DIP Agent the: (i) Closing Fee, (ii) Collateral Monitoring Fee, and (iii) the Unused Line Fee (each as defined in the DIP Credit Agreement and, collectively, the "DIP Fees").  The Closing Fee will be calculated solely on account of the new money portion of the DIP Facility.

19.     Based on (i) my review of the terms of the DIP Facility and the DIP Financing Documents, (ii) my experience and knowledge of similar DIP financings in the market, and (iii) my analysis of interest rates and fees in comparable DIP financing facilities, I believe that the Applicable Rate and the DIP Fees provided for in the DIP Facility are reasonable under the circumstances as compared to similar debtor in possession financings in the market as well as the attendant interest rates and fees in comparable debtor in possession financing facilities.  The

8

Applicable Rate and DIP Fees are customary, usual, and in line with debtor in possession financings of this kind. The Debtors and their advisors, including Lincoln, considered the Applicable Rate and the DIP Fees when determining whether the DIP Facility constituted the best alternative reasonably available to the Debtors. As a result, I believe that paying the Applicable Rate and DIP Fees in order to obtain the DIP Facility is in the best interests of the Estates.

20. Based on my discussions with the Debtors and their advisors, I understand that the Debtors and the DIP Lenders agree that the terms, covenants, interest rates, and fees under the DIP Credit Agreement, including the Applicable Rate and the DIP Fees, were subject to negotiation and are an integral component of the overall terms of the DIP Facility, which, in turn, is integral to the Debtors' restructuring's efforts and effectuating the Proposed RNN Transaction. I believe that the Applicable Rate and the DIP Fees pursuant to the DIP Financing Documents are reasonable because such economics constitute the best terms on which the Debtors could obtain the financing necessary to maintain their ongoing business operations and fund these Chapter 11 Cases and are an integral component of the overall terms of the DIP Facility.

21. In addition, I believe that the other terms of the DIP Facility are reasonable under the circumstances, including the roll-up. The roll-up, in particular, was a heavily negotiated element of the DIP Facility. The DIP Lenders indicated that the "roll-up" was part and parcel of, and integral to, the overall DIP Facility and a condition precedent for the DIP Lenders to extend postpetition financing to the Debtors. It is my belief that the Pre-Petition Revolving Secured Parties were oversecured as of the Petition Date. Therefore, it is, in my view and experience, a matter of when—not if—the obligations secured under the Pre-Petition ABL Facility will be repaid by the Debtors. Accordingly, I believe the "roll-up" is justified and would not unduly

prejudice any creditor. Based on my discussions with the Debtors and their advisors and the results of the DIP marketing process, I believe that there are no alternative financing sources available to the Debtors, and the Debtors have an immediate need to obtain the DIP Facility and to use Cash Collateral to preserve value for their stakeholders and to prevent immediate and irreparable harm to the value of the Estates. The Debtors ultimately made the decision, and I agree, that the DIP Facility, including the roll-up, and consensual use of Cash Collateral, is in the best interests of the Debtors and their stakeholders.

## V.     THE DEBTORS' NEED FOR INTERIM RELIEF

22.     Without access to the DIP Facility and the further use of Cash Collateral, I believe the Debtors would suffer immediate and irreparable harm. Given the financing efforts and process described above and based on my experience as a restructuring professional and involvement in other financing transactions, I believe that the DIP Facility provides the Debtors with the best path forward in these Chapter 11 Cases as the Debtors work to consummate the Proposed RNN Transaction, subject to higher or better bids, and ultimately effectuate a value-maximizing transaction in the best interest of their Estates and stakeholders.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: July 3, 2023                    /s/ Eugene Lee
                                                                        Eugene Lee
                                                                        Managing Director
                                                                        Lincoln Partners Advisors LLC