**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| iMedia Brands, Inc., *et al.*,[1] | Case No. 23-10852 (KBO) |
| Debtors. | (Jointly Administered) |

**DEBTORS' MOTION PURSUANT
TO SECTIONS 105, 363, AND 365 OF
THE BANKRUPTCY CODE FOR ENTRY
OF AN ORDER (I) AUTHORIZING THE SALE
OF SUBSTANTIALLY ALL OF THE DEBTORS'
ASSETS FREE AND CLEAR OF ALL ENCUMBRANCES
OTHER THAN ASSUMED LIABILITIES; (II) APPROVING
THE DEBTORS' ENTRY INTO THE ASSET PURCHASE AGREEMENT;
(III) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY
CONTRACTS AND UNEXPIRED LEASES; AND (IV) GRANTING RELATED RELIEF**

iMedia Brands, Inc. and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), through their undersigned proposed counsel, hereby submit this motion (this "Motion") for entry of an order (i) authorizing the sale (the "Sale") of substantially all of the Debtors' assets free and clear of all Encumbrances other than Assumed Liabilities (each as defined in the APA (as defined herein), (ii) approving the Debtors' entry into the APA, (iii) authorizing assumption and assignment of certain executory contracts and unexpired leases, and (iv) granting related relief. In support hereof, the Debtors rely on the *Declaration of Eugene Lee, Proposed Investment Banker of the Debtors' Motion Pursuant*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: ValueVision Media Acquisitions, Inc. (8670); iMedia Brands, Inc. (3770); ValueVision Interactive, Inc. (8730); Portal Acquisition Company (3403); VVI Fulfillment Center, Inc. (5552); ValueVision Retail Inc. (2155); JWH Acquisition Company (3109); PW Acquisition Company, LLC (0154); EP Properties, LLC (3951); FL Acquisition Company (3026); Norwell Television, LLC (6011); and 867 Grand Avenue, LLC (2642). The Debtors' service address is 6740 Shady Oak Road, Eden Prairie, MN 55344-3433.

*to Sections 105, 363, and 365 of the Bankruptcy Code for Entry of an Order (I) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of All Encumbrances Other Than Assumed Liabilities; (II) Approving the Debtors' Entry into the Asset Purchase Agreement; (III) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief* (the "Lee Declaration"), filed concurrently herewith, and the *Declaration of James Alt, Chief Transformation Officer of iMedia Brands, Inc., in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 17] (the "First Day Declaration"),[2] and further represent as follows:

## JURISDICTION AND VENUE

1.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012.  Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors confirm their consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue for these chapter 11 cases and this Motion is proper in this district under 28 U.S.C. §§ 1408 and 1409.

---

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration or APA, as applicable.

3. The statutory bases for the relief requested herein are sections 105, 363, and 365 of title 11 of the United States Code, as amended (the "Bankruptcy Code"), Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"), and Local Rules 2002-1 and 6004-1.

**RELIEF REQUESTED**

4. By this Motion, the Debtors seek entry of an order approving the sale of substantially all of the Debtors' assets (the "Sale Order"), in the form attached hereto as **Exhibit A**, subject to modification.

5. The relief sought in the proposed Sale Order will consist of, among other things, the following:

(a) authorizing and approving the Sale, free and clear of all Encumbrances other than Permitted Encumbrances and Assumed Liabilities;

(b) authorizing and approving the Debtors' entry into the Asset and Equity Purchase Agreement attached as **Exhibit B** (the "APA") performance thereunder, including consummating the Sale on the terms and conditions provided therein;

(c) authorizing and approving the assumption and assignment of the Purchased Contracts (as defined below);

(d) approving procedures set forth in the APA for the assumption and assignment of the Purchased Contracts, and approving the manner of notice regarding such assumption and assignment of the Purchased Contracts; and

(e) granting related relief.

In support of this Motion, the Debtors respectfully state as follows:

**BACKGROUND**

6. On June 28, 2023 (the "Petition Date"), each Debtor filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of

3

the Bankruptcy Code.  Concurrently with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no official committee of unsecured creditors has been appointed in these chapter 11 cases.

7.  The events leading up to the Petition Date and the facts and circumstances supporting the relief requested herein are set forth in the First Day Declaration and the Lee Declaration.

**FACTS SPECIFIC TO RELIEF REQUESTED**

**I.  THE SALE PROCESS**

**A.  The Debtors and the Prepetition Sale Process**

8.  As detailed in the First Day Declaration, the Debtors own a portfolio of entertainment, consumer brands, and media commerce businesses, each of which cross-promotes and exchanges data with each other to optimize the engagement experiences it creates for advertisers and consumers in the United States and Western Europe.  The Debtors seek to consummate a sale of the Purchased Assets (as defined in the APA) that will maximize recoveries for the Debtors' estates, ensure the continued employment of the Debtors' employees, and provide for the continued viability of the Debtors and their brands.

9.  In April 2023, the Debtors engaged Lincoln Partners Advisors, LLC ("Lincoln") to serve as their investment banker.  *See* Lee Declaration ¶ 6.  Between May 2023 and June 30, 2023, Lincoln contacted and provided a teaser to 287 potential buyers, including distinct buyers for the 1-2-3.tv business, the iMDS business, and the Debtors as a whole.  *Id*. ¶ 7.  Of the parties contacted by Lincoln, over 70 executed non-disclosure agreements and had preliminary conversations with the Debtors and their advisors regarding purchasing the Debtors' assets.  *Id.*

10.    As a result of their marketing process, the Debtors received just a single binding offer to purchase the Debtors' assets from RNN-TV Licensing Co. LLC (the "Buyer") for a purchase price of $27,447,305.40 plus interest and fees (other than the ETF (as defined in the DIP Credit Agreement) owed under the DIP Credit Agreement (other than to the Buyer or its affiliates) and the Pre-Petition Credit Agreement (as defined in the DIP Credit Agreement), and expenses for professional fees of the DIP Lenders (other than the Buyer or its affiliates) and the Pre-Petition Lenders (as defined in the DIP Credit Agreement) (the "Cash Balance"), plus a credit of $7,500,000 plus interest, fees and expenses owed to the Buyer of its loans under the DIP Facility (the "Credit"), with the Credit allocated to payment of any such obligations under the DIP Credit Agreement, plus additional cash to provide minimum cash of $2,241,563 to the Debtors to facilitate a wind down of their estates, and the assumption of the Assumed Liabilities, including the payment of the Cure Costs for the Purchased Contracts (the "Purchase Price").[3]  Id. ¶ 9-10. The Debtors immediately began discussions with the Buyer regarding the Buyer's willingness to serve as a stalking horse bidder or otherwise purchase the Debtors' assets.   During these discussions and leading up to the Petition Date, Lincoln nonetheless continued its efforts to solicit additional interest in the Debtors' businesses and assets.   Although the Debtors received no additional offers, the Debtors' marketing process remains ongoing.  Id. ¶ 13

**B.    Sale Timeline**

11.    Following arm's-length negotiations, the Debtors, the Buyer, and the DIP Lenders reached agreement on a case timeline that reflects the Debtors having already conducted a marketing process for the Purchased Assets prepetition, as well as the Debtors' need to

---

[3] As discussed in the Lee Declaration, the Debtors also received two non-binding bids to acquire certain assets.  These offers are preliminary and require a substantial amount of due diligence from the potential buyers before reaching a binding offer.  The Debtors have nevertheless continued to engage with the potential purchasers to provide diligence in connection with the proposals.  *See* Lee Declaration. ¶ 9.

5

consummate the Sale as soon as possible in order to preserve the Debtors' businesses and maximize value for their estates. To that end, the Debtors are pursuing the following Sale timeline:

| Event | Proposed Deadline |
|---|---|
| Deadline to file and serve Cure Notice | July 6, 2023 |
| Sale Objection Deadline | July 21, 2023 |
| Deadline to file schedule of Purchased Contracts | July 25, 2023 |
| Sale Hearing | July 27, 2023 |
| Entry of the Sale Order | August 2, 2023 |
| Consummation of Sale Transaction | August 5, 2023 |

12. In addition, the Debtors intend to continue their marketing efforts postpetition to ensure that the Debtors receive the highest and otherwise best offer for their assets. The Debtors believe that the vigorous prepetition marketing process they have undertaken – which will extend postpetition during these chapter 11 cases – will ensure the Debtors obtain the highest and otherwise best value for their assets. While the Debtors will continue these efforts in earnest, they believe that the Sale to the Buyer as contemplated by the APA reflects the best and highest offer that the Debtors have received as of the date hereof.

