**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| iMedia Brands, Inc., *et al.*,[1] | Case No. 23-10852 (KBO) |
| Debtors. | (Jointly Administered) |
| | **Related to Docket Nos. 93, 208** |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED**
**CREDITORS TO DEBTORS' MOTION PURSUANT TO SECTIONS 105,**
**363, AND 365 OF THE BANKRUPTCY CODE FOR ENTRY OF AN ORDER**
**(I) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS'**
**ASSETS FREE AND CLEAR OF ALL ENCUMBRANCES OTHER THAN ASSUMED**
**LIABILITIES; (II) APPROVING THE DEBTORS' ENTRY INTO THE ASSET**
**PURCHASE AGREEMENT; (III) AUTHORIZING ASSUMPTION AND**
**ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND**
**UNEXPIRED LEASES; AND (IV) GRANTING RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "Committee") appointed in the

chapter 11 cases of iMedia Brands, Inc. and its debtor affiliates (collectively, the "Debtors")

hereby submits this objection (the "Objection") to the Debtors' *Motion Pursuant to Sections 105,*

*363, and 365 of the Bankruptcy Code for Entry of an Order (I) Authorizing the Sale of*

*Substantially All of the Debtors' Assets Free and Clear of All Encumbrances Other Than*

*Assumed Liabilities; (II) Approving the Debtors' Entry Into the Asset Purchase Agreement;*

*(III) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired*

*Leases; and (IV) Granting Related Relief* [Docket No. 93] (the "Sale Motion").  In support of

the Objection, the Committee relies on the declaration of David MacGreevey in support this

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are:  ValueVision Media Acquisitions, Inc. (8670); iMedia Brands, Inc. (3770); ValueVision Interactive, Inc. (8730); Portal Acquisition Company (3403); VVI Fulfillment Center, Inc. (5552); ValueVision Retail Inc. (2155); JWH Acquisition Company (3109); PW Acquisition Company, LLC (0154); EP Properties, LLC (3951); FL Acquisition Company (3026); Norwell Television, LLC (6011); and 867 Grand Avenue, LLC (2642).  The Debtors' service address is 6740 Shady Oak Road, Eden Prairie, MN 55344-3433.

Objection and the Committee's objection to the Debtors' motion for approval of DIP financing, filed substantially contemporaneously herewith (the "MacGreevey Declaration"), and respectfully states as follows:

## PRELIMINARY STATEMENT[2]

1.      Rather than seek approval of the proposed sale to RNN through the usual competitive bidding and public auction process that is standard in Bankruptcy Code section 363 sales, the Debtors seek approval of a sale to RNN on a hyper-aggressive timeline (with sale closing to occur by August 5, 2023—just 33 days after the filing of the Sale Motion) and pursuant to a private sale.  While the Committee acknowledges that private sales occasionally have been permitted in this jurisdiction when there are compelling circumstances, the Debtors' don't come close to justifying a private sale in these cases for the numerous reasons detailed below.

2.      *First*, despite the Debtors' purportedly "fulsome" prepetition marketing process described in their papers, the Committee believes that the Debtors' prepetition sale process for substantially all of their assets actually was quite abbreviated—and the Debtors' postpetition sale process similary was brief and likely provided only about 10 days for potentially interested parties to submit indications of interest.  Making matters worse, because the Debtors never sought approval of bidding procedures, potentially interested buyers were (and still are) left to wonder what would happen if somehow they were able to submit indications of interest, and then bids, on the Debtors' arbitrary timeline.  The Committee's view that the Debtors' marketing process is facially deficient is confirmed by the fact that two new bidders for substantially all of the Debtors' assets have emerged—and the Committee does not believe that either was part of

---

[2]     Capitalized terms used in the Preliminary Statement but not defined therein shall have the meanings ascribed to them in the Objection.

the prepetition process, with one of the bidders learning of the opportunity when reading an article about the Debtors' bankruptcy filings on Debtwire.

3.      *Second*, the Debtors' assertions that an expedited private sale is justified because the Debtors' liquidity does not support a process longer than the one proposed do not hold water. The only reason that the Debtors lack liquidity for a legitimate sale process is because the Debtors' DIP lenders—*i.e.*, the Debtors' prepetition lenders and RNN—provided the Debtors with only enough liquidity for the sale process being proposed.  Of course, it is the DIP lenders that will be the primary beneficiaries of the proposed private sale, as the prepetition lenders will not have to take the "haircut" they likely would experience in a liquidation, and RNN is walking off with the Debtors' business without a proper market test.  The Debtors cannot rely on a manufactured liquidity crisis as the justification for a private sale to one of the very parties that created the issue.

4.      *Third*, the lack of a transparent sale process likely has chilled bidding in these cases.  Buyers new to the Debtors' sale process had very limited guidance regarding the "process"—*i.e.*, that indications of interest were due by July 14, 2023, and that final bids and executed documents were due less than two weeks later (*i.e.*, two days prior to the sale hearing), and were left to wonder how (if at all) any competing bid would be considered and evaluated.  It is unreasonable to expect that potential buyers would commit the substantial time and manpower required to diligence the potential transaction, compile the necessary documentation, and obtain the necessary financing on an extremely compressed timeline without some assurance they even would have a chance at being successful.  While two potential buyers appear willing to do this, there are unique facts that make them willing to do so.

5.     *Fourth*, the Debtors failed to make relevant disclosures regarding a significant connection between the Debtors and the proposed buyer, RNN.  Despite the Debtors' repeated suggestions that RNN has no connections or affiliations with the Debtors, it turns out that Richard French, Jr., the long-time president and chief executive of RNN Media Group, was appointed to the iMedia Brands, Inc. board of directors in September 2022, and thereafter resigned from the board in late December 2022.  The Committee submits that it must be given time to investigate the role that Mr. French played during his time on the iMedia board, as well the circumstances regarding his appointment and sudden resignation just over three months later, before any sale to RNN (private or otherwise) is consummated—as well to probe for additional connections between the Debtors and RNN.  Indeed, the Committee's concerns regarding possible connections is heightened because RNN's bid seeks to foreclose claims and causes of action against certain of the Debtors' directors and officers, which the Committee submits is not customary in an asset sale transaction.  Moreover, while the Debtors repeatedly tout the Special Committee's oversight of the sale process to reassure the Court and parties in interest that the proposed private sale to RNN is a legitimate arms'-length transaction, the reality is that the Special Committee actually has no decision-making authority and therefore cannot provide proper oversight of the Debtors' sale process—or for that matter their chapter 11 cases.

