## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-----------------------------------------------------------------x
In re:                                          :
                                                :    Chapter 11
                                                :
iMedia Brands, Inc., et al.,¹                   :
                                                :    Case No. 23-10852 (KBO)
                                                :
                                                :    (Jointly Administered)
                              Debtors.          :
-----------------------------------------------------------------x
```

**LIMITED OBJECTION OF B.H. MULTI COM CORP. TO DEBTORS' MOTION PURSUANT TO SECTIONS 105, 363, AND 365 OF THE BANKRUPTCY CODE FOR ENTRY OF AN ORDER (I) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL ENCUMBRANCES OTHER THAN ASSUMED LIABILITIES; (II) APPROVING THE DEBTORS' ENTRY INTO THE ASSET PURCHASE AGREEMENT; (III) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (IV) GRANTING RELATED RELIEF**

B.H. Multi Com Corp. ("Multi Com") and B.H. Multi Color Corp. ("Multi Color", and together with Multi Com, "B.H. Multi") as creditors of iMedia Brands, Inc. d/b/a ShopHQ (the "Debtor") and consignors of certain consigned goods, by and through their undersigned counsel, hereby submit this limited objection (the "Objection") in connection with the *Debtors' Motion Pursuant to Sections 105, 363, and 365 of the Bankruptcy Code for Entry of an Order (i) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of All Encumbrances Other Than Assumed Liabilities; (ii) Approving the Debtors' Entry Into the Asset Purchase Agreement; (iii) Authorizing Assumption and Assignment of Certain Executory*

---

¹ The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: ValueVision Media Acquisitions, Inc. (8670); iMedia Brands, Inc. (3770); ValueVision Interactive, Inc. (8730); Portal Acquisition Company (3403); VVI Fulfillment Center, Inc. (5552); ValueVision Retail Inc. (2155); JWH Acquisition Company (3109); PW Acquisition Company, LLC (0154); EP Properties, LLC (3951); FL Acquisition Company (3026); Norwell Television, LLC (6011); and 867 Grand Avenue, LLC (2642). The Debtors' service address is 6740 Shady Oak Road, Eden Prairie, MN 55344-3433.

*Contracts and Unexpired Leases; and (iv) Granting Related Relief (the "Sale Motion")*[2] [Docket No. 93] and respectfully represent as follows:

## INTRODUCTION

1. On September 28, 2022, B.H. Multi entered into a certain consignment agreement or arrangements (the "Consignment Agreement") with the Debtor, pursuant to which, *inter alia*, B.H. Multi supplied the Debtor with sample jewelry merchandise on consignment for the purpose of marketing, display and promotional purposes only (collectively, the "Consigned Goods"). Pursuant to the terms of the Consignment Agreement, the Consigned Goods could not be sold by the Debtor. *See* Declaration of Hertsel Akhavan [ECF Docket No. 161-1], ("Akhavan Declaration") at ¶ 3 and Exhibit "A" thereto at ¶ 4.

2. In connection with the Consignment Agreement, on September 28, 2022, Multi Com filed a UCC Financing Statement against the Debtor and, in connection therewith, Multi Com sent notices of its interest to all secured parties of record. Akhavan Declaration, ¶ 4.

3. In connection with the Consignment Agreement, on September 28, 2022, Multi Color filed a UCC Financing Statement against the Debtor and, in connection therewith, Multi Com sent notices of its interest to all secured parties of record. Akhavan Declaration, ¶ 5.

4. Upon information and belief, the Debtor is currently in possession of Consigned Goods from B.H. Multi with an aggregate consignment cost in the amount of $66,336.00 (the "Consignment Cost").[3] Akhavan Declaration, ¶ 6.

5. The Consignment Agreement entered into by and between and B.H. Multi and the Debtor provides that the Consignment Agreement is intended to be a true consignment and that

---

[2] Capitalized terms not defined herein shall have the meaning ascribed to such terms in the Sale Motion.

