IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Legacy IMBDS, Inc., *et al.*,[1] | Case No. 23-10852 (KBO) |
| Debtors | (Jointly Administered) |
| | **Related to Docket No. 706** |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS TO CONFIRMATION OF THE COMBINED
JOINT CHAPTER 11 PLAN OF LIQUIDATION AND DISCLOSURE
STATEMENT OF LEGACY IMBDS, INC., AND ITS DEBTOR AFFILIATES**

The Official Committee of Unsecured Creditors (the "Committee") appointed in the chapter 11 cases of Legacy IMBDS, Inc. (f/k/a iMedia Brands, Inc.) and its debtor affiliates (collectively, the "Debtors") hereby objects (the "Objection") to confirmation of the *Combined Joint Chapter 11 Plan of Liquidation and Disclosure Statement of Legacy IMBDS, Inc., and Its Debtor Affiliates* (the disclosure statement portion, the "Disclosure Statement" and the chapter 11 plan portion, the "Plan" and, together, the "Combined Plan and Disclosure Statement").[2] In support of the Objection, the Committee respectfully states as follows:

**PRELIMINARY STATEMENT**

1.    Although the Debtors and the Committee have been able to resolve the large majority of the Committee's concerns regarding the Debtors' plan of liquidation, one issue

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: ValueVision Media Acquisitions, Inc. (8670); Legacy IMBDS, Inc. (3770); ValueVision Interactive, Inc. (8730); Portal Acquisition Company (3403); VVI Fulfillment Center, Inc. (5552); ValueVision Retail Inc. (2155); JWH Acquisition Company (3109); PW Acquisition Company, LLC (0154); EP Properties, LLC (3951); FL Acquisition Company (3026); Norwell Television, LLC (6011); and 867 Grand Avenue, LLC (2642). The Debtors' service address is 6740 Shady Oak Road, Eden Prairie, MN 55344-3433.

[2] Docket No. 706. Capitalized terms used but not defined in the Objection have the meanings ascribed to them in the Combined Plan and Disclosure Statement.

remains—and it is critically important to unsecured creditors. In particular, through the Plan, the Debtors propose to release their claims and causes of action against all of the Debtors' current and former directors, managers, officers, and employees, except for those against Tim Peterman.[3] To be approved, such releases must represent a valid exercise of the Debtors' business judgment and be fair, reasonable, and in the best interests of the Debtors' estates. The proposed Debtor releases do not come close to satisfying this standard.

2.      *First*, the inclusion of broad Debtor releases in the Plan does not represent a valid exercise of the Debtors' business judgment. Although the Debtors' board formed an investigation committee and began an investigation of certain issues raised to the board by one or more whistleblowers, the investigation never progressed beyond document collection and retention matters before running out of funding, meaning that the board was never able to assess whether there had been wrongdoing in connection with the matters identified to the board. Moreover, the investigation committee had a limited scope of authority and was not able to investigate other matters that came to its attention, despite investigation committee members' concerns regarding other potential wrongdoing by directors and officers. As such, the Committee submits that the Court should not defer to the Debtors' business judgment to include such releases in the Plan.

3.      *Second*, the proposed Debtor releases are fundamentally unfair to creditors and do not benefit the Debtors' estates. Unsecured creditors' only potential recoveries under the Plan will come through the prosecution of the Debtors' claims and causes of action that were not sold in the Debtors' recent asset sale. Here, the Debtors propose to release nearly all of their remaining causes of action (*i.e.*, all claims except those against Tim Peterman), and to do so for

---

[3]  Mr. Peterman is the Debtors' former director, chief executive officer, and chief financial officer.

no consideration—as the parties benefitting from the releases are providing no consideration whatsoever to the estates. Moreover, the releases are not in any way necessary to the consummation of the Plan, as they are not a component of a settlement to be implemented through the Plan nor are they a prerequisite to the receipt of Plan funding. At the end of the day, the releases have been included in the Plan for no valid business reason—but rather simply because the Debtors' board wants them.

4.   It is unfortunate that the Debtors and the Committee cannot come to the Court with a fully consensual Plan, as it would have been far less costly for the estates if the parties had been able to move forward consensually and avoid the expense of depositions, briefing, and a contested confirmation hearing. It is even more unfortunate that the Committee was not able to recommend the Plan to its constituents before the voting deadline, making it far less likely that the Plan will receive sufficient votes to satisfy confirmation requirements. While the Committee was able to negotiate a Plan structure that—but for the broad Debtor releases—has the potential to provide recoveries to unsecured creditors, the Debtors' insistence on including releases that are neither factually nor legally supportable destroys the potential benefits of the Plan for unsecured creditors. Unless the Debtor releases are stricken from the Plan, unsecured creditors would be far better off if the cases were simply converted to chapter 7, thereby preserving the Debtors' remaining causes of action for the benefit of creditors.

