**<u>Exhibit B</u>**

**Panagos Deposition Excerpt**
**(Pages 68–105; 116–17)**

1 | and I'm going to come through on that promise now.
2 | BY MR. HUTTENLOCHER:
3 |      Q.     So Mr. Panagos, I understand you were
4 | also a member of the Investigation Committee of the
5 | Board of iMedia Brands; is that correct?
6 |      A.     Yes.
7 |      Q.     And do you recall when the
8 | Investigation Committee was formed?
9 |      A.     I don't recall the specific dates,
10 | no.
11 |           (Exhibit 4, Resolutions of the Board
12 | of Directors of iMedia Brands, Inc., Appointment of
13 | Independent Investigation Committee dated June 8,
14 | 2023, was marked for Identification by the court
15 | reporter.)
16 | BY MR. HUTTENLOCHER:
17 |      Q.     I'm going to bring up a document and
18 | an exhibit which we'll mark as Exhibit 4, which is a
19 | document entitled Resolutions of the Board of
20 | Directors of iMedia Brands, Inc., Appointment of
21 | Independent Investigation Committee dated June 8,
22 | 2023.
23 |           Do you see that?
24 |      A.     Yes.
25 |      Q.     Okay.  And I'm happy to scroll down



1  through the document but I'm going to go to the last

2  page just to show you the -- there's an Investigation

3  Committee charter, which is on page 3 of this PDF and

4  then down to the last page includes a series of

5  signatures of board members, including yourself.

6           Do you see that?

7      A.    Yes.

8      Q.    I'm going to go back to the first

9  page and let me know if you'd like to review the

10 document or if you want me to just kind of ask some

11 questions specifically and you can review as you

12 need.

13     A.    Let me just take a quick look at it.

14     Q.    Yeah, for sure.  Let me know when

15 you're ready.  Okay?

16     A.    Okay.  Can I see the next page?  Next

17 page.  Next page.  Next page.  Next page.  Thank you.

18     Q.    I'm going to go back to the first

19 page.  Now, I may have asked this already, but

20 Mr. Panagos, does reviewing this document refresh

21 your recollection that the independent Investigation

22 Committee of the Board of Directors of iMedia Brands

23 was formed on or before June 8, 2023?

24     A.    Yes.

25     Q.    And looking down to the first



1    paragraph starting, "Further resolved," is it correct

2    that board members Alan Aldworth, Jill Frizzley and

3    yourself were appointed to serve as the sole members

4    of the Committee?

5         A.    Yes.

6         Q.    And looking at the top of page 2, it

7    says:  "Further, resolved that board member Tim

8    Peterman shall be and is hereby, recused from matters

9    related to the Board's consideration of the

10   Investigation," which is a capitalized term.

11              Do you see that?

12        A.    Yes.

13        Q.    Do you know why Mr. Peterman had to

14   be recused from matters related to the Board's

15   consideration of the Investigation?

16        A.    Can you go back up a page?

17        Q.    Certainly.

18        A.    As you can see in the first

19   "whereas," the allegations related to numbers 1, 2

20   and 3, Mr. Peterman was a central figure with respect

21   to all three of those issues.

22        Q.    Now, I'm going to go down to page 3,

23   which is the Independent Investigation Committee

24   Charter.

25              Do you see that?



1      A.      Yes.

2      Q.      And did you have any involvement in

3  drafting the Independent Investigation Committee

4  Charter?

5      A.      I'm sure I saw a draft of it before

6  it was finalized.

7      Q.      Do you know if you made any comments

8  To the Investigation Committee Charter?

9      A.      I do not recall.

10     Q.      And if we look at the paragraph

11 that's the first under "Purpose," it says:  "Pursuant

12 to this charter, adopted by the Board of Directors of

13 iMedia Brands, which is defined as the Company, on

14 June 8, 2023, the Board hereby establishes an

15 Independent Investigation Committee, as the committee

16 for the purpose of conducting and overseeing an

17 independent investigation on behalf of the Board into

18 certain allegations related to 1, customer refunds;

19 2, payment of sales tax; and 3, executive

20 compensation, open paren, defining the term

21 Investigation, closed paren, and making any

22 appropriate recommendations to the Board regarding

23 the Investigation.

24             Do you see that, Mr. Panagos?

25     A.      Yes.



1    Q.      And does that refresh your

2    recollection as to the purpose of the Investigation

3    Committee?

4    A.      Yes.

5    Q.      Do you know how it came to be that

6    the three topics enumerated in that paragraph under

7    "Purpose" were selected as areas for investigation by

8    the Investigation Committee or by the Board of

9    iMedia?

10    A.      There were whistleblower allegations

11    regarding these three issues that came internally

12    from employees at the company.

13    Q.      Do you know if it was a single

14    whistleblower that raised all three issues or were

15    there multiple whistleblowers?

16    A.      I believe it was multiple

17    whistleblowers but I don't recall specifically.

18    Q.      So with respect to the -- strike

19    that.

20    Other than the three issues that are

21    enumerated here in the first paragraph here, were

22    there any other topics that the Investigation

23    Committee investigated?

24    A.      No.

25    Q.      I'd like to start with the sales tax



1   issue.