C. **Need for an Expedited Sale Process**

13. Appreciating their challenging financial condition and the need to complete a sale and to exit bankruptcy as quickly as possible, the Debtors accomplished as much as possible prior to the commencement of these chapter 11 cases. With the APA in place, the Debtors are poised to execute the last leg of their Sale process and achieve a successful outcome for their estates and all parties in interest. The ongoing operations of the Debtors' businesses come with considerable expense, which will be funded during these chapter 11 cases by the DIP Facility provided, in part, by the Buyer as DIP Lender. That DIP Facility is conditioned upon strict sale

6

milestones, including the requirement that the Debtors close on the Sale within 33 days of the execution of the APA.  This added liquidity provided by the Buyer will give the Debtors enough time to complete the Sale, maximize the value of their assets (which is in the best interests of the Debtors, their estates, and all parties in interest), and preserve over 580 jobs.  But it is crucial to stress that time is of the essence given the Debtors' current financial situation, and it is against this backdrop that the Debtors decided to pursue the expedited Sale timeline described above.

## II.   THE APA

14.   The APA was negotiated in good faith and at arm's-length by the Debtors and the Buyer.  The Buyer is a disinterested strategic purchaser and is not an "insider" of the Debtors, as that term is defined in the Bankruptcy Code.  In addition, as set forth in the First Day Declaration, the Debtors have managed their prepetition restructuring efforts with the oversight of the Special Committee, which is comprised of three independent directors to manage the Debtors' balance sheet transformation process, including the pursuit of the consummation of the APA.  *See* First Day Declaration ¶ 9.  The board of directors of iMedia Brands, Inc. (the "Board"), the Special Committee, and the Debtors' independent professional advisors not only reviewed, analyzed, and discussed the APA, but also considered and analyzed other strategic alternatives available to the Debtors under the difficult, time-constrained circumstances they found themselves in.  Following weeks of analysis and process, the Board determined that pursuing the Sale of the Purchased Assets and executing the APA with the Buyer provided the best opportunity to maximize value for the Debtors' estates and all parties in interest.  See Lee Declaration ¶ 12.

15.    Certain material terms of the APA, and certain provisions of the APA that are required to be highlighted pursuant to Local Rule 6004-1(b)(iv), are described below:[4]

| Key Terms of the APA[5] | |
| --- | --- |
| **Buyer** | RNN -TV Licensing Co. LLC |
| **Purchase Price (APA) § 2.06** | The aggregate consideration for the Purchased Assets (the "**Purchase Price**") shall consist of (i) cash in an amount equal to $27,447,305.40 plus interest and fees (other than the ETF (as defined in the DIP Credit Agreement)) owed under the DIP Credit Agreement (other than to the Buyer or its affiliates) and the Pre-Petition Credit Agreement (as defined in the DIP Credit Agreement), and expenses for professional fees of the DIP Lenders (other than the Buyer or its affiliates) and the Pre-Petition Lenders (as defined in the DIP Credit Agreement) (the "**Cash Balance**"), which shall be paid at Closing pursuant to Section 2.08(b)(i), (ii) if the amount of Cash and Cash Equivalents held by Sellers at Closing (such amount, the "**Closing Cash**") is less than the Minimum Cash Amount, cash in an amount equal to the difference between the Minimum Cash Amount (i.e., $2,241,563) and the Closing Cash (the "**Minimum Cash Shortfall**"), (iii) a credit of $7,500,000 plus interest, fees and expenses owed to the Buyer in its capacity as a lender under the DIP Facility pursuant to Section 363(k) of the Bankruptcy Code against certain obligations owed by Sellers under the DIP Credit Agreement as of the Closing (the "**Credit**"), with the Credit allocated to payment of any such obligations under the DIP Credit Agreement, and (iv) the assumption of the Assumed Liabilities, including the payment of the Cure Costs for the Purchased Contracts |
| **Purchased Assets (APA § 2.01)** | "Purchased Assets" shall include the following: <br><br> The Purchased Assets shall include substantially all of the assets of the Debtor, free and clear of all liens, claims, interests and encumbrances (other than Permitted Encumbrances and Assumed Liabilities), including: <br><br> (a)    subject to Section 2.05, the Contracts (including Leases with respect to Leased Real Property) set forth on Section 2.01(a) of the Disclosure |

---

4    Any summary of the APA contained herein is qualified in its entirety by the actual terms and conditions of the APA. To the extent that there is any conflict between any summary contained herein and the actual terms and conditions of the APA, the actual terms and conditions of the APA shall control in all respects.

5    Capitalized terms used in this table and not otherwise defined herein shall have the meanings ascribed to such terms in the APA.

8

| Key Terms of the APA[5] |
|---|
| | Schedules (collectively, the "Purchased Contracts");<br><br>(b) the Leased Real Property set forth on Section 2.01(b) of the Disclosure Schedules, together with any buildings, fixtures and improvements located on or attached to such real property, and all rights arising therefrom (including, without limitation, any purchase options, repurchase option, rights of first offer and rights of first refusal with respect to the Leased Real Property), and all tenements, hereditaments, appurtenances and other real property rights appertaining thereto;<br><br>(c) all tangible assets, including machinery, equipment, computers, telephone, supplies and other tangible personal property owned by any Seller, including any such personal property located at any Leased Real Property and any such tangible property on order to be delivered to any Seller;<br><br>(d) all warranties, indemnities or guaranties from any Person with respect to any Purchased Asset, including any item of real property, personal property or equipment;<br><br>(e) all Intellectual Property owned by any Seller, including the Intellectual Property set forth on Section 2.01(e) of the Disclosure Schedules (the "Seller Intellectual Property");<br><br>(f) all of Sellers' direct or indirect interests (the "Purchased Shares") in the Persons listed in Section 2.01(f) of the Disclosure Schedules (each, a "Purchased Entity," and collectively, the "Purchased Entities") (it being understood, for the avoidance of doubt, that the purchase of the Purchased Shares of iMedia & 123tv Holding GmbH, a German Gesellschaft mit beschränkter Haftung, and its Subsidiaries will be completed by Sellers' transferring their direct equity interests in iMedia & 123tv Holding GmbH);<br><br>(g) the Service Provider Agreements and Seller Plans, each as set forth on Section 2.01(g) of the Disclosure Schedules that Buyer elects to assume |

9

| Key Terms of the APA[5] |
|---|
| (which, for the avoidance of doubt, will include Sellers' self-insured medical plan), if any, in accordance with Section 7.05(c) (collectively, the "Assumed Plans and Agreements") and the Seller Plans of the Purchased Entities (the "Purchased Entities' Plans"), all funding arrangements related thereto (including all assets, trusts, insurance policies and administrative service Contracts related thereto), and all rights and obligations thereunder, in each case, to the extent transferable in accordance with the existing terms and conditions of the applicable Contract(s); |
| (h) all deposits (excluding Utility Deposits), credits, prepaid expenses, deferred charges, advance payments, refunds, rights of set-off, rights of recovery, security deposits, prepaid items and duties related to the Purchased Assets (including Purchased Contracts); |
| (i) all accounts receivable, notes, negotiable instruments and chattel paper owned or held, together with any unpaid interest or fees accrued thereon or other amounts due with respect thereto, and other amounts receivable from any Person before the Closing, whether or not in the Ordinary Course; |
| (j) all confidentiality, non-competition, non-solicitation or similar agreements entered into by any Seller or any of their respective representatives in connection with a sale of any Seller, any Purchased Asset, any Purchased Entity or any Assumed Liabilities; |
| (k) all rights, privileges, claims and causes of action against customers, suppliers, vendors, lessors, lessees, licensees or licensors of any Seller (solely to the extent against such Persons in their capacity as such), arising in the ordinary course of business under or related to any Purchased Contract, other Purchased Asset (including any use, ownership, possession, operation, sale or lease of such other Purchased Asset) or Assumed Liability, including Proceedings, Claims, counterclaims, defenses, credits, rebates, Tax refunds (other than any Tax Refunds described in |