6.     Finally, even if the Court were inclined to approve the proposed private sale to RNN, certain aspects of the relief requested require particular scrutiny and should be denied.  In particular, (i) the Debtors should not be permitted to sell potential claims against their directors and officers (or Mr. French) to RNN; (ii) RNN's proposed *uncapped* expense reimbursement should be prohibited because the RNN transaction does not provide a benefit to the estates; (iii) RNN should not receive a "good faith" finding because it has attempted to foreclose the

meaningful involvement of other bidders through its private sale construct and constrained sale timeline; and (iv) the Debtors' confusing and unfair contract assumption procedures should be scrapped and replaced by procedures approved in advance by the Court.

7.      For these reasons, as discussed more fully herein, the Committee objects to the Debtors' Sale Motion and asks the Court to deny the Debtors' requested relief.  Instead, the Committee submits that if a sale is to move forward, reasonable Court-approved bidding procedures must be established for which potential buyers receive notice, and a public auction must be held to promote competitive bidding that will maximize value for all parties—and not just for the DIP lenders.

## BACKGROUND

### I.      The Chapter 11 Cases

8.      The Debtors commenced these voluntary cases on June 28, 2023 (the "Petition Date"), and the cases are being jointly administered pursuant Rule 1015 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 1015-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").  The Debtors continue to operate their businesses and manage their properties as debtors in possession, and no trustee or examiner has been appointed.

9.      On July 3, 2023, the Debtors filed the Sale Motion, which attached an executed Asset and Equity Purchase Agreement (the "APA") between the Debtors and RNN-TV

Licensing Co. LLC ("RNN" or the "Buyer").[3]  At the same time, the Debtors filed the

declaration of Eugene Lee in support of the Sale Motion.[4]

      10.     On July 6, 2023, the Debtors filed a motion[5] authorizing them to obtain post-

petition financing ("DIP Financing") from their pre-petition secured lender, Siena Lending

Group, LLC ("Siena"), as DIP agent and DIP lender, along with other lenders to the DIP credit

agreement (the "DIP Financing Agreement") including, with respect to $7.5 million of the $15

million in new-money postpetition loans to the Debtors, RNN.  An order approving the DIP

Motion on an interim basis was entered by the Court on July 6, 2023 [Docket No. 116] (the

"Interim DIP Order").[6]

      11.     On July 10, 2023, the United States Trustee appointed the Committee pursuant to

section 1102(a) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the

"Bankruptcy Code").[7]  On July 11, 2023, the Committee selected McDermott Will & Emery

LLP as its counsel and AlixPartners, LLP as its financial advisor (both subject to Court

---

[3]    The APA is executed by Mr. Richard French, Jr., on behalf of RNN, and by Mr. Tim Peterman, on behalf of the Debtors.  Mr. French is the long-time president and chief executive of RNN Media Group (and a former iMedia Brands, Inc. board member), while Mr. Peterman is the Debtors' chief executive officer and a board member.

[4]    *Declaration of Eugene Lee in Support of the Debtors' Motion Pursuant to Sections 105, 363, and 365 of the Bankruptcy Code for Entry of an Order (I) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of All Encumbrances Other Than Assumed Liabilities; (II) Approving the Debtors' Entry Into the Asset Purchase Agreement; (III) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief* [Docket No. 94] (the "Lee Declaration" or "Lee Decl.").

[5]    *Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing, (B) Grant Liens and Superpriority Administrative Expense Claims to Post-Petition Lenders and (C) Utilize Cash Collateral, (II) Providing Adequate Protection to Pre-Petition Secured Parties, (III) Modifying the Automatic Stay, (IV) Granting Related Relief, Pursuant to 11 U.S.C. Sections 105, 361,362, 363, 364, 503, 506, 507 and 552, and (V) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2* [Docket No. 88] (the "DIP Motion").

[6]    The approval of the DIP Motion on a final basis is the subject of a separate Committee objection (the "Committee DIP Objection"), which is being filed concurrently herewith.

[7]    *See Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 126].

approval).  Since being appointed, the Committee and its advisors have been working diligently to get up to speed regarding the Debtors' affairs, the Sale Motion, the DIP Motion, and numerous other issues in these cases.

## II.    The Marketing and Sale Process

12.     The Debtors engaged Lincoln Partners Advisors LLC ("Lincoln") as their investment bankers on April 18, 2023.  *See* Lee Decl. ¶ 6.  Initially, Lincoln was charged with identifying new lenders to refinance the Debtors' existing ABL credit facility.  *See id*.  However, Lincoln's mandate subsequently was expanded to include exploration of the sale of the Debtors' iMDS and 1-2-3.tv businesses.  *See id*.  Ultimately, given the Debtors' "urgent need to raise liquidity," Lincoln's marketing process was expanded to include a sale of the Debtors' entire business enterprise.  *See id*.  In connection with this new mandate, Lincoln contacted "a targeted list of potential strategic buyers" to solicit indications of interest.  *See id*.

13.     Lincoln asserts that "[b]etween May 2023 and the Petition Date, Lincoln ran a marketing and sale process," which included contacting 103 buyers for the entire company.  *See id*. ¶ 7.  The Lee Declaration does not disclose when in May 2023 this process started, nor does it disclose when in May (or perhaps June) Lincoln pivoted to marketing the entirety of the Debtors' operations (in addition to the iMDS and 1-2-3.tv businesses).  The Committee suspects—and is seeking to confirm through a deposition of Mr. Lee[8]—that the company's sale "teaser" was not distributed to potential buyers until late May or early June 2023.