[3] The Consignment Cost is the amount due and payable to B.H. Multi for the Consigned Goods.

B.H. Multi, as the Consignor, shall retain title to the Consigned Goods at all times. *See* Akhavan Declaration, Exhibit "A" at ¶ 2.

6.　　Pursuant to the Consignment Agreements, and fundamental to the consignment arrangement, at all times, B.H. Multi retained, and continue to retain title to the Consigned Goods. *See* Akhavan Declaration, Exhibit "A" at ¶ 2. At no point did title to the Consigned Goods ever vest with the Debtor under the Consignment Agreements, and the Debtor had no right to sell the Consigned Goods. *See* Akhavan Declaration, Exhibit "A".

7.　　The Consignent Agreement provides in part that upon demand from B.H. Multi, the Debtor shall within five (5) days return the Consigned Goods to B.H. Multi. *See* Akhavan Declaration, Exhibit "A" at ¶ 6. On June 9, 2023, B. H. Multi demanded the return of all of their Consigned Goods in writing. Akhavan Declaration, ¶ 6. The Debtor failed to return the Consigned Goods. Akhavan Declaration, ¶ 6.

8.　　To the extent the Court nonetheless deems the Consigned Goods to be property of Debtor's estate for the purposes of the Sale Motion or finds that the Debtor has an interest in the Consigned Goods in connection with the Sale Motion, B.H. Multi holds valid, perfected, senior security interests in and to the Consigned Goods, which senior security interests cannot be primed unless B.H. Multi consents or the Debtor provides adequate protection.

9.　　Through the Sale Motion, the Debtor seeks entry of a final order (the "Final Order") which, *inter alia*, authorizes the sale of substantially all of its assets free and clear of all liens, claims and encumbrances.

10.　　The APA contemplates the sale of the Debtor's interest in and to the Consigned Goods. The APA provides, in pertinent part, as follows:

> 1.1 Subject to the entry of the Sale Order and upon the terms and subject to the conditions of this Agreement and the Sale Order, on the Closing

3

Date, Sellers shall sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, free and clear of all Claims (other than Assumed Liabilities) and Encumbrances (other than Permitted Encumbrances), to Buyer and/or one or more other Affiliates of Buyer as designated by Buyer (subject to Section 11.03) (a "**Buyer Designee**"), and Buyer shall, and shall cause its Buyer Designees (if any) to, purchase, acquire and accept from Sellers, all of Sellers' right, title and interest in the assets, properties, interests, rights and other assets of Sellers as of the Closing of every kind and nature, whether tangible or intangible (including goodwill), real, personal or mixed, known or unknown, fixed or unfixed, accrued, absolute, contingent or otherwise, wherever located and whether or not required to be reflected on a balance sheet prepared in accordance with GAAP or specifically referred to in this Agreement, including any such properties, rights, interests, and other assets acquired by Sellers after the date hereof and prior to the Closing in accordance with Section 5.01, including the following assets, properties, rights, interests and other assets of Sellers, but excluding, in all circumstances, any Excluded Assets which, notwithstanding the foregoing provisions of this Section 2.01 or anything in this Agreement to the contrary, will remain, as applicable, the assets, properties, interests and rights of Sellers and their Affiliates (collectively, the "**Purchased Assets**"):

*       *       *

(q) all inventory owned by Sellers, including finished products and goods, raw materials, work in process, replacement and component parts including inventory of Sellers held at any third-party location and inventory previously purchased and in transit to Sellers;

11.    Although the APA refers to "Permitted Encumbrances,"[4] and "Consigned Inventory"[5] it does not appear that the Consigned Goods or B.H. Multi's perfect liens fall within

---