## BACKGROUND

### I.   General Background

5.   These chapter 11 cases were commenced on June 28, 2023 (the "Petition Date"), and they are being jointly administered. The Debtors continue to manage their estates as debtors

in possession, and no trustee or examiner has been appointed. On July 10, 2023, the United States Trustee appointed the Committee.

6. The Debtors filed for chapter 11 to pursue a sale of substantially all of their assets pursuant to Bankruptcy Code section 363. On August 15, 2023, following an auction, the Court entered an order (the "Sale Order")[4] approving the sale of substantially all the Debtors' assets to IV Media, LLC. The sale closed the following day.[5]

## II. The Proposed Plan

7. On November 2, 2023, the Debtors filed the current version of the Combined Plan and Disclosure Statement, and, on November 30, 2023, they filed their Plan supplement (the "Plan Supplement").[6]

8. The Plan includes a broad release of claims belonging to the Debtors' estates (the "Debtor Release").[7] Parties benefiting from the Debtor Release include a litany of "Company Parties,"[8] which include all of the Debtors' current and former directors, managers, officers, and employees, except for the "Non-Released Company Parties"[9] (collectively, the "Insiders"). The Debtors disclosed the sole Non-Released Company Party in the Plan Supplement—the Debtors' former director, chief executive officer, and chief financial officer, Tim Peterman.[10] In short,

---

[4] Docket No. 461.

[5] *Combined Plan and Disclosure Statement*, Article II.A.130.

[6] Docket No. 779.

[7] *Combined Plan and Disclosure Statement*, Article XIII.B.

[8] *Id.* at Article II.A.126 (defining "Released Parties" to include the "Company Parties").

[9] *Id.* at Article II.A.34.

[10] Plan Supplement, Exhibit D.

4

through the Plan, the Debtors propose to release all of their potential claims and causes of action, except those against Tim Peterman.

9. The Disclosure Statement projects that unsecured creditors will recover just 0.0% to 2.0% under the Plan.[11] However, the Disclosure Statement clarifies that these projected recoveries are "mere speculation" because recoveries for holders of unsecured claims will depend significantly on recoveries from the prosecution of certain "Retained Causes of Action."[12] In his recent deposition (the "Panagos Dep."),[13] independent director Steven Panagos confirmed that unsecured creditor recoveries will be "[v]ery de minimis," with "the primary source of recovery [being] litigation claims against either the D&O[s] or other[s]."[14] Mr. Panagos also acknowledged that unsecured creditors may see zero recovery in these cases.[15]

### III. The Debtors' Investigation

10. On June 8, 2023, the Debtors established an independent investigation committee consisting of three directors: Mr. Alan Aldworth, Ms. Jill Frizzley, and Mr. Panagos (the "Investigation Committee"). In his deposition, Mr. Panagos testified regarding the Investigation Committee and its role.[16]

11. The Investigation Committee was formed in response to certain whistleblower complaints and was charged with overseeing an internal investigation into allegations related to

---

[11] *Combined Plan and Disclosure Statement*, Article I.

[12] *Id*. at n.2.

[13] Pages 115–16 of the Panagos Dep. are excerpted and attached hereto as **Exhibit A**.

[14] *Panagos Dep.*, 115:18–25.

[15] *Id.* at 116:1–8.

[16] Pages 68–105 and 116–17 of the Panagos Dep. are excerpted and attached hereto as **Exhibit B**.

(1) customer refunds,[17] (2) non-payment of sales taxes,[18] and (3) executive compensation[19] (the "Investigation").[20] Mr. Panagos further identified other areas of concern, including issues regarding inventory reserves, transactions with companies affiliated with members of the Debtors' board, and Mr. Peterman's dual service as the Debtors' chief financial officer and chief executive officer.[21] The Investigation Committee, however, was not authorized to expand its investigation beyond the three areas mentioned above, meaning that these additional areas of concern were never investigated by the Investigation Committee or anyone else.[22]

12. The appointing resolutions empowered the Investigation Committee to retain independent advisors, incur expenses, access information and employees, and, ultimately, report the investigation results to the Debtors' full board and make recommendations to the board regarding appropriate actions. Although the Investigation Committee's charter specifically provided that the Investigation Committee would receive "appropriate funding" from the Debtors to carry out its mandate, the Investigation Committee was able to do little more than collect and preserve documents before running out of funding due to the Debtors' liquidity issues.[23]

---

[17] This aspect of the Investigation related to allegations that management knowingly failed to return refunds due to customers. *See id.*, 82:7–83:14.