2              Can you share what you understand the

3   sales -- the payment of sales tax issue was that was

4   identified, where it came to light through a

5   whistleblower that needed to be investigated?

6        A.     Yeah, there were significant unpaid

7   sales taxes that the company had that arose either

8   through -- it was from a transaction that had

9   happened a period of time and it was -- the

10  whistleblower allegation was that management knew

11  that they owed the sales taxes but management did not

12  authorize the payment of those sales taxes to the

13  taxing authorities.

14       Q.     Do you know the dollar amount or the

15  magnitude, and an estimate is fine, of how much in

16  sales tax was owed to taxing authorities?

17       A.     I believe the number in the aggregate

18  was somewhere in the neighborhood of $3 and a half

19  million.

20       Q.     Do you know how many states happened

21  to be involved -- were owed back taxes?

22       A.     I recall that it was a minimum of a

23  dozen states.  16 is the number that I have in my

24  head, but I'm not sure if that's accurate.

25       Q.     Based on the financial performance of



1   the company, was a $3.4 million potential liability

2   something that was a significant liability for the

3   company?

4          A.      It's very material.

5          Q.      Were you concerned about the

6   allegation of this amount of unpaid sales taxes?

7          A.      Yes.  My understanding is that sales

8   taxes are a fiduciary obligation.  The company

9   collects sales taxes from individuals and then holds

10  them in a fiduciary capacity and remits them to the

11  states and nonpayment of those taxes creates direct

12  liability -- potential direct liability of officers

13  and directors for, you know, willful nonpayment of

14  those sales taxes.  It's a very serious issue in

15  restructuring situations -- well, whenever it occurs,

16  it's serious, but because cash is tight in

17  restructuring-related situations, it's -- it's

18  something that is focused on by financial

19  professionals who work in this space to ensure that

20  those obligations are satisfied.

21         Q.      Was this topic discussed among the

22  members of the Investigation Committee?

23         A.      Yes.

24         Q.      Did your fellow members of the

25  Investigation Committee share your concerns as to the



1  seriousness of this particular issue?

2         A.      Yes.

3         Q.      Did the Investigation Committee make

4  any recommendations to the Board about handling or

5  addressing this issue with unpaid sales taxes?

6         A.      With respect to all three of the

7  issues, the investigations committee never completed

8  its work and, therefore, never made any

9  recommendations, formal or otherwise, to the full

10 Board of Directors.

11        Q.      Do you recall if the issue of the

12 unpaid sales taxes was discussed at the full board

13 level?

14        A.      Yes, it was.

15        Q.      And did the Board take action to

16 ensure that those sales taxes were paid?

17        A.      The board questioned the

18 Restructuring Committee -- Special Committee whose

19 purview and authority it was to -- over the cash

20 flows and the budgets for the company and, you know,

21 there was a lot of conversation at the board level

22 that I would say the Special Committee was left with

23 the impression that the board did not find the

24 situation or find the issue to be as serious as other

25 members of the Board of Directors.



1          So this is before the -- before the

2   formation of this -- of this committee and somewhat

3   afterward.  Ultimately, the sales taxes were set

4   aside and resolved and paid as part of the -- out of

5   the debt proceeds and, you know, granted authority

6   for the payment of those funds, but it was something

7   that the Special Committee worked very, very hard to

8   ensure that those payments were ultimately made.

9          Q.     I believe you mentioned that some of

10  the -- the board members or some of the nonSpecial

11  Committee board members did not take the issue as

12  seriously as possibly the members of the Special

13  Committee.  Are there individuals you have in mind

14  that didn't take it as seriously?

15          A.     I would say Mr. Peterman primarily

16  and, you know, when you speak with Mr. Alt, I think,

17  you know, he had the direct conversations regarding

18  how those payments should be made and whether the

19  cash available should be set aside for the sales

20  taxes or whether the cash should be put to other

21  corporate uses as the company was scrambling to stay

22  out of Chapter 11.

23          Q.     Even if either the Special Committee

24  or the Investigation Committee didn't maybe make a

25  formal recommendation to the Board, did you express



1   your view to the larger board as to what should have

2   been done with these unpaid sales taxes?

3          A.     Yes.

4          Q.     What did you tell the rest of your

5   fellow board members?

6          A.     That these were fiduciary

7   obligations, that these were monies that were

8   collected on behalf of others and that they needed to

9   be paid to the taxing authorities and that this was a

10  serious issue for consideration.

11         Q.     Anyone other than Mr. Peterman

12  challenge your view in that regard?

13         A.     I don't recall specifically but I

14  don't believe the -- my impression was that the other

15  members of the board, Mr. Porter and Ms. Krueger were

16  quite as concerned about the issue as I was.

17         Q.     Did you ever propose a motion to the

18  full board to instruct management to pay the sales

19  taxes as soon as possible?