10

| Key Terms of the APA[5] |
|---|
| Section 2.03(j)), rights of set off, rights of recovery (including rights to insurance proceeds), rights of subrogation, rights of recoupment, rights under or with respect to express or implied guarantees, warranties, representations, covenants, indemnities, exculpation, advancement, reimbursement of expenses or contract renewal rights and other similar rights, in each case, whether direct or derivative, known or unknown, liquidated or unliquidated, contingent or otherwise ("Purchased Third Party Claims"); |
| (l)   all Cash and Cash Equivalents (other than any Excluded Cash); |
| (m)   all bank accounts of Sellers, other than Excluded Accounts; |
| (n)   all of Sellers' avoidance claims or causes of action arising under sections 544, 547, 548, 549 and 550 of the Bankruptcy Code and any similar state Law, and all other claims, causes of action, lawsuits, judgements, privileges, counterclaims, defenses, rights of recovery, rights of set-off, rights of subrogation and all other rights of any kind under any other provision of the Bankruptcy Code or such similar state Laws (collectively, "Avoidance Actions"), but only to the extent against any of the Sellers' vendors, suppliers, counterparties, employees, directors, officers and any other person doing business with, employed by or directors of the Buyer on and after Closing in regards or related to the Purchased Assets (and excluding, for the avoidance of doubt, any Avoidance Action against officers, directors or other insiders who are not employed by or directors of the Buyer after Closing) (collectively, "Purchased Avoidance Actions"); |
| (o)   all goodwill related to the Purchased Assets; |
| (p)   all rights of Sellers under non-disclosure or confidentiality, invention assignment, work made for hire, non-compete, or non-solicitation agreements with current or former Service Providers, in each case, which relate to the |

| Key Terms of the APA[5] |
|---|

|  |  |  |
|---|---|---|
|  |  | Business or any of the Purchased Assets or Assumed Liabilities; |
|  | (q) | subject to Section 7.15, all inventory owned by Sellers, including finished products and goods, raw materials, work in process, replacement and component parts, including inventory of Sellers held at any third-party location and inventory previously purchased and in transit to Sellers; and |
|  | (r) | all of the current or historical written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies, Tax Returns related to Taxes imposed with respect to any Purchased Entity or Purchased Assets (provided that the Sellers shall be entitled to retain and use copies of any Tax Returns that are necessary for the Sellers' and their Affiliates' Tax, accounting or legal purposes), ledgers, journals, title policies, customer lists, supplier lists, vendor lists, price lists, mailing lists, invoices, shipping records, standard forms of documents, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, maintenance schedules, functional requirements, operating instructions, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (catalogs, sales brochures, flyers, pamphlets, web pages, etc.), consulting materials, opinions and other documents owned by the Sellers, development, quality control, quality assurance, regulatory documents, all personnel and employment records for the Transferred Employees or any individual independent contractors of the Sellers or the Purchased Entities (excluding performance assessments), unless prohibited by applicable Law, and other books and records owned by the Sellers, in each case whether stored in hard copy form or on electronic, magnetic, optical or other media and |

| Key Terms of the APA[5] | |
|---|---|
| | excluding any such items relating to Excluded Assets (collectively, the "Records"). |
| **Assumed Liabilities (APA § 2.02)** | "Assumed Liabilities" shall include the following: |
| | (a)    all Liabilities relating to or arising out of the ownership or operation of the Purchased Assets (including, for the avoidance of doubt, any Liabilities for Taxes arising from the ownership or operation of the Purchased Assets in a Post-Closing Tax Period (including, with respect to any Taxes arising in a Straddle Period, the portion of such Taxes that are allocable to Buyer under Section 7.06(c)) by Buyer solely for and in respect of periods following the Closing and excluding any Excluded Liabilities; for the avoidance of doubt any such Liabilities relating to or arising out of facts, events or circumstances occurring prior to the Closing, regardless of whether such Liabilities arise or are asserted prior to or after the Closing, shall be Excluded Liabilities (except to the extent such Liability is otherwise expressly set forth as an Assumed Liability); |
| | (b)    all Liabilities, to the extent not paid in connection with the DIP Facility, arising under and with respect to the Assumed Plans and Agreements and the Purchased Entities' Plans, if any (including, for the avoidance of doubt, with respect to any Purchased Entity Employee); |
| | (c)    other than in respect of PTO Liabilities, all Liabilities associated with Transferred Employees arising on or after (i) the Closing Date or (ii) in the case of Business Employees who become Transferred Employees after the Closing Date, the date such Business Employees become Transferred Employees; |
| | (d)    all Liabilities arising out of, relating to, or with respect to any notice pay or benefits and claims under the WARN Act with respect to any Transferred Employee arising on or following the Closing Date; |
| | (e)    all Post-Closing COBRA Liabilities; |

13

| Key Terms of the APA[5] |
|---|

|  | (f) | all Liabilities related to the claims incurred as of the Closing Date but not reported in respect of Seller's self-insured medical plan ("IBNR Claims"); |
|---|---|---|
|  | (g) | all Liabilities of each Seller relating to or arising out of the Purchased Contracts solely in respect of periods following the Closing and not to the extent relating to or arising out of any breach or default thereof or other activities on or prior to the Closing and excluding any Excluded Liabilities; |
|  | (h) | all Liabilities outstanding as of and after the Closing with respect to (i) returns of goods or merchandise sold by any Seller, in compliance with the return policy in effect as of such sale, (ii) gift cards and certificates, validly issued by Sellers and outstanding as of the Closing, (iii) customer prepayments to the extent related to a Purchased Asset, and (iv) customer loyalty obligations or programs; |
|  | (i) | any and all Liabilities for Transfer Taxes; |
|  | (j) | certain accounts payables related to the Purchased Assets and specified by Buyer in its sole and absolute discretion, as set forth on Section 2.02(j) of the Disclosure Schedules; |
|  | (k) | Cure Costs required to be paid pursuant to Section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Purchased Contracts; |
|  | (l) | during the Designation Rights Period, all administrative expenses arising under Designated Contracts until such time as they become an Excluded Asset or a Purchased Contract and any incremental costs or expenses (i) that arise out of the Sellers' extension and continuation of the Chapter 11 Cases that is directly attributable to the Buyer's extension of the Designation Rights Period and (ii) are incurred as a result of the Sellers' performance of their obligations under this Agreement; |
|  | (m) | Liabilities, to the extent not paid in connection with the DIP Facility, for payroll incurred in the |

14

| Key Terms of the APA[5] | | |
|---|---|---|
| | | Ordinary Course of Business arising after the Petition Date through the Closing Date (including, for the avoidance of doubt, the employer portion of Taxes payable in respect thereof, and excluding any Liabilities related to equity or equity-based incentive awards, cash bonuses, accrued paid time off, or any similar obligations arising under any Service Provider Agreement or Seller Plan) and remaining unpaid as of the Closing Date ("Post-Petition Wages") in the aggregate amount of up to $1,922,719; |
| | (n) | Liabilities for Specified Sales Taxes remaining unpaid as of the Closing Date in the aggregate amount of up to $1,201,106; |
| | (o) | Liabilities of the Company's iMedia Digital Services business unit incurred in the Ordinary Course of Business arising after the Petition Date through the Closing Date and remaining unpaid as of the Closing Date in the aggregate amount of up to $1,146,586; |
| | (p) | with respect to each Distribution Contract that (i) as of the date hereof, is a Purchased Contract and (ii) after the date hereof, becomes an Excluded Contract, Liabilities arising under any such Distribution Contracts, to the extent relating to periods from and after the Petition Date through the date on which such Distribution Contract became an Excluded Contract in the aggregate amount for all such contracts up to $704,991; |
| | (q) | Liabilities for general and administrative expenses incurred in the Ordinary Course of Business arising after the Petition Date through the Closing Date and remaining unpaid as of the Closing Date in the aggregate amount of up to $1,247,860; and |
| | (r) | any other Liability expressly to be assumed by Buyer pursuant to the Sale Order |
| **Excluded Assets (APA § 2.03)** | | "Excluded Assets" shall include the following: |
| | (a) | the organizational documents, corporate records and minute books, in each case, to the extent solely pertaining to the organization, existence or capitalization of Sellers (and not used in the |

| Key Terms of the APA[5] |
|---|

|  |  |  |
|---|---|---|
|  |  | operation of the Business or the Purchased Assets); |
|  | (b) | subject to Section 2.05, any Contract that is not a Purchased Contract or a Designated Contract, including for the avoidance of doubt the Contracts (including Leases with respect to Leased Real Property) set forth on Section 2.03(b) of the Disclosure Schedules (collectively, the "Excluded Contracts"); |
|  | (c) | an amount of Cash and Cash Equivalents equal to the Minimum Cash Amount (the "Excluded Cash"); |
|  | (d) | the Utility Deposits; |
|  | (e) | the Carve-Out Reserve Account and one other bank account of Sellers designated by the Company as an excluded bank account for purposes of winding down the Business (for avoidance of doubt, without duplication of any Cash and Cash Equivalents covered in Section 2.03(c)) (collectively, the "Excluded Accounts"); |
|  | (f) | all rights that accrue or will accrue to any Seller or any of their Subsidiaries (other than the Purchased Entities) pursuant to this Agreement or any of the other Transaction Documents; |
|  | (g) | other than the Purchased Shares (or any equity interests owned by Purchased Entities), all shares of capital stock or other equity interests of any Seller or any Subsidiary of any Seller; |
|  | (h) | other than the Assumed Plans and Agreements and the Purchased Entities' Plans, all Seller Plans, together with all funding arrangements related thereto (including all assets, trusts, insurance policies and administrative service Contracts related thereto), and all rights and obligations thereunder; |
|  | (i) | all current and prior director and officer (or similar) insurance policies of the Sellers and all rights of any nature with respect thereto, including all insurance proceeds or recoveries thereunder and rights to assert claims with |