14.     According to Mr. Lee, the Debtors received an indication of interest from RNN on June 15, 2023.  *See* Lee Decl. ¶ 9.  It is not unreasonable to assume that initial indications of interest were due from all potential buyers on that same date, although the Lee Declaration is

---

[8]    The Committee expects to take the deposition of Mr. Lee on July 25, 2023.

silent on this point.  As of the date of the Lee Declaration (*i.e.*, July 4, 2023), the Debtors had received only one binding offer for the sale of their assets—the bid from RNN for the purchase of substantially all of the Debtors' assets.  *See id.*

15.     The Sale Motion requests approval of a private sale to RNN, with a sale hearing to occur on July 28, 2023, and sale closing to occur by August 5, 2023—just 33 days after the filing of the Sale Motion.  Although the Sale Motion does not contemplate a competitive bidding process culminating in a public auction, Lincoln asserts that it has continued to run its marketing and sale process after the bankruptcy filings.  *See id.* ¶ 7.  In particular, "Lincoln has reached out to the interested buyers contacted prepetition, [and] solicit[ed] indications of interest by July 14, 2023, with final bids and executed documents due no later than 2 days prior to the hearing to approve the sale."  *Id.* ¶ 13.  It is not clear when after the Petition Date Lincoln contacted parties who had been contacted prepetition, but the Committee believes that such contact did not occur until after the Sale Motion was filed (*i.e.*, July 3, 2023).[9]

16.     Moreover, neither the Sale Motion nor the Lee Declaration explains what will happen if competing bids are received by the Debtors.  Indeed, the Debtors never sought approval of their postpetition sale procedures (*e.g.*, the Debtors' July 14, 2023 deadline for submission of indications of interest, or their contract assumption procedures), so potential buyers have been left with no definitive guidance regarding how to submit a bid—or how a bid would be considered (if at all) by the Debtors.

17.     Despite the extremely tight sale timeline and the lack of guidance regarding the sale process, the Debtors nonetheless have received two additional bids for the sale of substantially all of their assets.  On Friday, July 21, 2023, the Committee formally requested that

---

[9]     The Committee intends to confirm the postpetition sale timeline in its upcoming deposition of Mr. Lee.

the Debtors schedule an auction for July 28, 2023, in hopes that a competitive auction process would improve the current offer on the table from RNN—an offer which provides absolutely no recovery to holders of unsecured claims.[10]

## III.   The APA

18.    Pursuant to the APA, RNN will purchase substantially all of the Debtors' assets for a purchase price of $27,447,305.40 plus fees and interest owed under the DIP Financing Agreement and the prepetition credit agreement, and expenses for professional fees of the DIP lenders and the prepetition lenders, plus a credit of $7.5 million plus interest, fees, and expenses owed to RNN on account of its loans extended under the DIP facility, plus additional cash to provide minimum cash of approximately $2.2 million to the Debtors to facilitate a wind-down of their estates, and the assumption of the Assumed Liabilities as defined in the Sale Motion, including cure costs for assumed contracts.  *See* Sale Motion ¶ 10.  The Committee understands that the total consideration being offered by RNN pursuant to its purchase offer is valued at approximately $49.9 million.[11]

19.    Section 2.01 of the APA describes a long list of assets being sold, which includes standard items such as real property, inventory, equipment, cash, intellectual property, and other

---

[10]   To date, the Debtors have not formally scheduled an auction by filing an appropriate notice on the docket, although the Committee was advised today that an auction will be held on Friday, July 28, 2023.  The Committee intends to request a status conference with the Court on Tuesday, July 25, 2023, if no auction has been scheduled and noticed by that time—so that there is some hope of salvaging the Debtors' deeply flawed sale "process."

[11]   This total includes a "Minimum Cash Amount" of $2,241,563 which has been earmarked to facilitate a wind-down of the Debtors' estates.  However, as detailed in the Committee DIP Objection and the MacGreevey Declaration, this funding will not be made available to the Debtors until after the Committee's DIP challenge deadline has expired—and then only if the Committee has not asserted a challenge.  *See* Interim DIP Order ¶ M. As such, it appears that the Debtors will be left with no source of funding after the proposed private sale to RNN closes on August 5, 2023.

forms of property.  It also includes certain avoidance actions (the "Avoidance Actions").

Specifically, Section 2.01(n) of the APA provides that the sale includes:

> all of Sellers' avoidance claims or causes of action arising under sections 544, 547, 548, 549 and 550 of the Bankruptcy Code and any similar state Law, and all other claims, causes of action, lawsuits, judgements (sic), privileges, counterclaims, defenses, rights of recovery, rights of set-off, rights of subrogation and all other rights of any kind under any other provision of the Bankruptcy Code or such similar state Laws (collectively, **"Avoidance Actions"**), but only to the extent against any of the Sellers' vendors, suppliers, counterparties, employees, directors, officers and any other person doing business with, employed by or directors of the Buyer on and after Closing in regards or related to the Purchased Assets (and excluding, for the avoidance of doubt, any Avoidance Action against officers, directors, or other insiders who are not employed by or directors of the Buyer after Closing) (collectively, **"Purchased Avoidance Actions"**)

APA § 2.01(n) (emphasis in original).

20.     Section 10.02 of the APA addresses expense reimbursement in the event that the APA is terminated and specifically provides that:

> Sellers acknowledge (i) that Buyer has made a substantial investment in time and incurred substantial out-of-pocket expenses in connection with the negotiation and execution of this Agreement, its due diligence with respect to the Purchased Assets, and its efforts to consummate the transactions contemplated hereby, and (ii) that Buyer's efforts have substantially benefited Sellers and will benefit Sellers and will benefit the bankruptcy estate of Sellers through the submission of the offer reflected in this Agreement which will serve as the minimum bid on which other potentially interested bidders can rely.  Therefore, notwithstanding anything contained in this Agreement to the contrary, as compensation for entering into this Agreement, taking action to attempt to consummate the transactions contemplated hereby and including the costs and expenses related thereto and other losses and damages, including foregoing other opportunities, if this Agreement is terminated in accordance with its terms other than pursuant to Section 10.01(e) or Section 10.01(e) (sic), then Sellers, on a joint and several basis, shall pay to Buyer (by wire transfer of immediately available funds), an amount equal to the Expense Reimbursement promptly following such termination, but in any event no later than the date that is two (2) Business Days following the date of such termination.

APA § 10.03.  "Expense Reimbursement" is defined in the agreement as "an aggregate, uncapped amount for reimbursement of reasonable and documented out-of-pocket third-party expenses (including costs of government filings, attorneys' fees and expenses) incurred by Buyer

in connection with the consideration, evaluation and negotiation of this Agreement and the transactions contemplated hereby."  APA p.5.

## IV.    The Assumption Notice

21.    In connection with their Sale Motion, the Debtors filed a notice regarding contracts that the Debtors may assume and assign to RNN in connection with the proposed asset sale.[12]  The Cure Notice attaches a list of contracts, and for each includes a "Cure Cost" and "Proposed Cure Payment."  The Debtors explain that they "have conducted a review of their books and records and have determined the cure amount for unpaid monetary obligations under such Purchased Contracts"[13]—and have listed that amount as the "Cure Cost."  The Cure Notice also purports to explain the "Proposed Cure Payment" listed on the contract schedule:

> [The contract exhibit] also includes the amounts, and the terms on which, the Buyer proposes to pay each counterparty to assume and assign each Purchased Contract. The Buyer (or the Debtors on behalf of the Buyer) is separately sending a proposed Assumption and Assignment Agreement to each counterparty to a Purchased Contract.  If the counterparty fails to return an executed copy of the Assumption and Assignment Agreement prior to the Sale Hearing, the Buyer may elect to exclude such counterparty's Contract from the Sale.