[4] The APA defines "Permitted Encumbrances" to mean the following Encumbrances: (a) statutory liens for current Taxes that are not yet due or payable or that are being contested in good faith by appropriate Proceedings and for which adequate reserves have been established in accordance with GAAP; (b) mechanics', materialmen's, repairmen's and other statutory Encumbrances incurred in the Ordinary Course and for adequate reserves have been established in accordance with GAAP and which would not, individually or in the aggregate, have a material impact on the Business or materially impair the ability of the Purchased Entities to use or operate the property to which they relate; (c) Encumbrances incurred or deposits made in the Ordinary Course and on a basis consistent with past practice in connection with workers' compensation, unemployment insurance or other types of social security; (d) with respect to Leased Real Property, easements, declarations, covenants or rights-of-way, restrictions and similar non-monetary Encumbrances (that would be disclosed by an accurate survey of real property) which do not, individually or in the aggregate, materially adversely affect the use or occupancy of the Leased Real Property to which they relate; (e) zoning ordinances, variances, conditional use permits and similar regulations, permits, approvals and conditions that are not materially violated by and do not materially interfere with the business as currently conducted at the applicable Leased Real Property, or the improvements located thereon; (f) Encumbrances

the definition of Permitted Encumbrances or Consigned Inventory, and there is no other language in the Sale Motion that clearly excludes the Consigned Goods from the Debtor's proposed sale.

12.    Additionally, the schedule of executory contracts and leases that may be assumed and assigned as part of the sale contemplated in the APA does not include the Consignment Agreement, and noticeably absent from the APA is any language providing for the Buyer's assumption of the Debtor's obligations with respect to the Consigned Goods under the Consignment Agreement.   As drafted, the APA would purport to convey to Buyer all of the benefit of Debtor's rights under the Consignment Agreements without Buyer assuming any of the corresponding obligations.  While B.H. Multi is amenable to entering into new consignment agreements with Buyer, as of the date hereof, B.H. Multi does not currently have a consignment agreement in place with Buyer.

13.    The Debtor's rights in the Consigned Goods are governed by and arise solely from the Consignment Agreement.   Consequently, unless the Consignment Agreement is assumed and assigned to Buyer, the Debtor has no rights in the Consigned Goods that can be sold and assigned to Buyer.

14.    B.H. Multi is also concerned that its title and security interests in and to the Consigned Goods may be irreparably harmed if possession of the Consigned Goods is transferred to Buyer before B.H. Multi is able to enter into a consignment agreement with Buyer,

---

that will be released at the Closing with no Liability to the Purchased Entities, Buyer or its Affiliates; (g) any Encumbrance granted or incurred pursuant to an Order of the Bankruptcy Court; (h) outbound Intellectual Property licenses that are subject to Section 365(n) of the Bankruptcy Code; (i) non-exclusive licenses of Intellectual Property granted in the Ordinary Course; (j) Encumbrances consented to in writing by Buyer; and (k) any Encumbrance set forth on Section 1.01(a) of the Disclosure Schedules.

[5] The APA defines "Consigned Inventory" to mean means those goods consigned by C&B Newco, LLC to the Company pursuant to (i) that certain Consignment Agreement, dated as of March 1, 2021, between C&B Newco, LLC and the Company and (ii) that certain Amended and Restated Consignment Agreement effective as of November 23, 2022, between C&B Newco LLC and the Company.

file UCC financing statements against Buyer evidencing its consignment interest and liens, and to serve any required notices of their consignment interests.

15.     B.H. Multi is fully supportive of the proposed sale to Buyer, and is happy to see the Debtor's business continue as a going concern and welcome the opportunity to continue their business relationships.  B.H. Multi is simply seeking assurance that its interests in and to the Consigned Goods are not compromised or impaired by the Debtor's proposed sale before B.H. Multi is able to take the necessary steps to perfect its consignment interests with Buyer.

## LIMITED OBJECTION

16.     B.H. Multi does not object to entry of the Sale Order insofar as the Debtor has demonstrated that the offer memorialized in the APA appears to be the highest and best offer for the Debtor's assets.