[18] This aspect of the Investigation related to the Debtors' nonpayment of approximately $3.5 million in past due sales taxes. *See id.*, 72:25–82:3.

[19] This aspect of the Investigation related to allegations that Mr. Peterman manipulated EBITDA calculations presented to the board's compensation committee to enable him to qualify for a management bonus. *See id.*, 83:15–85:18.

[20] *Id.* at 71:1–72:12.

[21] *Id.* at 86:15–88:2.

[22] *Id.* at 72:20–24, 85:19–23.

[23] *Id.* at 102:1-4.

13.     The Debtors retained the law firm Sidley Austin LLP ("Sidley") as counsel to the Debtors' board of directors, including to perform the Investigation.[24] Sidley went "pencils down" very early in the Investigation after running out of funding.[25] Consequently, Sidley never reached any conclusions regarding potential wrongdoing with respect to the three areas identified for investigation by the Investigation Committee and never drafted a report, or even made an oral report to the Investigation Committee, regarding any of their findings.[26] The Investigation Committee, in turn, never completed its work and, therefore, never made any recommendations, formal or otherwise, to the Debtors' full board.[27]

## OBJECTION

14.     The Debtor Release is legally impermissible, factually unsupported, and unnecessary to the Debtors' ability to confirm their liquidating plan. The Committee repeatedly has raised these issues with the Debtors to no avail. Instead, the Debtors have opted to trudge forward with a Plan that prioritizes releases for their Insiders over the maximization of value for their creditors. The Committee therefore requests that confirmation of the Plan be denied or conditioned upon removal of the Debtor Release.

15.     A plan may provide for the settlement or release of estate claims. *See* 11 U.S.C. § 1123(b)(3)(A). Such releases, however, must represent "a valid exercise of the debtor's

---

[24] Docket No. 592. Notably, Sidley represented the Debtors' entire board, and the Investigation Committee did not have its own separate and independent counsel. The majority of the members of the Investigation Committee (Mr. Panagos and Ms. Frizzley) were uncomfortable with Sidley representing both the Investigation Committee and the board generally, but they were outvoted with respect to the board's decision to retain Sidley for both roles. *Panagos Dep.*, 91:6–92:2.

[25] *Id. at* 104:4–11.

[26] *Id*. at 104:15–25.

[27] *Id*. at 75:6–10.

business judgment" and be "fair, reasonable, and in the best interests of the estate." *In re Spansion, Inc.*, 426 B.R. 114, 143 (Bankr. D. Del. 2010) (citing *In re DBSD North America, Inc.*, 419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009)); *see also* Hr'g Tr. at 23:17–19, *In re Gulf Coast Health Care, LLC*, No. 20-11177 (KBO) (Bankr. D. Del. May 4, 2022) ("Gulf Coast Hr'g Tr.").

16. Courts evaluating estate releases have looked to the factors articulated in *In re Master Mortgage Investment Fund, Inc.*, 168 B.R. 930 (Bankr. W.D. Mo. 1994) and later adopted in *In re Zenith Electronics Corp.*, 241 B.R. 92 (Bankr. D. Del. 1999) (such factors, the "Master Mortgage Factors"). *See, e.g.*, *In re Abeinsa Holding, Inc.*, 562 B.R. 265, 282 (Bankr. D. Del. 2016) (applying the Master Mortgage Factors); *In re Indianapolis Downs, LLC.*, 486 B.R. 286, 303 (Bankr. D. Del. 2013) (same); *see also* 7 Collier on Bankruptcy ¶ 1123.02[3] (16th ed. 2022) (explaining that "courts have identified five factors [i.e., the Master Mortgage Factors] to consider when analyzing a plan that proposes settlement of estate claims against nondebtor third parties, such as officers, directors and other insiders").

17. The Master Mortgage Factors consider:

> (1) The identity of interest between the debtor and non-debtor released party such that a suit against the non-debtor will deplete the estate's resources;
>
> (2) The substantial contribution to the plan made by the non-debtor released party;
>
> (3) The necessity of the release to the reorganization;
>
> (4) The overwhelming acceptance of the plan and release by creditors and interest holders; and
>
> (5) The payment of all or substantially all of the claims of creditors and interest holders under the plan.