20         A.     We were -- the Special Committee was

21  working and had the authority to -- to manage the

22  cash and approve the budgets, so it was -- it was

23  something that was ultimately in our purview to make

24  sure that we negotiated.  The company didn't have the

25  $3 and a half million, so it was something that



 1  was -- you know that was a very fine line and though

 2  the number in the aggregate was $3 and a half

 3  million, it was spread over a number of states, 12 to

 4  16 states and there wasn't -- there was work being

 5  done by Huron once they discovered this issue to

 6  reconcile the numbers on a state-by-state issue.  You

 7  know, it doesn't help if you owe the money to 16

 8  states, you don't want to overpay one state and

 9  underpay a different state.  So you had to make sure

10  that you had the proper numbers on a state-by-state

11  basis and because this was a -- an issue that went

12  back with the company many years, the sufficiency

13  and, you know, the reconciliation process was a very

14  lengthy and involved process that Mr. Alt will be

15  able to give you chapter and verse on.

16          Q.      And I believe you mentioned that for

17  this issue concerning the payment of sales taxes,

18  that the Investigation Committee was not able to

19  complete its investigation into that particular

20  issue?

21          A.      We were not.

22          Q.      What issues did the Investigation

23  Committee consider investigating with respect to this

24  topic of the payment of sales taxes?

25          A.      I'm sorry.  Could you please rephrase



1  the question?

2         Q.        Yeah, let me -- I'm going to try to

3  be a little bit more colloquial and -- with what I'm

4  getting at is, if Huron and Mr. Alt were able to

5  figure out the amount of sales tax that was owed to

6  the various taxing authorities, to the best of their

7  ability, what issues would have been left for the

8  Investigation Committee to look at when it came to

9  the issue of the payment of the sales taxes?

10        A.        Given that it was a -- an issue that

11  was a multiyear issue or an issue from one or two

12  years prior, I don't recall specifically what the

13  time period was involved but there was some sort of a

14  glitch in the financial reporting at the company

15  that, you know, resulted in these taxes not being

16  paid for a period of time and that the company had

17  ultimately fixed the issue on a go-forward basis but

18  for that period of time, there was no payment of

19  those sales taxes and so the question was, was who

20  was aware of the issue and why was the issue not

21  addressed sooner.  And if I recall the whistleblower

22  allegation was such that it was that management was

23  aware of the issue but they chose to ignore the

24  issue.  So the investigation was to determine whether

25  or not, you know, management acted appropriately once



1  they learned of the liability.

2        Q.      Any members of management in

3  particular that were potentially implicated by the

4  whistleblower allegation?

5              MR. DEVORE:  Just a caution here to

6  remember to distinguish between what you have heard

7  directly and what's been advised with counsel to the

8  Investigation Committee has advised.

9              THE DEPONENT:  I'm sorry, Andrew.

10  Could you rephrase that?

11              MR. DEVORE:  Yeah, just remember

12  that, you know, in answering these questions not to

13  divulge attorney-client communications from the

14  investigation -- the special -- the Investigation

15  Committee's counsel.  If you have independent

16  knowledge, of course, you're free to answer, but just

17  don't reveal attorney-client communications.

18              THE DEPONENT:  Got it.  Thank you.

19              MR. DEVORE:  With that instruction,

20  if you're able to answer, you can.

21              THE DEPONENT:  Could you repeat the

22  question, please?

23              MR. HUTTENLOCHER:  Jennifer, I'm

24  sorry.  Would you mind reading it back?

25  (Designated question was read back.)



1        A.        I believe the specific whistleblower

2    allegation was that the primary member of management

3    that knew was Mr. Peterman.  I don't know if there

4    were.

5        Q.        Did you determine whether any board

6    members of iMedia Brands was aware of the issue or

7    made aware of the issue?

8                  MR. DEVORE:  Objection to form.

9        A.        There was a question as to whether or

10   not the audit committee was aware.

11   BY MR. HUTTENLOCHER:

12       Q.        But am I correct that you weren't

13   able to complete an investigation to determine

14   whether members of the audit committee were aware of

15   this particular issue?

16       A.        That is correct.

17       Q.        And do you recall which members of

18   the iMedia Brands board were a member of the audit

19   committee at the time that these unpaid sales taxes

20   were accruing?

21       A.        I don't know the answer to that.

22       Q.        I believe you mentioned that the

23   sales taxes are now fully paid and was done so out of

24   the DIP funding?

25       A.        That's my understanding, yes.



1       Q.    Do you know if that included any

2   fines or penalties to these taxing authorities?

3       A.    I don't recall.

4       Q.    Is that a question as well that

5   should be -- would be better directed to Mr. Alt?

6       A.    Yes.

7       Q.    I believe the second issue then was

8   the -- actually, it's listed here on the first issue

9   of the purpose was customer refunds.

10      Do you see that?

11      A.    Yes.

12      Q.    And what was the issue with the

13  customer refunds?

14      A.    It's my understanding that customers

15  returned goods and their refunds were not processed

16  and money was not refunded back to the customers and

17  management knowingly -- sorry, and that management

18  knowingly -- that management knew this and yes, it

19  did not process the refunds.

20      Q.    And I believe you've covered this

21  before but the Investigation Committee did not

22  complete its investigation with respect to this

23  customer refund issue, correct?