| Key Terms of the APA[5] |
|---|

| | | |
|---|---|---|
| | | respect to any such insurance proceeds or recoveries; |
| | (j) | all attorney-client privilege and attorney work-product protection of Sellers or associated with their businesses solely to the extent arising with respect to legal counsel representation of Sellers or their Affiliates or their businesses in connection with the transactions contemplated by this Agreement or any of the Transaction Documents; for the avoidance of doubt, all attorney-client privilege and attorney work-product relating to the Purchased Assets and the Assumed Liabilities shall be Purchased Assets; |
| | (k) | all personnel and employment records for the Transferred Employees or any individual independent contractors of the Sellers that cannot be provided under applicable Law; |
| | (l) | all rights to any Tax refunds, or credits (in lieu of refunds) against Tax liabilities, of Sellers that relate to Taxes that are Excluded Liabilities or that are paid by Sellers after the Closing, but solely to the extent that such Tax refunds are not attributable to a loss, credit or other tax attribute of Buyer or any of its Affiliates including, without limitation, any tax attributes of any Seller or Group Company that would otherwise be transferred to Buyer or any of its Affiliates (including any Purchased Entity) pursuant to the transactions contemplated by this Agreement; provided, that if Buyer or any of its Affiliates incurs any reasonable, out-of-pocket costs or expenses (including Taxes) as a direct result of the receipt any such Tax refund or credit (in lieu of a refund), Buyer shall be entitled to retain the portion of such Tax refund or credit (in lieu of a refund) equal to the amount of such reasonable, out-of-pocket costs or expenses; |
| | (m) | all Intellectual Property owned by a Person other than a Seller (other than rights to Intellectual Property granted to a Seller pursuant to a Purchased Contract); |

| Key Terms of the APA[5] | |
|---|---|
| | (n) all Service Provider Agreements other than those that are Assumed Plans and Agreements; |
| | (o) all claims that Sellers or their Affiliates may have against any Person with respect to Excluded Assets or Excluded Liabilities; |
| | (p) all rights, claims and causes of action of Sellers under this Agreement and any other Transaction Document or any agreement, certificate, instrument, or other document executed and delivered between Sellers and Buyer or their respective Affiliates in connection with the transactions contemplated by this Agreement, or any other agreement between Sellers and Buyer or their respective Affiliates entered into on or after the date hereof relating to the foregoing; |
| | (q) all of Sellers' direct or indirect interests in the Persons listed in Section 2.03(q) of the Disclosure Schedules (such Persons being (i) Portal Acquisition Company and (ii) 1317047 B.C. Ltd.); |
| | (r) all Avoidance Actions other than Purchased Avoidance Actions; |
| | (s) any funds collected on behalf of another person or held (whether in trust or otherwise) pursuant to applicable Law for the benefit of a U.S. federal, state, county or city taxing or licensing authority with respect to an unpaid Tax obligation, solely to the extent such funds are funded in accordance with the DIP Budget; and |
| | (t) Consigned Inventory unless an election is made by Buyer pursuant to Section 7.15. The term "Consigned Inventory" means those goods consigned by C&B Newco, LLC to the Debtor pursuant to (i) that certain Consignment Agreement, dated as of March 1, 2021 and (ii) that certain Amended and Restated Consignment Agreement effective as of November 23, 2022 |
| **Excluded Liabilities (APA § 2.04)** | "Excluded Liabilities" shall be any and all liabilities other than the Assumed Liabilities, including the following: |

| Key Terms of the APA[5] | | |
|---|---|---|
| | (a) | all Liabilities for any Taxes (in each case, other than (x) Liabilities for Taxes of any Purchased Entity, (y) Transfer Taxes for which Buyer is liable pursuant to this Agreement, or (z) Specified Sales Taxes), (i) arising from or with respect to the Purchased Assets, the Assumed Liabilities or the operation of the Business that are attributable to any Pre-Closing Tax Period (including, with respect to any Taxes arising in a Straddle Period, the portion of such Taxes that are allocable to the Seller under Section 7.06(c), (ii) imposed on or with respect to the Excluded Assets or Excluded Liabilities, (iii) of any Seller or any Affiliate (other than a Purchased Entity) or predecessor of Seller for any period, including Taxes of Seller or any Affiliate (other than a Purchased Entity) or predecessor of Seller that could become a liability of, or be assessed or collected against, Buyer or any of its Affiliates (including the Purchased Entities), or that could become an Encumbrance on the Purchased Assets, (iv) for which Seller or any of its Affiliates (other than a Purchased Entity) would be liable as a result of being a member of an affiliated, consolidated, combined or unitary group on or prior to the Closing Date, pursuant to Treasury Regulations Section 1.1502-6 or any analogous or similar Law, and (v) arising in connection with the transactions contemplated by this Agreement (other than Transfer Taxes for which Buyer is liable pursuant to this Agreement); |
| | (b) | [Reserved]; |
| | (c) | all Liabilities arising under any Excluded Contract, other than those described in Section 2.02(l); |
| | (d) | all Liabilities of Sellers for Indebtedness, including any intercompany Indebtedness among Sellers or due from a Purchased Entity to a Seller; |
| | (e) | all Liabilities relating to any accounts payable other than those specifically identified by Buyer as an Assumed Liability; |

19

| Key Terms of the APA[5] |
|---|
| (f) all Liabilities and other obligations of Sellers relating to or arising from any Collective Bargaining Agreement (except as required by applicable Law); |
| (g) all Liabilities associated with Service Providers who do not become Transferred Employees, other than, with respect to any such Service Providers, (i) IBNR Claims, (ii) Post-Closing COBRA Liabilities and (iii) Post-Petition Wages; |
| (h) all Liabilities arising out of, relating to, or with respect to any notice pay or benefits and claims under the WARN Act with respect to any current or former Service Provider arising on or prior to the Closing Date; |
| (i) all Service Provider Agreements and Seller Plans (other than the Assumed Plans and Agreements and the Purchased Entities' Plans), and Liabilities arising out of, relating to or with respect to any Service Provider Agreement or any Seller Plan (other than the Assumed Plans and Agreements and the Purchased Entities' Plans); |
| (j) all Liabilities arising out of, relating to, or with respect to any bonus or other incentive compensation arrangement of Sellers, including, without limitation, the accrued, but un-paid, 2022 annual incentive bonuses; |
| (k) all Liabilities arising out of, relating to, or with respect to any Service Provider's accrued paid time off under any vacation or other paid time off policy or similar arrangement of Sellers (the "**PTO Liabilities**"); |
| (l) all Ordinary Course current Liabilities of the Sellers attributable to the ownership or operation of the Purchased Assets in respect of the period following the Petition Date and prior to the Closing other than those set forth in Sections 2.02(m), Sections 2.02(n), 2.02(o), 2.02(p), and 2.02(q); |
| (m) all Liabilities arising in connection with any violation of any applicable Law relating to the period prior to the Closing; |

20

| Key Terms of the APA[5] |
|---|
| (n) all Liabilities of Sellers to their equity holders; |
| (o) all Liabilities arising out of relating to any business or property formerly owned or operated by any of the Sellers, any affiliate or predecessor thereof, but not presently owned and operated by the Sellers; |
| (p) all Liabilities of Sellers arising under or pursuant to any Environmental Health and Safety Requirements, including with respect to any real property owned, operated, leased or otherwise used by Sellers, whether or not used in the Ordinary Course, including any Liabilities for noncompliance with any Environmental Health and Safety Requirements (including the Release of Hazardous Materials), in each case to the extent arising as a result of any act, omission, or circumstances taking place on or prior to the Closing, whether known or unknown as of the Closing; |
| (q) all Liabilities arising out of, relating to or with respect to any Order or Proceeding involving, against or affecting, any Purchased Asset (i) commenced, filed, initiated or threatened as of the Closing or (ii) relating to facts, events or circumstances arising or occurring prior to the Closing; |
| (r) any obligation of any Seller to indemnify any Person by reason of, or in connection with, the fact that such Person was a director, officer, manager, employee or agent of such Seller or any Purchased Entity or any other Person; |
| (s) all Liabilities for: (i) costs and expenses incurred or owed in connection with the administration of the Chapter 11 Cases by Sellers; and (ii) all costs and expenses incurred in connection with the negotiation, execution and consummation of the transactions contemplated under this Agreement by Sellers; |
| (t) all Liabilities arising out of, relating to or with respect to any Proceedings whether in existence prior to, at the Closing Date or arising thereafter relating to Sellers or the Excluded Assets; and |