*Id*.

22.    The Cure Notice identifies nearly 200 agreements as being subject to potential assignment.  By the Debtors' own calculations, the great majority of those agreements require payment of Cure Costs as a condition to such assignment.  In some instances, the necessary Cure Costs are well over a million dollars.  Even so, the Cure Notice lists the Proposed Cure Payments as being $0 for every single Purchased Contract.

---

[12]    *Notice to Contract Parties to Potentially Assumed Executory Contracts and Unexpired Leases* [Docket No. 132] (the "Cure Notice").

[13]    Cure Notice at 2.

**OBJECTION**

## I.    The Court Should Not Approve a Sale to RNN by Private Sale

23.    In general, a debtor may sell assets outside of the ordinary course of business so long as the debtor meets the burden of proving that the sale satisfies four requirements: (1) a sound business reason for the sale exists; (2) accurate and reasonable notice of the sale has been given to interested parties; (3) the sale yields a fair and reasonable price; and (4) the parties have acted in good faith.  *See In re First Merchants Acceptance Corp.*, 1997 Bankr. LEXIS 1492, at *10-11 (Bankr. D. Del. 1997) (citing *In re Titusville Country Club*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991)); *In re Exaeris Inc.*, 380 B.R. 741, 744 (Bankr. D. Del. 2008) (citations omitted); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 149-50 (3d Cir. 1986) (establishing that "good faith" of the purchaser is a necessary finding by courts examining 363 sales).

24.    Additional requirements must be met when a debtor proposes to sell assets pursuant to a private sale.  Specifically, a private sale requires there be (1) an emergency, or in the absence of a demonstrated emergency, compelling facts and circumstances which support approval of the sale; (2) facts that justify not soliciting other prospective purchasers; and (3) a showing that the sale is in the best interest of the estate when the consideration paid and all other circumstances are taken into account.  *See In re Ancor Exploration*, 30 B.R. 802, 808 (N.D. Okla. 1983).

25.    The Debtors' simply cannot satisfy the applicable standard.  While private sales occasionally have been permitted in this jurisdiction, there must be compelling reasons for departing from the long-established competitive auction process that is employed in the vast majority of chapter 11 sale cases—and that compelling reason is nonexistent in these cases. Moreover, the Committee believes that the Debtors' marketing and sale process has chilled

bidding, and is tainted by a lack of disclosure of connections between the Debtors and the

proposed buyer (*i.e.*, RNN).  As such, the Committee submits that the Debtors should be required

to go back to the drawing board, as any sale of the Debtors' assets should be conducted through a

Court-approved competitive sale process.

### A.    The Debtors' Justifications for the Private Sale Do Not Sufficiently Support the Relief Requested

26.    By the Sale Motion, "the Debtors request that the Court not require the Debtors to

conduct an auction process or to establish bidding procedures, but instead approve the heavily

negotiated and vetted Sale to the Buyer."  Sale Motion ¶ 27.  The Debtors suggest that a private

sale is appropriate for three reasons: (i) the Debtors purportedly have conducted a fulsome

prepetition and postpetition marketing process which remains ongoing;[14] (ii) they have

insufficient liquidity to extend the sale process;[15] and (iii) the private sale to RNN on an

expedited timeline will preserve jobs.[16]

27.    It makes sense intuitively that an expedited sale timeline probably would be

favored by employees, but it's hard to say whether adding a few weeks to a sale process would

---

[14]    *See, e.g.*, Sale Motion ¶ 23 ("The Debtors have conducted a fulsome process to market their assets, and that process remains ongoing. … [T]he Debtors will continue to market their assets postpetition and are providing other potential purchasers with the ability to submit a binding proposal to the Debtors within two days of the hearing to approve the Sale.  As a result, the Debtors will be certain by no later than the Sale Hearing that the Sale to the Buyer represents the highest and best offer for their assets." (internal citation omitted)); Lee Declaration ¶ 13 ("It is my view that the combination of the prepetition and postpetition marketing processes will ensure the highest and otherwise best value is received for the Debtors' assets."); Lee Declaration ¶ 15 ("I believe pursuing the Sale in the manner set forth in the Sale Motion will maximize the value of the Debtors' estates and is in the best interest of the Debtors.").

[15]    *See, e.g.*, Sale Motion ¶ 23 ("[T]he Debtors' proposed DIP Facility is conditioned upon strict Sale milestones, including the requirement that the Debtors close on the Sale within 33 days of the date hereof, given the Debtors have limited liquidity even with the DIP Facility in place."); Lee Declaration ¶ 14 ("[T]he Debtors' liquidity position does not support a process longer than the 5 weeks set forth in the Sale Motion.").

[16]    *See, e.g.*, Lee Declaration ¶ 14 ("This shortened timeline reduces the risk of losing employees who are crucial to preserving the value of the Debtors' assets, further justifying a sale on the timeline proposed by the Debtors in the Sale Motion.").

make any difference whatsoever with respect to employee turnover.  In any case, this same

argument could be made in any chapter 11 sale case to justify the need for a quick sale, and does

not constitute the sort of compelling justification that would be necessary for Court approval of

the proposed private sale to RNN.  The Debtors' other two justifications for the requested private

sale similarly fail to move the needle as discussed below.

<blockquote>(i)      <strong>The Debtors Have Not Conducted a Sufficiently Rigorous Marketing Process to Justify a Private Sale</strong></blockquote>

28.     As the Court is well aware, debtors seeking approval of quick sales almost always

try to justify the proposed timeline by asserting that their assets already were sufficiently

marketed prepetition—so that only a very limited postpetition marketing process is necessary.

Here, the Debtors are seeking to use this tried-and-true argument not only to justify an extremely

expeditated sale process (with a sale closing proposed to occur by August 5, 2023—just 33 days

after the filing of the Sale Motion), but also to justify a private sale process that would eliminate

the only sort of market check that could provide any level of comfort to the Court and parties in

interest that the sale price actually maximizes value for the Debtors' business.