17.     B.H. Multi seeks only to clarify its rights and the Debtor's and Buyer's obligations with respect to the Consigned Goods and proceeds resulting from the sale or other disposition thereof (the "Proceeds"), and object solely to the extent that (i) Debtor is seeking to assign its rights in and to the Consigned Goods without assuming and assigning the Consignment Agreement to Buyer, or Buyer is not otherwise explicitly assuming the Debtor's obligations related to the Consigned Goods under the Consignment Agreement, (ii) Debtor is seeking to transfer its rights in the Consigned Goods to Buyer prior to B.H. Multi having a reasonable opportunity to perfect its security interests in the Consigned Goods as against Buyer, or (iii) Debtor is seeking to sell the Consigned Goods to Buyer without explicitly providing for use of the proceeds of such sale to pay the obligations owed to B.H. Multi as a result of such sale.

18.     In order to perfect their consignment interests and liens with respect to Buyer, B.H. Multi will be required to: (i) enter into a consignment agreement with Buyer, (ii) make

appropriate UCC filings against Buyer, and (iii) serve required notices to any prior filed secured creditors of Buyer.  This process will take some time to complete.

19.    If the Court were to authorize the transfer of Debtor's rights in the Consigned Goods to Buyer prior to these steps being taken, B.H. Multi' interests in and to the Consigned Goods could be severely prejudiced and irreparably harmed.  Such a result would be manifestly unjust and is prohibited by 11 U.S.C. § 363(e).[6]

## BASIS FOR OBJECTION

### I. Goods on consignment are not property of the Debtor's bankruptcy estate

20.    Under 11 U.S.C. § 541, a debtor's estate is comprised of all legal or equitable interests of the debtor in property as of the commencement of the case. While the definition is extraordinarily broad, there are certain limitations. *In re Vote*, 261 B.R. 439, 441 (Bankr. App. 8th Cir. 2001) (citing *U.S. v. Whiting Pools, Inc.*, 462 U.S. 198, 76 L.Ed.2d 515 (1983). When the debtor does not have an interest in the property, the property does not become part of the estate. *In re National Equipment & Mold Corp.*, 64 B.R. 239 (Bankr. N.D. Ohio 1986). The property transferred must have belonged to the debtor in the first instance, because the trustee can take no greater rights than the debtor himself holds. *In re Graphics Technology, Inc.*, 306 B.R. 630, 634 (Bankr. App. 8th Cir. 2004); *In re Bashour*, 139 B.R. 697 (Bankr. N.D.Ohio 1992).

21.    A bankruptcy court may not allow the use or sale of property as "property of the estate" without first determining whether the property is property of the estate. This is so

---

[6] 11 U.S.C. § 363(e) provides in part as follows:

> Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest.

particularly when the title documents to such assets reflect that a party other than the debtors owns property of the estate. *See Moldo v. Clark (In re Clark)*, 266 B.R. 163, 172 (B.A.P. 9th Cir. 2001) ("[T]he property that can be sold free and clear under section 363(f) is defined by subsections (b) and (c) of section 363 as 'property of the estate.'"); *Darby v. Zimmerman (In re Popp)*, 323 B.R. 260, 266 (B.A.P. 9th Cir. 2005) (even before one gets to Section 363(f), Section 363(b), as interpreted by *Rodeo*, requires that the estate demonstrate that the property it proposes to sell is "property of the estate").

22.    As such, property in which a debtor has no interest never becomes property of the estate. *Graphics Technology, Inc.*, 306 B.R. at 634. The mere fact that the debtor has control or possession does not equate to ownership. *Id*. In fact, it is "axiomatic that a mere possessor of the property of another, without more, cannot obtain legal title." *Id* at 635.