*Zenith*, 241 B.R. at 110.

18. These factors "are neither exclusive nor conjunctive requirements" but, rather, "provide guidance in the Court's determination of fairness." *In re Hercules Offshore, Inc.*, 565

B.R. 732, 756 (Bankr. D. Del. 2016) (quoting *In re Wash. Mut., Inc.*, 442 B.R. 314, 346 (Bankr. D. Del. 2011)); *Gulf Coast Hr'g Tr.*, at 23:18–21 (factors are a "guidepost" in determining whether a release is fair and represents a valid exercise of business judgment). As non-exclusive factors, courts may give "due consideration of other factors that may be relevant to the case." *Hercules Offshore*, 565 B.R. at 756 (quoting *Wash. Mut., Inc.*, 442 B.R. at 347); *Gulf Coast Hr'g Tr.*, at 23:21–24 (all factors "need not be present for a court to approve a proposed release," and they "are not the exclusive set of factors a court may consider in reaching a decision").

19. As shown below, granting the Debtor Release is not a proper exercise of business judgment and is fundamentally unfair to the Debtors' estates and creditors.

I. **Granting the Debtor Release Is *Not* a Valid Business Judgment**

20. Even without addressing the individual Master Mortgage Factors, it is clear that granting the Debtor Release is ***not*** "a valid exercise of the debtor's business judgment." *Spansion, Inc.*, 426 B.R. at 143. Although courts generally refuse to second-guess board decisions, courts need not defer to the board's judgment where "the directors' decision was uninformed" or where "the directors were not disinterested or independent." *See In re Los Angeles Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011). Here, the Debtor Release cannot be a valid business judgment because (1) the Debtors failed to perform a sufficient investigation into the potential claims and causes of action they seek to release, and (2) the directors approving the Debtor Release are also its beneficiaries and therefore not disinterested.

21. *First*, business judgment is respected when decisions "were the product of a rational process and the directors availed themselves of all material and reasonably available information." *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 124 (Del. Ch. 2009). In the context of a release, material information includes the value of the claims being

9

released, the cost to pursue the claims, the likelihood of success in pursuing the claims, and the ability to collect if the claim was successfully pursued.[28] Obtaining the information necessary to support a release, both legally and factually, requires an investigation.

22. Unsurprisingly, courts consistently stress the significance of a thorough investigation when approving releases.[29] Conversely, courts refuse to approve releases when an appropriate investigation has not been conducted. In *Voyager Digital Holdings*, for example, the plan contained "extremely broad" releases for "all directors, officers, and Persons employed by each of the Debtors and their Affiliates." *In re Voyager Digital Holdings, Inc.*, 649 B.R. 111, 131 (Bankr. S.D.N.Y. 2023). Judge Wiles found, however, that the "evidence before [him] did not suggest that the Debtors had done any investigation, or made any careful consideration, of all of the types of claims that would be covered by [the release's] sweeping language." *Id*. at 132. Judge Wiles further explained:

> As I said during oral argument, this is not a release that is tailored to claims that have actually been reviewed and assessed by the Debtors. Instead, it is a release that is deliberately as broad and all-encompassing as possible, untethered to any actual review of many of the claims that would be subject to the release. I therefore do not

---

[28] A plan's inclusion of an estate release pursuant section 1123(b)(3)(A) (which provides for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate") is essentially a settlement, and the "standards for approving settlements under Rule 9019 or as part of a plan are the same." *In re Woodbridge Grp. of Companies, LLC*, 592 B.R. 761, 772 (Bankr. D. Del. 2018). In either case, courts consider, among other things, the probability of success in litigation, the complexity of the litigation involved (including the expense attending it), and any collection difficulties. *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996). Thus, supporting a release (or settlement) necessarily requires an evaluation of the claims' merits and value.

[29] *See, e.g.*, *In re Mallinckrodt PLC*, 639 B.R. 837, 865 (Bankr. D. Del. 2022) (approving release where evidence "show[ed] that the potential claims being released were fully and independently investigated"); Hr'g Tr. at 6:4–7, *In re Akorn, Inc.*, No. 20-11177 (KBO) (Bankr. D. Del. Sept. 8, 2020) (approving release where committee "performed its own investigation and analysis into the nature, extent, viability and value of the released claims which was not meaningfully challenged"); *In re Retail Grp., Inc.*, No. 20-33113-KRH, 2021 WL 962553, at *15 (Bankr. E.D. Va. Mar. 9, 2021) (approving release where "evidence presented [was] that, after an extensive investigation by the Debtors and by the Special Committee, the Debtors were unable to find any material Causes of Action").