24      A.    We did not.

25      Q.    And what was the -- was there any



1  particular member of management that was mentioned by

2  the whistleblower allegations about this particular

3  customer refund issue that possibly knew about it?

4        A.      It's my recollection that

5  Mr. Peterman was the party that was -- was alleged to

6  have the knowledge and did nothing about it.

7        Q.      Any other members of the iMedia Board

8  of Directors that potentially knew about this

9  particular issue with customer refunds?

10        A.      It's not clear who knew what.

11        Q.      If the Investigation Committee was

12  able to complete its work, is that a topic that the

13  Investigation Committee would have sought answers to?

14        A.      Yes.

15        Q.      The third issue here is concerning

16  executive compensation.

17                Do you see that?

18        A.      Yes.  It's not on the screen, but I

19  recall it.

20        Q.      Oh, I'm sorry.  I'm looking at it,

21  but I'll put it on the screen just so that my

22  question makes some sort of sense.

23                So No. 3 in the enumerated list of

24  Purpose areas is executive compensation.

25                Do you see that?



1        A.      Yes.

2        Q.      And what do you recall the issue was

3   as relayed by the whistleblower concerning executive

4   compensation?

5        A.      It's my recollection that the

6   accusation was that Mr. Peterman prepared a schedule

7   for the Compensation Committee that had adjustments

8   to the company's EBITDA, that then allowed him to

9   qualify for a management bonus.

10       Q.      And do you know if Mr. Peterman was

11  paid that management bonus based on --

12       A.      Peterman --

13       Q.      I'm sorry.  I'll need -- let me ask

14  that question again.

15               Do you know whether Mr. Peterman was

16  paid that bonus based on the alleged adjusted EBITDA

17  numbers that were alleged by the whistleblower?

18       A.      I recall hearing two components.  One

19  is that the bonus was approved and authorized, but I

20  don't recall if the bonus was partially paid or was

21  going to be partially paid.  I don't recall if the

22  monies actually were transferred or not to

23  Mr. Peterman's account.

24       Q.      And other than Mr. Peterman, did the

25  whistleblower's allegations implicate any other



1   members of the iMedia Brands' Board of Directors?

2           A.      Not that I recall now.

3           Q.      Had the Investigation Committee been

4   able to complete its investigation, would it have

5   investigated whether any members of the Board of

6   Directors knew about the potential incorrect

7   adjustments to EBITDA used by Mr. Peterman to assist

8   his qualification for a management bonus?

9           A.      That it was my understanding that

10  the -- that the adjustments that were proposed or

11  alleged were presented to the Compensation Committee,

12  so I don't recall who was on the Compensation

13  Committee, but the question would have been who was

14  aware and who knew what when.

15          Q.      And fair to say the Investigation

16  Committee wasn't able to ask those questions or get

17  answers to those questions?

18          A.      That is correct.

19          Q.      Other than the three issues that

20  we've talked about, to the best of your knowledge,

21  was the Investigation Committee empowered to

22  investigate other topics?

23          A.      They were not.

24          Q.      Is that unusual, in your experience?

25          A.      I would say that the Investigation



 1  Committee, if the powers were going to be expanded

 2  would have to go back to the full board for approval

 3  if there were items that were of no -- that came to

 4  the committee's attention that we believed would

 5  require investigation.  We would have to go back and

 6  I would have to consult with counsel, go back and

 7  look at the charter to see, you know, where the line

 8  is, at what point do you have to go back to the full

 9  board or whether or not the committee had the

10  authority on its own.

11          Q.     And Mr. Panagos, you're still a

12  member of the iMedia Brands' Board of Directors,

13  correct?

14          A.     I am.

15          Q.     Separate from the three issues that

16  were enumerated in the Investigation Committee

17  charter, do you believe that there are other similar

18  issues or potential allegations of wrongdoing that

19  should be investigated by the Board of Directors?

20          A.     Mr. Alt brought to my attention,

21  during the course of his work potential issues around

22  inventory reserves.

23          Q.     Any other issues other than the

24  inventory reserves?

25          A.     The significant dollars that were



1   spent by the company over a number of years with the

2   companies affiliated with two of the board members,

3   Michael Friedman and Eyal Lalo.  I don't know how to

4   pronounce his last name.  But there were very

5   significant dollars that were spent with those

6   directors' companies overtime so that would be

7   something that, you know, in an insolvent situation,

8   you know, would be, typically, looked at.

9           Q.      Any other issues?

10          A.      Those are the primary two that come

11  to mind.

12          Q.      Even some of the issues that you have

13  identified with the company's accounting controls

14  with regard to sales tax, executive compensation and

15  potentially with respect to inventory reserves, do

16  you think an investigation of the Company's

17  accounting practices in general would be warranted

18  under the circumstances?

19              MR. DEVORE:  Objection to form.

20          A.      Mr. Peterman was both CFO and CEO, so

21  that's something that is unusual in my experience

22  and, you know, something that is unusual, something

23  that you don't usually see.  So it's not clear, you

24  know, how the company addressed that issue -- not

25  clear to me how the company addressed that issue.



1  I'm sure the audit committee had some procedures, I

2  would think but I don't know.