21

| Key Terms of the APA[5] | |
|---|---|
| | (u) all other Liabilities of Sellers that are not expressly included as Assumed Liabilities or that relate to any Excluded Asset, whether arising prior to or after the Closing. |
| **Sale Free and Clear (APA § 3.05; L.R. 6004-1(b)(iv)(M))** | Sellers have good and valid title to, or valid leasehold interests in, all of the Purchased Assets, free and clear of all Encumbrances (other than Permitted Encumbrances) and, at the Closing, subject to the Sale Order and any other applicable Order of the Bankruptcy Court, and subject to Section 2.05, Sellers will transfer, convey and assign good and valid title to, or valid leasehold interests in, the Purchased Assets (including record and beneficial ownership of the Purchased Shares) free and clear of all Encumbrances (other than Permitted Encumbrances). |
| **No Successor Liability (APA § 7.11; L.R. 6004-1(b)(iv)(L))** | Buyer shall not be deemed to: (a) be the successor of any Seller, (b) have, de facto, or otherwise, merged with or into Sellers, (c) be a mere continuation or substantial continuation of Sellers or the enterprise(s) of Sellers or (d) be liable or have any Liability for any acts or omissions of Sellers in the conduct of their businesses or arising under or related to the Purchased Assets other than the Assumed Liabilities and Permitted Encumbrances or as expressly set forth and agreed in this Agreement |
| **Conditions to Closing (APA § 8.01 and § 8.02)** | The obligations of each of Buyer and Sellers to consummate the Closing are subject to the satisfaction or valid waiver at or prior to the Closing of the following conditions:<br><br>(v) no judgment, injunction or Order shall then be in effect prohibiting or making illegal the consummation of the Closing; and<br><br>(w) the Bankruptcy Court shall have entered the Sale Order, and the Sale Order shall be a Final Order<br><br>In addition, the following is a summary of the conditions to Closing in favor of the Buyer:<br><br>(a) all representations and warranties made by Debtor and the other Sellers in the APA must be true and correct in all material respects;<br><br>(b) all covenants and agreements made by the Debtor and the other Sellers in the APA shall have been performed in all material respects; |

| Key Terms of the APA[5] | | |
|---|---|---|
| | (c) | since the date of the APA, there shall not have occurred any Material Adverse Effect (as this term is defined in the APA); |
| | (d) | Sellers shall have delivered all documents and other items required under the APA; |
| | (e) | (i) none of the Purchased Entities shall have filed bankruptcy; and (ii) the Vendor Loan Agreement Relating to the Impulse Transaction with respect to iMedia & 123tv Holding GmbH, shall be in effect; and (iii) the Purchased Entities shall have obtained a full and final discharge of all guarantees provided by them by the DIP Lenders in the form of a release letter; |
| | (f) | at Closing the Gross A/R and Inventory is not less than 88% of the projected amount of Gross A/R and Inventory set forth in the Initial Budget for the last day of the most recent Budget Test Period; |
| | (g) | at Closing (i) Sellers shall have paid all sales Taxes as contemplated by the DIP Budget and if requested obtain a certification from the Debtor's outside accounting firm to this effect; (ii) Sellers shall have paid all outstanding amounts owed to the State of California and the State of New York in respect of their outstanding warrants relating to such amounts, and shall have used reasonable best efforts to resolve all of the matters relating to the amounts owed to California and New York; and (iii) Sellers shall have used reasonable best efforts to fully pay and resolve all outstanding sales Taxes owed to other jurisdictions. |
| **Sale to Insider (L.R. 6004-1(b)(iv)(A))** | The Debtors do not believe that Buyer is an "insider" of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code. The Debtors have managed their prepetition restructuring efforts through and with the oversight of the disinterested and independent Special Committee, which is comprised of three independent directors. | |
| **Agreements with Management (L.R. 6004-1(b)(iv)(B))** | None | |

23

| Key Terms of the APA[5] | |
|---|---|
| **Releases (L.R. 6004-1(b)(iv)(C))** | None |
| **Private Sale (L.R. 6004-1(b)(iv)(D))** | The APA contemplates a private sale. |
| **Closing (APA § 2.08; L.R. 6004-1(b)(iv)(E))** | The closing (the "**Closing**") of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities hereunder shall take place via the exchange of documents by mail or electronic delivery services, as soon as possible following entry of the Sale Order, but in no event later than three (3) Business Days, after satisfaction of the conditions set forth in Article 8, or at such other time or place as Buyer and the Company may agree in writing |
| **Good Faith Deposit (L.R. 6004- 1(b)(iv)(F))** | None |
| **Interim Arrangements with Buyer(L.R. 6004-1(b)(iv)(G))** | None |
| **Use of Proceeds (L.R. 6004-1(b)(iv)(H))** | None |
| **Tax Exemption (L.R. 6004-1(b)(iv)(I))** | None |
| **Preservation of Books and Records (APA § 6.01; L.R. 6004-1(b)(iv)(J))** | Buyer shall provide to Sellers and their respective Affiliates and representatives (after reasonable advance notice and during regular business hours and in a manner that does not materially interfere with the normal operations of Buyer or the Business) reasonable access to, including the right to make copies of, all books and records included in and otherwise related to the Purchased Assets, to the extent necessary to permit Sellers to determine any matter relating to their respective rights and obligations hereunder or to any Pre-Closing Tax Period (for example, for purposes of preparing any Tax Return or conducting a Tax or accounting audit or any claim or litigation matter) or otherwise related to the Excluded Assets, for periods prior to the Closing and shall preserve such books and records until the latest of (a) the retention period required by applicable Law, (b) the conclusion of all bankruptcy proceedings relating to the Chapter 11 Cases and (c) in the case of books and records relating to Taxes, three (3) years following the Closing Date. Such access shall include access to any information in electronic form to the extent reasonably available. Unless otherwise consented to in writing by Sellers (such consent not to be unreasonably withheld, conditioned or delayed), Buyer will not, for a |

24

| Key Terms of the APA[5] | |
|---|---|
| | period of three (3) years following the Closing Date, destroy, alter or otherwise dispose of any such books and records, without first offering to surrender to Sellers such books and records or any portion thereof that Buyer may intend to destroy, alter or dispose of; <u>provided</u> that nothing in this Agreement shall require Buyer to suspend any document preservation policies relating to the retention of electronic data maintained in the ordinary course of business. |
| **Sale of Avoidance Actions (L.R. 6004-1(b)(iv)(K))** | The Purchased assets include all Avoidance Actions against any of the Sellers' vendors, suppliers, counterparties, employees, directors, officers and any other person doing business with, employed by or directors of the Buyer on and after Closing in regards or related to the Purchased Assets (and excluding, for the avoidance of doubt, any Avoidance Action against officers, directors or other insiders who are not employed by or directors of the Buyer after Closing). |
| **Credit Bid/Credit (APA § 2.06; Local Rule 6004- 1(b)(iv)(N))** | The Buyer is entitled to use its portion of the DIP Term Loan as a credit toward the Purchase Price. |
| **Relief from Bankruptcy Rule 6004(h) (L.R. 6004-1(b)(iv)(O))** | This Motion seeks relief from the fourteen-day stay imposed by Bankruptcy Rule 6004(h) |

## III.    ASSUMPTION AND ASSIGNMENT NOTICE

16.     The Debtors have reviewed their prepetition executory contracts and unexpired leases and have designated certain of those executory contracts and unexpired leases as those that a purchaser of all of the Debtors' assets may wish to have assumed and assigned to it.  At the Sale Hearing, to facilitate and effectuate the sale of Purchased Assets, the Debtors will also seek authorization to assume certain executory contracts and unexpired leases (collectively, the "Purchased Contracts") and to assign the Purchased Contracts to the Buyer.  By this Motion, the Debtors request approval of the assumption and assignment of the Purchased Contracts to the Buyer.

17.     On or before July 10, 2023, the Debtors intend to file and serve a notice (the "Cure Notice") setting forth the Purchased Contracts preliminarily identified by the Buyer as executory contracts and unexpired leases that the Buyer may elect to assume (the "Initial Purchased Contracts") and setting forth (a) the proposed amounts required to cure all monetary defaults under a Purchased Contract to the extent required by section 365 of the Bankruptcy Code in connection with the assumption and assignment of such Purchased Contract (the "Cure Costs") and (b) the settlement amount that Buyer proposes to pay in satisfaction of such Cure Costs (the "Cure Payments").   In the event that a non-Debtor counterparty objects to the assumption of such counterparty's Purchased Contract, including the proposed Cure Cost thereof, which the Debtors request such non-Debtor counterparty do within seven (7) days after filing and service of the Cure Notice, the Debtors will provide Buyer with a schedule identifying each objecting counterparty and the disputed Cure Cost.  If the parties are unable to reach agreement on the Cure Cost for a Purchased Contract, the Debtors may have such Cure Cost determined by the Bankruptcy Court at or prior to the Sale Hearing.

18.     At any time prior to Closing, Buyer may provide the Debtors with written notice that it intends to designate an executory contract or unexpired lease as a "Designated Contract" that it may purchase.   The Buyer will then have through the earlier of (i) the date on which the Bankruptcy Court enters an order confirming a plan of reorganization or liquidation, and (ii) January 24, 2024 (and as may be extended with the consent of a Designated Contract counterparty the "Designation Rights Period") to either (i) enter into an agreement with a counterparty to any Designated Contract pursuant to which such counterparty consents to the assumption and assignment to Buyer or its designee of such Designated Contract on the terms set forth in such agreement, or (ii) pay the Cure Costs to the counterparty to such Designated Contract.