29.     That said, the Court certainly has seen cases where the prepetition marketing

process was sufficiently long and robust so that a quick postpetition marketing and sale process

may be justified.  But this is not one of those cases.  Here, the Committee believes that the

marketing of the company as a whole did not commence in earnest until late May or early June

2023, when a "teaser" was sent out to potentially interested parties.[17]  Apparently RNN was the

first and only party to submit an indication of interest for the entire company before the Petition

Date—and that was received by the Debtors on June 15, 2023.  *See* Lee Declaration ¶ 9.  The

---

[17]   As noted above, the Committee expects to take the deposition of Mr. Lee on July 25, 2023, to drill down on the details of Lincoln's prepetition and postpetition sale process.

Lee Declaration is silent with respect to what work, if any, Lincoln did to identify additional

potential buyers between the date it received RNN's indication of interest and the Petition Date.

Even if Lincoln continued to diligently pursue additional buyers in the final two weeks before

the chapter 11 filings, the prepetition marketing process for the business as a whole likely was

quite short (perhaps a month or less) and would have required potential buyers to perform

diligence on an unreasonably fast timeline.

30.      Similarly, Lincoln's postpetition marketing process does not come close to

justifying a quick sale.  In particular, "Lincoln has reached out to the interested buyers contacted

prepetition, [and] solicit[ed] indications of interest by July 14, 2023, with final bids and executed

documents due no later than 2 days prior to the hearing to approve the sale."  Lee Declaration

¶ 13.  It is not clear when after the Petition Date Lincoln contacted parties who had been

contacted prepetition, but the Committee believes that such contact did not occur until after the

Sale Motion was filed (*i.e.*, July 3, 2023).  If the Committee is correct about this timing,

potentially interested buyers would have had about 10 days to put together their indications of

interest, even assuming that the necessary people were working around the Fourth of July

holiday.

31.      Making matters worse, because the Debtors never sought approval of bidding

procedures, potentially interested buyers were (and still are) left to wonder what would happen if

some how they were able to submit indications of interest, and then bids, on the Debtors'

arbitrary timeline.  The Committee has the same concerns, as neither the Sale Motion nor the Lee

Declaration explains what will happen if competing bids are received by the Debtors.

Additionally, without Court-approved bidding procedures, there is no guidance for potential

buyers—except what Lincoln may be telling them informally—regarding what sort of information must be included in a bid to be seriously considered.

32.     Although the Committee believes the Debtors' marketing process is facially deficient, recent events seem to confirm that view.  In particular, the Committee understands that, on or about July 14, 2023, the Debtors received a competing bid from another potential buyer interested in purchasing substantially all of the Debtors' assets—and that buyer was new to the Debtors' marketing process.  The Committee also has spoken to a second potential buyer interested in the same assets, and that buyer submitted a bid to the Debtors on July 21, 2023. This second buyer also is new to the Debtors' marketing process, and learned of the potential opportunity when reading about the Debtors' bankruptcy filings in a Debtwire article.  While the Committee is encouraged by the appearance of these new potential buyers, their emergence raises serious concerns regarding the Debtors' marketing process, as the new bidders were not identified by Lincoln in its purportedly robust prepetition process.  The Committee submits that the Debtors' limited and flawed process cannot justify an expedited sale process—and certainly not the extraordinary relief requested by the Debtors in seeking approval of a private sale.

**(ii)     The Debtors' Limited Liquidity Position Was Manufactured by its DIP Lenders, Including RNN**

33.     RNN's proposed bid for the Debtors' business provides absolutely no recovery to unsecured creditors.  Indeed, the Committee has been advised that the bid does not clear the Debtors' secured debt, although the Debtors' prepetition secured lenders purportedly are nonetheless supporting the sale.  Moreover, as discussed in the MacGreevey Declaration, the Committee also does not believe that the proposed wind-down consideration included in RNN's proposal would be sufficient to consummate a liquidating plan, thereby preventing the formation

of a litigation trust to pursue claims which the Committee believes may be viable—and which

would provide the only chance at recovery for unsecured creditors.

34.    Despite these issues, the Debtors are seeking approval of the RNN bid on an

extremely expedited timeline because "the Debtors' liquidity position does not support a process

longer than the 5 weeks set forth in the Sale Motion."  Lee Declaration ¶ 14.  However, the only

reason that is the case is because the Debtors' DIP lenders—*i.e.*, the Debtors' prepetition lenders

and RNN—provided the Debtors with only enough liquidity for the sale process being proposed.

Of course, it is the DIP lenders that will be the primary beneficiaries of the proposed private sale,

as the prepetition lenders will not have to take the "haircut" they likely would experience in a

liquidation, and RNN is walking off with the Debtors' business without a proper market test.[18]

The Debtors cannot rely on a manufactured liquidity crisis as the justification for a private sale to

one of the very parties that created the issue.  Viewed differently, the DIP lenders are seeking to

take advantage of a bankruptcy sale process without paying the freight to make it a legitimate

one.

**B.    The Debtors' Sale Process Has Chilled Bidding**

35.    Although no one sitting on or advising the Committee is an investment banker, it

doesn't take a banker to conclude that the lack of a transparent sale process likely has chilled

bidding in these cases.  In the usual chapter 11 sale case, there are detailed Court-approved

procedures regarding how to submit a qualified bid—and how that bid will be vetted through a

---

[18]    As noted in the Debtors' first day declaration [Docket No. 17] (the "Alt Declaration"), "in July 2021, the Company acquired the portal and advertising business of Synacor, Inc. ("Synacor"), which now does business under the name iMedia Digital Services, [and i]n November 2021, the Company acquired the entities comprising the 1-2-3.tv business, a leading German interactive media company."  Alt Declaration ¶ 14.  The Committee understands that the Debtors acquired these businesses for aggregate consideration in excess of $120 million, yet RNN's bid is less than $50 million—and RNN's bid is for the Debtors' entire business, and not just these two components of the business which were acquired within the last two years.  The Committee is trying to gain a better understanding regarding how these businesses could have lost so much value in such a short period.

public auction.  Here, proposed buyers new to the sale process had very limited guidance

regarding the "process"—*i.e.*, that indications of interest were due by July 14, 2023, and that

final bids and executed documents were due less than two weeks later (*i.e.*, two days prior to the

sale hearing).  As noted above, buyers were left to wonder what would happen if some how they

were able to submit indications of interest, and then bids, on the Debtors' arbitrary timeline.  It is

unreasonable to expect that potential buyers would commit the substantial time and manpower

required to diligence the potential transaction, compile the necessary documentation, and obtain

the necessary financing on an extremely compressed timeline without some assurance they even

would have a chance at being successful.  While two potential buyers appear willing to do this,

there are unique facts that make them willing to do so.  It would be impossible—and indeed

imprudent—for most potential buyers to seriously engage in the Debtors' marketing and sale

process given the hurdles erected by the Debtors to the meaningful participation by any bidder

other than RNN.[19]