23.    As noted above, pursuant to the Consignment Agreement, the Consigned Goods B.H. Multi retained title to all of the Consigned Goods. The Debtor had no right to sell the Consigned Goods, which were samples that were to be used by the Debtor for marketing and display purposes only.  At no point did title to the Consigned Goods ever vest in the Debtors, and consequently, the Consigned Goods are not property of the Debtor's bankruptcy estate.

### i. The Consigned Goods and Proceeds are not property of the Debtor's bankruptcy estates pursuant to applicable common law

24.    Under common law, a consignment is a commercial transaction between a seller or supplier (consignor) who delivers goods to a merchant or distributor (consignee) without receiving payment until the consignee sells the goods on behalf of the consignor. *See* "consignment" and "consign," Black's Law Dictionary (10th ed. 2014). "Consignments of personal property are, for the most part, governed by Revised Article 9 of the Uniform Commercial Code, which distinguishes between consignments that satisfy the definition

contained in [section] 9-102(a)(20) and those that do not." COLLIER ON BANKRUPTCY ¶541.05. Consignments that satisfy the UCC definition require perfection in accordance with the UCC[7]. *See id*; *see also* N.Y. U.C.C. Law § 9-109(a)(4), cmt. 6 (stating that "Article [9] applies to every 'consignment' to the extent the consignment meets the definition under section 9-102"). Consignments that do not satisfy the definition are governed by state common and statutory law. COLLIER ON BANKRUPTCY ¶541.05; *see also* N.Y. U.C.C. Law § 9-319(b).

25.     An unperfected consignor may prevent the application of the UCC's requirements and assert a common law "true consignment" if it can prove, by a preponderance of the evidence, that the transaction is not governed by Article 9 because the consignment does not fit the UCC definition. *See* Gary D. Spivey, Annotation, Consignment Transactions Under Uniform Commercial Code Article 9 on Secured Transactions, 58 A.L.R.6th 289 (2010) ("[T]he UCC provision subordinating the consignor's security interest does not apply if the transaction does not satisfy the statutory definition of a 'consignment,' as where it is shown that the consignee was 'generally known' by its creditors to be substantially engaged in selling the goods of others."). *See also In re TSAWD Holdings, Inc.*, 565 B.R. 292, 299 (Bankr. D. Del. 2017).

---

[7] Section 9-102(a)(20) of the New York Uniform Commercial Code defines "consignment" as:

…a transaction, regardless of its form, in which a person delivers goods to a merchant for the purposes of sale and:
    (A) the Merchant:
        (i) deals in the goods of that kind under a name other than the name of the person making delivery;
        (ii) is not an auctioneer; and
        (iii) is not generally known by its creditors to be substantially engaged in selling the goods of others;
    (B) with respect to each delivery, the aggregate value of the goods is $1,000 or more at the time of delivery;
    (C) the goods are not consumer goods immediately before delivery; and
    (D) the transaction does not create a security interest that secures an obligation.

N.Y. U.C.C. Law § 9-102(a)(20).

26.     Here, B.H. Multi possess a superior interest in the Consigned Goods because Article 9 of the UCC is not applicable. B.H. Multi agreement with the Debtor does not fit the UCC definition of a consignment because the Debtor was generally known by their creditors to be substantially engaged in selling the goods of others.

27.     Because the Consigned Goods and the Proceeds are the subject of a common law consignment, also known as "true consignment," the Consigned Goods and the Proceeds are not property of the Debtor's estate within the meaning of Bankruptcy Code § 541 and cannot be encumbered by the liens sought in the Sale Motion. *See In re Whitehall Jewelers Holdings, Inc.*, No 08-11261 (KG), 2008 WL 2951974, *6 (Bankr. D. Del. Jul. 28, 2008) (holding that debtors could not sell property free and clear of consignment liens).

>    ***ii. Alternatively, B.H. Multi Holds Perfected Security Interests in and to the Consigned Goods and the Proposed Sale is Prohibited By 11 U.S.C. § 363(e) and 11 U.S.C. §363(f).***

28.     Even if the Court determines that the Consigned Goods are property of the Debtor's estate, B.H. Multi, holds perfected security interests in the Consigned Goods.