> believe that the evidence before me justified and warranted the full scope of the Debtors' releases as they were proposed.

*Id*. Accordingly, the court refused to approve the original release and agreed only to approve a narrower release that was "limited to matters that the Special Committee actually investigated." *Id*.

23. Unlike the debtors' investigation in *Voyager*, the Debtors' investigation in these cases was never completed—and indeed was suspended very early in the process. As discussed, (1) the Debtors' liquidity issues halted the Investigation in its infancy, (2) Sidley was unable to reach any conclusions or make any recommendations to the Investigation Committee, and (3) as a result, the Investigation Committee was unable to complete its work and make recommendations to the Debtors' board regarding the matters identified for investigation. Consequently, in deciding to grant the Debtor Release, the Debtors were not "act[ing] on an informed basis," which is a prerequisite for demonstrating proper business judgment. *See Los Angeles Dodgers*, 457 B.R. 308, 313

24. *Second*, a court's acceptance of a board's business judgment presumes that the directors were "disinterested" and "independent." *Id*. That is not the case here, as the Insiders that approved the Debtor Release are also benefitting from it.

25. Insider dealings in bankruptcy are "subjected to rigorous scrutiny." *Pepper v. Litton*, 308 U.S. 295, 306 (1939); *see also In re LATAM Airlines Grp. S.A.*, 620 B.R. 722, 769 (Bankr. S.D.N.Y. 2020) ("courts apply a 'heightened scrutiny' test in assessing the bona fides of a transaction among a debtor and an insider"); *In re Foster Mortg. Corp.*, 68 F.3d 914, 919 (5th Cir. 1995) (cautioning that a "court's scrutiny must be great when the settlement is between insiders"). This same "[h]eightened scrutiny is warranted when an insider benefits from a compromise or release that a debtor in possession proposes on behalf of its bankruptcy estate."

*In re Astria Health*, 623 B.R. 793, 801 (Bankr. E.D. Wash. 2021). Indeed, courts should be "loath[] to eradicate even potential causes of action because it is simply bad public policy to allow Chapter 11 to be used to insulate corporate directors or their professionals from the consequences of their actions." *In re Congoleum Corp.*, 362 B.R. 167, 194 (Bankr. D.N.J. 2007). It is therefore incumbent on courts to "prevent plan releases of estate claims from being served up by rote to every chapter 11 debtor's officers and directors." *Astria Health*, 623 B.R. at 801.

26. The Debtor Release is not some ordinary agreement negotiated at arm's-length with the affected parties. To the contrary, the Debtor Release is a condition being foisted upon the estates for the benefit of the very same Insiders that approved the Plan's filing. Conditioning a plan's approval on insiders receiving a personal benefit reserved for parties making a "substantial contribution" is an abuse of plan exclusivity. Applying the heightened scrutiny that insider transactions demand, the Debtor Release is indefensible.

27. Because the Debtors' decision to grant the Debtor Release was not made on an informed or independent basis, the business judgment standard is not satisfied.

II. **The Debtor Release Is *Not* Fair, Reasonable, or in the Estates' Best Interests**

28. In addition to not representing a valid exercise of business judgment, the Debtor Release is in no way fair, reasonable, or in the estates' best interests. For a release to benefit an estate or its creditors, whatever the estate is surrendering must be of commensurate value to whatever the estate is receiving in exchange. That is why courts consider, for example, whether a release is being given in exchange for a substantial contribution to the plan and whether the plan pays substantially all of the claims of creditors and interest holders (*i.e.*, the second and fifth Master Mortgage Factors).

29.     In this case, there is nothing remotely fair about the Debtor Release. The Plan makes clear that unsecured creditors' recoveries are entirely contingent upon the successful prosecution of the Retained Causes of Action.[30] The Retained Causes of Action, by definition, exclude claims released under the Plan.[31] As a result, increasing the number of released claims is unavoidably decreasing unsecured creditors' hope of recovering *anything*.