3        Q.      I could cover the topic of the

4  inventory reserves with Mr. Alt, but with respect to

5  the transactions between Mr. Friedman's company and

6  Mr. Lalo's company and iMedia Brands, are there any

7  specific aspects of that business relationship that

8  you believe may be -- may be worth investigation for

9  any potential wrongdoing?

10       A.      Only circumstantial.

11       Q.      Is there any particular that you're

12 thinking of when you make a reference to something

13 circumstantial?

14       A.      It would require me to speculate and,

15 you know, the facts -- the facts are that

16 Mr. Peterman was CEO and Mr. Peterman was CFO.  There

17 were other potential issues regarding the actions of

18 Mr. Peterman and there were significant dollars spent

19 with those vendors but other than that, I'm not aware

20 of any -- any specific allegations and I am not aware

21 of anything.

22       Q.      Is it fair to say that relationship

23 is unusual enough that it seems, in your view, it

24 would be worth investigation by the Board or a

25 committee of the Board?



1        A.        It's my understanding that there were

2    specific audit committee procedures around looking at

3    that relationship, so I would need to educate myself

4    with respect to those before I answered that question

5    and I'm not aware of exactly what they did and how

6    they did it.

7        Q.        But in any event, the Investigation

8    Committee didn't have an opportunity to investigate

9    that particular issue, correct?

10        A.        It was not -- it was not on our slate

11    of issues to investigate.  You know, we didn't have

12    any information that, you know, gave us cause to go

13    and look at it, plus, you know, the -- we were very

14    focused, you know, in a very short amount of time and

15    constrained by dollars for our professionals.

16        Q.        And with respect to professionals,

17    did the Investigation Committee have counsel to

18    advise it?

19        A.        Yes.

20        Q.        Who or what law firm was that?

21        A.        Sidley Austin.

22        Q.        And was there a specific lawyer at

23    Sidley Austin that was the point of contact for

24    counsel's advice to the investigation?

25        A.        The Investigation Committee work was



1  led by an attorney by the name of Tim Treanor,

2  T-r-a-i-n-o-r I believe is how it's spelled.

3          Q.      And I believe you mentioned earlier

4  that Sidley also was counsel to the full Board of

5  Directors; is that right?

6          A.      Yes, although -- though Sidley was

7  ostensibly representing the full Board of Directors,

8  I never had any separate conversations or

9  conversations with Sidley regarding their

10  representation of me as a board of director.

11          Q.      Are you referring to a conversation

12  between yourself and your individual -- in your

13  capacity as an individual board member in the

14  conversation with Sidley?

15          A.      Yes, yes.

16          Q.      So -- and as a -- do I understand

17  correctly that there was -- I believe we mentioned

18  them earlier, Mr. Califano was a lawyer at Sidley who

19  was advising the full Board of Directors; is that

20  right?

21          A.      You know, I don't recall specifically

22  when Sidley was retained as to whether Sidley was

23  retained to represent the entire Board of Directors

24  or just a subset of the Board of Directors.  I just

25  don't recall specifically.  It was very muddy around



1   that time.

2        Q.      Was there, to your knowledge, any

3   ethical screens erected at Sidley Austin between

4   Mr. Califano and Mr. Treanor who was apparently

5   specifically advising the Investigation Committee?

6        A.      There was a split vote for the

7   retention of Sidley for them to represent both the

8   Investigations Committee as well as some or all of

9   the Board of Directors.  Let me phrase it like that

10  because I'm unclear.

11             But, ultimately, the split vote

12  resulted in Sidley being authorized to retain -- to

13  represent both.  That's my recollection and I

14  specifically made the request that Sidley create an

15  ethical barrier, information barrier, et cetera, and

16  that the investigation side should not be interfacing

17  with, speaking with or doing anything with the side

18  of Sidley that was representing the board members.

19       Q.      As part of that split vote, did you

20  vote against Sidley representing the Investigation

21  Committee?

22       A.      I did.

23       Q.      Do you know whether there were other

24  board members that voted with you?

25       A.      Jill Frizzley voted with me and



1 | Landel Hobbs, I know that those two were not in

2 | favor.  I don't recall if anybody else joined us.

3 |      Q.     Understanding it was muddy, to your

4 | understanding, but with respect to Sidley's

5 | representation of the whole board I guess run through

6 | Mr. Califano, you mentioned it could have been the

7 | whole board or just a subset of the Board.  Who would

8 | the subset --

9 |      A.     I would have to -- sorry.  I would

10 | have to see his engagement letter to refresh my

11 | recollection.

12 |      Q.     Do you have a subset of the board

13 | members in mind when you were thinking that maybe

14 | they were engaged -- that Mr. Califano was engaged by

15 | just a subset of the Board members?

16 |      A.     Well, the board members that were

17 | pushing strongly for the retention of Sidley were

18 | Mr. Porter and Ms. Krueger and I forget if there were

19 | others that joined them but I think ultimately they

20 | did because they ultimately got the votes and were

21 | retained.

22 |      Q.     Do you --

23 |      A.     But I'd also have to go back and

24 | refresh my recollection as to exactly what was voted

25 | on when.  I don't -- I don't recall specifically but



1  I recall there being just a lot of conversation

2  around all of that.