At any time that is no later than 10 days prior to the end of the Designation Rights Period, the Buyer may (i) designate any Designated Contract for assumption and assignment or (ii) designate any Designated Contract as an Excluded Contract (in which case such contract shall become an excluded contract upon 2 days' notice of such determination). Any Designated Contract that is not assumed and assigned prior to the expiration of the Designation Rights Period shall be deemed an Excluded Contract. Upon designation of a Designated Contract as an Excluded Contract or the expiration of the Designation Rights Period, the Debtors will seek to reject any Excluded Contracts.

<strong>BASIS FOR RELIEF REQUESTED</strong>

**A.** **Sufficient Business Justification Exists for Consummation of the Sale under Sections 105(a) and 363(b) of the Bankruptcy Code**

19. Pursuant to section 105(a) of the Bankruptcy Code, a "[c]ourt may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Section 363(b) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). Although section 363(b) of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, courts have required that such use, sale or lease be based upon the sound business judgment of the debtor. *See, e.g.*, *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (internal citation omitted); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 107071 (2d Cir. 1983); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147-48 (3d Cir. 1986).

20. Generally, courts have applied four (4) factors in determining whether a sale of a debtor's assets should be approved: (a) whether a sound business reason exists for the proposed

27

transaction; (b) whether fair and reasonable consideration is provided; (c) whether the transaction has been proposed and negotiated in good faith; and (d) whether adequate and reasonable notice is provided. *See Lionel,* 722 F.2d at 1071-72 (setting forth the "sound business justifications" requirement); *Abbotts Dairies,* 788 F.2d at 145-57 (interpreted by courts as implicitly adopting the articulated business justification test and adding the "good faith" requirement); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991) ("Once a court is satisfied that there is a sound business reason or an emergency justifying the pre-confirmation sale, the court must also determine that the trustee has provided the interested parties with adequate and reasonable notice, that the sale price is fair and reasonable, and that the purchaser is proceeding in good faith.").

21.     This fundamental analysis does not change if the proposed sale is private, rather than public. *See, e.g.*, *In re Ancor Exploration Co.,* 30 B.R. 802, 808 (Bankr. N.D. Okla. 1983) ("[T]he bankruptcy court should have wide latitude in approving even a private sale of all or substantially all of the estate assets not in the ordinary course of business under § 363(b)."). The bankruptcy court "has ample discretion to administer the estate, including the authority to conduct public or private sales of estate property.". *In re WPRV-TV, Inc.*, 143 B.R. 315, 319 (D.P.R. 1991), vacated on other grounds, 165 B.R. 1 (D.P.R. 1992). Thus, a court-approved auction process is not required as long as the four-factor test is met. *See, e.g.*, *In re Great Atl. & Pac. Tea Co., Inc.*, 544 B.R. 43, 49-50 (Bankr. S.D.N.Y. 2016) ("[E]ven asset sales are not conditioned on such a requirement [of a formal auction], which does not appear in the Bankruptcy Code or the Bankruptcy Rules."). Here, the proposed private sale of the Purchased Assets to the Buyer meets all of these requirements and should be approved because the Purchased Assets will have been adequately marketed prior to the Sale Hearing and the APA represents the highest and best offer for the Purchased Assets.

**i.    There Is a Sound Business Reason to Proceed with the Sale.**

22.    The demonstration of a valid business justification by the debtor leads to a strong presumption "that in making [the] business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).  The Debtors submit that their decision to consummate the Sale with the Buyer represents a reasonable exercise of the Debtors' business judgment, such that the Sale should be approved under sections 105(a) and 363(b) of the Bankruptcy Code.

23.    The Debtors have conducted a fulsome process to market their assets, and that process remains ongoing.  To date, the Debtors received just a single binding offer to purchase their assets.  However, the Debtors will continue to market their assets postpetition and are providing other potential purchasers with the ability to submit a binding proposal to the Debtors within two days of the hearing to approve the Sale.  *See* Lee Declaration ¶ 14.  As a result, the Debtors will be certain by no later than the Sale Hearing that the Sale to the Buyer represents the highest and best offer for their assets.  Additionally, the Debtors' proposed DIP Facility is conditioned upon strict Sale milestones, including the requirement that the Debtors close on the Sale within 33 days of the date hereof, given the Debtors have limited liquidity even with the DIP Facility in place.  This shortened timeline reduces the risk of losing employees who are crucial to preserving the value of the Debtors' assets, further justifying the Sale on such timeline. *See* Lee Declaration ¶ 14.  The Debtors believe that consummating the transaction contemplated by the APA will maximize value for the Debtors' estates, provide for the continuation of the jobs of the

29

Debtors' employees, and afford the Debtors with the best possible opportunity to continue to service their customers and maintain business relationships with their partners and vendors.

### ii.    The Purchase Price Is Fair and Reasonable Under the Circumstances

24.    The Purchase Price represents a fair and reasonable price for the Purchased Assets. Notably, the Debtors' vigorous prepetition marketing efforts, which took place over three months and included the canvassing of over 280 potential buyers for either portions of or the entirety of the Debtors' business, did not elicit any better offers.  *See* Lee Declaration ¶ 9.  In addition, the Debtors have continued their marketing efforts postpetition. *Id.* ¶¶ 8, 13.  Subject to any higher or better offers received prior to the Sale Hearing, the Debtors submit that the Purchase Price is fair and reasonable under the circumstances of these chapter 11 cases.  As described above, the Purchase Price includes financing to fund these chapter 11 cases and to wind down the Debtors' estates (including through the payment of administrative expenses post-closing of the Sale so that these chapter 11 cases can be closed).  Beyond the monetary elements of the Purchase Price, consummating the Sale with the Buyer will preserve the jobs of substantially all of the Debtors' employees and provide for the ongoing functioning of the Debtors' businesses as a viable go-forward enterprise (including through the continued performance under the Purchased Contracts post-closing and the curing of defaults thereunder through the payment of the related Cure Costs). *See e.g., In re Pursuit Cap. Mgmt.*, LLC, 874 F.3d 124, 128 (3d Cir. 2017) (trustee provided testimony that the offer represented a "fair and reasonable price").

### iii.    The Sale Is Proposed in Good Faith

25.    As discussed, *supra*, the terms of the Sale are the product of extensive, arm's-length negotiations with the Buyer.  The Buyer is a disinterested strategic purchaser and is not an "insider" of the Debtors.  In addition, at all relevant times, the Debtors have managed their prepetition

30

restructuring efforts, including the negotiation of the APA with the Buyer, with the oversight of the Special Committee.  Following weeks of analysis and process, the Board determined that pursuing the Sale of the Purchased Assets to the Buyer provided the best opportunity to maximize value for the Debtors' estates and all parties in interest.  *See* Lee Declaration ¶ 12.

     **iv.**     **Adequate Notice Has Been Provided**

26.     Bankruptcy Rule 2002(c)(1) states, in pertinent part, that the notice of a proposed use, sale or lease of property shall include the terms and conditions of any private sale and the deadline for filing objections and shall generally describe the property.  The Debtors have provided (or will timely provide) adequate notice of the Sale to parties-in-interest through first class mail.  *See* Fed. R. Bankr.P. 2002(c)(1) (notice must contain "the terms and conditions of any private sale and the time fixed for filing objections."); *see also Delaware & Hudson Ry.*, 124 B.R. at 18.  The Debtors submit that the information contained herein satisfies these notice requirements.

27.     The Debtors additionally submit that, due to the Debtors' limited liquidity, the Debtors do not have (or have access to) funds sufficient to support an elongated, formal auction process postpetition.  Accordingly, the Debtors believe that the notice provided is adequate and appropriate under the circumstances of these chapter 11 cases, particularly considering the prepetition marketing process and the Debtors' intention to continue the marketing process postpetition.  It is the Debtors' position that there is no benefit to conducting a formal auction of their assets because the costs and delays associated with conducting an additional marketing and auction process will reduce the Debtors' realization of the highest and best value for the Purchased Assets.  *See* Lee Declaration ¶ 14.  Time is of the essence in these chapter 11 cases to close on the Sale with the Buyer, with the most likely outcome of failing to do so on the Sale timeline provided for herein being significant deterioration in value of the Debtors' assets and the loss of jobs for the

Debtors' employees.  *See* Lee Declaration ¶ 14.  For these reasons, the Debtors request that the Court not require the Debtors to conduct an auction process or to establish bidding procedures, but instead approve the heavily negotiated and vetted Sale to the Buyer.