## C.    Lack of Disclosure Taints Any Sale to RNN—By Private Sale or Otherwise

36.    In both the Sale Motion and the Lee Declaration, the Debtors repeatedly suggest

that RNN has no connections or affiliations with the Debtors.[20]  To be clear, the Debtors are very

careful with their language and don't actually say those things—but they clearly try to give the

---

[19]  As an example of the procedural roadblocks unnecessarily being imposed by the Debtors to the meaningful participation of any bidder other than RNN, the Committee understands that while the Debtors have given RNN complete freedom to negotiate cure amounts with contract counterparties, the Debtors have specifically prohibited one of the new bidders that has emerged from doing the same (relying on the bidder's non-disclosure obligations).  The Committee is concerned that the Debtors will use this fact—*i.e.*, that the RNN bid may include fully-negotiated cure costs, while any other bid will not—to justify the RNN bid as higher or better.

[20]  *See, e.g.*, Lee Decl. ¶ 12 ("The APA was negotiated in good faith and at arm's length by the Debtors and the Buyer."); Sale Motion ¶ 36 ("[T]he APA was negotiated at arms-length and in good faith with the Buyer, and the Buyer is not affiliated with any of the Debtors or their representatives.").

Court and parties in interest the impression that this is a true arms'-length deal and therefore that the proposed sale will maximize value.  It turns out that is not the case.

37.    While the Lee Declaration states that "the Debtors had initial discussions with [RNN] about their interest in the Debtors in mid-May,"[21] the reality is that RNN likely already had significant information regarding its target well before that time.  In fact, Richard French, Jr., the long-time president and chief executive of RNN Media Group, was appointed to the iMedia Brands, Inc. board of directors in September 2022 (he thereafter resigned from the board in late December 2022).[22]  The Committee is seeking to better understand the connections between the Debtors and RNN and intends to begin this investigation through the deposition of Tim Peterman, who is the Debtors' CEO and sits on the board[23]—but it is clear that there are at least some relevant connections that were not disclosed in the Debtors' papers.  It is imperative that the Committee be able to fully investigate the role that Mr. French played during his time on the iMedia board, as well the circumstances regarding his appointment and sudden resignation just over three months later, before any sale to RNN (private or otherwise) is consummated.  The Committee also must be given time to investigate any other possible connections between RNN and the Debtors and its management.  Indeed, the Committee's concerns regarding undisclosed connections are heightened because RNN's bid seeks to foreclose claims and causes of action against certain of the Debtors' directors and officers, which the Committee believes is not customary in an asset sale transaction.  *See* Objection ¶¶ 41-45.

---

[21]    Lee Decl. ¶ 9.

[22]    *See* iMedia Brands, Inc., Current Report (Form 8-K) (Sept. 15, 2022); iMedia Brands, Inc., Current Report (Form 8-K) (Dec. 28, 2022).

[23]    The Committee expects to take the deposition of Mr. Peterman on July 26, 2023.

38.    In many cases, the involvement of independent directors helps the Court and other parties in interest get comfortable with the legitimacy of a sale process.  In other words, if truly disinterested directors are charged with running a sale process, they presumably will follow a path that maximizes value for the benefit of creditors.  Here, the Debtors' repeated mention of the role of the Special Committee[24] should not provide the Court much (if any) comfort because while the Special Committee is able to provide recommendations to the Board regarding the sale and other matters, the Board itself—and not the Special Committee—is the ultimate decision maker.[25]  This governance construct effectively renders the Special Committee's involvement meaningless, as it has no authority to cause the Debtors to do anything.  The fact that the Debtors would file these cases without giving the Special Committee sole authority over the sale and restructuring process shows a reluctance by the board to give up power—and that adds to the Committee's already serious concerns regarding the Debtors' sale process.

* * *

39.    Accordingly, the Committee respectfully requests that the Court order the Debtors, after consultation with the Committee, to file proposed bidding and notice procedures to be considered by the Court on an expedited basis.

---

[24]    *See, e.g.*, Sale Motion ¶ 14 ("[T]he Debtors have managed their prepetition restructuring efforts with the oversight of the Special Committee, which is comprised of three independent directors to manage the Debtors' balance sheet transformation process, including the pursuit of the consummation of the APA.")

[25]    The Debtors don't attempt to hide this in their pleadings.  *See, e.g.*, Sale Motion ¶ 14 ("Following weeks of analysis and process, the **Board** determined that pursuing the Sale of the Purchased Assets and executing the APA with the Buyer provided the best opportunity to maximize value for the Debtors' estates and all parties in interest.") (emphasis added).

**II.    Certain Aspects of the Proposed Sale to RNN Require Particular Scrutiny and Should Be Denied**

40.     Even if the Court were inclined to approve the proposed private sale to RNN, certain aspects of the relief requested require particular scrutiny and should be denied, as discussed below.

**A.    The Debtors Should Be Prohibited From Selling Certain Claims and Causes of Action to RNN**

41.     As described above, RNN proposes to purchase the Debtors' Avoidance Actions, "but only to the extent against any of the Sellers' vendors, suppliers, counterparties, employees, directors, officers and any other person doing business with, employed by or directors of the Buyer on and after Closing in regards or related to the Purchased Assets (and excluding, for the avoidance of doubt, any Avoidance Action against officers, directors, or other insiders who are not employed by or directors of the Buyer after Closing)."  APA § 2.01(n).  While it is common for buyers to purchase preference claims against go-forward vendors, the Committee believes that it is unusual for a buyer to purchase claims against a debtor's directors and officers ("D&Os").  Although the quoted language is not entirely clear, it can be construed to "bury" Avoidance Actions against, among other parties, (i) any of the Debtors' directors or officers that are hired in some capacity by or are doing business with RNN and (ii) any of RNN's directors, so long as those Avoidance Actions somehow relate to the assets being purchased.  The Committee objects to RNN's purchase of claims against the Debtors' D&Os, as the Committee believes that there may be meritorious claims against certain of these individuals.  Moreover, the Committee does not believe that the Debtors should effectively release any potential claims against former iMedia director Richard French, Jr. (then and now also the president and chief

executive of RNN Media Group), at least not without further investigation into the connections

between RNN and the Debtors and their management.