29.     11 U.S.C. § 363(f) provides that a debtor may sell property free and clear of such security interests only if:

>    (i) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>    (2) such entity consents;
>    (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>    (4) such interest is in bona fide dispute; or
>    (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

30.     To the extent the Debtor seeks to sell and assign any of its rights in the Consigned Goods, B.H. Multi does not consent unless its security interests in the Consigned Goods are adequately protected as set forth herein, and the Debtor cannot establish that it can satisfy any of

the other requirements of 11 U.S.C. § 363(f) with respect to the Consigned Goods unless it satisfies B.H. Multi's liens from the proceeds of the proposed sale.

## **CONCLUSION**

31.     B.H. Multi respectfully requests that language be added to the Sale Order which, *inter alia*: provides (i) that to the extent Debtor sells and assigns any rights related to the Consigned Goods, Buyer shall be deemed to have assumed all of Debtor's obligations relating to the Consigned Goods under the respective Consignment Agreement, (ii) Debtor may not transfer any rights in the Consigned Goods until B.H. Multi is able to perfect its security interests in the Consigned Goods as against Buyer, or otherwise consent to such transfer, and (iii) provides that to the extent Debtor sells and assigns any rights related to the Consigned Goods to Buyer, such rights are subject to the valid and senior rights, title and interest of B.H. Multi in all Consigned Goods.[8]

## **RESERVATION OF RIGHTS**

32.     B.H. Multi reserves all rights with respect to the Sale Motion and entry of the Sale Order, including the right to supplement or amend this Objection, to participate in additional briefing, including but not limited to briefing why B.H. Multi retain superior rights in the Consigned Goods pursuant to applicable common law principals or, in the alternative, Article 9 of the UCC, to file a fulsome objection to the Sale Motion and entry of the Sale Order, to seek discovery with respect to the same, and to be heard at any hearing or trial related to the Sale Motion.

---

[8] Although B.H. Multi believes the language in (iii) to offer some protection, they have serious concerns that such language may not be sufficiently enforceable against Buyer's creditors, and are concerned that their security interests may not be adequately protected unless they are able to perfect their liens against Buyer through appropriate UCC filings and notices, or alternatively, unless Buyer's secured creditors agree to subordinate their rights and claims relating to the Consigned Goods to the rights and claims of B.H. Multi prior to the transfer of any rights in the Consigned Goods to Buyer.

33.     Nothing contained herein shall constitute a waiver of any of the claims, rights or remedies of B.H. Multi, which are hereby expressly reserved.

**WHEREFORE**, B.H. Multi respectfully requests that this Court (i) deny Debtor's Sale Motion to the extent it seeks to impact any of the Consigned Goods, or (ii) include the language discussed *supra* in the Sale Order to protect the rights of B.H. Multi in the Consigned Goods, and for such other and further relief as is just and equitable.

**BIELLI & KLAUDER, LLC**

Dated:  July 26, 2023
      Wilmington, Delaware

*/s/ Melissa M. Hartlipp*
David M. Klauder, Esquire (No. 5769)
Melissa M. Hartlipp, Esquire (No. 7063)
1204 N. King Street
Wilmington, DE 19801
Phone: (302) 803-4600
Email: dklauder@bk-legal.com
Email: mhartlipp@bk-legal.com

- and -

**KLESTADT WINTERS JURELLER
SOUTHARD & STEVENS, LLP**

Ian R. Winters, Esquire, a*dmitted pro hac vice*
Brendan M. Scott, Esquire, *admitted pro hac vice*
200 West 41st Street, 17th Floor
Phone: 212-972-3000
Email: iwinters@klestadt.com
Email: bscott@klestadt.com

 *Counsel to B.H. Multi Com Corp. and B.H. Multi Color Corp.*