30.     At the same time, the Insiders benefiting from the release have made no contribution to the estates for the releases they are seeking, as "it is well settled that an employee or corporate director is not entitled to claim that he has 'contributed' to a reorganization by merely performing his duties." *In re 710 Long Ridge Rd. Operating Co., II, LLC*, No. 13-13653 (DHS), 2014 WL 886433, at *18 (Bankr. D.N.J. Mar. 5, 2014) (citing *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 606–07 (Bankr. D. Del. 2001); *In re Nat'l Heritage Found., Inc.*, 478 B.R. 216, 229 (Bankr. E.D. Va. 2012); *In re SL Liquidating, Inc.*, 428 B.R. 799, 803–04 (Bankr. S.D. Ohio 2010)). As discussed further below, mere participation in a bankruptcy process is not a contribution that warrants a release.

31.     At bottom, the Debtor Release eliminates unsecured creditors' only potential source of recoveries while simultaneously giving away a substantial benefit to parties who are making absolutely no contribution toward those recoveries. Under these facts, the Debtor Release is neither fair nor in the best interests of the Debtors' estates.

---

[30]  *Combined Plan and Disclosure Statement*, Article I n.2 ("As detailed herein, the projected recoveries for the Holders of Allowed Unsecured Claims range from 0-2%. The Debtors have provided this estimated range because it would be mere speculation to assess any value to the Retained Causes of Action and any potential recovery therefrom for such Holders. Recoveries for such Holders will depend significantly on the value of the Liquidating Trust Assets, including the Retained Causes of Action. This value is not reasonably calculable at this time and will depend on, among other things, the viability of any such Retained Causes of Action, the creditworthiness of any defendants of such Retained Causes of Action, and the cost to investigate and bring causes of action on behalf of the Liquidating Trust.").

[31]  *Combined Plan and Disclosure Statement*, Article II.A.129.

### III. The Master Mortgage Factors Do Not Support the Debtor Release

32. The Master Mortgage Factors further confirm that the Debtor Release is unwarranted.

33. *First*, courts consider whether an "identity of interest" exists between the debtor and the proposed releasee. *Zenith*, 241 B.R. at 110. An "identity of interest" exists when claims "***will*** deplete the estate's resources" if not released. *Wash. Mut.*, 442 B.R. at 346 (emphasis added); *accord SL Liquidating*, 428 B.R. at 803–04 (no identity of interest where "threat against the estate" purportedly posed by released claims was "not real"). Here, the Debtors cannot demonstrate that they share an identity of interest with the parties benefiting from the Debtor Release.

34. Most often, plan proponents try to demonstrate a shared identity of interest by pointing to the debtor's obligation to indemnify the released parties, such that claims against the released parties are essentially claims against the debtor that will deplete estate assets. *See, e.g.*, *In re Boy Scouts of Am. & Delaware BSA, LLC*, 642 B.R. 504, 599 (Bankr. D. Del. 2022), *aff'd*, 650 B.R. 87 (D. Del. 2023) (finding released parties "share[d] an identity of interest with Debtors" where the released parties had "both indemnification and advancement rights against Debtors such that a suit against them [was], in essence, a suit against Debtors and/or [would] deplete [Debtors'] assets"). In the present case, however, any claims against Insiders will have no effect on the Debtors and their estates.

35. As an initial matter, the Debtor Release applies to parties to whom the Debtors have no indemnification obligation (*e.g.*, regular employees). And while the Debtors do owe indemnification obligations to certain Insiders, those obligations are circumscribed under the Plan so that, going forward, they are limited to the extent of coverage available under the

Debtors' insurance policies.[32]  Further still, the Court's order approving the IV Media sale provided that the Debtors only retained claims against directors and officers to the extent of insurance coverage—so, again, there can be no indemnification claims back against the Debtors.[33]  Thus, even with respect to the Debtors' directors and officers, there is no risk of depleting the "*estates'* resources" and therefore no shared identity of interest.  In fact, because of the Debtors' insurance coverage, rather than *deplete* the estates, any recovery against Insiders would *enhance* the estates for the benefit of unsecured creditors who have no other source of recovery.[34]

36.   *Second*, courts consider whether parties made a "substantial contribution" to the reorganization.  *Zenith*, 241 B.R. at 110.  Here, the Insiders have made absolutely no contribution to the estates that would enhance recoveries for creditors.

---

[32]   *See Combined Plan and Disclosure Statement*, Article VIII.C.

[33]   *Sale Order*, ¶ 47.