3       Q.      Did the Investigation Committee have

4  an alternative law firm or individual counsel in mind

5  that it was -- that it would have preferred to have

6  hired than Mr. Treanor at Sidley?

7       A.      Well, the Investigation Committee was

8  not formed until Sidley was hired as counsel, so

9  there was -- counsel was first hired and then Sidley

10 conducted interviews of board members to determine

11 who they believed would our best -- were best

12 situated or qualified to be on that Investigation

13 Committee.  So it wasn't that the committee hired --

14 that the committee was formed and then they hired

15 counsel.  It was the board hired counsel for the

16 committee and then the committee was formed upon the

17 advice of that counsel.

18      Q.      Okay.  I'm just going to put that

19 charter of the Investigation Committee back up.

20      A.      Sure.

21      Q.      And I'm looking in particular to

22 this -- the second sentence of the first full

23 paragraph under Roman numeral III with the heading

24 Authority.  Do you see that?

25      A.      Yep.



1      Q.      And that sentence says, quote:   The

2   committee shall have the authority in its sole

3   discretion to retain or obtain the advice of

4   independent legal, accounting or other advisors, as

5   it deems necessary to carry out its duties, including

6   complete authority to approve their fees and other

7   retention terms.

8              Do you see that?

9      A.      Yes.

10      Q.      So even if Sidley was selected as

11   counsel prior to the Investigation Committee being

12   formed, did the Investigation Committee ever seek to

13   retain or obtain the advice of independent legal

14   counsel?

15      A.      Well, we used Sidley.  It was my

16   understanding that Sidley was the counsel that we

17   were -- that we were using.

18      Q.      I guess if -- if you and Ms. Frizzley

19   had both objected to the hiring of Sidley as part of

20   the split vote that you referenced before, do you

21   believe that the committee was empowered to then hire

22   different counsel upon the formation of the

23   Investigation Committee or were you stuck with the

24   Board's selection of Sidley?

25      A.      That's a good question.  I don't



 1 | know.

 2 |      Q.     So I know that you mentioned that the

 3 | Investigation Committee wasn't able to complete its

 4 | investigation, but did it engage in any at least

 5 | preliminary steps with respect to conducting

 6 | investigation -- conducting an investigation?

 7 |      A.     The first step that they embarked

 8 | upon was data gathering of documents, imaging of

 9 | people's computers for documents, as well as emails

10 | and it was a very large data gathering effort that I

11 | know Sidley took with the help of an outside vendor

12 | to do the technical IT portion.

13 |      By the way, can we take a five-minute

14 | bio break?

15 |      MR. HUTTENLOCHER:  Absolutely.  We

16 | can go off the record right there and we can come

17 | back at the top of the hour.

18 | (A brief recess was taken.)

19 | BY MR. HUTTENLOCHER:

20 |      Q.     Mr. Panagos, I think where we left

21 | off was kind of the first actions of the

22 | Investigation Committee was to engage in data

23 | gathering which was constructed principally by Sidley

24 | with the assistance of an outside vendor; is that

25 | right?



1     A.      Now, Michael, what I would like to

2  just go back and add on to -- and make a

3  clarification that, you know, ultimately, Jill

4  Frizzley and I were comfortable with Jim Treanor at

5  Sidley, having the requisite experience, personality,

6  et cetera and actually had quite a bit of confidence

7  with him for his ability to appropriately run the

8  investigation.  So I just wanted to -- no aspersions

9  to Mr. Treanor and his sufficiency, his expertise,

10  his professionalism, et cetera, I just wanted to, you

11  know, make sure that that was clear.

12     Q.      No, I appreciate that clarification

13  and given all that, though, you did at least have

14  some trepidation about having the same firm represent

15  the Investigation Committee and members of the

16  broader Board of Directors, correct?

17     A.      Yes.

18     Q.      So in returning to the issue of the

19  data gathering where I believe we left off, did the

20  committee encounter any issues or problems in

21  collecting data from various individuals associated

22  with iMedia?

23     A.      You know, I guess I'm a little bit

24  unclear in answering this question as to, you know,

25  what is privileged and what is not, so I'm really not



1   sure how to answer the question, to be honest with

2   you.  So I don't -- you know, Sidley embarked upon,

3   you know, a data gathering exercise.  You know, I

4   don't know kind of at what point in time, you know,

5   kind of privilege extends, you know, around issues

6   and collection of data from whom, when, et cetera,

7   you know, for an investigation that was in process

8   and never completed.

9             MR. DEVORE:  Steve, I draw the line

10  with any advice -- any communications that you

11  received from Sidley as to -- if you know

12  independently, that's one thing but I would caution

13  you not to reveal, you know, communications from

14  Sidley or advice to the committee.

15        A.    Yeah, so Michael, any that would know

16  in their difficulty in obtaining information from

17  members of -- from the parties that they were

18  requesting the information from, you know, I would

19  have learned from Sidley.  So I think, to that

20  light -- to that light, you know, that's what we've

21  got.  I'm just going to put you guys on hold for just

22  one second.