**B.      The Sale Is Appropriate Pursuant to Bankruptcy Rule 6004(f)**

28.      Bankruptcy Rule 6004(f) authorizes a debtor to sell property outside of the ordinary course of business by private sale or public auction. As discussed above, the proposed consideration represents a fair and reasonable value under these circumstances, and a court-approved auction process is not required to prove it so under the Bankruptcy Code, Bankruptcy Rules, or Local Rules. *See, e.g., In re The Great Atl. & Pac. Tea Co., Inc.*, 544 B.R. 43, 49-50 (Bankr. S.D.N.Y. 2016).   Additionally, courts have held that a debtor has broad discretion to determine the manner in which its assets are sold. *See In re Bakalis*, 220 B.R. 525, 531 (Bankr. E.D.N.Y 1998) (noting that a trustee has ample authority to conduct a sale of estate property through private sale).

29.      Courts in this district have approved private sales of estate property pursuant to section 363(b)(1) of the Bankruptcy Code when there has been a valid business reason for not conducting an auction.  *See, e.g.*, *In re FTX Trading LTD.*, No. 22-11068 (JTD) (Bankr. D. Del. March 38, 2023), D.I. 1174 (approving the private sale of assets for approximately $45 million); *In re Medley Health Inc.*, No. 22-11257 (KBO) (Bankr. D. Del. Jan. 13, 2023), D.I. 296 (approving the private sale of assets for approximately $1 million); *In re RTI Holding Company, LLC*, No. 20-12456 (JTD) (Bankr. D. Del. Feb. 1, 2021), D.I. 1006 (approving the private sale of real property for approximately $1.6 million); *In re PQ New York, Inc.*, No. 20-11266 (JTD) (Bankr. D. Del. June 29, 2020), D.I. 435 (approving the private sale of assets for approximately $3 million); *Buffets Holdings, Inc.*, No. 08−10141 (MFW) (Bankr. D. Del. Feb. 3, 2009) (approving the private sale of real property for approximately $2.4 million); *In re Nortel Networks Inc.*, No. 09-10138 (HG)

32

(Bankr. D. Del. Nov. 23, 2010), D.I. 4402 (approving the private sale of assets for approximately $23 million); *In re W.R. Grace & Co.*, No. 01−01139 (JKF) (Bankr. D. Del. Dec. 18, 2008), D.I. 20290 (approving the private sale of real property for approximately $3.8 million); *In re Wellman, Inc.*, No. 08−10595 (SMB) (Bankr. S.D.N.Y. Oct. 6, 2008), D.I. 507 (approving private sale of industrial complex for $17.9 million); *In re W.R. Grace & Co.*, No. 01−01139 (JKF) (Bankr. D. Del. July 24, 2007), D.I. 16374 (authorizing private sale of assets for approximately $22 million).

30.     The proposed Sale of the Purchased Assets was subject to a strategic and vigorous marketing and negotiation process prepetition, and will be subject to a continued and expansive marketing process postpetiton. *See* Lee Declaration ¶¶ 6-9. Given the prepetition and postpetition marketing process, the Debtors believe that the pursuit of the Sale with the Buyer is in the best interests of the Debtors, their estates, and all parties in interest.

31.     In an exercise of their sound business judgment, the Debtors have determined that (a) consummating the proposed Sale with the Buyer on a private basis is appropriate in light of the facts and circumstances of these chapter 11 cases, and (b) the Sale is in the best interest of their estates and all parties in interest. Because a private sale is specifically authorized under Bankruptcy Rule 6004 and the Debtors believe that a private sale is in the best interests of their estates, the Debtors respectfully submit that the Sale should be approved.

**C.     The Sale of the Purchased Assets Free and Clear of All Encumbrances Other Than the Assumed Liabilities Is Authorized Under Section 363(f) of the Bankruptcy Code**

32.     Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests and encumbrances if:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in bona fide dispute;

33

> or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

33.     Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Purchased Assets to the Buyer "free and clear" of liens and interests other than the Permitted Encumbrances and Assumed Liabilities. *See Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that because section 363(f) is written in the disjunctive, a court may approve a sale free and clear if any one subsection is met); *see also Mich. Emp't Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (same); *In re Bygaph, Inc.*, 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same). Furthermore, a debtor possesses broad authority to sell its assets free and clear of liens. *See In re Trans World Airlines, Inc.*, 322 F.3d 283, 289 (3d Cir. 2003).

34.     The Debtors submit that, in the interest of maximizing value for the Debtors' estates, it is appropriate to sell the Purchased Assets to the Buyer on a final "as is" basis, free and clear of any and all Encumbrances other than Permitted Encumbrances and Assumed Liabilities (and except as otherwise expressly set forth in the Sale Order), in accordance with section 363(f) of the Bankruptcy Code, because one or more of the tests of section 363(f) are satisfied with respect to such Sale. In particular, the Debtors believe that section 363(f)(2) of the Bankruptcy Code will be met because the Debtors' Prepetition ABL Lenders and DIP Lenders consented to the Sale to

34

the Buyer pursuant to the APA; *provided* that the Sale Order provides that the Cash Balance (as defined in the APA) is paid directly to the Agent at the Closing.[6]

35.    Moreover, with respect to any other party asserting a lien, claim, encumbrance or the like against the Purchased Assets, the Debtors anticipate that they will be able to satisfy one or more of the other conditions set forth in section 363(f) of the Bankruptcy Code.  In particular, known lienholders will receive notice and will be given sufficient opportunity to object to the relief requested.  Such lienholders that do not object to the Sale should be deemed to have consented. *See FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 285-86 (7th Cir. 2002) ("[L]ack of objection (provided of course there is notice) counts as consent.  It could not be otherwise; transaction costs would be prohibitive if everyone who might have an interest in the bankrupt's assets had to execute a formal consent before they could be sold.") (internal citations omitted); *Hargrave v. Twp. of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (holding that creditor's failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2)); *In re Elliot*, 94 B.R. at 345 (same).

D.    **The Sale Should Be Subject to the Protections of Section 363(m) of the Bankruptcy Code**

36.    As discussed above, the APA was negotiated at arms-length and in good faith with the Buyer, and the Buyer is not affiliated with any of the Debtors or their representatives. Accordingly, this Court should find that Buyer has acted in good faith within the meaning of section 363(m) of the Bankruptcy Code.  *See generally*, *Marin v. Coated Sales, Inc.* (*In re Coated Sales, Inc.*), No. 89 Civ. 3704 (KMW), 1990 WL 212899 (S.D.N.Y. Dec. 13, 1990) (holding that to show lack of good faith, a party must demonstrate "fraud, collusion, or an attempt to take grossly

---

[6] The Prepetition ABL Secured Parties and the DIP Lenders do not consent to a Sale to the Buyer that does not pay all existing prepetition debts in full and comply with all provisions of the DIP Credit Agreement and the DIP Order.

unfair advantage of other bidders"); *see also generally In re Pisces Leasing Corp.*, 66 B.R. 671, 673 (E.D.N.Y. 1986) (examining the facts of each case, concentrating on the "integrity of [an actor's] conduct in the course of the sale proceedings" (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)).

E.      **The Assumption and Assignment of the Purchased Contracts in Connection with the Sale Satisfies Section 365 of the Bankruptcy Code**

37.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  The standard applied to determine whether the assumption of a contract or an unexpired lease should be authorized is the "business judgment" standard.  *See In re AbitibiBowater Inc.*, 418 B.R. 815, 831 (Bankr. D. Del. 2009) (finding that a debtor's decision to assume or reject an executory contract will stand so long as "a reasonable business person would make a similar decision under similar circumstances."); *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (stating a debtor's decision to reject an executory contract is governed by the business judgment standard and can only be overturned if the decision was the product of bad faith, whim, or caprice).  Here, the Debtors have exercised their sound business judgment in determining that assumption and assignment of the Purchased Contracts to the Buyer is in the best interests of the Debtors and their estates.  The assumption and assignment of the Purchased Contracts is necessary for the Debtors to obtain the benefits of the APA; accordingly, the Court should approve the proposed assumption and assignment under section 365(a) of the Bankruptcy Code.

38.     Furthermore, section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Purchased Contracts must be cured or that adequate assurance be provided that such defaults will be promptly cured.  11 U.S.C. § 365(b)(1).  As detailed in the

APA, the Buyer has agreed to assume all liabilities with respect to agreed Cure Costs and agreed settlement amounts in full settlement and satisfaction of any Cure Costs related to the Purchased Contracts ("Cure Payments").