42.    The proposed sale order [Docket No. 93-1] (the "Sale Order") similarly contains

provisions that would release a host of unnamed parties from potential liability:

> This Order (a) shall be effective as a determination that upon the Closing that (i) no claims or causes of action arising from any period prior to the Closing other than the Assumed Liabilities can be asserted against the Buyer or any of its assets ….

Sale Order ¶ 14.

* * *

> None of the Buyer or its affiliates, successors, assigns, equity holders, officers, directors, employees, or professionals shall have or incur any liability to, or be subject to, any action by any of the Debtors or any of their estates, predecessors, successors, or assigns, arising out of the negotiation, investigation, preparation, execution, or delivery of the APA and the entry into and consummation of the sale of the Purchased Assets, except as expressly provided in the APA or this Order.

Sale Order ¶ 22.

* * *

> Subject to and upon the Closing, the Debtors hereby waive any and all actions related to, and hereby **release the Buyer and any of its agents and designees** and their respective property from, any and all claims and causes of action relating to the Sale Transaction and the APA, whether known or unknown, now existing or hereafter arising, asserted or unasserted, mature or inchoate, contingent or non-contingent, liquidated or unliquidated, material or nonmaterial, disputed or undisputed, and whether imposed by agreement, understanding, law, equity, or otherwise, except to the extent specifically assumed or established under this Order.

Sale Order ¶ 27 (emphasis added).

43.    As with the language in the APA discussed above, these provisions of the Sale

Order would release the Debtors' D&Os from various claims and causes of action, so long as

such individuals are employed or "designated" by RNN.  These provisions also would release

Mr. French from any sale-related claims, which the Committee does not believe is appropriate

given Mr. French's recent stint on the iMedia board, at least without further investigation into potential claims.

44.     In addition to the Committee's concerns regarding the release of potentially valuable claims and causes of action detailed above—which may be the only source of recovery for unsecured creditors—the inclusion of these release provisions will make it difficult to compare bids if an auction is scheduled as requested by the Committee.  In other words, it will be difficult to evaluate how to value the potential claims being released to do an apples-to-apples comparison of RNN's bid and any other bid that does not include these release provisions.

45.     For these reasons, the Committee submits that any APA or Sale Order provision that could have the effect of releasing the Debtors' D&Os or Mr. French from sale-related claims should be stricken from these documents.

**B.      The Proposed Expense Reimbursement Should Be Prohibited or Otherwise Capped**

46.     As noted above, under the APA, RNN is entitled to receive an ***uncapped*** expense reimbursement within two business days following the date of termination of the agreement "as compensation for entering into [the APA]," and the Debtors have essentially acknowledged that RNN is a "stalking horse," agreeing that RNN "will serve as a minimum bid on which other potentially interested bidders can rely."  *See* APA § 10.02(b).  The irony is not lost on the Committee that the Debtors have done everything in their power to treat RNN as a stalking horse, yet they refuse to adopt the auction procedure for which a stalking horse exists.

47.     The allowance of bid protections such as an expense reimbursement generally are evaluated under section 503(b) of the Bankruptcy Code.  Specifically, section 503(b)(1)(A) of the Bankruptcy Code provides in pertinent part that "[a]fter notice and hearing, there shall be allowed, administrative expenses, . . . including (1)(A) the actual, necessary costs and expenses

of preserving the estate." 11 U.S.C. § 503(b)(1)(A). In the Third Circuit, for a claim to qualify

under this standard, it must "arise from a [postpetition] transaction with the debtor-in-

possession" and "be beneficial to the debtor-in-possession in the operation of the business."

*Calpine Corp. v. O'Brien Envtl. Energy, Inc., (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527,

532-33 (3d Cir. 1999); *accord In re Philadelphia Newspapers, LLC*, 690 F.3d 161, 172-73 (3d

Cir. 2012), *as corrected* (Oct. 25, 2012).

48.    The Committee submits that this standard is not satisfied, and that no expense

reimbursement should be awarded to RNN if the Debtors are fortunate enough to consummate a

value-maximizing transaction with another bidder despite the huge roadblocks that Debtors have

erected to prevent such an outcome. Although at this point the Committee does not know for

sure how the decision to move forward with an expedited private sale process was made, it is not

unlikely that RNN dictated this process as a requirement for its participation. Unfortunately, at

least in the Committee's view this process cannot be approved, and for that reason the Debtors

will need to start over. In other words, because the Debtors moved forward with a process that

everyone should have known would not pass muster, the Court will now be given a choice

between approving a tainted sale that likely does not maximize value on the one hand, and

denying the proposed sale and risking the conversion of these cases to chapter 7 on the other. To

be clear, the Committee does not believe the DIP lenders actually will pull the plug on these

cases regardless of the Court's decision, but that of course is a possibility.

49.    In short, rather than provide a benefit to the estates, the RNN bid and the related

private sale process have hurt the Debtors' estates and created the real possibility that the

Debtors end up in chapter 7. It could be argued that RNN has provided a benefit because

without RNN, the Debtors never would have made it into chapter 11, and would have been

forced into a liquidation at the end of June.  But while that may be true, that would have been a

better outcome for unsecured creditors because the Debtors have accumulated significant

additional secured debt since the time of the chapter 11 filings—so even this argument fails to

show a benefit to the estates.

50.     Aside from the applicable legal standard, the Committee submits that approving

RNN's requested expense reimbursement would further chill bidding because any bidder coming

to the table would need to increase its bid by the full amount of RNN's sale-related expenses.

Any sort of bid protection has some impact on bidding because it raises the hurdle for

participation, but here because the amount of the requested reimbursement is uncapped and

unknown, it almost certainly would give other potential bidders pause before deciding to

participate.  As such, if the Court is inclined to approve any expense reimbursement for RNN—

which the Committee strongly opposes—the Committee requests that the expense reimbursement

be subject to a reasonable cap to avoid unnecessarily chilling bidding.