[34]   Moreover, the Debtor Release's breadth renders the evidentiary showing required to establish an identity of interests impossible.  Sweeping categories of parties, as opposed to specific individuals, are subject to the Debtor Release.  As this Court observed when deciding whether to extend the automatic stay to third parties (which also requires an "identity of interest"), a court cannot make specific factual findings that there is an identity of interest between a debtor and unidentified parties.  *See* Hr'g Tr. 39:3–9, In re Gulf Coast Health Care, No. 21-11336 (KBO) (Bankr. D. Del. Dec. 2, 2021) ("I don't think that I could find that there's an identity of interests between the debtor and most of the third parties here.  I think issue number one is that [] specific parties are not identified in the motion.").

37. As discussed, the idea that mere participation in a restructuring qualifies as a substantial contribution has been rejected, repeatedly.[35] Yet, the Debtors try to justify the Debtor Release on this exact basis.[36] The court in *Aegean Marine Petroleum Network* easily and correctly rebuffed similar arguments when denying a third-party release to insiders:

> I am told that the directors in this case had to navigate through many troubles, and that in return they have earned the right to be freed of litigation claims relating to pre-bankruptcy matters. Frankly, that just does not follow. There are plenty of officers and directors of non-bankrupt companies who have to steer their companies through difficult situations. I am sure that they would also like to dispose of potential litigation claims against them as a reward for the work that they have done. But that is not recognized as a ground on which to terminate litigation claims outside of bankruptcy. There is no reason why it should constitute an excuse to terminate litigation claims just because a company is emerging from bankruptcy.

599 B.R. 717, 728–29 (Bankr. S.D.N.Y. 2019). Even if mere participation were sufficient (which it is not), the Insiders' participation is undoubtedly "overstated" considering that restructuring work is principally handled by hired professionals. *See SL Liquidating*, 428 B.R. at 803–04 (finding management's contributions were "overstated given the fact that the Debtors

---

[35] *See, e.g.*, *Genesis Health*, 266 B.R. at 606–07 (although management "no doubt made meaningful contribution to the reorganization by designing and implementing the operational restructuring" and "negotiating the financial restructuring with parties in interest," they had "been otherwise compensated for their contributions" and "management functions they performed do not constitute contributions"); Hr'g Tr. at 9:16–19, *In re Boomerang Tube, LLC*, No. 15-11247-MFW (Bankr D. Del. Nov. 9, 2015) ("negotiating a plan is not a sufficient substantial contribution by a director and officer, such as to warrant a release."); *Aegean*, 599 B.R. at 729 ("directors did what they were paid to do, and that does not mean they are entitled to releases of third-party claims"); *Nat'l Heritage*, 478 B.R. at 229 (rejecting argument that "officers and directors contributed by performing their duties in the reorganization" because "officers and directors, all of whom are insiders, performed their duties either because they were paid to do so (in the case of the officers), or because they had a fiduciary obligation to do so (in the case of the directors)."); *SL Liquidating*, 428 B.R. at 803–04 (participating in the plan process was not a substantial contribution because the "efforts of the directors and officers [were] consistent with their preexisting fiduciary duties and job responsibilities" (citing *In re Exide Techs.*, 303 B.R. 48, 74 (Bankr. D. Del. 2003) (even "meaningful" work contribution not justification for release)).

[36] *Combined Plan and Disclosure Statement*, Article III.G (explaining that the Plan "releases certain of the Debtors' current directors, managers, officers, and employees (i.e., the Company Parties) who were instrumental in saving the Debtors' business from liquidation, guiding the Debtors through the Sale, and preserving the jobs of the Debtors' approximately 600 employees.").

16

hired Latham & Watkins as lead bankruptcy counsel, Frost Brown Todd as local bankruptcy counsel, Morris-Anderson as investment advisor, and Mesirow Financial, Inc. as investment bankers. The justification for the hiring of these professionals was to draft the plan and implement the sale."). Simply put, the Insiders, with the aid of an army of professionals, did the jobs they were being paid to do and/or that their fiduciary duties obligated them to do. That is not a substantial contribution.[37]

38.    *Third*, courts consider whether a release is "essential" to the "reorganization," such that, without it, "there is little likelihood of success." *Zenith*, 241 B.R. at 110.[38] Here, the Debtor Release is not necessary for the Plan's success because no contribution is being made by the Insiders that is contingent upon them receiving a release, and the Debtor Release is not a component of a larger global settlement.[39] In fact, rather than being integral in any way to the Plan, the Debtor Release is and has been the biggest obstacle to consensual confirmation. Because the Debtors insisted on including the broad Debtor Release in the Plan despite lacking the necessary legal and factual justification for doing so, the Committee was not able to recommend the Plan to its constituents, making confirmation much less likely. Under these

---

[37] The Plan's overly expansive definitions further preclude a finding that parties made a substantial contribution. Releases must be analyzed on an individual-by-individual basis. *See, e.g., Genesis*, 266 B.R. at 606 (releases were impermissible where "as to the debtor's management personnel . . . there is no showing that the ***individual releasees*** have made a substantial contribution of assets to the reorganization") (emphasis added); *In re Bigler* LP, 442 B.R. 537, 544 (Bankr. S.D. Tex. 2010) (release requires "consideration ***by each participant***" to be valid) (emphasis added). In short, if individuals cannot be identified, then neither can their respective contributions.