23             MR. HUTTENLOCHER:  Okay.  Jen, if we

24  can remain on the record.  I wanted to communicate

25  something to Andrew on the record here.  So Andrew as



1   I believe you are likely aware, the committee had an

2   informal interview with Mr. Panagos where Mr. Treanor

3   had attended and we had received information, as part

4   of that discussion with respect to to the individuals

5   who were giving problems -- who were reticent or

6   there were issues that came up in the data collection

7   process.

8               So I think -- I'm not sure that that

9   constitutes privileged information to begin with but

10  I think with respect to those factual questions that

11  don't have to do with legal advice that those are

12  proper areas of inquiry and on the other and

13  ultimately if there is a privilege attached, that

14  with respect to those questions that that privilege

15  would have been waived, that would have been knowing

16  that counsel for the Special Committee had attended

17  that interview.

18              MR. DEVORE:  We're not going to agree

19  at this point, you know, on the fly as to whether

20  there was a waiver, you know, obviously Ropes was not

21  on that discussion, so I don't know what

22  qualifications were had around the informal interview

23  that was permitted, so, but, you know, as far as

24  today's deposition goes, the instruction stands and

25  we can, you know, you clearly already know the



1   information that you're trying to elicit here and we

2   can address -- so I don't think it's a discovery

3   issue, you know, whether there was a waiver, whether

4   that's information you can use at a later point in

5   time, you know, we can address it offline.  You

6   already know the information you're seeking to elicit

7   so I think we can sort of agree to disagree, you

8   know, at this point and address it offline.

9                  MR. HUTTENLOCHER:  I am okay

10  following that approach, especially given that it's

11  now 5 p.m. on the east coast and wouldn't have access

12  to a judge now anyway.  I'll reserve our rights to

13  keep the deposition open for these particular

14  questions and hopefully we'll be able to work it out

15  offline.  I'm just going to ask a few questions and

16  if there's assertions of privilege and instruction

17  not to answer, so be it.  Let's just have a record of

18  what the questions and answers are so we can address

19  the issue when necessary.

20                  So Mr. Panagos in the course of the

21  investigation, did -- did the Investigation Committee

22  have any concerns that Mr. Peterman had deleted or

23  destroyed documents that would have been relevant to

24  the scope of the investigation.

25                  MR. DEVORE:  And Mr. Panagos, as



1    before, I caution you not to reveal attorney-client

2    communications so if you can answer that separately,

3    you're free to answer but please do not reveal

4    attorney-client communications.

5          A.      Anything I learned regarding that

6    topic would be directly from Sidley.

7                  MR. HUTTENLOCHER:  Based on that, is

8    there an instruction not to answer that question from

9    counsel?

10                 MR. DEVORE:  The witness has answered

11   the question that he only knows the information

12   you're eliciting through counsel, so I think he's

13   answered that he's following counsel's instruction.

14                 MR. HUTTENLOCHER:  Okay, fair enough.

15   BY MR. HUTTENLOCHER:

16         Q.      As part of the collection of

17   documents, did the Investigation Committee seek to

18   collect data from cell phones of board members?

19                 MR. DEVORE:  Same instruction.

20         A.      Well, I do know firsthand that my

21   data was collected so that's firsthand knowledge that

22   I have on that one.

23

24   BY MR. HUTTENLOCHER:

25         Q.      And what about with respect to other



```
 1  board members?

 2       A.       Any information I have I would have

 3  received from Sidley, although I do know

 4  independently that Jill Frizzley also provided

 5  information.

 6       Q.       Do you know independently whether

 7  Mr. Lalo -- whether his cell phone was sought to

 8  collect data from it for the investigation?

 9       A.       I do not know independently.

10       Q.       And any knowledge of you would have

11  of that would come from counsel at Sidley Austin; is

12  that correct?

13       A.       Yes, that is correct.

14       Q.       And what about with respect to

15  Mr. Friedman?

16       A.       Same.

17       Q.       What about the collection of data or

18  whether that's on the systems of the company or from

19  cell phones of any members of management of iMedia

20  Brands?

21       A.       Same.

22       Q.       And with respect to certain employees

23  in particular Matt Barsness, Andrea Offerson and Alex

24  Wasserburger.  Do you know of --

25       A.       Same; same.
```



 1       Q.       Other than seeking the collection of

 2   documents, did the Investigation Committee engage in

 3   any other work streams?

 4       A.       No.

 5       Q.       Did it interview anybody at the

 6   company?

 7       A.       I'm sorry.  Did who interview anyone

 8   at the company?

 9       Q.       Anyone from the Investigation

10   Committee participate in an interview of any board

11   members in its role as the Investigation Committee?

12       A.       I can only speak for myself.  I did

13   not -- I did not attend any -- any interviews at all

14   and to my knowledge, the other members of the

15   committee did not either.

16       Q.       Do you know whether any counsel from

17   Sidley and Austin was -- conducted an interview of

18   any employees or board members of iMedia Brands in

19   connection with its role as counsel to the

20   Investigation Committee?

21           MR. DEVORE:  Mr. Panagos, that was a

22   yes-or-no question.  Do you know?