39.     Section 365(f)(2) of the Bankruptcy Code provides that a debtor may assign an executory contract or unexpired lease of nonresidential real property if "adequate assurance of future performance by the assignee of such contract or lease is provided."  11 U.S.C. § 365(f)(2). The words "adequate assurance of future performance" must be given a "practical, pragmatic construction" in light of the facts and circumstances of the proposed assumption.  *See In re Fleming Cos., Inc.*, 499 F.3d 300, 307 (3d Cir. 2007) (internal citation omitted); *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (same); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (finding that adequate assurance of future performance does not mean absolute assurance that debtor will thrive and profit).  The Buyer is well-suited to consummate the Sale and continue performance thereafter under the Purchased Contracts – the Buyer is a well-capitalized business consisting of the largest group of independent broadcast stations in the United States.  *See generally In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (holding that adequate assurance of future performance is given where the assignee of lease has financial resources and expressed a willingness to devote sufficient funding to the business to ensure its success).  Furthermore, any party to a Purchased Contract that is not satisfied with the adequate assurance of future performance provided by the Buyer will have an opportunity to file an objection to such adequate assurance of future performance by the Sale Objection Deadline.

40.     The Debtors also seek approval of the procedures set forth in the Sale Order and APA to facilitate the fair and orderly assumption and assignment of the Purchased Contracts or

37

Designated Contracts. The Debtors intend to file and serve the Cure Notice on or prior to July 10, 2023. In the event a non-Debtor counterparty objects to the Cure Notice, which the Debtors request such non-Debtor counterparty do within seven (7) days after filing and service of the Cure Notice, the Debtors will provide Buyer with a schedule identifying each objecting counterparty and the disputed Cure Costs. If the parties are unable to reach agreement on the Cure Cost for a Purchased Contract, the Debtors may have such Cure Cost determined by the Bankruptcy Court.

41.     The Debtors additionally request the ability, as set forth in the APA, to permit the Buyer to exercise the designation rights with respect to the Designated Contracts during the Designation Rights Period. As described in more detail above, at any time prior to Closing, Buyer may provide the Debtors with written notice that it intends to designate an executory contract or unexpired lease as a "Designated Contract" that it may purchase. During the Designation Rights Period, the Buyer may purchase a Designated Contract by either (i) entering into an agreement with a counterparty to any Designated Contract pursuant to which such counterparty consents to the assumption and assignment to Buyer or its designee of such Designated Contract on the terms set forth in such agreement, or (ii) paying the Cure Costs to the counterparty to such Designated Contract. At any time that is no later than 10 days prior to the end of the Designation Rights Period, the Buyer may (i) designate any Designated Contract for assumption and assignment or (ii) designate any Designated Contract as an Excluded Contract (in which case such contract shall become an excluded contract upon 2 days' notice of such determination). Any Designated Contract that is not assumed and assigned prior to the expiration of the Designation Rights Period shall be deemed an Excluded Contract. Upon designation of a Designated Contract as an Excluded Contract or the expiration of the Designation Rights Period, the Debtors will seek to reject any Excluded Contracts.

38

42.     The Debtors therefore respectfully request that the Court approve the proposed assumption and assignment of the Purchased Contracts to the Buyer, as well as approving the procedures set forth in the APA for the assumption and assignment of the Purchased Contracts post-closing, including the manner of notice regarding such assumption and assignment.

**F.     The Expense Reimbursement Provided for in the APA Is Reasonable and Appropriate**

43.     The APA also provides for the Expense Reimbursement, which amount will constitute an allowed administrative expense claim of the Debtors to the Buyer for reasonable and documented out-of-pocket expenses.  The Expense Reimbursement shall only be payable under the terms and conditions set forth in the APA.

44.     The Debtors and the Buyer, each represented by sophisticated advisors, negotiated the terms of the Expense Reimbursement at arm's-length.  In connection with negotiating a transaction that required extensive costs and efforts by the Buyer, the Expense Reimbursement is reasonable and appropriate under the circumstances.  Notably, there is no break-up fee being sought for the benefit of the Buyer.  Moreover, the Expense Reimbursement is only payable if the APA is terminated and the Sale does not close (other than due to the Buyer's default).  The Buyer has committed substantial time and resources and incurred associated opportunity cost in connection with negotiating the APA.  *See* Lee Declaration ¶ 11.  The APA establishes a floor of value for the Purchased Assets and facilitates the Debtors' ongoing efforts to obtain a higher or better value for their assets.  For these reasons, the Expense Reimbursement is reasonable and appropriate.

G.    **The Agent Should Be Authorized to Credit Bid on the Purchased Assets under Section 363(k) of the Bankruptcy Code If Sale Pursuant to the APA is Not Consummated**

45.    Section 363(k) of the Bankruptcy Code provides that, unless the court for cause orders otherwise, the holder of a claim secured by property that is the subject of a sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property." 11 U.S.C. § 363(k). Even if a secured creditor is undersecured as determined in accordance with section 506(a) of the Bankruptcy Code, section 363(k) allows such secured creditor to bid the full face value of its claim and does not limit the credit bid to the claim's economic value. *See Cohen v. KB Mezzanine Fund II, LP (In re Submicron Sys. Corp.)*, 432 F.3d 448, 459-60 (3d Cir. 2006).

46.    The Prepetition ABL Secured Parties and the DIP Lenders hold claims against the Debtors that are secured by valid, binding, enforceable, nonavoidable and perfected liens on and security interests in substantially all of the Purchased Assets. The Debtors submit that in the event the Sale pursuant to the APA is not consummated, the Agent should therefore be entitled to credit bid those secured claims in connection with the Sale pursuant to section 363(k) of the Bankruptcy Code, in accordance with the terms of the DIP Credit Agreement and the DIP Order.[7] Similarly, the Buyer should be entitled to use its portion of the DIP Term Loan as a credit toward the Purchase Price in accordance with the terms of the DIP Credit Agreement and the DIP Order.

**WAIVER OF STAY UNDER BANKRUPTCY RULES 6004(h) AND 6006(d)**

47.    Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). Furthermore, Bankruptcy

---

[7]    Under the APA, the Buyer is entitled to use its portion of the DIP Term Loan as a credit toward the Purchase Price in accordance with the terms of the DIP Credit Agreement and the DIP Order.

40

Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d). As set forth in the Lee Declaration and throughout this Motion, any delay in the Debtors' ability to consummate the Sale on the timeline contemplated herein would be extremely detrimental to the Debtors, their creditors and estates. *See* Lee Declaration ¶ 14. For this reason and those set forth above, the Debtors submit that ample cause exists to justify a waiver of the fourteen-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d).

## NOTICE

48.     Notice of this Motion will be provided to: (a) the United States Trustee for the District of Delaware, 844 N. King Street, Room 2207, Wilmington, Delaware, Attn: Richard Schepacarter; (b) counsel to the Buyer, Fried, Frank, Harris, Shriver & Jacobson LLP, One New York Plaza, New York, NY 10004; Attn: Jennifer Rodburg (Jennifer.Rodburg@friedfrank.com); (c) all parties known by the Debtors to assert a lien or encumbrance on any of the Purchased Assets; (d) all persons known or reasonably believed to have asserted an interest in or a claim to any of the Purchased Assets; (e) all persons known or reasonably believed to have expressed an interest in acquiring all or a substantial portion of the Debtors' assets within the one (1) year prior to the Petition Date; (f) all non-debtor counterparties to the Purchased Contracts; (g) the United States Attorney's Office for the District of Delaware; (h) the state attorneys general for all states in which the Debtors conduct business; (i) the Internal Revenue Service; (j) the United States Securities and Exchange Commission; (k) the holders of the fifty (50) largest unsecured claims against the Debtors on a consolidated basis; (l) counsel to DIP Agent and Prepetition Agent, Blank Rome LLP, 1201 North Market Street, Suite 800, Wilmington, Delaware 19801; Attn: Regina Stango Kelbon, Esq. (regina.kelbon@blankrome.com); (m) counsel to Crystal Financial LLC d/b/a SLR

Credit Solutions, Morgan Lewis & Bockius, LLP, One Federal Street, Boston, Massachusetts 021110 (Attn: Julia Frost-Davies, email: julia.frost-davies@morganlewis.com) (n) the indenture trustee for the Senior Unsecured Notes; (o) all of the Debtors' other known creditors and equity security holders; and (p) any party that has requested notice pursuant to Bankruptcy Rule 2002.

49.     In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Debtors request entry of the Sale Order, granting the relief requested herein and such other and further relief as is just and proper.

Dated:  July 3, 2023
       Wilmington, Delaware

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/    Laura Davis Jones*
Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: 302-652-4100
Facsimile: 302-652-4400
Email:  ljones@pszjlaw.com
       tcairns@pszjlaw.com

-and-

**ROPES & GRAY LLP**
Ryan Preston Dahl (admitted *pro hac vice*)
Cristine Pirro Schwarzman (admitted *pro hac vice*)
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
E-mail:  ryan.dahl@ropesgray.com
       cristine.schwarzman@ropesgray.com

-and-

**ROPES & GRAY LLP**
Stephen L. Iacovo (admitted *pro hac vice*
191 North Wacker Drive, 32nd Floor
Chicago, Illinois 60606
Telephone: (312) 845-1200
Facsimile: (212) 845-5500
E-mail:  stephen.iacovo@ropesgray.com

*Proposed Counsel to the Debtors and Debtors in Possession*

43