### C.     RNN Is Not Entitled to a Good Faith Finding

51.     The Debtors state that the proposed private sale to RNN should be subject to the

protections of Bankruptcy Code section 363(m) because "the APA was negotiated at arms-length

and in good faith with the Buyer, and the Buyer is not affiliated with any of the Debtors or their

representatives."  Sale Motion ¶ 36.  As the Court is aware, this is a standard buyer protection

and is approved in the large majority of Bankruptcy Code section 363 sales.  *See generally*, *In re*

*Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) (holding that to show

lack of good faith, a party must demonstrate "fraud, collusion between the purchaser and other

bidders or [the Debtor], or an attempt to take grossly unfair advantage of other bidders"); *see*

*also generally In Re Trans World Airlines, Inc*., No. 01-00056 (PJW), 2001 WL 1820326

(Bankr. D. Del. 2001) (examining the facts of each case, concentrating on the integrity of an

actor's conduct in the course of the sale proceedings) (*quoting In re Rock Indus. Mach. Corp*.,

572 F.2d 1195, 1198 (7th Cir. 1978)).

52.     Here, the Committee submits that RNN has gone beyond "tak[ing] grossly unfair

advantage of other bidders" by dictating a process—including through its leverage as a DIP

lender—that intentionally foreclosed the meaningful involvement of other bidders.  While the

Committee is hopeful that one or more other bidders ultimately will have the opportunity to

compete for the Debtors' assets, any such bidder faces an enormous uphill battle at this stage in

the process.  Under these circumstances, the Committee submits that any sale to RNN should not

include a "good faith" finding.

> **D.      The Debtors' Contract Assumption Procedures Are Confusing and Unfair to Contract Counterparties**

53.     As noted below, the Cure Notice identifies nearly 200 agreements as being

subject to potential assignment.  The Cure Notice acknowledges that cure amounts (labeled in

the notice as "Cure Costs") are due under many of those contracts, but at the same time states

that the buyer proposes to pay $0 to counterparties when assuming their contracts (labeled in the

notice as "Proposed Cure Payments").  To be fair, the Cure Notice also states that "[t]he Buyer

(or the Debtors on behalf of the Buyer) is separately sending a proposed Assumption and

Assignment Agreement to each counterparty to a Purchased Contract"—but the Cure Notice

does not indicate whether such "Assumption and Assignment Agreements" will include non-zero

settlement offers.

54.     The Cure Notice further provides in capital, bolded letters that "IF NO

OBJECTION TO (A) THE CURE COSTS … IS FILED BY THE CURE OBJECTION

DEADLINE OR SALE OBJECTION DEADLINE, AS APPLICABLE, THEN (I) YOU WILL

BE DEEMED TO HAVE STIPULATED THAT THE CURE COSTS AS DETERMINED BY THE DEBTORS ARE CORRECT ….” (emphasis removed).  While the Debtors were careful to state that only a failure to object to the “Cure Cost” would be binding on contract counterparties, it is not surprising that many contract counterparties were confused by the notice and believed that the Debtors were trying to bind them to a $0 cure amount.  Indeed, the Committee was concerned enough about the situation that it filed an objection[26] to the Cure Notice to help alleviate counterparties' confusion and the financial burden being imposed on them to file cure objections.

55.     In addition to being confusing, the Cure Notice—which was filed on July 11, 2023 and presumably served that day—purported to require that cure objections be filed no later than seven days after filing and service of the notice.  Of course, the assumption procedures (and the objection deadline in particular) were never approved by the Court—and likely would not have been approved if advance permission to issue the notice had been requested given this timeline.  The Committee submits that the objection deadline purportedly imposed by the Cure Notice is unreasonable given the regular delays unfortunately still being experienced with U.S. mail delivery.

56.     Given the infirmities with the Debtors' proposed contract assumption procedures, the Committee submits that the Debtors should be required to start over with a procedure that has been approved in advance by the Court and incorporates the feedback of the Committee.

## III.    The Committee's "Big Ticket" APA Concerns

57.     For the benefit of potential purchasers that are new to the Debtors' sale process, including the two bidders for substantially all of the Debtors' assets that recently have emerged

---

[26]    *Objection of the Official Committee of Unsecured Creditors to the Notice to Contract Parties to Potentially Assumed Executory Contracts and Unexpired Leases* [Docket No. 208].

(as discussed above), the Committee has the following significant concerns regarding RNN's

APA, which the Committee hopes will be addressed in any competing purchase agreement

submitted to the Debtors:

- The purchase agreement should not seek to purchase Avoidance Actions, except for preference actions against go-forward vendors.

- The purchase agreement should not contain a requirement for any sort of break-up fee or expense reimbursement.

- The purchase agreement should not contain the working capital condition to closing in APA § 8.02(f).[27]  Alternatively, if such a condition is included in the purchase agreement, the Debtors should capture any positive variances in working capital.

- Repayment of the Debtors' DIP financing should not have to occur prior to the sale closing; rather, the DIP financing should be repaid with proceeds from the sale closing.

- The purchase agreement should provide for a reasonable transition services agreement between the buyer and the Debtors to facilitate the wind-down of the Debtors' estates.

The Committee obviously may identify additional issues with competing purchase agreements,

but is filing this short list of significant concerns to provide some guidance to potential

purchasers.

## **RESERVATION OF RIGHTS**

58.    The Committee reserves the right to file additional objections to the relief sought

in the Sale Motion after taking the depositions of Mr. Lee and Mr. Peterman.

---

[27] "[A]t Closing, the actual Gross A/R and Inventory is less than eighty-eight percent (88%) of the projected amount of Gross A/R and Inventory set forth in the Initial Budget for the last day of the most recent Budget Test Period that has ended."  APA § 8.02(f).

## **CONCLUSION**

WHEREFORE, for the reasons stated, the Committee respectfully requests that the Court deny the Sale Motion in its current form and grant the Committee such other and further relief as the Court deems just and proper.

*[Remainder of Page Intentionally Left Blank]*

Dated: July 24, 2023
　　　　 Wilmington, Delaware

**McDermott Will & Emery LLP**

/s/ David R. Hurst

David R. Hurst (I.D. No. 3743)
The Nemours Building
1007 North Orange Street, 10th Floor
Wilmington, DE 19801
Telephone:　　(302) 485-3900
Fax:　　　　　(302) 351-8711
E-mail:　　　　dhurst@mwe.com

- and -

Darren Azman (admitted *pro hac vice*)
Kristin Going (admitted *pro hac vice*)
Stacy A. Lutkus (admitted *pro hac vice*)
Lucas B. Barrett
One Vanderbilt Avenue
New York, NY 10017-3852
Telephone:　　(212) 547-5400
Fax:　　　　　(212) 547-5444
E-mail:　　　　dazman@mwe.com
　　　　　　　 kgoing@mwe.com
　　　　　　　 salutkus@mwe.com
　　　　　　　 lbarrett@mwe.com

*Proposed Counsel to the Official Committee*
*of Unsecured Creditors*