[38] Fundamentally, the Debtor Release cannot be essential to the "reorganization" because the Debtors no longer have any business to reorganize. *SL Liquidating*, 428 B.R. at 803 (only "a reorganizing debtor" must "be protected from suits that may deplete its assets so that it can, in fact, reorganize").

[39] Sometimes, releases are a component of a global settlement and therefore necessary to facilitate the overall restructuring. *See, e.g.*, *Tribune*, 464 B.R. at 188 (approving "part of the Debtors' Release" where it was "a component of the of the DCL Plan Settlement, which made a substantial contribution to the estate, [was] a necessary piece of the reorganization, and [had] been accepted by creditors").

circumstances, the only ostensible basis for the Debtor Release is that the Insiders themselves wanted it, which hardly makes it necessary.

39. *Fourth*, courts consider whether the "substantial majority" of creditors support the release, as evidenced by "overwhelming" support for the plan. *See Zenith*, 241 B.R. at 110. Although the outcome of voting on the Plan will not be known until after the Objection has been filed, preliminary voting results shared with the Committee do not reflect "overwhelming" support for the Plan.

40. *Fifth*, courts consider whether a plan provides for payment of "all or substantially all" creditor claims. *See Zenith*, 241 B.R. at 110. This factor is straightforward. The Debtors' own projections estimate unsecured creditors will receive a pittance in exchange for their claims, with recoveries ranging from 0.0% to 2.0%.[40] On this point, it should be reiterated that, according to the Debtors, creditor recoveries are "mere speculation."[41] In reality, the Debtors have no basis for suggesting that recoveries will be anything greater than $0, as the only possible recoveries for unsecured creditors in these cases will come through the prosecution of the Debtors' claims and causes of action.

*  *  *

41. In sum, the Debtor Release is not a valid exercise of the board's business judgment nor is it fair to the Debtors' estates or creditors. The Debtors' failure to investigate potential claims against Insiders necessarily means that the Debtors' board was uninformed when approving the Debtor Release, so that the board's decision to include such release in the Plan is not entitled to deference. Moreover, the Debtor Release cannot possibly be in the estates'

---

[40] *Combined Plan and Disclosure Statement*, Article I.

[41] *Id*.

interest, as no contribution is being made by the Insiders, the estates' unsecured creditors are effectively receiving nothing under the Plan, and none of the other Master Mortgage Factors support the release. In this situation, the Debtor Release is nothing more than a giveaway of value that should be preserved for unsecured creditors.

## **RESERVATION OF RIGHTS**

42. The Committee continues to review the Plan and reserves the right to amend, modify, or supplement the Objection for any reason and raise additional objections at any hearing on the Combined Plan and Disclosure Statement.

*[Remainder of Page Intentionally Left Blank]*

**CONCLUSION**

WHEREFORE, for the reasons stated, the Committee respectfully requests that the Court: (i) deny confirmation of the Plan or (ii) alternatively, condition approval of the Plan on removal of the Debtor Release.

Dated: December 12, 2023
Wilmington, Delaware

**MCDERMOTT WILL & EMERY LLP**

*/s/ David R. Hurst*
David R. Hurst (I.D. No. 3743)
The Brandywine Building
1000 N. West Street, Suite 1400
Wilmington, DE 19801
Telephone:    (302) 485-3900
Facsimile:    (302) 351-8711
E-Mail:       dhurst@mwe.com

*- and -*

Darren Azman (admitted *pro hac vice*)
Kristin Going (admitted *pro hac vice*)
Stacy A. Lutkus (admitted *pro hac vice*)
Lucas B. Barrett
One Vanderbilt Avenue
New York, NY 10017
Telephone:    (212) 547-5400
Facsimile:    (212) 547-5444
E-Mail:       dazman@mwe.com
              kgoing@mwe.com
              salutkus@mwe.com
              lbarrett@mwe.com

*Counsel to the Official Committee of Unsecured Creditors*