23       A.       Do I know if they did -- I'm sorry.

24   BY MR. HUTTENLOCHER:

25       Q.       Do you know whether or not counsel



1  for the Investigation Committee conducted any

2  interviews of any employees or board members of

3  iMedia Brands?

4        A.      I believe yes.  I have knowledge

5  agency to whether they did or didn't.

6        Q.      And did Sidley conduct any interviews

7  of any employees or board members of iMedia Brands?

8              MR. DEVORE:  Same instruction as

9  before.

10        A.      Any information I have regarding what

11  they did, I would have learned from them so I think

12  it's still the same fruit of the tree as they say on

13  Law and Order.

14              MR. HUTTENLOCHER:  We're all made

15  better lawyers by watching Law and Order, so...

16              Just for the record, I don't think

17  any of the questions that I asked elicited the advice

18  of counsel but I understand that counsel for the

19  Debtors disagrees, and we'll take that question up

20  with the Court at the appropriate time or if we can't

21  otherwise resolve it.

22  BY MR. HUTTENLOCHER:

23        Q.      Mr. Panagos, did -- in your view, did

24  the Investigation Committee have sufficient resources

25  to complete its investigation?



1        A.        I would define resources as time and

2   money and we had an insufficient amount of time and

3   an insufficient amount of money.

4        Q.        Was there a point in which Sidley

5   went pencils down on the investigation?

6        A.        Yes.

7        Q.        And when was that?

8        A.        I would have to go back and look at

9   my records, but at some point in time, they ran out

10  of money and didn't want to incur further exposure

11  and potential nonpayment of fees.

12       Q.        Do you know if Sidley completed their

13  work with respect to at least the collection of data?

14                 MR. DEVORE:  Same instruction.

15       A.        Yeah, same answer, anything I would

16  know about their completion of work would have been

17  received directly from Sidley but we can say that a

18  report does not exist that I'm aware of nor have I

19  ever reviewed a draft.  How is that?

20  BY MR. HUTTENLOCHER:

21       Q.        And did Sidley ever provide, yes or

22  no, an oral report on its findings to the

23  Investigation Committee?

24                 MR. DEVORE:  Objection to form.

25       A.        On findings, no.



```
 1   BY MR. HUTTENLOCHER:
 2        Q.      Did it provide all reports with
 3   respect to the status of the investigation?
 4                MR. DEVORE:  Again, that's a
 5   yes-or-no question.
 6        A.      Yes, we had regular investigations.
 7                MR. DEVORE:  It's a yes-or-no
 8   question, Steve.
 9                THE DEPONENT:  Yes, thank you.
10        A.      Yes.
11   BY MR. HUTTENLOCHER:
12        Q.      Did you receive more than one, yes or
13   no?
14        A.      Yes.
15        Q.      Did you receive those on a weekly
16   basis or were they more frequent than that?
17        A.      As scheduled.
18        Q.      Mr. Panagos, as part of your work as
19   a board member for iMedia Brands, have you reviewed
20   the combined joint Chapter 11 plan of liquidation and
21   disclosure statement of Legacy IMBDS Inc. and its
22   debtor affiliates?
23        A.      That's a very, very thick and
24   voluminous document but I have a general
25   understanding of what's in there.
```



*[Pages 106–15 Have Been Intentionally Omitted]*

1        Q.       And are you aware that there's a

2    chance that unsecured creditors can see zero

3    recovery --

4        A.       Yes.

5        Q.       I was just going to complete -- under

6    the terms of the proposed plan?

7        A.       If litigation is ultimately

8    unsuccessful, yes.

9        Q.       This is a yes-or-no question as well,

10   but have any current or former directors, managers or

11   officers or employees other than Tim Peterman been

12   discussed as being potentially carved out from the

13   scope of the release?

14               MR. DEVORE:  Discussed by who?

15               MR. HUTTENLOCHER:  By the board.

16       A.       There was some discussion, yes.  I

17   don't recall exactly what it was, though.

18   BY MR. HUTTENLOCHER:

19       Q.       Do you recall who was discussed --

20       A.       I do not.

21       Q.       Was discussed at the board level?

22       A.       The names were unfamiliar to me.  I

23   don't recall them.

24       Q.       Did the Investigation Committee

25   investigate whether the company has any claims or



1  causes of action against any former board members of

2  iMedia?

3              MR. DEVORE:  I apologize, Jennifer,

4  could you read that back.  It's late in the day and I

5  didn't hear it, Mike.

6  (Designated question was read back.)

7       A.     No.

8  BY MR. HUTTENLOCHER:

9       Q.     Did the Investigation Committee

10 investigate whether the company has any claims or

11 causes of action against any former officers or

12 employees of iMedia Brands?

13      A.     No.

14      Q.     I believe you mentioned that the plan

15 calls for the formation of a litigation trust; is

16 that correct?

17      A.     Yes.

18      Q.     In your view, do you believe that the

19 litigation trust that would be formed as part of the

20 plan should be performing any additional

21 investigation as to whether there are potential

22 claims against directors, officers or employees of

23 iMedia Brands?

24              MR. DEVORE:  Objection.

25      A.     I'm sorry, do I -- could you repeat

